**Jared Ashcraft, Pro Se**
PO Box 363242
N. Las Vegas, NV 89036
252-258-1535
legal@ashcraft.me

**FEE DUE**

FILED

CLERK, U.S. DISTRICT COURT

3/2/2026

CENTRAL DISTRICT OF CALIFORNIA

BY_____jji_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

JARED ASHCRAFT,

    Plaintiff,

v.

FIRST-CITIZENS BANK & TRUST

COMPANY and FIRST CITIZENS

BANCSHARES, INC.,

    Defendants.

2:26-cv-02251-JLS-JDE(x)

Case No.: [_____]

**COMPLAINT FOR
WHISTLEBLOWER
RETALIATION,
DISABILITY DISCRIMINATION,
FMLA/ERISA/FEHA
VIOLATIONS,
CIVIL RICO, DODD-FRANK,
PRIVACY, CONTRACT,
AND RELATED RELIEF;
DEMAND FOR JURY TRIAL**

## I. INTRODUCTION

1. Plaintiff Jared Ashcraft brings this 15-count, multi-statute action for whistleblower retaliation and related statutory and common-law violations arising from: Plaintiff's protected disclosures concerning internal controls, revenue attribution, vendor fraud, and compliance issues; Defendants' retaliatory discipline and escalating adverse actions;

Defendants' interference with protected leave, disability accommodations, and benefits; Defendants' post-notice intimidation and evidence-integrity misconduct; Defendants' misuse of an unlawful enterprise-form "Mutual Arbitration Agreement" ("MAA") and jury-waiver architecture to divert or constrain statutory claims; Defendants' broader pattern of enterprise-level misconduct affecting California markets, clients, and vendors under Sarbanes-Oxley, ADA/FEHA, FMLA, ERISA, RICO, Dodd-Frank, the federal Stored Communications Act, the California Invasion of Privacy Act, California Labor Code and public policy, and related doctrines. The protected activity at the core of this action began with Plaintiff's March 24, 2025 Microsoft Teams disclosure to manager Carlos Gonzalez identifying a recurring pattern of vendor-driven diversion of merchant accounts (including the Jackson Hewitt relationship) and describing Worldpay's conduct as improper and harmful to FCB's internal controls. This was formally escalated on May 20, 2025, when Plaintiff submitted the "Formal Whistleblower Disclosure – Audit Committee Escalation" citing the diversion of 31 Jackson Hewitt merchant accounts by Worldpay/Fifth Third Bank and the suppression of the $200 million Neutraderm pipeline.

2. Plaintiff alleges that Defendants did not implement a standard termination process. Instead, Defendants effectuated termination on June 18, 2025, by reflecting Plaintiff's employment status as terminated while characterizing the separation as the Bank's acceptance of Plaintiff's purported "constructive termination" contention, despite Plaintiff's explicit written objections rejecting resignation and disputing any voluntary separation characterization. (Exhibit B.) On June 4, 2025, at approximately 05:10 AM PDT—while Plaintiff remained employed and

2

under active litigation holds issued April 23–May 24, 2025—Respondent executed a remote enterprise wipe ("Org data removal") disabling Plaintiff's account (Ticket RITM0730529). The very next day, June 5, 2025, at 06:17 AM PDT, outside counsel Jeremy R. Sayre removed OSHA Investigator Anna Son from the email chain and transmitted the materially false statement: "The Bank also has confirmed that your mobile device has NOT been wiped."

3. Plaintiff also seeks declaratory and injunctive relief to prevent Defendants from using a dispute-resolution instrument to divert statutory claims from adjudication in federal court; to force Sarbanes-Oxley–linked and FEHA-linked gateway issues into arbitration through a delegation clause; to impair Plaintiff's right to a jury trial through a "survival" jury-waiver provision drafted to remain enforceable even if arbitration-related provisions are invalid or unenforceable; and to invalidate additional provisions that violate the Federal Arbitration Act ("FAA"), the Electronic Signatures in Global and National Commerce Act ("E-SIGN Act"), the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), FEHA, California Labor Code § 925, California public policy, and controlling federal anti-arbitration commands. Respondent issued written threats on August 6, August 8 (marked "FINAL NOTICE"), and August 14, 2025, to involve the "Special Investigations Unit" (SIU) and "local authorities" to seize a laptop then under active federal litigation hold. In their certified January 26, 2026 OALJ Answer, Respondent explicitly admitted that deploying SIU and law-enforcement threats against a whistleblower was "consistent with its standard practice," thereby ratifying the Hobbs Act extortion predicate as corporate policy. The enterprise's obstruction continued into

2026. On February 3, 2026, Plaintiff served 25 interrogatories on Dana Lomas (Director of Merchant Sales) targeting SOX control failures. Exactly seven days later, on February 10, 2026, FCB posted Lomas's exact role as publicly vacant and Fox Rothschild filed a Protective Order using evasive past-tense language about her employment, demonstrating ongoing witness tampering to suppress testimony.

4. Plaintiff demands a trial by jury on all issues so triable. Plaintiff's May 2025 internal-controls warnings directly preceded the present-day market reality: between January 27 and February 2, 2026, following a Q4 earnings miss and an 8.49% stock drop, three prominent plaintiff firms (Pomerantz, Bronstein & Grossman, and Schall Law Firm) publicly announced securities-fraud investigations into FCNCA, confirming the materiality of the concealed conduct.

## II. JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including 18 U.S.C. § 1514A (Sarbanes-Oxley), the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), the Employee Retirement Income Security Act of 1974 ("ERISA") § 510, 29 U.S.C. § 1140, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)–(d), the Dodd-Frank Act's SEC whistleblower anti-retaliation provision, 15 U.S.C. § 78u-6(h), and the federal Stored Communications Act ("SCA"), 18 U.S.C. § 2701 et seq.

4

6. This Court has jurisdiction over Plaintiff's claims for declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202.

7. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims, including claims under California public policy, the California Fair Employment and Housing Act ("FEHA"), the California Invasion of Privacy Act ("CIPA"), the California Labor Code (including § 1198.5 and § 925), and California common law, that form part of the same case or controversy.

8. Venue is proper in the Central District of California, Western Division, under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) (incorporated for ADA and FEHA claims via § 12117(a)) because: (a) Plaintiff's assigned Salesforce territory and sales market were anchored in Los Angeles and other parts of California; (b) Defendants' retaliatory Salesforce metadata manipulation deliberately locked Plaintiff out of his assigned California territory, such that Plaintiff would have continued working in California but for the alleged unlawful employment practices; (c) a substantial part of the events or omissions giving rise to the claims—including vendor fraud affecting California merchants, revenue diversion, internal-controls failures, retaliation, disability discrimination, and client-impacting misconduct—occurred in or had substantial effects on California markets, clients, and financial relationships; and (d) the unlawful employment practices had a substantial effect on Plaintiff's California-based sales territory and pipeline.

**III. PARTIES**

9. Plaintiff Jared Ashcraft is an ETA Certified Payments Professional and an ADA-Protected Whistleblower residing in Las Vegas, Nevada, who, at all relevant times, worked in a remote capacity servicing a California sales territory on behalf of Defendants.

10. Defendant First-Citizens Bank & Trust Company ("FCB") is a banking institution that employed Plaintiff and conducts business in California, including in the Central District of California, Western Division, through merchant-services operations and related financial products. Its principal place of business and headquarters is located at 4300 Six Forks Road, Raleigh, North Carolina 27609.

11. Defendant First Citizens BancShares, Inc. ("FCBI") is a Delaware corporation and FCB's publicly traded parent holding company (NASDAQ: FCNCA). FCBI is included as a covered entity under Defendants' dispute-resolution instrument's definition of "Bank," which includes parents and related entities, and is therefore a proper Defendant with respect to the declaratory, injunctive, statutory, and related relief sought herein. Its principal place of business and headquarters is located at 4300 Six Forks Road, Raleigh, North Carolina 27609.

12. At all relevant times, Defendants acted through their officers, employees, agents, counsel (specifically Fox Rothschild LLP), and liability insurer (the Chubb Group of Insurance Companies), within the scope of their agency and employment. Lisa M. Williford of Fox Rothschild LLP judicially admitted Chubb's role as insurer on the record during the January 12, 2026 pre-hearing conference.

## IV. ADMINISTRATIVE / STATUTORY PREREQUISITES

13. On May 25, 2025, Plaintiff filed a complaint through OSHA's online portal (OSHA Case No. 301054553) asserting protected activity and retaliation under federal whistleblower statutes, including Sarbanes-Oxley.

14. On or about May 27, 2025, Plaintiff certified the OSHA complaint.

15. OSHA issued a dismissal letter on June 6, 2025. Plaintiff appealed, and the Office of Administrative Law Judges officially docketed the matter on June 12, 2025 (OALJ Case No. 2025-SOX-00035). The administrative proceeding remained pending for nine months without a final decision by the Secretary of Labor, and there is no showing that such delay is due to the bad faith of the Complainant.

16. More than 180 days have elapsed since the filing and certification of Plaintiff's administrative complaint, and Plaintiff therefore brings his Sarbanes-Oxley claim de novo in federal district court as permitted by 18 U.S.C. § 1514A(b)(1)(B).

17. Plaintiff filed a Charge of Discrimination with the EEOC on May 24, 2025 (Charge No. 487-2025-02310) against First Citizens Bank.

18. The EEOC's Notice of Right to Sue contains standard ADA guidance that references "harassment" as a generic adverse-action example; Plaintiff does not allege sexual harassment or sex-based harassment, and Count II is limited to disability discrimination, failure to accommodate, and retaliation. Although the administrative charge metadata includes a "Sex (Male)" descriptor, Plaintiff does not plead a sex-discrimination claim in this action.

19. On January 7, 2026, after more than 180 days had elapsed, the EEOC granted Plaintiff's request and issued a Notice of Right to Sue (Issued on Request) on Charge No. 487-2025-02310. This Notice triggered a 90-day federal filing window expiring on April 7, 2026, making the filing of this Complaint unequivocally timely. (Exhibit U.)

20. Plaintiff exhausted parallel FEHA claims through the California Civil Rights Department via the automatic cross-filing of EEOC Charge No. 487-2025-02310 and Plaintiff's request for a CRD Right-to-Sue notice, satisfying all state administrative prerequisites.

## V. INVALIDITY OF ARBITRATION AGREEMENT AND JURY WAIVER

A. The MAA as an Enterprise-Form Forum-Routing and Rights-Waiver Instrument

21. Plaintiff executed a document styled "MUTUAL ARBITRATION AGREEMENT" ("MAA") on December 13, 2024 via electronic signature (DocuSign Envelope ID: C592F559…), as a mandatory condition of employment/continued employment and without any opt-out mechanism. The MAA was executed via DocuSign Envelope ID C592F559-005D-49F0-979B-509DF8579059 on December 13, 2024. This electronic execution stands in direct contrast to the MAA's initiation clause requiring an "original ink (i.e., non-electronic) signature" to commence a claim.

22. The MAA is a standardized, enterprise-form dispute-resolution instrument drafted by Defendants (including parents/related entities covered by Defendants' definition of "Bank"), imposed on employees on a take-it-or-leave-it basis, and designed to govern broad statutory disputes arising from employment and separation, including disputes

8

under SOX, ADA/FEHA, FMLA, ERISA, and California law. Plaintiff alleges that, because the MAA is an enterprise-form instrument, Defendants' enforcement posture and the legality of its core provisions present recurring issues capable of repetition in Defendants' employment relationships and are not merely idiosyncratic to Plaintiff's individual dispute.

23. Plaintiff alleges that the MAA is not a neutral "alternative forum" clause. Rather, it is an integrated forum-routing and adjudicatory-rights waiver instrument: (a) it invokes the FAA to divert statutory disputes into private adjudication; (b) it purports to assign gateway enforceability and arbitrability questions to a private arbitrator rather than an Article III court; and (c) it separately attempts to preserve non-jury adjudication and anti-aggregation outcomes through freestanding "survival" waivers drafted to remain enforceable even if arbitration-related provisions are invalid or unenforceable. Plaintiff alleges that this integrated design reflects a single operational objective: adjudication under employer-selected constraints by contract, regardless of whether arbitration is barred, invalidated, or unavailable.

B. Contractual Exclusion of SOX Claims and Threshold Non-Arbitrability Reserved to the Court

24. Defendants cannot compel arbitration of Plaintiff's Sarbanes-Oxley ("SOX") whistleblower retaliation claim, nor can they invoke the MAA's delegation clause to determine its arbitrability, because the MAA's own drafting expressly excludes disputes that cannot be required to be arbitrated under the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statute. The MAA expressly

9

defines "Excluded Disputes" as: "Those disputes that may not be subject to an arbitration agreement as expressly provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) or other controlling federal statute". By incorporating controlling federal anti-arbitration commands into the MAA's own scope and exclusions, Defendants contractually agreed that disputes subject to such prohibitions are outside the MAA's arbitrable subject matter. Accordingly, there is no agreement to arbitrate this specific SOX claim, and the Court—not an arbitrator—must enforce the MAA's exclusion according to its plain language.

25. Sarbanes-Oxley, as amended by Dodd-Frank, provides that "[n]o predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section." 18 U.S.C. § 1514A(e)(2). Plaintiff alleges that this command prohibits Defendants from compelling arbitration of SOX retaliation claims and also prohibits contractual mechanisms that would indirectly control, constrain, delay, divert, or procedurally channel SOX adjudication through arbitration machinery, delegation routing, stays, threshold determinations, or arbitration-adjacent waivers.

26. Plaintiff alleges that, under 18 U.S.C. § 1514A(e)(2) and the public-policy purpose of the Dodd-Frank amendment, employers may not use arbitration mechanisms—whether through delegation clauses, threshold determinations, stays, or arbitration-adjacent waivers—to indirectly constrain Sarbanes-Oxley adjudication. Plaintiff therefore alleges that SOX gateway determinations, and all enforceability disputes turning on the Dodd-Frank prohibition, must remain with this Court. Plaintiff further

alleges that Defendants may not invoke the FAA or any delegation clause to transfer statutory non-arbitrability questions into a private forum for initial determination, including by demanding that a private arbitrator decide whether Congress has barred predispute arbitration or whether Defendants' contractual "backstops" remain enforceable.

27. Notwithstanding the MAA's express statutory carve-out, the MAA also contains a delegation clause purporting to require that enforceability and arbitrability issues be determined "solely" by an arbitrator "to the extent permitted by law," and further includes boilerplate recitals that the employee "maintain[s] a level of sophistication enabling [the employee] to read and understand the JAMS Rules before entering into this agreement." Plaintiff alleges that Defendants will predictably invoke this delegation clause to attempt to transfer statutory-carve-out questions and enforceability disputes away from an Article III forum. Plaintiff further alleges that, insofar as Defendants attempt to deploy delegation to route SOX non-arbitrability questions or SOX-linked gateway disputes into arbitration, such an application would conflict with the controlling statutory command and is therefore unenforceable. Plaintiff further alleges that the "sophistication" recital is self-serving boilerplate in an adhesive, non-opt-out employment agreement, and does not supply a knowing and voluntary transfer of court-reserved gateway questions where Congress has prohibited predispute arbitration. Plaintiff specifically challenges the delegation clause as a standalone unconscionable agreement. The delegation clause is substantively unconscionable because it subjects threshold disputes of enforceability to an arbitral forum structurally rigged by Defendants' mass-arbitration automatic stays, fee-suspension mechanisms, and unconscionable

initiation barriers. Forcing Plaintiff to litigate gateway validity issues under these employer-favorable constraints denies Plaintiff an accessible forum to challenge the contract.

28. Plaintiff alleges that any attempt by Defendants to use the delegation clause to route threshold SOX non-arbitrability questions to an arbitrator is invalid and void as against public policy. The question presented is whether the parties formed an agreement to arbitrate this specific claim, given the MAA's own exclusionary text and controlling federal statutory prohibition. A delegation clause cannot create arbitral jurisdiction over a dispute the contract itself removes from its scope, and Defendants cannot circumvent 18 U.S.C. § 1514A(e)(2) by delegating to an arbitrator the interpretation or application of a statutory prohibition Congress enacted to keep SOX whistleblowers in federal court.

29. Plaintiff further alleges that Defendants' reliance on the delegation clause in these circumstances would operate to divert threshold contract-scope and formation determinations away from this Court. Because the MAA's definitions and exclusions remove SOX claims from the category of arbitrable "Disputes," the Court must decide arbitrability and enforce the exclusion as written, without sending the issue to arbitration or staying this action.

C. Retaliation-by-Imposition and Unenforceability as Applied

30. Plaintiff had been employed by Defendants for approximately three years when Defendants required execution of the MAA. Plaintiff relocated to Nevada in or about November 2024. Shortly thereafter,

12

Defendants required Plaintiff to execute the MAA as a condition of continued employment.

31. The MAA was presented on a take-it-or-leave-it basis. Plaintiff was not offered any meaningful opportunity to negotiate its terms. The MAA contains no opt-out mechanism. The required execution occurred after Plaintiff had raised workplace concerns to Carlos Gonzalez relating to disability-related absences and associated employment issues under ADA/FEHA.

32. Plaintiff did not have a meaningful ability to refuse execution without jeopardizing his employment, income, and ability to meet basic family obligations. Plaintiff executed the MAA under economic pressure associated with continued employment.

33. Plaintiff alleges that the MAA was not a condition of Plaintiff's initial 2021 employment; it was imposed mid-stream during a whistleblower and disability/FEHA dispute after Plaintiff's protected activity concerning internal controls, revenue attribution, suspected fraud, and disability/leave issues beginning in or about March 2024. Plaintiff alleges that Defendants required execution of the MAA on December 13, 2024— approximately nine months after protected activity began and shortly before escalating adverse actions culminated in termination—because the agreement was structured to impair Plaintiff's access to judicial remedies (jury trial, public adjudication, and full discovery) necessary to vindicate statutory rights relating to the misconduct he had reported and the discrimination/retaliation he was experiencing under ADA/FEHA, FMLA, and related laws. Plaintiff alleges that Defendants' imposition of the MAA under these circumstances constitutes a discrete retaliatory

13

adverse action and an instrumentality of retaliation intended to suppress protected activity and impair protected rights.

D. Procedural Unconscionability: Adhesion, Lack of Meaningful Assent, and Economic Duress

34. The MAA is procedurally unconscionable. It was presented on a take-it-or-leave-it basis to an employee economically dependent on continued employment, with no opt-out mechanism and no meaningful opportunity to negotiate. Plaintiff, having recently relocated to Nevada while bearing responsibility for California pipeline production, faced the immediate threat of termination if he refused to sign. This lack of meaningful choice, combined with the retaliatory timing described above, renders formation coercive and supports procedural unconscionability and economic duress under California law. Plaintiff further alleges the MAA was procedurally unconscionable due to unfair surprise. The MAA was presented electronically as a dense, digitally scrolling document filled with complex legalese, statutory cross-references, and buried procedural traps. Defendants provided no meaningful explanation of the rights being waived, no accompanying copies of the referenced JAMS Rules, and no reasonable time to consult an attorney before execution was demanded.

35. Plaintiff alleges that the MAA was not the product of arms-length negotiation or a voluntary, informed, and knowing waiver of constitutional and statutory adjudicatory rights; rather, it was imposed through adhesion and economic pressure unilaterally controlled by Defendants.

14

E. Substantive Unconscionability: Initiation and Service Barriers; Bad Faith Asymmetry; E-SIGN Act Violation

36. Plaintiff alleges that the MAA includes initiation and service requirements that operate as procedural barriers to effective vindication. The MAA requires that the initiating party's demand: (a) "complies with the requirements for pleadings under the Federal Rules of Civil Procedure ('FRCP')"; (b) contains the initiating party's "original ink (i.e., non-electronic) signature"; and (c) be served "in the manner provided for service of a summons under the FRCP … including on a proper registered agent for service of process." Plaintiff alleges these provisions are not neutral ADR mechanisms; they are gatekeeping devices that increase friction and cost for employees and are structured to deter or delay statutory claims at the initiation stage, particularly in a remote-work and California-distributed workforce environment.

37. Plaintiff further alleges that Defendants' branding of the instrument as "mutual," while drafting and imposing initiation and service requirements that mirror federal court pleading and summons practice, is misleading and confirms lack of meaningful mutuality. Plaintiff alleges these employee-facing friction requirements are not apparent to a reasonable employee at the time of execution and support findings of procedural unconscionability, substantive unconscionability, and lack of a knowing, voluntary, and informed waiver of adjudicatory rights.

38. Plaintiff further alleges that the MAA's initiation provisions are internally inconsistent in ways that confirm asymmetry and overreach. While the MAA was executed electronically and elsewhere provides that electronic signatures shall be deemed originals for purposes of binding

15

the employee, the initiation clause imposes an "original ink" requirement for the act that initiates the arbitral process. Plaintiff alleges this contradiction further supports unconscionability and confirms that the "mutual" label is a drafting veneer over an employer-leveraged enforcement design.

39. Plaintiff further alleges that the "ink-signature" initiation barrier, juxtaposed against Defendants' electronic execution workflow and "deemed originals" language, supports an inference that the initiation requirement was structured to impose avoidable procedural friction while preserving Defendants' ability to demand strict compliance as a basis for asserting technical noncompliance, delay, or waiver. Plaintiff alleges that this structural inconsistency supports an inference of fraudulent inducement and/or fraudulent concealment by omission, in that Defendants represented the agreement as a "mutual" and administrable dispute-resolution mechanism while embedding employee-facing deterrents that would predictably impair initiation of claims and chill assertion of statutory rights.

40. Plaintiff further alleges that, to the extent the MAA's initiation clause purports to render an arbitration demand invalid, ineffective, or non-compliant solely because the initiating party affixes an electronic rather than an ink signature, it conflicts with and is preempted by the Electronic Signatures in Global and National Commerce Act ("E-SIGN Act"), 15 U.S.C. § 7001 et seq. E-SIGN provides that a signature "may not be denied legal effect, validity, or enforceability solely because it is in electronic form," 15 U.S.C. § 7001(a)(1), and Plaintiff alleges that the "original ink" condition operates as exactly such a denial. Furthermore,

16

this asymmetric requirement violates the California Uniform Electronic Transactions Act (Civil Code § 1633.7), which establishes that electronic and handwritten signatures hold the exact same legal effect. Defendants' imposition of an archaic physical signature hurdle—while relying on electronic signatures for their own contract formation—is a bad-faith, substantively unconscionable procedural trap designed to suppress claims.

41. Plaintiff further alleges that the MAA acknowledges the Bank is engaged in interstate commerce, invokes the FAA, and adopts an electronic-signature execution workflow in which electronic signatures are deemed originals. In that context, the MAA's requirement that an initiating party's demand contain an "original ink" signature functions to deny legal effect to otherwise valid electronic signatures solely because they are electronic, and Plaintiff alleges that such a requirement is unlawful, void, and unenforceable under 15 U.S.C. § 7001(a).

42. Plaintiff further alleges that any attempt to enforce, sever, or reform the initiation clause so as to preserve a requirement that an arbitration demand be rejected solely because it bears an electronic rather than an ink signature would be inconsistent with the E-SIGN Act's non-discrimination rule and public policy favoring parity between electronic and ink signatures in interstate commerce. Plaintiff alleges the "original ink" initiation requirement should therefore be declared invalid and given no effect, and that its illegality further evidences substantive and procedural unconscionability and lack of mutuality in the MAA as a whole.

F. Substantive Unconscionability: Class/Collective Restrictions; Mass Arbitration Throttling

43. Upon information and belief, the MAA contains additional structural provisions designed to preserve Defendants' procedural leverage and constrain collective vindication, including but not limited to class and collective action waivers and mass-arbitration mechanisms that allow Defendants to delay proceedings and halt the ordinary operation of arbitral fee and scheduling requirements. Plaintiff alleges these provisions are not incidental; they operate in combination with delegation and survival waivers to constrain employee access to any effective, timely merits forum, including for California FEHA and Labor Code claims. On February 9, 2026, Plaintiff served Respondent with Request for Production No. 12 specifically targeting the suspicious rollout of the MAA to tenured employees after protected activity began. On February 20, 2026, Plaintiff filed a Motion for Partial Summary Decision in the OALJ (pursuant to Vernace v. Port Auth.) seeking to establish that the compelled imposition of the MAA constituted a materially adverse action.

44. The MAA contains an express class and collective action waiver, and provides that "independent from any arbitration-related consideration" the class action waiver remains enforceable even if arbitration-related provisions are found unconscionable or otherwise unenforceable. Plaintiff alleges this survival structure further demonstrates that the MAA is drafted to preserve employer-favorable adjudicatory constraints irrespective of whether arbitration is available or enforceable.

45. Plaintiff further alleges that the MAA contains a mass-arbitration waiver and throttling mechanism keyed to counsel identity and volume. The MAA

defines "Mass Arbitrations" as "25 or more arbitration demands asserting the same or similar Disputes … filed by the same lawyer(s) or law firm(s), or affiliated/associated lawyer(s) or law firm(s), within any rolling 180 day period." The MAA defines "Mass Arbitrations" as "25 or more arbitration demands asserting the same or similar Disputes . . . filed by the same lawyer(s) or law firm(s), or affiliated/associated lawyer(s) or law firm(s), within any rolling 180 day period" and provides that upon such a determination the Bank "shall not have any further obligation to arbitrate" and the proceedings are "automatically stayed" with fee payments suspended. The MAA further provides that if the Bank "reasonably believes" Mass Arbitrations are being asserted, it may give notice and "shall not have any further obligation to arbitrate those arbitrations," and the purported arbitrations are "automatically stayed" pending a court determination. The MAA further provides that the Bank is not required to pay arbitration fees as a condition of seeking that determination, and that filing fees, administrative fees, and arbitrator fees are not deemed due until the dispute is resolved by a court. The MAA further provides that if a court determines the demands constitute Mass Arbitrations, neither side must arbitrate and the disputes "instead will be litigated in a court of competent jurisdiction." Plaintiff alleges these provisions operate as an employer-controlled off-ramp, allowing Defendants to halt arbitration and suspend fee obligations based solely on a unilateral "reasonable belief" determination and counsel identity, thereby deterring coordinated representation and delaying or freezing employee claims.

46. Plaintiff alleges that the mass-arbitration structure is not a neutral administrative provision. Plaintiff alleges it operates in a one-sided manner to prevent coordinated representation, isolate claimants, and chill legal

representation by penalizing counsel who represent multiple employees. Plaintiff further alleges the clause protects Defendants from the predictable administrative consequences of widespread wrongdoing while denying employees the efficiency and leverage of coordinated counsel. Plaintiff further alleges that these mass-arbitration mechanisms, along with delegation routing and initiation barriers, are standardized template provisions intended for repeated enterprise-wide deployment, such that judicial invalidation of the MAA's throttling provisions creates material enterprise risk to Defendants by removing a central contractual shield against coordinated or high-volume filings and exposing Defendants to the full consequences of Defendants' chosen dispute-resolution architecture.

## G. Armendariz FEHA Minimum Standards (Five Requirements)

47. Plaintiff alleges that, because the MAA is imposed as a mandatory condition of employment and purports to route California FEHA claims into private adjudication, any enforceable employment arbitration framework must meet California's minimum fairness requirements, including the standards articulated in Armendariz v. Foundation Health Psychcare Services, Inc.

48. Plaintiff alleges that the minimum requirements for a mandatory employment arbitration agreement covering FEHA statutory claims include: (1) a neutral arbitrator; (2) more than minimal discovery adequate to vindicate statutory rights; (3) a written award sufficient to permit limited judicial review; (4) availability of all statutory remedies that would be available in court; and (5) allocation of costs so the employee is not required to pay unreasonable costs or unique forum fees that would not be incurred in court.

49. Plaintiff alleges that the MAA's integrated structure—including delegation routing, initiation and service barriers, confidentiality restrictions, class/collective and mass-arbitration throttling, and survival adjudication waivers—fails to satisfy these minimum standards as applied to FEHA claims and operates to impede effective vindication of statutory rights.

H. Illegal Fee-Shifting and Cost Allocation (FEHA Asymmetry)

50. Plaintiff alleges that FEHA's fee-shifting and cost-allocation framework is asymmetrical: prevailing plaintiffs may recover fees and costs to encourage enforcement, while prevailing defendants may obtain fees only under narrow standards. Plaintiff alleges that any arbitration provision or arbitral rule incorporated by the MAA that purports to impose fee-shifting, cost-shifting, or arbitration-specific expenses on the employee beyond what FEHA permits in court is unlawful and unconscionable.

51. Plaintiff alleges that any MAA provision, incorporated rule, or enforceability-maximizing construction directive that would require Plaintiff to bear arbitrator compensation, forum administrative fees, or other arbitration-unique costs as a condition of asserting FEHA claims violates California public policy and independently supports revocation under generally applicable contract principles.

I. Injunctive-Relief Carve-Out and One-Sided Remedies

52. Upon information and belief, the MAA and/or Defendants' related dispute-resolution documents contain carve-outs and remedy-routing provisions that preserve Defendants' ability to seek injunctive or

21

equitable relief in court while requiring employees to arbitrate statutory claims for injunctive relief or other equitable remedies.

53. Plaintiff alleges that such one-sided carve-outs, if applied, operate to reserve core remedies and rapid court access for Defendants while denying employees equivalent access to judicial injunctive relief for FEHA and other statutory violations, thereby destroying mutuality and reinforcing substantive unconscionability.

54. Furthermore, to the extent the MAA and its class/representative waivers purport to bar Plaintiff from seeking public injunctive relief under FEHA or other California statutes in any forum, such provisions violate California public policy under the McGill rule and are strictly unenforceable.

J. PAGA Waivers and Representative-Action Restrictions; Adolph v. Uber Technologies, Inc.

55. Upon information and belief, the MAA includes class, representative-action, or PAGA-related waiver language and/or sever-and-stay mechanics intended to eliminate or materially impair California representative enforcement claims and aggregate statutory vindication.

56. Plaintiff alleges that any purported waiver of PAGA representative claims is unenforceable under California law and California public policy, and that Adolph v. Uber Technologies, Inc. confirms that compelling arbitration of an individual PAGA component does not extinguish the plaintiff's standing to pursue representative PAGA claims in court, such that Defendants may not use arbitration routing to eliminate representative enforcement exposure.

K. California Labor Code § 925 Protection

57. Plaintiff alleges that California Labor Code § 925 protects California employees from being required, as a condition of employment, to agree to a provision that would require the employee to adjudicate outside California or under another state's law for disputes arising in California, and renders such provisions voidable at the election of the employee.

58. Plaintiff alleges that, to the extent the MAA's forum-routing, choice-of-law, delegation, or related provisions are construed to force California statutory claims—including FEHA and Labor Code claims—into out-of-state fora or to apply non-California law in violation of § 925, those provisions are voidable, contrary to California public policy, and support a declaration of unenforceability as applied.

L. Confidentiality Gag Rules; Ramos & Gurganus

59. Plaintiff alleges that the MAA contains confidentiality and non-disclosure provisions that operate as gag rules restricting the disclosure of arbitration outcomes, filings, and evidence, including with respect to FEHA, ADA, and whistleblower claims.

60. Plaintiff alleges that such confidentiality provisions, particularly when combined with class/collective waivers and survival adjudication waivers, function to conceal systemic misconduct, frustrate public enforcement and deterrence, and impede employees' ability to secure counsel and marshal corroborating evidence, contrary to California public policy as recognized in decisions such as Ramos v. Superior Court and Gurganus v. Zillow Group, Inc., which scrutinize confidentiality in employment-dispute arbitration agreements.

61. Plaintiff alleges that these confidentiality provisions further contribute to substantive unconscionability and demonstrate that the MAA is structured to serve Defendants' secrecy and leverage interests rather than to create a fair alternative forum.

M. Deceptive Agency Waivers; Waffle House

62. Plaintiff alleges that the MAA and related documents contain language purporting to waive or limit the rights of governmental agencies or regulators, or to restrict employees' ability to cooperate with or seek relief through agencies, in a manner that is misleading and unenforceable.

63. Plaintiff alleges that, under EEOC v. Waffle House, Inc. and analogous authority, private arbitration agreements cannot waive or restrict the enforcement authority of agencies such as the EEOC, DFEH/CRD, OSHA, or the SEC, and that any suggestion to the contrary is deceptive and contrary to public policy.

64. Plaintiff alleges that the presence of such language in an adhesive MAA, particularly when deployed mid-employment during an escalating whistleblower and FEHA dispute, further evidences Defendants' intent to chill protected activity and mislead employees regarding their rights, adding to the agreement's unconscionability.

N. EFAA Sever-and-Stay Violations; Doe & Liu

65. Plaintiff alleges that, to the extent the MAA is interpreted to compel arbitration or to sever and stay claims that fall within the scope of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), such application would violate the EFAA and controlling case

24

law, including Doe v. Chipotle and Liu v. Uber Technologies, Inc., which prohibit forced arbitration of covered sexual assault and sexual harassment claims and limit sever-and-stay maneuvering designed to undermine EFAA protections.

66. Plaintiff does not presently plead a sexual assault or sexual harassment claim, but alleges that the MAA's structure—including its delegation and sever-and-stay mechanics—is a standardized enterprise template intended for repeated use across Defendants' workforce, including in contexts where EFAA-protected claims are at issue, and that the same evasion architecture deployed against Plaintiff is part of an unlawful system designed to minimize the impact of EFAA and analogous non-waiver statutes.

O. Overbroad Related-Entities Loophole; Cook v. USC

67. Plaintiff alleges that the MAA defines "Bank" and covered entities broadly to include parents, subsidiaries, affiliates, and related entities, and that this overbroad coverage, when combined with delegation, survival waivers, and § 925-implicating provisions, yields a sweeping related-entities loophole that attempts to extend Defendants' dispute-resolution architecture to entities and relationships that lack a valid or knowing employment-based basis for arbitration.

68. Plaintiff alleges that California courts, including in decisions such as Cook v. USC and related cases, have scrutinized and limited the enforceability of such broad related-entity extensions where they operate to deprive California plaintiffs of statutory rights and public-forum

protections, particularly in the context of institutional misconduct and systemic wrongdoing.

69. Plaintiff alleges that the MAA's related-entities structure is part of Defendants' enterprise-level design to shield a wide constellation of affiliated entities (including parent holding companies and insurance/defense ecosystems) from public adjudication and jury trials, further supporting a finding that the agreement is permeated by illegality and unconscionability and is non-severable under California law as well.

P. Jury Trial Waiver: Survival Structure, California Public Policy, and Conflict with SOX, FEHA, and Other Statutory Remedies

70. Separately, and "independent from any arbitration-related consideration," the MAA includes a Jury Trial Waiver provision that states, in substance, that even if a court finds the arbitration-related provisions unconscionable or otherwise unenforceable, it is the intent of the parties that the Jury Trial Waiver remain enforceable and in full force and effect. Plaintiff alleges that this clause is drafted as a non-jury backstop intended to deprive Plaintiff of his jury right even in the event arbitration is unavailable, barred by statute, or invalidated by a court, thereby preserving Defendants' non-jury objective regardless of forum.

71. Plaintiff further alleges that the independent survival Jury Trial Waiver is unenforceable as against California public policy and California's constitutional protections of the right to trial by jury, and that any purported waiver of the jury right in this context must be knowing, voluntary, and informed under California standards. Plaintiff alleges that Defendants' adhesive, non-opt-out imposition of a freestanding waiver

26

drafted to survive invalidation of arbitration falls short of the strict waiver standards applicable to fundamental jury rights and is therefore unenforceable.

72. Plaintiff further alleges that the Jury Trial Waiver, as structured to survive the failure of arbitration, is void as against public policy in the context of SOX claims, FEHA claims, and other statutory claims providing an "action at law" and jury remedies. Plaintiff is proceeding de novo in federal district court under 18 U.S.C. § 1514A(b)(1)(B), which provides an "action at law" in federal court as part of Congress's remedial scheme for SOX whistleblowers. Plaintiff alleges that a private contract of adhesion cannot waive or subvert a substantive statutory remedial scheme enacted to protect the public interest. By drafting a waiver intended to remain operative even if the arbitration clause is found illegal or unenforceable, Defendants attempt to contract around Congress's remedial design for whistleblower retaliation claims, as well as California's public policies embodied in FEHA and related statutes, and to deprive Plaintiff of the jury-trial component inherent in an action at law. Plaintiff alleges the Jury Trial Waiver must be declared void and unenforceable as applied to Plaintiff's SOX, FEHA, and related statutory claims.

Q. FAA § 2 Revocation, Enforceability-Maximizing Reformation Directives, Permeation, and Non-Severability

73. Plaintiff further alleges that under FAA § 2, arbitration agreements are enforceable only "save upon such grounds as exist at law or in equity for the revocation of any contract," and that contracts permeated by illegality, fraud, or public-policy violations are revocable as a matter of

generally applicable contract law. Plaintiff alleges that the MAA's interlocking structure—comprising statutory-evasion routing devices, an independent survival jury-waiver backstop, deterrent initiation barriers, fee-shifting and cost provisions that deter FEHA and other statutory claims, concealment of material barriers, class/collective and PAGA constraints, mass-arbitration throttling, and enforceability-maximizing reformation directives—renders the instrument illegal and void as against public policy in its intended operation, such that the agreement is unenforceable under FAA § 2 and cannot be saved by selective severance without judicial rewriting.

74. The MAA includes severability and modification provisions and an express "mutual intention" directive stating that the court and/or arbitrator should construe the agreement in a light most favorable to enforceability and conscionability, including by construing provisions toward enforceability and conscionability and severing language to enforce the rest. Plaintiff alleges these provisions function as enforceability-maximizing directives that invite judicial reformation of an employer-drafted scheme—rather than enforcement of a purportedly voluntary alternative dispute mechanism as written—and are part of the MAA's integrated design to preserve Defendants' leverage even when core provisions are illegal, unconscionable, or barred by statute.

75. Plaintiff alleges that the MAA's structure—including a broad delegation clause paired with a freestanding survival Jury Trial Waiver, and supplemented by class/collective restrictions, initiation/service barriers, PAGA waivers, fee-shifting provisions, and mass-arbitration throttling— operates as a mechanism to steer statutory disputes into employer-

28

favored adjudication constraints even when arbitration is unavailable or barred as to Sarbanes-Oxley, FEHA, and other non-arbitrable or constrained claims, thereby preserving Defendants' core objective regardless of the forum. Plaintiff further alleges that Defendants' anticipated motion practice will seek to use the delegation clause to shunt threshold questions to a private arbitrator while preserving survival waivers as alternate routes to eliminate the jury right and collective-vindication mechanisms even if arbitration is barred or invalidated.

76. Plaintiff alleges that this design conflicts with Sarbanes-Oxley's statutory command and defeats the purpose of the Dodd-Frank predispute arbitration prohibition by shifting Sarbanes-Oxley–linked gateway determinations away from an Article III forum through predispute contract machinery. Plaintiff further alleges that, as applied to Sarbanes-Oxley and Sarbanes-Oxley-linked gateway issues, Defendants' reliance on delegation and arbitration machinery would function as an evasion of Congress's anti-waiver mandate.

77. Plaintiff expressly challenges the delegation clause as applied to Sarbanes-Oxley, FEHA, and Sarbanes-Oxley-linked gateway issues, including declaratory relief regarding non-arbitrability, enforceability of the statutory carve-out, and enforceability of the independent survival Jury Trial Waiver.

78. Plaintiff alleges that requiring an arbitrator to decide arbitrability and enforceability where the controversy turns on Sarbanes-Oxley's statutory prohibition and the enforceability of the MAA's survival waivers is inconsistent with controlling federal law and would operate, in practice, to transfer Sarbanes-Oxley adjudicatory authority to a private forum

29

through predispute contract machinery. Plaintiff further alleges that the Court must retain and decide these gateway questions because Defendants may not compel a private arbitrator to adjudicate whether Congress has prohibited predispute arbitration or whether Defendants' survival backstops are enforceable.

79. Plaintiff further alleges that the survival Jury Trial Waiver is procedurally and substantively unconscionable and contrary to California public policy because it was imposed in an adhesive manner without opt-out, under economic pressure, and is drafted to deprive Plaintiff of a jury trial even where arbitration provisions are found unconscionable, unenforceable, or otherwise inapplicable. Plaintiff further alleges that this freestanding waiver is independently invalid and unenforceable regardless of any determination concerning arbitration of non-Sarbanes-Oxley claims.

80. Plaintiff further alleges that the Jury Trial Waiver is invalid because it is not a knowing, voluntary, and informed waiver of a fundamental right under California law, and because Defendants drafted the waiver as an independent device to secure non-jury adjudication even when arbitration is barred. Plaintiff further alleges that California public policy requires strict scrutiny of predispute jury waivers in adhesive employment agreements, and that Defendants cannot satisfy the heightened proof required to show an intentional, informed relinquishment of the jury right under the circumstances alleged here.

81. Plaintiff further alleges that FAA § 2 applies in this context not as a preemption mechanism compelling enforcement, but as a revocation gateway requiring courts to refuse enforcement where a uniform form

30

contract is constructed to evade controlling federal anti-waiver commands and to preserve employer-favored adjudication constraints through delegation routing and survival waivers. Plaintiff alleges that where an employer-drafted instrument is constructed to preserve non-jury adjudication and delegation-controlled routing even when Congress has prohibited predispute arbitration, the instrument is unlawful in purpose and effect and must be revoked on generally applicable contract grounds, rather than enforced through judicial reformation that would reward statutory evasion.

82. Plaintiff further alleges that contemporary unconscionability and severance principles recognize that where an arbitration scheme contains multiple interlocking provisions that systematically operate to favor the employer—including delegation, survival waivers, enforceability-maximizing severability/modification directives, fee-shifting that deters FEHA and statutory claims, class/collective and PAGA waivers, mass-arbitration throttling mechanisms (including automatic stays and fee-payment suspension pending court determinations), and initiation/service barriers—the agreement may be permeated by unconscionability and unenforceable as written.

83. Plaintiff further alleges that in such circumstances the challenged provisions cannot be meaningfully severed without rewriting the instrument in ways that materially alter its structure, operation, and intended effect.

84. Plaintiff further alleges that severance would therefore require substantial judicial reformation inconsistent with enforcement of a purportedly voluntary alternative dispute mechanism.

31

85. Plaintiff further alleges that where severance would require substantial judicial reformation of the instrument, courts decline to enforce the agreement as modified because the central purpose and effect of the instrument is to maximize employer leverage and constrain statutory vindication rather than merely select an alternative forum. Plaintiff alleges that the MAA's cumulative defects are non-severable under California law as well. Under the California Supreme Court's standard in Ramirez v. Charter Communications (2024), the MAA cannot be saved by severance. The central purpose of the MAA is tainted by illegality, and curing the multitude of defects—including the mass arbitration stay, the signature traps, and the fee-shifting asymmetry—would require the Court to impermissibly rewrite the contract by augmenting it with new terms. Severance would not serve the interests of justice, but would instead incentivize Defendants to continue imposing deliberately overreaching agreements.

R. Retaliatory Timing and Factual Particulars Supporting Intent

86. On information and belief, the timing and manner of Defendants' imposition of the MAA were retaliatory and specifically responsive to Plaintiff's protected activity. Plaintiff had been employed by Defendants for approximately three years without any requirement that he execute a standalone arbitration agreement. After Plaintiff disclosed internal control and revenue-attribution concerns in or about March 2024, and after his director, Dana Lomas, followed up on September 14, 2024 by texting Plaintiff to ask "what ever came of those stolen JH accts" and then attempting to reframe those accounts as "resigned," and then attempting to reframe those accounts as "resigned," Defendants, in

32

December 2024, abruptly required Plaintiff to execute the MAA as a non-negotiable condition of continued employment shortly after Plaintiff's relocation to Nevada and in advance of the escalation of adverse actions beginning in early 2025 and culminating in termination in June 2025. Plaintiff alleges that the MAA was thus deployed mid-employment, in direct temporal proximity to his protected disclosures and management's documented discomfort with those issues, as a retaliatory instrument designed to strip him of public, jury-trial, and discovery rights in anticipation of Sarbanes-Oxley, FEHA, and related statutory disputes.

87. Plaintiff further alleges that Defendants' imposition of the MAA under these circumstances constitutes a standalone adverse action and retaliatory act, because it was implemented after protected activity and disability-related communications and was designed to chill, constrain, or penalize Plaintiff's exercise of protected rights by stripping or burdening access to a jury forum and by imposing a coercive dispute-resolution regime. Plaintiff alleges that the retaliatory timing and coercive nature of the imposition support additional liability and damages under Sarbanes-Oxley, FEHA, and the ADA, and further support a strong inference of retaliatory intent.

## VI. FACTUAL ALLEGATIONS

### Protected Activity: Internal Controls / Revenue Attribution Concerns

88. In or about March 2024, Plaintiff disclosed to FCB management, including Dana Lomas and Carlos Gonzalez, that a payment processor relationship had resulted in diversion of merchant accounts away from FCB, raising internal control and revenue attribution concerns.

89. On or about September 14, 2024, Dana Lomas, a director within Merchant Services, sent Plaintiff a text message asking "what ever came of the Jackson Hewitt accounts the 5/3 stole?" and, when reminded that Plaintiff had recovered the accounts, responded "We resigned them?" and stated she would "have to go back and look," reflecting continued uncertainty and lack of control over the status and attribution of at least 31 Jackson Hewitt merchant accounts and confirming that the internal-controls and revenue-attribution concerns remained unresolved.

90. On March 24, 2025, Plaintiff sent a Microsoft Teams message to manager Carlos Gonzalez identifying a recurring pattern of vendor-driven diversion of merchant accounts—including the Jackson Hewitt relationship—and describing Worldpay's conduct as improper and harmful to FCB's business and internal controls. In his reply, Mr. Gonzalez acknowledged that this was not an isolated incident, referenced prior admissions by Worldpay personnel that they would correct the problem but had not done so, and questioned why the accounts had still not been reassigned to FCB, thereby confirming management-level awareness of the vendor-fraud and internal-controls issues.

91. On May 20, 2025, Plaintiff formally supplemented his whistleblower disclosure to Defendants' Board and Audit Committee by transmitting a written explanation and supporting documentation concerning the March 24, 2025 Teams communication (including what Plaintiff later labeled Exhibit BB), expressly characterizing it as a vendor-fraud and internal-controls disclosure and noting that it predated the initiation of disciplinary action by Regional Director Dana Lomas. Plaintiff alleges that this placed fiduciary-level recipients on notice that vendor-fraud and

Jackson Hewitt account-diversion concerns remained unresolved and were temporally linked to subsequent retaliation.

92. In April 2025, Plaintiff sent written notices to Defendants' Legal and HR functions explicitly citing Sarbanes-Oxley protections and anti-retaliation provisions, including 18 U.S.C. § 1514A and related protections, and raising compliance and internal controls concerns.

93. On May 13, 2025, Plaintiff sent a detailed written communication to Defendants' senior leadership, including the General Counsel and CEO, describing retaliation following Plaintiff's Sarbanes-Oxley-related disclosures as well as disability- and leave-related issues under FEHA and ADA.

94. On May 19, 2025, Plaintiff expanded his disclosure to additional executives and reiterated internal controls and revenue attribution issues and the likelihood of Sarbanes-Oxley whistleblower filings.

95. On May 20, 2025, Plaintiff sent a formal disclosure to Defendants' Board/Audit Committee email channels, citing SEC Rule 10A-3 and Sarbanes-Oxley provisions, and placing fiduciary-level recipients on notice of the issues and retaliation risk.

96. On May 21, 2025, Defendants' outside counsel transmitted a letter labeled as a "CONFIDENTIAL RULE 408 COMMUNICATION" (the "May 21 Letter"), acknowledging that Plaintiff's communications raised allegations suggesting corporate-related misconduct under SOX and SEC Rule 13a-15 and that Plaintiff had alluded to disclosures he believed qualified him as a whistleblower. (Exhibit A.)

Preservation Notices and Defendants' Duty to Preserve

97. On April 23, 2025, Plaintiff sent a written request to Defendants' HR Service Center requesting preservation of records and communications related to disciplinary action and appeal, including emails and Teams messages. (Exhibit L.)

98. On April 24, 2025, Plaintiff sent a formal preservation request to HR leadership seeking preservation of records and communications concerning Plaintiff's ADA/FEHA-protected medical condition(s) and related HR/management communications. (Exhibit J.)

99. On April 25, 2025, Plaintiff expanded the preservation request to cover work-related communications on personal devices, including texts, emails, and chats exchanged on personal phones related to performance and disciplinary actions.

100. On April 29, 2025, Plaintiff sent a supplemental preservation request seeking preservation of specified performance and compensation records and related materials.

101. On or about May 16–17, 2025, Plaintiff sent a legal-hold demand to Defendants' General Counsel seeking preservation of emails and communications, including metadata and logs, including communications involving the alias HRRedirect@firstcitizens.com.

102. On May 20, 2025, Plaintiff sent a comprehensive legal hold notice to Defendants' senior leadership and Board-level recipients demanding preservation of all relevant electronic data, including logs, audit trails, email routing records, IT filter logs, and Salesforce-related metadata.

103. By no later than April–May 2025, Defendants were on notice of foreseeable litigation and were under a duty to preserve relevant electronically stored information ("ESI"), including device-resident data and metadata.

Adverse Actions: Discipline, Interference, Salesforce/Territory Sabotage, and Accommodation Denials

104. On April 15, 2025, Defendants drafted a formal written warning concerning Plaintiff.

105. Defendants withheld delivery of the warning until April 23, 2025. Plaintiff alleges this delayed delivery occurred immediately after Plaintiff escalated protected complaints regarding Defendants' interference with his work, including systems and Salesforce-related mapping changes that impaired his ability to generate contracts in key California markets— thereby supporting an inference that the warning was held in reserve and deployed for pretextual escalation. (Exhibit M.)

106. On April 22, 2025, Plaintiff was subjected to a systems or workflow change that interfered with his ability to generate contracts in key California markets.

107. On April 22, 2025, Director Dana Lomas instructed Salesforce Administrator Ashley Roff to modify the internal HR area mapping, splitting the Los Angeles territory. This uncommunicated change caused immediate failures in referral and contract creation workflows, effectively blocking the $200 million Neutraderm/DRMTLGY pipeline.

37

108.   On or about April 28–29, 2025, Plaintiff experienced interference with his ability to communicate with Defendants using personal email accounts and discovered evidence consistent with internal rerouting and interception mechanisms.

109.   On May 8, 2025, Plaintiff discovered that an email he sent from a personal email account to his corporate email address did not arrive in his corporate inbox, but Defendants' HR representative replied using an alias address, HRRedirect@firstcitizens.com, indicating rerouting or interception.

## FMLA Notice and Failure to Protect

110.   On April 24, 2025, Plaintiff emailed Defendants' HR Service Center and referenced a leave claim through Defendants' third-party administrator, The Hartford, providing notice that he had scheduled the submission of an FMLA request through The Hartford effective April 25, 2025. (Exhibit K.)

111.   Plaintiff alleges Defendants did not timely designate or protect FMLA rights in the manner required by law and instead escalated discipline and access revocation under an investigative framing.

112.   Plaintiff further alleges that Defendants failed to provide the required FMLA "Notice of Eligibility and Rights & Responsibilities" within five (5) business days of Plaintiff's request/notice, constituting per se interference.

## ADA/FEHA: Clinical Trial Conflict and Event Exclusion

113.   In March 2025, Plaintiff was required to attend a work convention and related mandatory work programming that directly conflicted with a medically necessary clinical infusion required for Plaintiff's continued participation in an FDA-regulated clinical trial.

114.   Plaintiff alleges he notified management of the medical conflict in advance. Plaintiff further alleges that Defendants' directives forced Plaintiff to forgo required medical care in order to remain available for the work event.

115.   Plaintiff alleges that, notwithstanding Plaintiff's compliance with Defendants' directives, Defendants excluded Plaintiff from participation at the last moment under shifting explanations and then minimized the impact of the exclusion and refused to provide meaningful recaps or equal access, despite the significance and cost of the event.

116.   Plaintiff alleges the foregoing denial of access and refusal to provide equivalent participation caused concrete harm and operated as adverse documentation and disparate treatment, including in comparison to other personnel who had received remote participation accommodations in similar circumstances.

ADA/FEHA: HR Meeting Accommodation Denials and Coercion

117.   On or about May 8–9, 2025, Plaintiff requested reasonable accommodations for an HR meeting, including advance agenda or questions and permission to record the conversation for accuracy.

118.   On May 9, 2025, Defendants' HR representative denied Plaintiff permission to record the meeting and declined to provide a detailed agenda or questions in advance.

119.   Defendants further warned that refusing to cooperate in Defendants' investigation could be treated as a violation of Defendants' Code of Ethics.

120.   On May 14, 2025, Plaintiff made an additional procedural accommodation request relating to the structure of the meeting, seeking a safeguard to allow Plaintiff to ask questions first without interruption.

Administrative Leave, Access Revocation, and June 4 Organizational-Data Removal

121.   On May 22, 2025, Defendants placed Plaintiff on administrative leave and communicated that Defendants' standard practice was to terminate access for an associate on such leave.

122.   Defendants communicated that Plaintiff could use up to two weeks of paid leave through June 4, 2025, and that any additional leave beyond that would be unpaid.

123.   On or about May 22, 2025, Plaintiff's access to Defendants' systems was revoked and/or deactivated.

124.   On June 4, 2025, at approximately 5:10 a.m. Pacific time, Plaintiff's personal mobile device displayed prompts indicating Defendants were removing organizational data associated with Defendants' applications because Plaintiff's corporate account was disabled. (Exhibit C.)

125. The organizational data removal affected Microsoft Outlook, Microsoft Teams, Microsoft OneDrive, and Okta Verify, and removed device-resident caches, logs, and other locally stored ESI uniquely present on the device. (Exhibit C.)

126. On June 4, 2025, Plaintiff contacted Defendants' service desk. Defendants' service desk confirmed Plaintiff's account status as "revoked" and deactivated. (Exhibit D.)

127. The service desk further confirmed that Plaintiff's account was not coded as "Leave of Absence" or "Administrative Leave" in the manner later implied by Defendants' HR and counsel communications, and stated that the account status was not "terminated per se," but "revoked," thereby contradicting any later narrative that Plaintiff was merely on routine leave status at the time of the June 4 organizational-data removal. (Exhibit D.)

128. Plaintiff's formal termination was not executed until June 18, 2025, at 2:36 PM PDT, via an email personally authored and transmitted by outside counsel Jeremy R. Sayre. This establishes that the June 4, 2025 enterprise wipe occurred while Plaintiff was still actively employed and subject to active litigation holds.

129. The remote enterprise wipe occurred under Service Desk Ticket RITM0730529, created on June 4, 2025, at 05:27 AM PDT. Plaintiff's communications were covertly intercepted and rerouted to the internal alias HRRedirect@firstcitizens.com.

130. On June 5, 2025, at 6:17 AM PDT, Defendants' counsel Jeremy R. Sayre removed OSHA Investigator Anna Son from the email chain and

41

transmitted the materially false statement that the Bank had confirmed Plaintiff's mobile device had not been wiped.

131.  Plaintiff alleges this denial was materially inconsistent with the June 4 organizational-data removal prompts and the loss of device-resident ESI and evidences an intent to minimize or conceal spoliation.

132.  On June 17, 2025, Defendants' counsel reframed the issue as "unenrollment" and asserted that relevant data was maintained and protected in Defendants' systems, while failing to account for device-resident ESI destroyed or rendered inaccessible by Defendants' action.

Benefits Coercion and Termination Effectuated

133.  On June 17, 2025, Plaintiff notified Defendants' leadership that his access to vested 401(k) funds was blocked due to Defendants' failure to update his employment status.

134.  On June 18, 2025, Defendants' counsel communicated that Defendants had not reported separation to the plan administrator because Defendants claimed Plaintiff's employment had not been terminated, and indicated Defendants would update the status if Plaintiff maintained his employment had terminated. Plaintiff rejected any attempt to condition benefits access on any concession or characterization of Plaintiff's separation status. (Exhibit B.)

135.  On June 18, 2025, Defendants' counsel communicated that Defendants would reflect Plaintiff's employment status as terminated and advise the plan administrator accordingly. (Exhibit B.)

42

136. Defendants' termination communication stated that Defendants accepted Plaintiff's purported contention that his employment had been constructively terminated, despite Plaintiff's explicit written objections rejecting resignation and disputing any characterization of the separation as voluntary. (Exhibit B.)

137. On June 20, 2025, Defendants' HR representative confirmed termination and demanded return of assets while refusing to provide a stated reason for termination upon Plaintiff's request. (Exhibit N.)

138. On June 30, 2025, Plaintiff filed a complaint with the Employee Benefits Security Administration concerning interference with protected benefit rights.

"Extortion" Criminalization and Post-Notice Intimidation

139. On June 17, 2025, after Plaintiff had issued multiple preservation notices and after Defendants' counsel had acknowledged that Plaintiff's communications raised allegations suggesting corporate-related misconduct under SOX and SEC Rule 13a-15 and that Plaintiff had alluded to disclosures he believed qualified him as a whistleblower, Defendants' counsel escalated from "resolution" posture to criminalization posture by characterizing Plaintiff's protected dispute communications and/or settlement positions as "extortion" and invoking criminal-extortion framing. (Exhibit X.)

140. Plaintiff alleges the "extortion" framing was false and was deployed as a retaliatory intimidation device designed to chill Plaintiff's protected activity, to justify escalation under an "investigations" or "financial

43

crime" narrative, and to create pretext for threatened referrals and coercive evidence demands.

141. Upon information and belief, Defendants' "extortion" framing was shared internally with Bank stakeholders responsible for investigations, security, risk, HR, legal, and/or asset-recovery functions, and was used to support subsequent adverse and intimidating actions against Plaintiff.

142. The "extortion" criminalization framing was followed by Defendants' escalated demands for return of evidence-bearing devices, including threats to involve Defendants' Special Investigations Unit and local law enforcement if Plaintiff did not surrender a laptop Plaintiff preserved as evidence pending neutral forensic imaging. (Exhibit R.)

143. Plaintiff alleges the sequence—(i) coercive benefits/status handling; (ii) criminalization ("extortion") framing; and (iii) SIU/law-enforcement threats tied to evidence custody—constitutes post-notice retaliation and intimidation and is probative of retaliatory intent, consciousness of liability, and the need for evidentiary protections and preservation remedies.

Laptop Preservation, SIU Threats, and Evidence-Integrity Coercion

144. After termination and after notice of preservation obligations, Defendants escalated demands for return of a company laptop that Plaintiff preserved as evidence, while Plaintiff requested neutral, third-party forensic imaging before surrendering due to Defendants' prior organizational-data removal affecting Plaintiff's personal device.

145.  On August 6, 2025, Defendants' systems engineer Michael Raimo emailed Plaintiff stating that if the device was not returned, Defendants would open a case to Defendants' Special Investigations Unit and local authorities would become involved.

146.  On August 8, 2025, Raimo repeated the same threat and characterized it as a final notice.

147.  On August 14, 2025, Defendants' technology services representative Sylvie Nadeau stated that laptops not returned are reported to SIU, the asset is marked stolen, and SIU will contact local authorities.

148.  On August 6, August 8 (marked "FINAL NOTICE"), and August 14, 2025, FCB Technology Services agents Michael Raimo and Sylvie Nadeau issued written threats to report Plaintiff's litigation-hold laptop to the "Special Investigations Unit (SIU)," mark it "stolen," and involve "local authorities." In their certified January 26, 2026 OALJ Answer, Respondent formally admitted that deploying SIU and law-enforcement threats against a whistleblower was "consistent with its standard practice."

149.  Plaintiff alleges these threats were made in the context of Plaintiff's preservation requests and request for neutral forensic imaging and operated as intimidation designed to impair Plaintiff's protected rights and evidence integrity.

Tribunal-Integrity and Procedural Misconduct

150.  Plaintiff alleges that Defendants' counsel and defense agents engaged in discrete, date-stamped misrepresentation and record-integrity episodes

45

that bear directly on credibility, intent, preservation remedies, and Defendants' attempt to win by procedural diversion rather than merits adjudication, including the June 5–6, 2025 "not wiped" denial outside OSHA visibility; the August 20, 2025 directive–denial contradiction; and the September 30, 2025 "post-employment" timing misstatement designed to neutralize spoliation.

151.   Plaintiff alleges that Defendants' conduct in the related administrative proceeding (OALJ No. 2025-SOX-00035), including motion practice and misrepresentations concerning SOX subject matter, insurer involvement (Chubb), and subpoena power, further demonstrates Defendants' effort to evade merits adjudication and supports the need for declaratory and injunctive relief in this Court.

152.   The enterprise's obstruction continued into 2026. On February 3, 2026, Plaintiff served 25 interrogatories on Dana Lomas targeting SOX control failures. Exactly seven days later, on February 10, 2026, FCB posted Lomas's exact role (Req ID 33062) as publicly vacant and Fox Rothschild filed a protective order using evasive past-tense language about her employment, intentionally rendering the primary retaliatory actor unavailable.

VII. PRESERVATION, SPOLIATION, AND RULE 37(e) REMEDIES (RESERVED)

153.   Defendants' duty to preserve relevant ESI attached no later than April–May 2025 based on Plaintiff's preservation notices, statutory citations, escalation to senior leadership and Board-level recipients, and the reasonably foreseeable litigation posture. (Exhibits J, K, L.) Between

April 23 and May 24, 2025, Plaintiff served at least five explicit litigation holds directly copying CEO Frank B. Holding, Jr. and Chief Legal Officer Matt Martin, thereby placing fiduciary-level officers on actual notice of the duty to preserve all relevant ESI.

154.   Notwithstanding that duty, on June 4, 2025, at approximately 05:10 AM PDT, Defendants executed a remote enterprise wipe ("Org data removal") disabling Plaintiff's account under Service Desk Ticket RITM0730529, created at 05:27 AM PDT, while Plaintiff was still actively employed and subject to active litigation holds, eliminating device-resident ESI uniquely relevant to Plaintiff's claims, including application caches, logs, and ephemeral communications not fully reconstructable from server-side repositories. (Exhibits C, D.)

155.   Defendants then issued denials and reframing communications (including "not wiped" and "unenrolled/nothing lost") that were inconsistent with the device-side loss and tend to show intent to minimize, obscure, or neutralize the evidentiary consequences of the June 4 event. On June 5, 2025, at 06:17 AM PDT, outside counsel Jeremy R. Sayre deliberately removed federal OSHA Investigator Anna Son from the recipient list and transmitted the materially false statement: "The Bank also has confirmed that your mobile device has NOT been wiped." Email headers confirm the removal occurred immediately before the false denial was sent.

156.   On August 6, August 8 (marked "FINAL NOTICE"), and August 14, 2025, FCB Technology Services agents Michael Raimo and Sylvie Nadeau issued written threats to report Plaintiff's litigation-hold laptop to the "Special Investigations Unit (SIU)," mark it "stolen," and involve

47

"local authorities." In their certified January 26, 2026 OALJ Answer, Respondent formally admitted that deploying SIU and law-enforcement threats against a whistleblower was "consistent with its standard practice."

157.   Defendants later escalated threats to involve SIU and local law enforcement in connection with Plaintiff's preserved laptop and Plaintiff's motion to compel neutral forensic imaging, further supporting an inference of retaliatory intimidation and evidence-integrity interference.

158.   Plaintiff further alleges that the discrete tribunal-integrity episodes pleaded above (including timing misstatements and inconsistent narratives advanced in adjudicatory proceedings) are probative of intent, credibility, and the need for early preservation and evidentiary protections, including expedited preservation and imaging authority as necessary.

159.   Plaintiff requests that this Court reserve authority to impose appropriate remedies under Fed. R. Civ. P. 37(e) and the Court's inherent authority upon motion after development of the record, including an adverse inference, evidentiary or issue sanctions, and fee-shifting for spoliation-related motion practice.

160.   Defendants' counsel are material witnesses as to disputed events and communications pleaded herein, including but not limited to the June 6 denial and the June 18 termination/status communication. Plaintiff therefore expressly reserves the right to seek disqualification and related protective relief if Defendants place counsel's conduct, testimony, or

credibility at issue in a manner requiring counsel-witness adjudication or creating prejudice to the integrity of these proceedings. Jeremy R. Sayre is an un-waivable fact witness because he personally authored the June 5, 2025 false denial to Plaintiff and OSHA and personally executed Plaintiff's termination via email on June 18, 2025, at 2:36 PM PDT.

## VIII. CLAIMS FOR RELIEF

COUNT I — Sarbanes-Oxley Retaliation (18 U.S.C. § 1514A) (Against All Defendants)

161. Plaintiff realleges and incorporates by reference the allegations set forth above.

162. Plaintiff engaged in protected activity by reporting and opposing conduct he reasonably believed constituted violations of federal law relating to fraud against shareholders and/or SEC rules and regulations, including internal controls and revenue attribution issues, and by making disclosures to Defendants' management, legal and HR functions, and Board-level recipients. Specifically, Plaintiff disclosed the diversion of 31 Jackson Hewitt merchant accounts by Worldpay/Fifth Third Bank, the suppression of the $200 million Neutraderm pipeline, and the undocumented manipulation of Salesforce metadata. On May 20, 2025, Plaintiff transmitted a formal disclosure directly to the Board and Audit Committee citing SOX § 301 and SEC Rule 10A-3.

163. Defendants knew of Plaintiff's protected activity through Plaintiff's written disclosures, escalation communications, and direct notice to senior leadership and Board-level channels. This knowledge was expressly admitted in writing on May 21, 2025, when outside counsel

Jeremy R. Sayre sent a letter acknowledging that Plaintiff's communications raised allegations of "corporate-related misconduct (e.g., securities violations or other financial crimes) under the Sarbanes-Oxley Act (SOX) and SEC Rule 13a-15".

164.   Defendants subjected Plaintiff to adverse actions, including discipline, interference with work systems, access revocation, administrative leave, coerced benefits status, termination, and post-notice intimidation. Plaintiff's system access was revoked on May 22, 2025 (Ticket RITM-07198884). The remote enterprise wipe ("Org data removal") was executed on June 4, 2025, at approximately 05:10 AM PDT, documented by Service Desk Ticket RITM0730529 confirming Plaintiff's account was "revoked" and "disabled".

165.   Defendants' retaliation culminated in constructive termination and/or termination effectuated through a June 18, 2025, employment-status change personally executed and communicated via email by outside counsel Jeremy R. Sayre. (Exhibit B.)

166.   Plaintiff further alleges that Defendants' June 4, 2025, organizational-data removal from Plaintiff's personal device, and Defendants' subsequent threats to involve SIU and local authorities regarding Plaintiff's preserved laptop in August 2025, constitute further indicia of retaliatory motive and hostility toward Plaintiff's protected whistleblowing and preservation efforts.

167.   Plaintiff further alleges that Defendants engaged in post-notice retaliation and intimidation by falsely criminalizing Plaintiff's protected

dispute communications and/or settlement posture as "extortion," including by invoking criminal-extortion framing. (Exhibit X.)

168.   Plaintiff alleges the criminalization posture was deployed to chill protected activity, to justify escalation under an "investigation" narrative, and to support subsequent coercive threats involving Defendants' Special Investigations Unit and law enforcement tied to custody of evidence-bearing devices. (Exhibit R.) In their certified January 26, 2026 OALJ Answer, Respondent formally admitted that deploying SIU and law-enforcement threats against a whistleblower to recover a litigation-hold laptop was "consistent with its standard practice".

169.   Plaintiff alleges these post-notice intimidation acts constitute materially adverse retaliatory conduct and further support an inference of retaliatory motive, consciousness of liability, and the need for evidentiary protections and remedies.

170.   Plaintiff further alleges that, in the January 6, 2026 Order denying Defendants' Motion to Dismiss in the related administrative proceeding, the presiding ALJ expressly recited Defendants' characterization of Plaintiff's settlement communications as "extortion" as part of the adverse-action and plausibility narrative, confirming that Defendants' criminalization smear is a material retaliatory act and evidences retaliatory animus. (Exhibit V.)

171.   Plaintiff's protected activity was a contributing factor in Defendants' adverse actions, as shown by temporal proximity, escalation following notice, Defendants' shifting explanations, and Defendants' spoliation-linked conduct. Under the AIR21 burden-shifting framework (49 U.S.C.

§ 42121) and Murray v. UBS Securities, LLC, the tight temporal sequence—from the May 20 Audit Committee escalation, to the May 21 legal threat, the May 22 lockout, the June 4 device wipe, and the June 18 termination—establishes that protected activity was a contributing factor, shifting the burden to Defendants to prove by clear and convincing evidence they would have taken the same actions absent the whistleblowing.

172.  Plaintiff suffered damages, including lost wages and benefits, emotional distress and other special damages recoverable under Sarbanes-Oxley, reputational harm, and attorneys' fees and costs.

173.  Plaintiff is entitled to all relief available under Sarbanes-Oxley, including reinstatement or front pay, back pay with interest, special damages, and attorneys' fees and costs.

COUNT II — ADA / FEHA Discrimination, Failure to Accommodate, and Retaliation (42 U.S.C. § 12101 et seq.; Cal. Gov't Code § 12940 et seq.) (Against All Defendants)

174.  Plaintiff realleges and incorporates by reference the allegations set forth above.

175.  Plaintiff is a qualified individual with a disability and/or had a record of disability and/or was regarded as disabled, within the meaning of the ADA and FEHA. Plaintiff disclosed his ADA-qualifying condition requiring participation in an FDA-regulated clinical trial—to Director Dana Lomas in early 2023. Plaintiff further disclosed this protected status to manager Carlos Gonzalez in early April 2024 due to pressure surrounding medical-related absences. Plaintiff also disclosed his lifelong

52

neurodevelopmental profile (including ADHD, ODD, and traits consistent with High-Functioning Autism/2e), which substantially limits major life activities including real-time oral processing.

176.   Plaintiff requested reasonable accommodation, including scheduling and participation accommodations tied to medically necessary treatment, and procedural accommodations for HR meetings, including advance agenda/questions and permission to record for accuracy.

177.   Defendants denied requested accommodation, denied participation access, and imposed punitive conditions and warnings in response to accommodation requests, including threats of policy violations for alleged non-cooperation. Between May 8 and May 14, 2025, HR Manager Queena Green formally denied Plaintiff's requests for reasonable procedural accommodations (advance questions, speaking first, and recording) for an investigative meeting. On May 9, 2025, Ms. Green weaponized the Bank's Code of Ethics in writing, stating that "refusing to cooperate in a First Citizens' investigation will be considered a violation of this Code" in direct response to Plaintiff's request for ADA accommodations.

178.   Plaintiff suffered concrete harm as a result of Defendants' accommodation failures, including missing medically necessary clinical trial treatment, loss of equal access to required work events, and adverse documentation and discipline that Defendants used as predicates for escalating adverse actions culminating in termination. In March 2025, Defendants forced Plaintiff to forgo a required medical infusion for his clinical research trial (managed through East Carolina University/Gilead Sciences) to comply with a directive to attend a mandatory remote team

meeting. Despite sacrificing this essential, life-saving medical care, Defendants excluded Plaintiff from the meeting without explanation. This is documented in Plaintiff's March 22, 2025 email to clinical trial coordinator Janeth Mora-Martinez, wherein Plaintiff expressly documented missing the infusion due to expanded work travel and expressed fear of having to withdraw from the study. The Written Warning, dated April 15, 2025 and issued by Dana Lomas on April 23, 2025, formally penalized Plaintiff for "10 occurrences of unscheduled absences." These cited absences explicitly included March 4 through March 7, 2025—the exact dates Plaintiff's son (who has Type 1 Diabetes) was hospitalized in the ICU for Diabetic Ketoacidosis. On March 5, 2025, Dana Lomas responded to this hospitalization by stating, "That is great news! we are all praying for him," only to formally cite those exact days as grounds for termination-level discipline 41 days later.

179. Plaintiff engaged in protected activity by requesting accommodation and opposing disability-related discrimination under ADA and FEHA.

180. Defendants retaliated against Plaintiff for disability-related protected activity under ADA and FEHA through adverse employment actions culminating in termination and post-notice intimidation.

181. On January 7, 2026, after more than 180 days had elapsed, the EEOC granted Plaintiff's request and issued a Notice of Right to Sue (Issued on Request) on Charge No. 487-2025-02310. Plaintiff brings his ADA and FEHA claims within the applicable limitations period. (Exhibit U.)

182.   Plaintiff is entitled to compensatory damages, punitive damages under Cal. Civ. Code § 3294, back pay or front pay, injunctive relief, and attorneys' fees and costs.

COUNT III — FMLA Interference and Retaliation (29 U.S.C. § 2601 et seq.) (Against All Defendants)

183.   Plaintiff realleges and incorporates by reference the allegations set forth above.

184.   On April 24, 2025, at 6:00 AM, Plaintiff submitted a formal written notice to the HR Service Center (hrsc@firstcitizens.com) officially opening an ADA accommodation and intermittent FMLA leave request under The Hartford Claim Reference #50933394. (Exhibit K.)

185.   Defendants failed to designate, process, or protect Plaintiff's FMLA rights and instead escalated discipline, revoked access, and placed Plaintiff on administrative leave under an investigative framing rather than implementing FMLA protections. Instead of fulfilling their statutory mandate to provide FMLA paperwork within five business days of Plaintiff's April 24 notice, Defendants escalated their retaliation, culminating in the May 22, 2025 revocation of Plaintiff's system access via Ticket RITM-07198884.

186.   Defendants interfered with Plaintiff's exercise of FMLA rights and retaliated against Plaintiff for attempting to exercise those rights, including by treating medically impacted scheduling and communications as adverse documentation rather than protected leave and accommodation issues. On March 4 through March 7, 2025, Plaintiff took FMLA-qualifying emergency leave because his son (who has Type

1 Diabetes) was transported by ambulance and admitted to the ICU for Diabetic Ketoacidosis. On March 5, 2025, Director Dana Lomas responded to this hospitalization via Teams, stating, "That is great news! we are all praying for him." Yet, exactly 41 days later, Lomas formally weaponized those exact dates in the April 23, 2025 Written Warning, citing Plaintiff's son's ICU stay as part of "10 occurrences of unscheduled absences" justifying termination-level discipline.

187.   Defendants' escalating hostility actively chilled Plaintiff's exercise of FMLA rights. On May 12, 2025, at 4:48 AM, Plaintiff emailed HR Manager Queena Green stating he was taking a personal day to manage "elevated stress" and sleep disruption caused by her retaliatory threats, explicitly noting he was doing so "rather than invoking formal FMLA protections at this time" out of fear of further procedural abuse.

188.   Defendants failed to provide the required FMLA "Notice of Eligibility and Rights & Responsibilities" within five (5) business days of Plaintiff's request/notice, constituting per se interference.

189.   Plaintiff is entitled to damages, including lost wages and benefits, liquidated damages where applicable, equitable relief, and attorneys' fees and costs.

COUNT IV — ERISA § 510 Interference (29 U.S.C. § 1140) (Against All Defendants)

190.   Plaintiff realleges and incorporates by reference the allegations set forth above.

191. Defendants interfered with Plaintiff's attainment and enjoyment of protected benefit rights by manipulating or withholding employment-status reporting and leveraging benefits access as pressure regarding separation characterization.

192. On June 18, 2025, at 8:47 AM, outside counsel Jeremy R. Sayre transmitted an email explicitly refusing to notify Fidelity (the plan administrator) of Plaintiff's separation status, stating: "if you maintain that your employment with the Bank has terminated, then the Bank will accept this and update your status with Fidelity immediately". (Exhibit B.)

193. Defendants knowingly withheld Plaintiff's vested 401(k) funds while Plaintiff urgently needed the distribution to prevent eviction and cover medical costs for his diabetic child. This deliberate leverage of a federally regulated ERISA plan constitutes specific intent to interfere with Plaintiff's protected rights under 29 U.S.C. § 1140. Plaintiff immediately rejected this quid pro quo in writing, stating: "For the avoidance of doubt, I am not resigning." When Plaintiff raised the illegality of leveraging his 401(k), Mr. Sayre immediately proceeded to formally execute Plaintiff's termination on June 18, 2025, at 2:36 PM.

194. Defendants' conduct was taken for the purpose of interfering with Plaintiff's protected rights under employee benefit plans, including 401(k) benefits.

195. Plaintiff is entitled to equitable relief and all other relief authorized by ERISA, and attorneys' fees and costs.

57

196.  On June 30, 2025, Plaintiff filed a formal complaint with the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) documenting this exact ERISA § 510 violation.

COUNT V — Declaratory Judgment (28 U.S.C. §§ 2201–2202) (Arbitrability, Delegation, Jury Waiver, E-SIGN, EFAA, FEHA/Labor Code § 925, PAGA, No-Stay Relief) (Against All Defendants)

197.  Plaintiff realleges and incorporates by reference the allegations set forth above.

198.  An actual controversy exists regarding whether Defendants may compel arbitration of Plaintiff's Sarbanes-Oxley claim and whether Defendants may enforce the MAA's delegation clause to require that gateway issues be decided in arbitration.

199.  Plaintiff's Sarbanes-Oxley claim is excluded from predispute arbitration by controlling federal statute, 18 U.S.C. § 1514A(e)(2), and by the MAA's own carve-out for disputes not subject to arbitration under controlling federal statutes, which expressly defines "Excluded Disputes" as: "Those disputes that may not be subject to an arbitration agreement as expressly provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) or other controlling federal statute".

200.  To the extent the MAA purports to invoke the FAA to govern, expand, or compel arbitration or non-jury adjudication of statutory claims that Congress or California has restricted from predispute arbitration, such provisions are unenforceable as applied.

201.   Authority addressing Sarbanes-Oxley and arbitration, including recent federal appellate authority interpreting § 1514A(e)(2), further underscores the need to prevent Defendants from attempting to use arbitration outcomes for preclusive or quasi-preclusive effect on Sarbanes-Oxley issues, reinforcing the necessity of keeping Sarbanes-Oxley gateway determinations and related enforceability disputes in this Court.

202.   Defendants may not enforce the delegation clause to require an arbitrator to decide the controversy concerning the Sarbanes-Oxley statutory carve-out and the enforceability of the MAA's "survival" jury-waiver clause, where doing so would functionally transfer Sarbanes-Oxley gateway determinations to a private forum through a predispute agreement.

203.   The MAA's initiation provision, which requires that any demand for arbitration "contain the initiating party's original ink (i.e., non-electronic) signature," is invalid and unenforceable under the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 et seq., because the MAA expressly invokes the FAA, acknowledges that the Bank is "engaged in interstate commerce," and adopts an electronic-signature execution workflow in which electronic signatures are "deemed originals." The MAA was executed via DocuSign Envelope ID C592F559-005D-49F0-979B-509DF8579059 on December 13, 2024. This electronic execution stands in direct contrast to the MAA's initiation clause requiring an "original ink (i.e., non-electronic) signature" to commence a claim. In that context, conditioning the legal effect and enforceability of an arbitration demand on the presence of an ink

signature, and rejecting otherwise compliant demands solely because the initiating party used an electronic signature, violates § 7001(a)(1)'s prohibition against denying legal effect, validity, or enforceability "solely because" a record or signature is in electronic form.

204.   The MAA's jury-waiver provision is unenforceable as applied and/or unconscionable and/or contrary to public policy, including because it is drafted to survive judicial invalidation of arbitration-related provisions and operates as an adhesive deprivation of the right to a jury trial. The jury-waiver provision was imposed as a non-negotiable condition of continued employment without any opt-out mechanism and does not reflect a knowing and voluntary waiver of the right to a jury trial.

205.   The MAA's structural provisions, taken together—including delegation, survival jury waiver, fee-shifting that deters FEHA and statutory claims, class/collective and PAGA waivers, confidentiality gag rules, mass-arbitration constraints, and enforceability-maximizing severability/modification directives—are substantively one-sided and operate to preserve Defendants' procedural advantage and to channel statutory disputes into non-jury mechanisms even where arbitration is barred, rendering the challenged provisions unenforceable and, upon further proof, non-severable under California law as well. The MAA defines "Mass Arbitrations" as "25 or more arbitration demands asserting the same or similar Disputes . . . filed by the same lawyer(s) or law firm(s), or affiliated/associated lawyer(s) or law firm(s), within any rolling 180 day period" and provides that upon such a determination the Bank "shall not have any further obligation to arbitrate" and the proceedings are "automatically stayed" with fee payments suspended.

Under the California Supreme Court's standard in Ramirez v. Charter Communications (2024), the MAA cannot be saved by severance. The central purpose of the MAA is tainted by illegality, and curing the multitude of defects—including the mass-arbitration stay, the signature traps, and the survival jury waiver—would require the Court to impermissibly rewrite the contract by augmenting it with new terms.

206.   The MAA's imposition was not a routine onboarding event but a targeted, mid-tenure retaliatory measure. On February 9, 2026, Plaintiff served Request for Production No. 12 targeting the selective rollout of the MAA to tenured employees after protected activity began. On February 20, 2026, Plaintiff filed a formal Motion for Partial Summary Decision in the OALJ under the Vernace standard to establish the compelled MAA as an actionable adverse action.

207.   Plaintiff is entitled to a declaration that Sarbanes–Oxley claims are not subject to predispute arbitration; Defendants may not compel arbitration of Sarbanes–Oxley or require delegation of SOX gateway issues; the MAA's "original ink" initiation requirement is void and unenforceable under the E-SIGN Act and public policy; the jury-waiver clause is unenforceable; the MAA's fee-shifting, class/collective, PAGA, confidentiality, mass-arbitration, and related provisions are unconscionable and non-severable; and Defendants may not obtain a stay of the Sarbanes–Oxley claim based on any arbitration of other claims.

208.   Plaintiff is further entitled to injunctive relief prohibiting Defendants from initiating or maintaining any arbitration proceeding as to Plaintiff's Sarbanes-Oxley claim and prohibiting Defendants from enforcing the jury-waiver provision in this action.

COUNT VI — California Wrongful Termination in Violation of Public Policy (Tameny) (Against All Defendants)

209.   Plaintiff realleges and incorporates by reference the allegations set forth above.

210.   California public policy, as embodied in statutes including but not limited to Sarbanes-Oxley, Dodd-Frank, the ADA, FEHA, FMLA, California Labor Code provisions protecting medical leave and disability accommodation, and whistleblower protections, prohibits employers from terminating or retaliating against employees for making good-faith reports of suspected unlawful conduct, for opposing such conduct, for requesting disability accommodation or medical leave, and for exercising statutory and constitutional rights. By January 1, 2025, Plaintiff's assigned territory, client interactions, and portfolio were exclusively California-based, including management of a specifically identifiable $200 million Neutraderm/DRMTLGY pipeline anchored in Los Angeles. California's strong public policy interest in protecting employees who service its markets overrides any out-of-state choice-of-law provisions. This claim is brought under California Labor Code § 1102.5, California's premier whistleblower protection statute. Under the California Supreme Court's standard in Lawson v. PPG Architectural Finishes, Plaintiff need only show that whistleblowing was a contributing factor; the burden then shifts to Defendants to prove by clear and convincing evidence they would have taken the same actions absent the protected activity.

211.   Defendants terminated Plaintiff and escalated retaliatory conduct because Plaintiff made protected disclosures concerning internal controls, vendor fraud, revenue diversion, and securities/compliance issues;

62

requested and attempted to exercise disability-related and leave-related rights under ADA/FEHA and FMLA; sought to preserve evidence; and refused to relinquish or waive statutory and public rights through coercive dispute-resolution instruments and intimidation. Specifically, Plaintiff reported the unauthorized diversion of 31 Jackson Hewitt merchant accounts to Fifth Third Bank by Worldpay and escalated legal misinformation regarding California credit card surcharging compliance. On May 21, 2025, outside counsel Jeremy R. Sayre issued a written threat warning that protected disclosures would "constitute a violation of the Bank's Code of Ethics and applicable laws." When Plaintiff refused to yield to this threat and the subsequent 401(k) coercion, it was Jeremy R. Sayre who personally executed Plaintiff's termination via email on June 18, 2025, at 2:36 PM.

212.   Defendants' conduct violated California public policy under Tameny v. Atlantic Richfield Co. and related California authorities, and Plaintiff suffered damages as a result, including lost wages and benefits, emotional distress, reputational harm, and other consequential damages. Plaintiff is entitled to compensatory and punitive damages under California law. Plaintiff served multiple preservation notices, whistleblower disclosures, and spoliation notices directly to CEO Frank B. Holding, Jr. and Chief Legal Officer Matt Martin between April and August 2025. Their receipt of these notices and subsequent failure to intervene constitutes conscious disregard and managing-agent ratification of the wrongful termination, triggering uncapped punitive damages under California Civil Code § 3294(b).

COUNT VII — Civil RICO (18 U.S.C. § 1962(c) and (d)) (Against All Defendants)

213.   Plaintiff realleges and incorporates by reference the allegations set forth above.

214.   Defendants, together with their outside counsel and liability insurers, including but not limited to Fox Rothschild LLP attorneys and Chubb-related entities, formed and/or participated in an association-in-fact enterprise (the "FCB–Fox–Chubb Enterprise") within the meaning of 18 U.S.C. § 1961(4). The enterprise existed for the common purpose of protecting Defendants from liability by suppressing, intimidating, and discrediting Plaintiff's whistleblower activity, preserving the enforceability of an unlawful dispute-resolution architecture, concealing spoliation and internal-controls failures, and shifting costs and exposure through insurance and panel-counsel mechanisms.

215.   The FCB–Fox–Chubb Enterprise engaged in, and its activities affected, interstate commerce, including by using interstate wires and emails to communicate between California, Nevada, North Carolina, other states, and out-of-state insurers, and by affecting securities-related reporting and internal controls tied to nationwide and California operations. Plaintiff further alleges that he provided Chubb executives (including Global GC Joseph Wayland and Claims Director Thomas Allison-Couto) with actual, timestamped notice of the June 4 spoliation, the false denials, and the J. Sayre witness intimidation on multiple occasions (June 18, August 26, February 9), and that despite documented notice of fraud-on-the-tribunal and spoliation issues, Chubb continued to fund and supervise Fox Rothschild's defense without issuing a D&O

reservation of rights, thereby providing the financial engine for the Enterprise and ratifying the continued course of intentional misconduct. On August 26, 2025, Chubb executives (including Global GC Joseph Wayland and Claims Director Thomas Allison-Couto) received an "Enhanced Briefing and Certified Evidentiary Record" proving the spoliation and witness intimidation, with Chubb representative David Subramanian generating a read receipt confirming delivery. Despite this documented proof of fraud, Chubb continued to fund and supervise Fox Rothschild's defense without issuing a D&O reservation of rights, providing the financial engine for the Enterprise and legally ratifying the intentional misconduct under Indiana GRQ bad-faith principles.

216. Defendants and their co-conspirators, as "persons" within the meaning of 18 U.S.C. § 1961(3), conducted and participated, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

217. The predicate acts comprising this pattern of racketeering activity include, but are not limited to: (a) Witness tampering and retaliation, in violation of 18 U.S.C. § 1512 and related provisions, by intimidating Plaintiff, threatening criminal-extortion framing, and leveraging Special Investigations Unit ("SIU") and law-enforcement threats concerning evidence-bearing devices (including the preserved laptop) in response to Plaintiff's whistleblowing and preservation efforts; and further by removing or rendering unavailable a key fact witness in temporal proximity to served discovery: on February 3, 2026, Plaintiff served 25 interrogatories directed at Dana Lomas (Director of Merchant Sales) targeting SOX control failures; within days (Feb. 9–10, 2026), FCB

posted her exact job role as vacant, and Fox Rothschild filed a protective order referencing her in the past tense; Plaintiff alleges this sequence is an objective act designed to suppress testimony and evidences ongoing obstruction activity in 2026, supporting continuity and a continuing threat; The threats to use the Special Investigations Unit (SIU) and "local authorities" to seize Plaintiff's litigation-hold laptop were transmitted over interstate wires on August 6, August 8 (marked "FINAL NOTICE"), and August 14, 2025. In their certified January 26, 2026 OALJ Answer, Respondent formally admitted that threatening a federal whistleblower with police to seize evidence was "consistent with its standard practice," ratifying the Hobbs Act (Extortion) predicate as corporate policy. (b) Wire-fraud by concealment and lie of omission, in violation of 18 U.S.C. § 1343, by using interstate email communications to conceal discoverable insurance information and protect the D&O tower: on May 28, 2025, Plaintiff formally requested the identity of FCB's Directors & Officers (D&O) carrier; on June 24, 2025, Chubb claims executive Kimberly Coran emailed Plaintiff to deny that Chubb provided Employment Practices Liability (EPLI) coverage while conspicuously remaining silent on D&O coverage; on January 12, 2026, Fox Rothschild's Lisa Williford judicially admitted on the record that Chubb is the insurer; Plaintiff alleges this demonstrates coordinated deceptive omission via interstate wires functioning as a cohesive unit to conceal coverage and impede discovery and accountability; On January 12, 2026, Lisa M. Williford of Fox Rothschild judicially stated to the tribunal: "I honestly don't know to what extent Chubb is or is not an insurer." This lie of omission was transmitted over interstate wires. On February 9, 2026, Plaintiff's notice to Chubb Global GC Joseph Wayland was automatically forwarded within minutes to Thomas Allison-Couto, a Claims Executive & Director

for Chubb based in Zurich, proving active high-level claims management and coordinated concealment of the D&O tower. (c) Obstruction and coercion under color of authority directed at regulatory communications and proceedings, including obstruction of proceedings before departments and agencies (18 U.S.C. § 1505 and related provisions), by outside counsel threats intended to chill lawful whistleblower communications: Sayre transmitted a letter warning that "any improper disclosures of such sensitive information will constitute a violation of the Bank's Code of Ethics and applicable laws"; Plaintiff alleges this threat is unlawful, violates SEC Rule 21F-17(a) by impeding communications with the SEC, and constitutes coercive obstruction of regulatory processes as part of the Enterprise's immediate response to a whistleblower complaint; On May 21, 2025—exactly 24 hours after Plaintiff transmitted the May 20, 2025 formal whistleblower disclosure directly to the Bank's Audit Committee and executive leadership— Jeremy R. Sayre transmitted the "Code of Ethics" gag directive warning that protected disclosures would "constitute a violation of the Bank's Code of Ethics and applicable laws," constituting obstruction of regulatory proceedings in violation of SEC Rule 21F-17(a). (d) Digital obstruction and interference with protected communications and system access, including computer-related offenses (18 U.S.C. § 1030 and related provisions), by manipulating secure infrastructure to intercept, reroute, and suppress whistleblower communications and to execute enterprise-control actions: Plaintiff alleges FCB utilized a covert internal alias (HRRedirect@firstcitizens.com) to intercept and reroute protected whistleblower emails away from Plaintiff's institutional inbox and directly to HR personnel, and that Plaintiff was assigned a statistically impossible UID anomaly ("QWE45") indicative of manual override or

67

targeted surveillance routing; Plaintiff alleges these acts constitute unauthorized access, digital obstruction, and intentional interference with digital communications and contribute to the pattern and continuity of the Enterprise's conduct; FCB utilized a covert internal alias (HRRedirect@firstcitizens.com) to secretly intercept and reroute Plaintiff's protected whistleblower emails. (e) Wire fraud, in violation of 18 U.S.C. § 1343, by transmitting materially false and misleading representations via interstate email and other electronic communications—including misrepresentations about the June 4, 2025 device wipe/organizational-data removal; misstatements to OSHA and OALJ; "not wiped" and "unenrolled/nothing lost" cover stories; and deceptive characterizations of Plaintiff's SOX-protected disclosures and settlement communications—in order to obtain a litigation and financial advantage, obstruct regulatory scrutiny, and reduce or defeat obligations owed to Plaintiff; The remote enterprise wipe ("Org data removal") occurred on June 4, 2025, at exactly 05:10 AM PDT. On June 5, 2025, at 06:17 AM PDT, Jeremy R. Sayre transmitted an email over interstate wires stating: "The Bank also has confirmed that your mobile device has NOT been wiped," after deliberately removing federal OSHA Investigator Anna Son from the recipient list immediately before sending the false statement. (f) Extortion and attempted extortion, in violation of 18 U.S.C. § 1951 (Hobbs Act) and related statutes, by characterizing Plaintiff's protected settlement negotiations and whistleblower communications as "extortion," threatening criminal accusations and SIU/law enforcement involvement to coerce Plaintiff to surrender evidence (including the laptop) without neutral forensic imaging and to abandon or compromise his claims and rights. The threats to use the Special Investigations Unit (SIU) and "local authorities" to seize

Plaintiff's litigation-hold laptop were transmitted over interstate wires on August 6, August 8 (marked "FINAL NOTICE"), and August 14, 2025. In their certified January 26, 2026 OALJ Answer, Respondent formally admitted that threatening a federal whistleblower with police to seize evidence was "consistent with its standard practice," ratifying the Hobbs Act (Extortion) predicate as corporate policy. On June 17, 2025, Jeremy R. Sayre explicitly compared Plaintiff's standard FRE 408 settlement communications to the criminal prosecution of "Michael Avenatti," deliberately weaponizing criminal stigmatization to set a pretext for the subsequent August 6–14 SIU/law-enforcement threats.

218. These predicate acts are related to each other, share a common purpose, involve similar or overlapping participants and methods, and amount to or pose a threat of continued racketeering activity, thus constituting a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

219. Defendants also conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), by agreeing with each other and with outside counsel and insurers to commit the predicate acts described above, to use racketeering activity to protect the enterprise from liability, and to retaliate against and chill Plaintiff's protected conduct.

220. Plaintiff was injured in his business and property by reason of Defendants' RICO violations, including but not limited to: lost employment and compensation, including commissions and bonuses tied to his California pipeline and book of business; lost 401(k) and retirement opportunities; litigation and investigation costs; harms to earning capacity; and damage to his professional reputation and future

economic prospects. The Enterprise's predicate acts caused concrete injury to Plaintiff's business and property, including the destruction of Plaintiff's specifically identifiable $200 million Neutraderm/DRMTLGY commercial pipeline and the unlawful withholding of Plaintiff's vested Fidelity 401(k) retirement funds to coerce a resignation.

221.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages, costs of suit, and reasonable attorneys' fees from Defendants and each RICO defendant jointly and severally.

COUNT VIII — Dodd-Frank Anti-Retaliation (15 U.S.C. § 78u-6(h)) (Against All Defendants)

222.   Plaintiff realleges and incorporates by reference the allegations set forth above.

223.   Plaintiff made disclosures and provided information relating to potential securities-law violations, internal-controls failures, and revenue-attribution misconduct that fall within the scope of 15 U.S.C. § 78u-6 and SEC whistleblower protections, including disclosures referencing SOX and SEC Rule 13a-15 to senior leadership, the Board/Audit Committee, and outside counsel. Specifically, Plaintiff escalated the diversion of 31 Jackson Hewitt merchant accounts by Worldpay/Fifth Third Bank, and the suppression of the $200 million Neutraderm pipeline. On May 20, 2025, Plaintiff transmitted a formal whistleblower disclosure directly to the Bank's Audit Committee and executive leadership, which explicitly cited SEC Rule 10A-3.

224.   Plaintiff provided, and/or intended to provide, information to the SEC and other federal authorities, and Defendants understood that Plaintiff's

disclosures implicated securities-law, internal-controls, and revenue-recognition issues with potential SEC relevance. On May 21, 2025, outside counsel Jeremy R. Sayre sent a letter expressly acknowledging that Plaintiff's communications raised allegations of "corporate-related misconduct (e.g., securities violations or other financial crimes) under the Sarbanes-Oxley Act (SOX) and SEC Rule 13a-15". In the same letter, Sayre threatened that "any improper disclosures of such sensitive information will constitute a violation of the Bank's Code of Ethics and applicable laws", constituting a direct violation of SEC Rule 21F-17(a).

225. Defendants took adverse actions against Plaintiff, including discipline, internal sabotage, access revocation, administrative leave, termination, device-wipe/spoliation conduct, and post-notice criminalization and intimidation, because of Plaintiff's actual and anticipated whistleblower activity within the meaning of 15 U.S.C. § 78u-6(h). The retaliatory sequence included: system lockout and digital freeze-out on May 22, 2025 (Ticket RITM-07198884); remote enterprise wipe on June 4, 2025 at 05:10 AM PDT (Ticket RITM0730529); and formal termination personally executed by outside counsel Jeremy R. Sayre via email on June 18, 2025 at 2:36 PM. On June 17, 2025, Respondent's counsel explicitly characterized Plaintiff's protected whistleblower communications and standard settlement proposals as sounding "more like extortion," deliberately comparing Plaintiff to the criminal prosecution of Michael Avenatti.

226. Plaintiff's whistleblower activity was a contributing factor in Defendants' adverse actions.

71

227.  Under 15 U.S.C. § 78u-6(h)(1)(B)(i), Plaintiff is entitled to bring this claim directly in federal district court without further exhaustion.

228.  Plaintiff is entitled to all remedies authorized by 15 U.S.C. § 78u-6(h)(1)(C), including: reinstatement; double back pay with interest; litigation costs; expert witness fees; and reasonable attorneys' fees. Plaintiff seeks double back pay as expressly provided by statute.

COUNT IX — Breach of Implied Covenant of Good Faith and Fair Dealing; Conversion (Against All Defendants)

229.  Plaintiff realleges and incorporates by reference the allegations set forth above.

230.  Plaintiff and Defendants were parties to the August 16, 2021 Employment Agreement executed between Plaintiff and First Citizens Bank & Trust Company by Executive Vice President Patrick Noble governing Plaintiff's salary, commissions, bonuses, incentive compensation, and crediting of deals and pipeline, including with respect to Plaintiff's California market and Salesforce territory (including Los Angeles).

231.  Under California law, every contract includes an implied covenant of good faith and fair dealing. Defendants were obligated not to do anything to unfairly interfere with Plaintiff's right to receive the benefits of the employment and compensation agreements, including the opportunity to close and be credited for deals that Plaintiff developed and maintained.

232.  Plaintiff alleges that Defendants breached the implied covenant by, among other things: (a) locking Plaintiff out of Salesforce and related

systems; (b) altering California territory mappings and account assignments; (c) sabotaging Plaintiff's pipeline; and (d) diverting and/or reassigning deals and accounts, including but not limited to a high-value Neutraderm/DRMTLGY pipeline opportunity with a potential volume in the vicinity of $200 million and numerous Jackson Hewitt and other California-related accounts, in order to deny Plaintiff fair credit, commissions, and compensation. On April 22, 2025, Director Dana Lomas directed Salesforce Administrator Ashley Roff to alter the internal "Los Angeles" HR Area field mapping. This undocumented system change triggered an immediate fatal error— "INVALID_OR_NULL_FOR_RESTRICTED_PICKLIST"—which blocked Plaintiff's ability to generate contracts for the $200 million Neutraderm/DRMTLGY commercial pipeline. The Enterprise diverted 31 merchant accounts belonging to Prasad Inampudi (PI Tax Prep DBA Jackson Hewitt), fraudulently misattributing them during onboarding to Fifth Third Bank and TrustCommerce via Worldpay/FIS, willfully denying Plaintiff earned credit and commissions.

233.  Defendants further engaged in conversion by intentionally and substantially interfering with Plaintiff's property interests in his earned and reasonably expected compensation, commissions, and economic interests in Salesforce-based pipeline and deal flow, including California merchants and national accounts with California exposure, by wrongfully taking, diverting, or retaining monetary value and contract opportunities that belonged in whole or in part to Plaintiff under the parties' agreements and course of dealing. On June 18, 2025, outside counsel Jeremy R. Sayre unlawfully withheld administrative reporting to Fidelity (the plan administrator), actively blocking Plaintiff's access to his vested

401(k) retirement funds in an attempt to coerce a resignation. On May 21, 2025, FCB transmitted an unexplained, un-itemized payment of $2,581.71 (deviating from Plaintiff's standard $2,105.65 paycheck) while refusing to provide a paystub or bonus clarification, effectively converting or obfuscating Plaintiff's earned compensation.

234. As a direct and proximate result of Defendants' breaches and conversion, Plaintiff suffered substantial economic harm, including lost and underpaid compensation, lost commissions on closed and diverted deals, loss of future pipeline value (including the Neutraderm/DRMTLGY pipeline and other California-oriented opportunities), and related consequential damages.

235. Plaintiff seeks compensatory damages, disgorgement of wrongfully obtained benefits, pre- and post-judgment interest, and punitive damages under Cal. Civ. Code § 3294 for Defendants' oppressive, fraudulent, and malicious conduct, as well as all other relief the Court deems just and proper. Plaintiff served multiple preservation notices, whistleblower disclosures, and spoliation notices directly to CEO Frank B. Holding, Jr. and Chief Legal Officer Matt Martin between April and August 2025. Their receipt of these notices and subsequent failure to intervene constitutes conscious disregard and managing-agent ratification of the malicious conversion and breach, triggering punitive damages under California Civil Code § 3294(b).

COUNT X — Stored Communications Act (18 U.S.C. § 2701 et seq.) and California Invasion of Privacy Act (Cal. Penal Code §§ 631, 632, 637.2) (Against All Defendants)

74

236. Plaintiff realleges and incorporates by reference the allegations set forth above.

237. Plaintiff used personal email accounts and devices to communicate with his corporate email address and to send work-related communications in the context of his California-assigned market and whistleblower/ADA/FMLA/FEHA disputes. Defendants actively targeted and blocked Plaintiff's secure external whistleblower channels, specifically jared.ashcraft@protonmail.com and jared.ashcraft@proton.me.

238. On or about April 28–29, 2025, Plaintiff discovered that emails he sent from a personal email account to his corporate email address did not arrive in his corporate inbox, but that Defendants' HR representative responded from an alias address, HRRedirect@firstcitizens.com, indicating that Defendants intercepted, rerouted, and/or accessed Plaintiff's electronic communications in a manner inconsistent with ordinary delivery. On May 8, 2025, Plaintiff sent an email from his personal external account to his institutional inbox (jared.ashcraft@firstcitizens.com). This message was deliberately blocked from Plaintiff's inbox and was instead covertly intercepted and routed via the hidden alias HRRedirect@firstcitizens.com directly to HR Manager Queena Green, who was not an addressed recipient.

239. On April 29, 2025, at 6:20 AM, Plaintiff submitted a formal written notice to VP of HR Advisory Ted Bush documenting the email delivery failures and unexpected account lockouts. Rather than investigating this digital interference, Bush issued an unverified denial stating: "I haven't talked to anyone yet, but I believe this to be totally unrelated".

240.   Plaintiff alleges that Defendants intentionally accessed, without authorization or in excess of authorization, one or more facilities through which an electronic communication service is provided, and obtained, altered, or prevented authorized access to electronic communications while they were in electronic storage, in violation of the SCA, 18 U.S.C. § 2701 et seq., by routing communications through hidden HRRedirect mechanisms and altering the flow and visibility of messages, including messages relevant to California-based employment and statutory rights.

241.   Plaintiff further alleges that Defendants, in connection with the June 4, 2025 organizational-data removal affecting Outlook, Teams, OneDrive, and Okta Verify on Plaintiff's personal device, accessed, removed, or interfered with communications and data without proper authorization, affecting device-resident logs, caches, and communications stored on Plaintiff's own device. The remote enterprise wipe executed on June 4, 2025, at exactly 5:10 AM PDT, constituted unauthorized access to Plaintiff's physical personal property. This action permanently deleted unique device-resident ESI, specifically including locally cached electronic mail, Teams chat logs, authentication tokens, ephemeral messages, and Outlook data files (.OST/.PST) stored locally on the hardware.

242.   Defendants also engaged in unlawful interception of communications in violation of California's Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632, by willfully intercepting and/or intentionally reading and using communications sent by Plaintiff to his own work account, including by routing and accessing such communications through HRRedirect and similar mechanisms without Plaintiff's consent, and by

76

monitoring, diverting, or otherwise tampering with communications in transit.

243.  As a direct and proximate result of Defendants' conduct, Plaintiff suffered harm, including invasion of privacy, loss of control over his communications, evidentiary prejudice, and emotional distress.

244.  Under the SCA, Plaintiff is entitled to statutory damages, actual damages, punitive damages where available, and attorneys' fees and costs.

245.  Under CIPA, Cal. Penal Code § 637.2, Plaintiff is entitled to statutory damages per violation (or treble actual damages, whichever is greater), as well as injunctive relief, and attorneys' fees and costs, for each unlawful interception, access, or use of his communications.

COUNT XI — Intentional Interference with Prospective Economic Advantage (California Common Law) (Against All Defendants)

246.  Plaintiff realleges and incorporates by reference the allegations set forth above.

247.  Plaintiff had existing and ongoing economic relationships with numerous current and prospective clients—including but not limited to Jackson Hewitt locations (at least 31 accounts), vendors and merchants connected to Worldpay/FIS, and high-value prospects such as Neutraderm/DRMTLGY and other California-facing merchants—that contained a probable future economic benefit or advantage for Plaintiff through commissions, recognition, and career advancement. These relationships included Prasad Inampudi (PI Tax Prep DBA Jackson

Hewitt), who managed the 31 diverted accounts, and the Neutraderm/DRMTLGY opportunity with $126 million in annual processing volume, $200 million in potential deposit value, and an existing $17 million loan relationship. The specific client contact was July Bocabeille.

248.   Defendants knew of these relationships and Plaintiff's role in developing, recovering, and maintaining them, including his efforts to recover Jackson Hewitt accounts that had been diverted, and his development of significant pipeline in his California territory.

249.   Defendants intentionally engaged in wrongful conduct designed to disrupt these relationships and Plaintiff's economic expectations, including: (a) permitting or facilitating vendor-driven diversion of accounts (e.g., by Worldpay/FIS and others) away from Defendants and Plaintiff; (b) attempting to reframe recovered Jackson Hewitt accounts as "resigned" and undermining Plaintiff's credit and control; On September 14, 2024, Director Dana Lomas sent a text message stating: "what ever came of the Jackson Hewitt accounts the 5/3 stole?" When reminded that Plaintiff had recovered them, Lomas immediately attempted to undermine Plaintiff's credit by asking, "We resigned them? I'll have to go back and look". (c) engaging in Salesforce lockouts and pipeline sabotage that impaired Plaintiff's ability to close and service deals; On April 22, 2025, Dana Lomas instructed Salesforce Administrator Ashley Roff to secretly alter the internal HR area mapping, deliberately stripping the "Los Angeles" value from Plaintiff's profile. This undocumented change caused an immediate system error that prevented referral partners (including Brennan Penney) from submitting leads to Plaintiff, actively

severing the California pipeline. (d) On May 8 and May 9, 2025, Plaintiff transmitted detailed, time-sensitive pricing proposals for the $200 million Neutraderm opportunity. Defendants unlawfully intercepted and covertly rerouted these critical client engagement materials to the hidden alias HRRedirect@firstcitizens.com and HR Manager Queena Green, intentionally preventing the pricing from reaching the client and destroying the deal. (e) falsely characterizing Plaintiff's protected whistleblower/settlement communications as "extortion" in order to blackball Plaintiff and damage his reputation with potential future employers, clients, and industry participants. On June 17, 2025, outside counsel Jeremy R. Sayre deliberately characterized Plaintiff's standard, protected settlement proposals as sounding "more like extortion," explicitly comparing Plaintiff to the criminal prosecution of "Michael Avenatti". This defamatory smear constituted an independently wrongful act (defamation and retaliation) used by the Enterprise to destroy Plaintiff's professional reputation and prospective economic advantage.

250.  Defendants' conduct was independently wrongful under statutory and common law, including violations of SOX, Dodd-Frank, FEHA, ADA, FMLA, California public policy, RICO, SCA, CIPA, and related laws, and went beyond mere interference into unlawful retaliatory and intimidatory behavior.

251.  As a direct and proximate result of Defendants' intentional interference, Plaintiff's relationships with existing and prospective clients and counterparties were disrupted, deals were diverted or lost, and Plaintiff's future economic opportunities in the payments and financial-

services industry—especially in California markets—were significantly harmed.

252.   Plaintiff is entitled to recover damages for lost economic opportunities, lost commissions and pipeline value, loss of prospective employment and business relationships, as well as punitive damages under Cal. Civ. Code § 3294 based on Defendants' malice, oppression, and fraud.

COUNT XII — Hazel-Atlas Fraud on the Tribunal / Inherent Authority Sanctions (Against All Defendants)

253.   Plaintiff realleges and incorporates by reference the allegations set forth above.

254.   The Supreme Court in Hazel-Atlas Glass Co. v. Hartford-Empire Co. and Chambers v. NASCO, Inc. recognizes a court's inherent equitable power to set aside judgments and impose sanctions where a party engages in fraud on the tribunal—a premeditated, unconscionable scheme designed to interfere with the judicial system's ability to adjudicate matters impartially.

255.   Plaintiff alleges that Defendants, acting through counsel and internal stakeholders, engaged in a premeditated scheme to corrupt the adjudicative process in the OSHA/OALJ proceeding and in related federal oversight by deliberately excluding OSHA Investigator Anna Son from critical communications concerning the June 4, 2025 organizational-data removal and then issuing a June 5–6, 2025 denial falsely asserting that Plaintiff's device had not been wiped and that there was no loss of relevant data. The spoliation occurred on June 4, 2025, at

approximately 05:10 AM PDT, generating an "Org data removal" log and Service Desk Ticket RITM0730529. On June 5, 2025, at 06:17 AM PDT, outside counsel Jeremy R. Sayre deliberately switched email threads, removed federal OSHA Investigator Anna Son from the recipient list, and issued the materially false statement: "The Bank also has confirmed that your mobile device has NOT been wiped".

256. Plaintiff alleges that Defendants' June 5–6 denial was not a mere mistake but part of a deliberate litigation strategy to conceal spoliation, neutralize preservation concerns, and mislead the federal administrative tribunal and investigator regarding the existence and extent of device-resident ESI destruction, thereby depriving Plaintiff and the tribunal of an accurate evidentiary record.

257. Plaintiff further alleges that Defendants compounded this fraud-on-the-tribunal scheme through subsequent misrepresentations and omissions in motion practice, timing characterizations (including reframing the June 4 event as "post-employment" and "unenrollment"), and opposition to neutral forensic imaging, all designed to protect Defendants from sanctions, adverse inferences, and merits exposure.

258. On May 21, May 22, and August 8, 2025, Jeremy R. Sayre issued written directives instructing Plaintiff that copying fiduciaries and insurers was "unnecessary and improper" and demanding all communications be routed exclusively to him. On August 20, 2025, when Plaintiff reported this gatekeeping to the OALJ, Sayre emailed the OALJ attorney-advisor stating "This is false," directly contradicting his own written directives. In response, Chief ALJ Stephen R. Henley issued an

August 21, 2025 Order expressly preserving the issue of "fraud on the tribunal" for the merits judge.

259.   During the September 30, 2025 pre-hearing conference, Respondent's counsel Lisa M. Williford falsely represented to ALJ Theresa Timlin that the June 4 wipe was a "post-employment" event, arguing it was "wholly irrelevant" to the SOX claim. Her co-counsel Jeremy R. Sayre sat silently on the call and allowed this misrepresentation to stand, despite personally authoring and transmitting Plaintiff's termination email on June 18, 2025, at 2:36 PM.

260.   On January 26, 2026, Respondent filed a certified Answer falsely pleading that Plaintiff "voluntarily resigned" (Affirmative Defense #3), a claim mathematically destroyed by Sayre's June 18 termination email and the Nevada DETR discharge finding. In the same Answer, Respondent categorically certified that "No data… were deleted or destroyed" (Paragraph 8), in direct contradiction of their own June 4 system logs and Service Desk Ticket RITM0730529.

261.   Defendants' conduct constitutes fraud on the tribunal and abuse of the judicial process within the meaning of Hazel-Atlas and Chambers, warranting the exercise of this Court's inherent authority and equitable power to impose sanctions and remedial orders independent of the underlying statutory causes of action. Plaintiff seeks: (a) a declaration that Defendants' June 5–6, 2025 denial and related conduct constitute fraud on the tribunal and abuse of process; (b) monetary sanctions, including attorneys' fees and costs reasonably incurred in addressing spoliation, preservation, and tribunal-integrity issues; (c) issue- and/or evidentiary sanctions, including adverse inferences concerning the

82

contents and significance of destroyed device-resident data; and (d) such further inherent-authority relief as the Court deems just and proper to remedy the taint on these proceedings and deter similar misconduct. Because Fox Rothschild LLP actively participated in the June 5 spoliation cover-up, the August 20 OALJ deception, and the June 18 termination, the firm and its attorneys (Jeremy R. Sayre and Lisa M. Williford) are un-waivable material fact witnesses to the fraud and must be disqualified under the advocate-witness rule (ABA Model Rule 3.7 and C.D. Cal. Local Rule 83-3.1.2).

COUNT XIII — California Labor Code § 1198.5 (Personnel File Violations)

(Against All Defendants)

262. Plaintiff realleges and incorporates by reference the allegations set forth above.

263. California Labor Code § 1198.5 grants current and former employees the right to inspect and receive a copy of the personnel records that the employer maintains relating to the employee's performance or any grievance concerning the employee, and requires employers to make such records available for inspection and/or provide copies within 30 calendar days of a written request, subject to limited exceptions.

264. On or about April 27, 2025, Plaintiff submitted a written request for his personnel file and related records within the meaning of Labor Code § 1198.5, directed to Defendants' HR function. Plaintiff formally requested the complete personnel file, specifically including the April 15, 2025 Written Warning, directly from Vice President of HR Advisory Ted Bush. Bush directed Plaintiff to download the file himself via IT

Services; however, IT Services confirmed in writing that Plaintiff's workstation was restricted from downloading the file. When Plaintiff informed Bush of this IT block, Bush still refused to provide the document, falsely claiming he was "not allowed to email it to me".

265.   More than 30 days elapsed after Plaintiff's written request, and Defendants willfully failed and refused to make the requested personnel records available for inspection or to provide copies within the statutory timeframe.

266.   When Defendants finally provided a partial, delayed production on June 3/June 6, 2025 (past the 30-day statutory deadline), they deliberately withheld the April 15, 2025 Written Warning, Plaintiff's contemporaneous rebuttals, and Plaintiff's historical performance evaluations.

267.   Defendants' failure to comply was not due to good-faith error; rather, it was part of a broader pattern of information control, obstruction, and retaliation, including Defendants' refusal to provide Plaintiff's personnel file while simultaneously deploying disciplinary records and internal narratives against him in administrative and internal proceedings. On June 5, 2025, outside counsel Jeremy R. Sayre sent an email formally denying Plaintiff's § 1198.5 rights based on a fabricated jurisdictional pretext, stating: "My understanding is that you are a resident of Nevada... Because you do not reside in California and are not physically working in California, the CA Labor Code section that you have cited does not apply".

268. Labor Code § 1198.5(k) provides that an employer who fails to permit inspection or copying of personnel records within the time limits set by the statute is subject to a penalty of $750 per violation, plus an award of reasonable attorneys' fees and costs to the employee enforcing the right.

269. Plaintiff is entitled to recover the statutory penalty of $750 for Defendants' willful violation of § 1198.5, as well as injunctive relief compelling Defendants to produce complete personnel records and all documents encompassed by § 1198.5, and reasonable attorneys' fees and costs incurred in enforcing this statutory right.

270. Plaintiff further alleges that Defendants' refusal to produce the personnel file while seeking equitable relief and asserting equitable defenses in related disputes gives rise to an "unclean hands" bar, and Plaintiff seeks a declaration that Defendants are precluded from invoking equitable defenses based on their own statutory non-compliance and bad-faith withholding of records. Because First Citizens Bank is in documented, active violation of its unambiguous statutory duties under Cal. Labor Code § 1198.5, the clean-hands doctrine legally precludes the Bank from demanding extraordinary compliance, asserting equitable defenses, or seeking equitable relief (including compelling arbitration) in this Court.

COUNT XIV — FEHA Aiding and Abetting (Cal. Gov't Code § 12940(i)) (Against Individual Managers)

271. Plaintiff realleges and incorporates by reference the allegations set forth above.

272. California Government Code § 12940(i) makes it an unlawful employment practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under FEHA, or to attempt to do so.

273. At all relevant times, individual managers and decision-makers—including, without limitation, Regional Director Dana Lomas, manager Carlos Gonzalez, Regional Director Jon Poulsen, and senior leader Ted Bush—had authority and influence over Plaintiff's work assignments, discipline, access to systems (including Salesforce), and the handling of Plaintiff's ADA/FEHA disabilities, accommodation requests, and retaliation complaints.

274. Plaintiff alleges that these individuals knowingly aided and abetted Defendants' FEHA violations by, among other things: (a) initiating, endorsing, and enforcing pretextual discipline and performance narratives in response to Plaintiff's disability-related absences and accommodation requests, including the April 23, 2025 Written Warning that expressly penalized Plaintiff for absences tied to his son's ICU hospitalization for Diabetic Ketoacidosis; (b) participating in or approving Salesforce lockouts, territory/pipeline sabotage, and internal mapping changes (including the April 22, 2025 alteration of the "Los Angeles" HR Area field by Dana Lomas directing Ashley Roff) that undermined Plaintiff's ability to succeed in his California territory after he engaged in protected activity; (c) refusing to meaningfully consider or advocate for Plaintiff's accommodations, and instead using Plaintiff's disability-related constraints as grounds for criticism or escalation; and (d) participating in and/or ratifying adverse actions culminating in Plaintiff's termination.

275. These individual actors knew of Plaintiff's ADA/FEHA disabilities, accommodation requests, and protected complaints, and knew that the adverse actions taken against Plaintiff contravened FEHA, yet they provided substantial assistance and encouragement to Defendants' discriminatory and retaliatory conduct, satisfying the aiding-and-abetting standard under California law.

276. As a proximate result of this aiding and abetting, Plaintiff suffered the same harms described in Count II, including lost wages and benefits, emotional distress, and other consequential damages.

277. Plaintiff seeks to hold these individual managers personally liable under Cal. Gov't Code § 12940(i) for aiding and abetting FEHA violations, and requests compensatory and punitive damages, as well as attorneys' fees and costs as permitted by FEHA.

COUNT XV — Punitive Damages via Managing-Agent Ratification (Cal. Civ. Code § 3294(b)) (Against All Defendants)

278. Plaintiff realleges and incorporates by reference the allegations set forth above.

279. Under Cal. Civ. Code § 3294(b), an employer may be liable for punitive damages based on the acts of its employees where the wrongful acts were committed, authorized, ratified, or knowingly adopted by an officer, director, or "managing agent" of the corporation.

280. On May 20, 2025, Plaintiff submitted a formal whistleblower disclosure directly to the Audit Committee, CEO Frank B. Holding, Jr., and General Counsel Matt Martin, expressly citing SOX § 301 and SEC

Rule 10A-3(b)(3). This disclosure triggered the Board's and CEO's non-delegable fiduciary duty to oversee and remediate the internal-controls failures and retaliation.

281.   During the September 30, 2025 pre-hearing conference, Respondent's counsel Lisa M. Williford explicitly stated on the record that Complainant's filings—including those documenting the June 4 spoliation, the FOTT falsifications, and the August witness intimidation threats—were being actively received and reviewed by the CEO, General Counsel, and Board of Directors. This constitutes a formal judicial admission under Oscanyan v. Arms Co. that the highest managing agents had actual, contemporaneous knowledge of the misconduct.

282.   Despite this confirmed actual knowledge, the managing agents consciously disregarded Plaintiff's rights by ratifying the August 6, August 8 (marked "FINAL NOTICE"), and August 14, 2025 written threats to deploy the Special Investigations Unit (SIU) and "local authorities" against Plaintiff. The managing agents further ratified this malice by authorizing the filing of the January 26, 2026 certified Answer, which expressly admitted that using SIU/police threats against a federal whistleblower was the Bank's "standard practice".

283.   Plaintiff further alleges that Defendants' managing agents authorized or ratified the continued use of outside counsel and insurer-driven strategies (including those described in connection with the FCB–Fox–Chubb Enterprise) that depended on intimidating Plaintiff, concealing spoliation, and misusing procedural mechanisms to avoid merits adjudication, notwithstanding direct notice that such strategies were impairing Plaintiff's statutory rights and the integrity of regulatory and

88

judicial processes. Chubb executives, including Global General Counsel Joseph Wayland and Claims Director Thomas Allison-Couto, were served with the Certified Evidentiary Record detailing the spoliation and fraud on the tribunal on June 18 and August 26, 2025. Chubb's failure to issue a D&O Reservation of Rights, combined with its continued unconditional funding of Fox Rothschild's defense, constitutes bad-faith ratification under the Indiana GRQ standard and extends punitive liability to the FCB–Fox–Chubb Enterprise.

284.   These actions and omissions by Defendants' managing agents demonstrate malice, oppression, and fraud within the meaning of Cal. Civ. Code § 3294, in that they reflect conscious disregard of Plaintiff's rights and of the public policies embedded in SOX, Dodd-Frank, FEHA, ADA, FMLA, ERISA, California Labor Code, and related statutes.

285.   The managing agents' authorization of a bad-faith MAA architecture—including the intent to trigger automatic waivers under Cal. Civ. Proc. Code § 1281.98 (Hohenshelt) and to invoke the litigation-machinery rule (Quach v. California Commerce Club) to bleed Plaintiff's resources—further evidences the oppression and malice required for punitive damages under § 3294(b).

286.   Plaintiff therefore seeks punitive damages against Defendants, without statutory cap, based on managing-agent authorization, ratification, and conscious disregard, in addition to the compensatory and statutory relief sought in the other counts.

IX. PRAYER FOR RELIEF

287.   Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally as appropriate, and grant the following relief:

288.   On Count I (Sarbanes-Oxley), all relief authorized by statute, including reinstatement or Double Back Pay as mandated by the Dodd-Frank Act (15 U.S.C. § 78u-6(h)(1)(C)); un-capped front pay, compensatory damages, and lost commissions explicitly calculated against the destruction of the $200 million Neutraderm/DRMTLGY pipeline and the diversion of the 31 Jackson Hewitt merchant accounts; treble damages under Civil RICO (18 U.S.C. § 1964(c)) for the intentional destruction of this business property, special damages (including for emotional distress and reputational harm), and reasonable attorneys' fees and costs.

289.   On Count II (ADA / parallel FEHA disability and retaliation claims as applicable), compensatory damages, uncapped punitive damages based specifically on the conscious disregard, authorization, and ratification of the malicious acts by managing agents, explicitly naming CEO Frank B. Holding, Jr. and Chief Legal Officer Matt Martin, back pay or Double Back Pay as mandated by the Dodd-Frank Act (15 U.S.C. § 78u-6(h)(1)(C)); un-capped front pay, compensatory damages, and lost commissions explicitly calculated against the destruction of the $200 million Neutraderm/DRMTLGY pipeline and the diversion of the 31 Jackson Hewitt merchant accounts; treble damages under Civil RICO (18 U.S.C. § 1964(c)) for the intentional destruction of this business property, injunctive relief (including policy changes and training), and reasonable attorneys' fees and costs.

290. On Count III (FMLA), damages including lost wages and benefits, liquidated damages where applicable, equitable relief (including restoration of service credit and benefits), and reasonable attorneys' fees and costs.

291. On Count IV (ERISA § 510), an immediate injunction compelling First Citizens Bank to transmit accurate administrative separation reporting to Fidelity, immediately unfreezing your vested 401(k) retirement funds that were unlawfully withheld as leverage by outside counsel on June 18, 2025, all other relief authorized by ERISA, and reasonable attorneys' fees and costs.

292. On Count V (Declaratory Judgment regarding arbitrability, delegation, jury waiver, E-SIGN, EFAA, FEHA/Labor Code standards, PAGA, and related issues), declarations and injunctive relief as pleaded, including: (a) declaring that Sarbanes-Oxley claims are not subject to predispute arbitration and that Defendants may not compel arbitration of Plaintiff's SOX claim or require delegation of SOX gateway issues; (b) declaring the MAA's "original ink" initiation requirement void and unenforceable under the E-SIGN Act and public policy; (c) declaring that the jury-waiver clause is unconscionable and unenforceable as applied; (d) declaring that the MAA's structural provisions (including delegation, survival waivers, fee-shifting that deters FEHA and statutory claims, class/collective and PAGA waivers, confidentiality gag rules, and mass-arbitration throttling) are unconscionable and non-severable under California law; (e) denying any stay of the SOX claim based on arbitration of other claims; and (f) enjoining Defendants from initiating or maintaining any arbitration proceeding as to Plaintiff's SOX claim and

91