

FILED

CLERK, U.S. DISTRICT COURT

3/26/2026

CENTRAL DISTRICT OF CALIFORNIA

BY_____jji_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

Jared Ashcraft, Pro Se

PO Box 363242

North Las Vegas, NV 89036

legal@ashcraft.me

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

JARED ASHCRAFT,

      PLAINTIFF,

v.

FIRST-CITIZENS BANK & TRUST
COMPANY, A NORTH CAROLINA
CORPORATION; AND
FIRST CITIZENS BANCSHARES, INC.,
A DELAWARE CORPORATION,

      DEFENDANTS.

**Case No.: 2:26-cv-02251-JLS-JDE**

**FIRST AMENDED COMPLAINT FOR
WHISTLEBLOWER RETALIATION,
DISABILITY DISCRIMINATION,
FMLA/ERISA/FEHA VIOLATIONS, CIVIL
RICO, DODD-FRANK, PRIVACY,
CONTRACT, AND RELATED RELIEF;
DEMAND FOR JURY TRIAL**

## I. INTRODUCTION

1. Plaintiff Jared Ashcraft brings this action for whistleblower retaliation and related statutory and common-law violations arising from a unified course of conduct by his employer and its corporate parent.

2. This conduct includes retaliation for protected disclosures concerning internal controls, revenue attribution, vendor diversion, and securities/compliance issues.

3. It further encompasses disability- and leave-related interference, coercive post-notice handling of evidence-bearing devices, the misuse of an adhesive enterprise-form

[1]

arbitration instrument, witness-availability interference, and a broader concealment pattern tied to later public-disclosure and offering materials.

4. Plaintiff's protected activity began no later than March 2024, when he raised concerns that merchant accounts he had originated, including Jackson Hewitt accounts, had been diverted away from Defendants, creating internal-control and revenue-attribution issues.

5. That activity materially escalated on March 24, 2025, when Plaintiff sent manager Carlos Gonzales a Microsoft Teams disclosure identifying a recurring pattern of vendor-driven diversion and describing Worldpay's conduct as harmful to FCB's business and internal controls.

6. The protected activity escalated again on May 20, 2025, when Plaintiff transmitted a formal Audit Committee escalation citing SOX, SEC Rule 10A-3, the diversion of 31 Jackson Hewitt accounts, and the suppression of the $200 million Neutraderm/DRMTLGY pipeline.

7. Plaintiff alleges that Defendant First-Citizens Bank & Trust Company ("FCB") did not respond with a legitimate compliance process.

8. Instead, FCB escalated pretextual discipline, interfered with Plaintiff's accommodations and leave rights, sabotaged Plaintiff's California territory and pipeline, and rerouted or intercepted Plaintiff's whistleblower-related communications.

9. FCB subsequently placed Plaintiff on administrative leave and, internal records reflect, revoked Plaintiff's system access on May 22, 2025 (via Ticket RITM-07198884).

10. On June 4, 2025, at 05:10 AM PDT, FCB executed a remote "Org data removal" event on Plaintiff's personal device (via Ticket RITM0730529) while Plaintiff was still employed and while multiple preservation notices were in effect.

[2]

11. The June 4, 2025 organizational-data removal was followed by concealment and intimidation.

12. On June 5, 2025, at 06:17 AM PDT, outside counsel Jeremy R. Sayre removed OSHA Investigator Anna Son from an email recipient list and sent a written statement that Plaintiff's device had "NOT been wiped," notwithstanding the prior day's device-side removal prompts and service-desk confirmation that Plaintiff's account had been revoked.

13. On June 17, 2025, counsel characterized Plaintiff's protected dispute communications as "extortion."

14. On June 18, 2025, counsel used benefits-status leverage in the 401(k) pathway and then personally transmitted Plaintiff's termination email at 2:36 PM PDT.

15. Coercive conduct continued after termination. In August 2025, FCB agents threatened to involve the "Special Investigations Unit" and "local authorities" to seize a litigation-hold laptop that Plaintiff was preserving pending neutral forensic imaging.

16. In the certified January 26, 2026 Answer filed in the related OALJ matter, Defendants took the position that those follow-up efforts were consistent with Defendants' "standard practice," despite comparator evidence from the Stephanie Daughtridge offboarding sequence showing a plain administrative "Action Required: Asset Return" process with no threats.

17. The enterprise's obstruction continued into 2026. After the administrative tribunal confirmed on January 12, 2026, that it lacked third-party subpoena power, Plaintiff served discovery on Director of Merchant Services Dana Lomas on February 3, 2026, targeting SOX control failures and retaliation facts.

[3]

18. Seven days later, on February 10, 2026, FCB posted Lomas's exact role as vacant and filed a protective-order motion using evasive past-tense language about her employee status, supporting an inference of witness-availability interference.

19. Plaintiff further alleges that his internal-controls warnings and spoliation-related notices preceded a market-sensitive disclosure context overseen by Defendant First Citizens BancShares, Inc. ("FCBI").

20. On May 29, 2025, Plaintiff submitted an SEC TCR alleging internal-controls failures, books-and-records issues, retaliation, and SEC Rule 21F-17 concerns.

21. On January 6, 2026, the OALJ entered an order recognizing that Plaintiff's SOX theory concerned internal-control failures, vendor diversion, and "fraud against shareholders."

22. Thereafter, FCBI filed a prospectus supplement dated February 25, 2026, for a $500 million senior-notes offering with a March 3, 2026 issue date, expressly incorporating the February 24, 2026 Form 10-K and its accompanying clean-controls representations.

23. Plaintiff seeks damages, declaratory relief, injunctive relief, and punitive damages where authorized, while expressly preserving the Court's authority to impose Rule 37(e) and inherent-authority remedies on appropriate motion.

## II. JURISDICTION AND VENUE

24. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including 18 U.S.C. § 1514A, 42 U.S.C. § 12101 et seq., 29 U.S.C. § 2601 et seq., 29 U.S.C. § 1140, 18 U.S.C. § 1962(c)-(d), 15 U.S.C. § 78u-6(h), and 18 U.S.C. § 2701 et seq.

25. This Court has jurisdiction over Plaintiff's declaratory and injunctive claims under 28 U.S.C. §§ 2201 and 2202.

[4]

26. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims, including FEHA, California Labor Code § 1198.5, California Labor Code § 925, California common-law wrongful termination, implied covenant, conversion, and intentional interference claims, because those claims form part of the same case or controversy.

27. Venue is proper in this District under 28 U.S.C. § 1391, and independently proper for the ADA claim under 42 U.S.C. § 2000e-5(f)(3) as incorporated by 42 U.S.C. § 12117(a).

28. A substantial part of the events giving rise to these claims occurred in or had substantial effects in California, including Plaintiff's assigned Los Angeles-centered Salesforce territory, California merchants and prospects, California-facing revenue relationships, and California-based pipeline sabotage.

29. Venue is also proper as to the civil RICO claim under 18 U.S.C. § 1965(a) because Defendants transact business in this District and the alleged enterprise's acts affected California markets, merchants, and financial relationships.

**III. PARTIES**

30. Plaintiff Jared Ashcraft is a resident of Nevada. At all relevant times, Plaintiff worked remotely but serviced an assigned California market, including Los Angeles and surrounding California territory, in his role as Senior Merchant Services Specialist.

31. Defendant First-Citizens Bank & Trust Company ("FCB") employed Plaintiff and conducted the merchant-services operations, human resources actions, discipline, system controls, and day-to-day management at issue here.

32. Defendant First Citizens BancShares, Inc. ("FCBI") is the publicly traded parent of FCB.

33. FCBI's securities filings, Audit Committee oversight, CEO/CFO certifications, and debt-offering materials are directly implicated by the facts alleged herein.

[5]

34. FCBI and FCB operated as an integrated enterprise with centralized executive, legal, audit, compliance, and dispute-resolution control over the compliance and retaliation conduct at issue.

35. At all relevant times, Defendants acted through common officers, managing agents, employees, outside counsel, and enterprise participants, including but not limited to Frank B. Holding, Jr., Craig L. Nix, Matthew G.T. Martin, Dana Lomas, Carlos Gonzales, Jon Poulsen, Ted Bush, Ashley Roff, Queena Green, Jeremy R. Sayre, and Lisa M. Williford.

## IV. ADMINISTRATIVE AND STATUTORY PREREQUISITES

36. On May 25, 2025, Plaintiff filed a whistleblower complaint through OSHA's online portal asserting protected activity and retaliation under federal whistleblower statutes, including SOX.

37. On or about May 27, 2025, Plaintiff certified the OSHA complaint.

38. OSHA issued a dismissal letter on June 6, 2025. Plaintiff appealed, and the matter was docketed before the Office of Administrative Law Judges as OALJ No. 2025-SOX-00035.

39. More than 180 days elapsed after the filing of Plaintiff's OSHA complaint without a final decision by the Secretary of Labor, and Plaintiff therefore brings his SOX claim de novo under 18 U.S.C. § 1514A(b)(1)(B).

40. On May 24, 2025, Plaintiff filed EEOC Charge No. 487-2025-02310.

41. On January 7, 2026, the EEOC issued Plaintiff a Notice of Right to Sue on that charge. Plaintiff files his ADA-based claims within the applicable 90-day window.

[6]

42. Plaintiff timely presented his disability-discrimination and retaliation allegations to the California Civil Rights Department (CRD) through direct intake submission and the EEOC/CRD worksharing process. CRD processed the intake, conducted an intake interview, and advised Plaintiff that because the EEOC had already issued a Right-to-Sue notice, CRD would not separately investigate or issue duplicative court-filing relief.

43. CRD thereafter issued a Notice of Intake Closure asserting lack of jurisdiction. Plaintiff alleges that he reasonably relied on CRD's direction regarding the effect of the EEOC Right-to-Sue notice, and further alleges that any additional FEHA exhaustion objection is barred, excused, tolled, satisfied by substantial compliance, or otherwise cannot support dismissal with prejudice.

## V. THE MAA AND THE ACTUAL ARBITRABILITY CONTROVERSY

44. On December 13, 2024, FCB required Plaintiff to execute a document titled "Mutual Arbitration Agreement" ("MAA") as a condition of continued employment.

45. The MAA was executed through DocuSign under Envelope ID C592F559-005D-49F0-979B-509DF8579059.

46. The MAA is an adhesive, enterprise-form dispute-routing instrument drafted by Defendants, with no meaningful negotiation and no opt-out.

47. The MAA defines "Bank" broadly enough to include parent and related entities, thereby confirming FCBI's direct stake in the contract and its enforcement.

48. The MAA was not a routine onboarding instrument. Plaintiff had already engaged in protected activity concerning internal controls, vendor diversion, disability-related issues, and compliance concerns before FCB imposed the MAA mid-tenure.

49. The MAA invokes the FAA, purports to delegate arbitrability questions to an arbitrator, contains a survival jury-waiver provision designed to persist even if arbitration fails, and

[7]

includes structural provisions that operate to preserve non-jury, employer-favorable adjudication.

50. The MAA expressly excludes disputes that may not be subject to arbitration under the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal statute.

51. SOX, as amended by Dodd-Frank, provides that no predispute arbitration agreement shall be valid or enforceable if it requires arbitration of a dispute arising under 18 U.S.C. § 1514A.

52. Plaintiff alleges that the SOX claim is therefore excluded both by statute and by the MAA's own carve-out, and that Defendants may not use the MAA's delegation clause to transfer SOX gateway questions to a private arbitrator.

53. The MAA's "original ink (i.e., non-electronic) signature" initiation requirement is invalid under the E-SIGN Act and public policy because the agreement treats electronic signatures as valid for employer execution while attempting to deny equal legal effect to an electronically signed employee arbitration demand.

54. The MAA's jury-waiver provision is not knowing or voluntary, is adhesive, and is unenforceable as applied to this case.

55. To the extent the MAA imposes out-of-state choice-of-law or forum-routing consequences on an employee who was working primarily in a California territory, such provisions are void or unenforceable under California Labor Code § 925.

56. The MAA's delegation, fee-allocation, confidentiality, class/collective waiver, mass-arbitration throttling, severability, and survival provisions operate together as a one-sided integrated scheme and are substantively and procedurally unconscionable.

[8]

57. An actual controversy therefore exists concerning whether Defendants may compel arbitration of Plaintiff's SOX claim, whether Defendants may invoke delegation to route SOX gateway issues away from this Court, whether the "original ink" clause is void, and whether the jury waiver is enforceable.

**VI. FACTUAL ALLEGATIONS**

**Performance and California Territory**

58. Plaintiff was a high-performing Senior Merchant Services Specialist.

59. Plaintiff had multiple years of strong reviews, produced substantial merchant-services business, and developed high-value pipeline and merchant relationships for FCB.

60. By 2025, Plaintiff's assigned territory and deal flow were centered in California, including the Los Angeles HR area and specific California-facing merchant opportunities.

61. On March 3, 2025, manager Stephanie Daughtridge sent Plaintiff a praise email reflecting positive management feedback and performance recognition.

62. Plaintiff's compensation and work expectations were tied to deal development, account credit, pipeline management, commissions, referrals, and territory integrity within Salesforce and related systems.

**Protected Disclosures: Internal Controls and Vendor Diversion**

63. In or about March 2024, Plaintiff disclosed to FCB management that merchant accounts he had originated, including Jackson Hewitt accounts, had been diverted away from FCB, raising internal-control and revenue-attribution issues.

64. On September 14, 2024, Director Dana Lomas texted Plaintiff asking, in substance, "what ever came of the Jackson Hewitt accounts the 5/3 stole?".

[9]

65. When reminded that Plaintiff had recovered them, Lomas responded, "We resigned them? I'll have to go back and look", reflecting continued confusion and an attempt to undermine Plaintiff's credit.

66. These Jackson Hewitt facts were not isolated sales-credit disputes; they implicated internal controls, revenue attribution, books-and-records reliability, vendor oversight, and how Defendants booked and reported revenue streams.

67. FCB management was also aware of a large, California-anchored Neutraderm/DRMTLGY opportunity managed by Plaintiff.

68. Upon information and belief, the Neutraderm opportunity involved approximately $126 million in annual processing volume, approximately $200 million in potential deposit value, and an existing $17 million lending relationship.

69. On March 24, 2025, Plaintiff sent Carlos Gonzales a Microsoft Teams message identifying a recurring pattern of vendor-driven diversion of merchant accounts, including Jackson Hewitt.

70. Plaintiff described Worldpay's conduct as improper and harmful to FCB's internal controls.

71. Gonzales's response confirmed management-level awareness that the problem was recurring, unresolved, and previously acknowledged by vendor personnel.

**ADA Accommodations and Associational Disability (FMLA)**

72. In early 2023, Plaintiff disclosed a qualifying medical condition to Dana Lomas in confidence.

[10]

73. In early April 2024, Plaintiff disclosed protected medical information and leave-related concerns to Carlos Gonzales because of pressure surrounding medically related absences and scheduling.

74. Plaintiff also advised management that he might need FMLA protections and accommodation-related safeguards.

75. Between March 4 and March 7, 2025, Plaintiff's son (who has Type 1 Diabetes) suffered a life-threatening medical emergency and was hospitalized in the ICU for Diabetic Ketoacidosis.

76. Plaintiff took emergency family-medical leave during this period to care for his son.

77. Dana Lomas contemporaneously acknowledged this life-threatening hospitalization on March 5, 2025, stating via Teams, "That is great news! we are all praying for him."

78. On March 22, 2025, Plaintiff emailed his clinical-trial coordinator documenting that work demands had caused him to miss a required medical infusion for his FDA-regulated study.

79. In that email, Plaintiff expressed fear that he might have to withdraw from the trial due to FCB's failure to accommodate his medical schedule.

80. FCB subsequently excluded Plaintiff from the work event tied to the missed clinical-trial infusion and failed to provide equivalent access or meaningful remediation.

**Escalating Retaliation and Territory Sabotage**

81. On April 15, 2025, FCB prepared a written warning concerning Plaintiff, but withheld delivery of that warning until April 23, 2025.

82. Plaintiff alleges the warning was held in reserve and deployed as a pretextual escalation device after Plaintiff's protected complaints regarding vendor diversion.

[11]

83. The written warning issued on April 23, 2025, formally penalized Plaintiff for "10 occurrences of unscheduled absences."

84. These cited absences explicitly included March 4 through March 7, 2025—the exact dates Plaintiff's son was hospitalized in the ICU, which Lomas had previously acknowledged.

85. On April 22, 2025, Dana Lomas directed Salesforce Administrator Ashley Roff to deliberately alter internal HR-area mapping affecting Plaintiff's Los Angeles territory.

86. This undocumented "Los Angeles" field change caused an immediate fatal system error ("INVALID_OR_NULL_FOR_RESTRICTED_PICKLIST").

87. This error prevented referral partners from submitting leads to Plaintiff and effectively blocked Plaintiff's ability to advance the Neutraderm/DRMTLGY commercial pipeline.

**Preservation Demands and CIPA/SCA Violations**

88. On April 23, 2025, Plaintiff began issuing written preservation demands concerning disciplinary records, communications, emails, Teams messages, and related evidence.

89. On April 24, 2025, Plaintiff sent a formal written HR notice opening an ADA accommodation and intermittent FMLA leave request, tied to Hartford Claim No. 50933394.

90. On April 25, 2025, Plaintiff expanded the preservation request to include work-related communications on personal devices, texts, chats, and other off-system communications.

91. On April 29, 2025, Plaintiff sent a supplemental preservation request covering additional performance, compensation, and related materials.

92. By no later than late April 2025, FCB and FCBI were on actual notice of foreseeable litigation and under a duty to preserve relevant ESI.

[12]

93. On or about April 28-29, 2025, Plaintiff began experiencing unexplained email-delivery failures and account interference.

94. Documentary evidence reflects that emails sent from Plaintiff's personal accounts, including specific ProtonMail addresses (jared.ashcraft@protonmail.com and jared.ashcraft@proton.me), to his own corporate inbox were not arriving.

95. On May 8, 2025, an email Plaintiff sent from a personal external account to his institutional inbox was blocked and routed to HR Manager Queena Green through the internal alias HRRedirect@firstcitizens.com, even though Green was not the addressed recipient.

96. On May 8 and May 9, 2025, Plaintiff transmitted detailed, time-sensitive pricing proposals for the Neutraderm opportunity.

97. Internal records indicate that FCB intercepted and rerouted these critical client engagement materials to HRRedirect@firstcitizens.com, which prevented the pricing proposals from reaching the client and foreseeably disrupted the prospective deal.

**HR Coercion and Escalating Disclosures**

98. Between May 8 and May 14, 2025, Plaintiff requested procedural accommodations for an HR meeting, including advance questions or an agenda, the ability to ask questions first, and permission to record for accuracy.

99. FCB denied those requests.

100.        On May 9, 2025, Queena Green warned Plaintiff in writing that refusal to cooperate in a First Citizens investigation would be treated as a Code of Ethics violation, directly in response to Plaintiff's accommodation requests.

[13]

101.   On May 12, 2025, Plaintiff advised Green that he was taking a personal day due to elevated stress caused by FCB's conduct, noting his hesitation to invoke formal FMLA protections because of fear of further abuse.

102.   On May 13, 2025, Plaintiff sent a detailed written communication to senior leadership, including legal leadership, describing retaliation following SOX-related disclosures and leave-related interference.

103.   On May 19, 2025, Plaintiff expanded those disclosures to additional executives.

104.   On May 20, 2025, Plaintiff sent a formal whistleblower disclosure to Board and Audit Committee channels citing SOX, SEC Rule 10A-3, the diversion of 31 Jackson Hewitt accounts, internal-control failures, and the suppression of the Neutraderm/DRMTLGY opportunity.

105.   This May 20 disclosure placed fiduciary-level recipients at FCBI on direct notice of securities/compliance implications and retaliation risk.

106.   On May 21, 2025, outside counsel Jeremy R. Sayre sent Plaintiff a letter labeled "CONFIDENTIAL RULE 408 COMMUNICATION."

107.   Sayre expressly acknowledged that Plaintiff's communications raised allegations of "corporate-related misconduct," including "securities violations or other financial crimes" under SOX and SEC Rule 13a-15.

108.   In the same May 21 letter, counsel threatened that "improper disclosures" of sensitive information would violate the Bank's Code of Ethics and applicable laws, an act designed to chill external reporting.

109.   Also on May 21, 2025, payroll records reflect that FCB transmitted an unexplained, un-itemized payment of $2,581.71 to Plaintiff (deviating from Plaintiff's standard $2,105.65 paycheck).

[14]

110.    FCB refused to provide a paystub or bonus clarification for this transaction, creating a compensation irregularity indicative of bad-faith interference with Plaintiff's compensation arrangement.

**Suspension, SEC TCR, and Device Spoliation**

111.    On May 22, 2025, FCB placed Plaintiff on administrative leave.

112.    FCB communicated that two weeks of paid leave would run through June 4, 2025, and that Plaintiff's system access would be terminated.

113.    On or about May 22, 2025, based on internal records, Plaintiff's access to FCB's systems was revoked via Ticket RITM-07198884.

114.    On May 29, 2025, Plaintiff submitted a Tip, Complaint, and Referral ("TCR") to the Securities and Exchange Commission.

115.    Plaintiff's TCR selected "internal controls/books and records" as the specific category and detailed the vendor diversion, whistleblower obstruction, SEC Rule 13a-15 issues, and SEC Rule 21F-17 concerns.

116.    On June 4, 2025, at exactly 05:10 AM PDT, Plaintiff's personal mobile device displayed prompts indicating that organizational data associated with Defendants' applications was being removed.

117.    The June 4 event affected Microsoft Outlook, Microsoft Teams, Microsoft OneDrive, and Okta Verify on Plaintiff's personal device.

118.    This remote wipe destroyed or rendered inaccessible unique device-resident ESI, including locally cached electronic mail, Teams chat logs, authentication tokens, ephemeral messages, and Outlook data files stored locally on the hardware.

[15]

119.    On June 4, 2025, Plaintiff contacted FCB's service desk. The service desk confirmed that Plaintiff's account status was "revoked" and deactivated under Service Desk Ticket RITM0730529.

120.    The service desk confirmed the account was not coded as "Leave of Absence" or "Administrative Leave."

121.    At the time of the June 4 wipe, Plaintiff had not yet been terminated.

**Concealment and Extortion Framing**

122.    On June 5, 2025, at 06:17 AM PDT, outside counsel Jeremy R. Sayre transmitted an email to Plaintiff stating that "The Bank also has confirmed that your mobile device has NOT been wiped."

123.    Prior to transmitting this statement, Sayre excluded OSHA Investigator Anna Son from the recipient list.

124.    Plaintiff alleges that the June 5 statement was materially false. Plaintiff further alleges that the observable act of removing the OSHA investigator from the recipient list prior to transmitting that statement supports a reasonable inference of a strategy to minimize the spoliation event and mislead the federal administrative tribunal.

125.    On June 17, 2025, Defendants' counsel reframed the June 4 wipe as "unenrollment" while still failing to account for the destroyed device-resident ESI.

126.    On June 17, 2025, counsel characterized Plaintiff's protected communications and settlement posture as sounding "more like extortion," explicitly comparing Plaintiff to the criminal prosecution of "Michael Avenatti".

127.    This "extortion" framing was false, retaliatory, and defamatory, and was used internally to justify escalation under a financial-crime narrative.

[16]

**Termination and Benefits Coercion**

128.     On June 17 and June 18, 2025, Plaintiff notified leadership that access to Plaintiff's vested 401(k) funds was being blocked because FCB had not reported Plaintiff's separation status to Fidelity.

129.     On June 18, 2025, at 8:47 AM, Jeremy R. Sayre refused to notify Fidelity of Plaintiff's separation status, stating: "if you maintain that your employment with the Bank has terminated, then the Bank will accept this and update your status with Fidelity immediately".

130.     Plaintiff expressly rejected any quid pro quo and stated, in writing, that he was not resigning.

131.     Later on June 18, 2025, at 2:36 PM PDT, Jeremy R. Sayre transmitted the email formally effectuating Plaintiff's termination.

132.     That communication stated that FCB accepted Plaintiff's purported contention that his employment had been constructively terminated, even though Plaintiff had expressly rejected resignation in writing.

133.     On June 20, 2025, HR confirmed termination and demanded return of assets but refused to provide a clear reason for termination.

134.     On June 30, 2025, Plaintiff filed an EBSA complaint concerning interference with Plaintiff's protected benefit rights.

**Labor Code 1198.5 and Post-Employment Coercion**

135.     Regarding Plaintiff's personnel file, on April 27, 2025, Ted Bush directed Plaintiff to download his personnel file himself through IT pathways.

[17]

136.    IT then confirmed in writing that Plaintiff's workstation was restricted from downloading the file.

137.    Bush refused to provide the written warning and related personnel-file materials, asserting that he was not allowed to email it.

138.    More than 30 days elapsed and FCB did not timely produce a compliant personnel-file production.

139.    When FCB later made a delayed and partial production, they withheld the April 15/23 written warning, Plaintiff's rebuttals, and historical performance evaluations.

140.    On June 5, 2025, Jeremy R. Sayre formally denied Plaintiff's California Labor Code § 1198.5 rights based on a jurisdictional objection that Plaintiff lived in Nevada and was not physically working in California.

141.    After termination, Plaintiff preserved a company laptop as evidence and requested neutral third-party forensic imaging before surrendering it, because FCB had already executed the June 4 organizational-data removal on Plaintiff's personal device.

142.    On August 6, 2025, Michael Raimo threatened that if the laptop was not returned, a case would be opened to the Special Investigations Unit (SIU) and local authorities would become involved.

143.    On August 8, 2025, Raimo repeated the same threat and labeled it "FINAL NOTICE."

144.    On August 14, 2025, Sylvie Nadeau stated that unreturned laptops are reported to SIU, marked stolen, and referred to local authorities.

[18]

145.    Comparator evidence from the Stephanie Daughtridge offboarding sequence shows that ordinary laptop-return practice was a plain administrative "Action Required: Asset Return" email, with no threats.

**OALJ Proceedings and Witness Interference**

146.    In the related OALJ proceeding, on January 6, 2026, the tribunal denied Defendants' motion to dismiss and expressly described Plaintiff's SOX theory as involving internal-control failures, vendor diversion, revenue-reporting issues, and "fraud against shareholders."

147.    On January 12, 2026, the tribunal confirmed on the record that it lacked third-party subpoena power.

148.    On January 26, 2026, Defendants filed a certified Answer in the OALJ proceeding asserting that Plaintiff voluntarily resigned, that no data on Plaintiff's device had been deleted or destroyed, and that the SIU/law-enforcement follow-up efforts were consistent with standard practice.

149.    On January 29, 2026, Defendants publicly held out Dana Lomas as current Director of Merchant Sales.

150.    On February 3, 2026, Plaintiff served discovery directed to Dana Lomas regarding the Jackson Hewitt diversion, internal controls, revenue reporting, and related retaliation facts.

151.    On February 10, 2026, FCB publicly posted the exact "Director, Merchant Sales" role as vacant.

152.    Concurrently, Fox Rothschild filed a protective-order motion using evasive past-tense language regarding Lomas's employment status.

[19]

153.     Defendants did not meaningfully clarify Lomas's status or timely supplement their witness disclosures, supporting an inference of witness-availability interference.

**Parent Company (FCBI) Disclosures and Ratification**

154.     Defendants' concealment, intimidation, and witness-interference conduct was part of a coordinated enterprise-level effort to suppress whistleblower evidence, protect a clean litigation and regulatory posture, and preserve facially clean public-disclosure positions.

155.     On February 24, 2026, FCBI filed its Form 10-K for the year ended December 31, 2025, maintaining that disclosure controls and procedures were effective, that internal control over financial reporting was effective, that no material weakness was known, and that no known fraud involving management existed.

156.     On February 25, 2026, FCBI dated a prospectus supplement for a $500 million senior-notes offering (issue date March 3, 2026) that expressly incorporated the February 24, 2026 Form 10-K.

157.     Plaintiff pleads these SEC filings and offering materials as evidence of materiality, parent-level involvement, motive, ratification, continuity, and the enterprise's objective of preserving a facially clean public-disclosure narrative despite contrary information already circulating within the organization.

158.     Between April 23 and May 24, 2025, Plaintiff served multiple preservation notices directly copied to FCBI CEO Frank B. Holding, Jr., CLO Matt Martin, Board and Audit Committee channels, and leadership recipients.

159.     Despite those notices, Defendants permitted or caused the June 4 wipe, maintained the June 5 denial, escalated the August threat sequence, and later adopted certified positions contrary to the documentary record.

[20]

160.     Plaintiff alleges that this sequence supports malice, oppression, fraud, and conscious disregard within the meaning of California Civil Code § 3294.

161.     Frank B. Holding, Jr., Matt Martin, and other managing agents had actual notice of the core facts through Plaintiff's executive escalations, preservation demands, and the later administrative record.

162.     Their failure to intervene, correct the record, halt the coercive conduct, or remediate the June 4 event supports an inference of authorization or ratification.

163.     Jeremy R. Sayre and Lisa M. Williford are material fact witnesses to several events pleaded here, including the June 5 denial, the June 17-18 separation communications, the January 26 certified Answer positions, and the Dana Lomas status sequence.

## VII. CLAIMS FOR RELIEF

## COUNT I
**Sarbanes-Oxley Retaliation**
**18 U.S.C. § 1514A**
**(Against Defendants FCB and FCBI)**

164.     Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

165.     Plaintiff engaged in protected activity by reporting conduct that Plaintiff reasonably believed constituted mail, wire, bank, securities, or shareholder fraud; violations of SEC rules; internal-control failures; books-and-records failures; and related corporate misconduct, including the diversion of the 31 Jackson Hewitt accounts, the suppression of the Neutraderm/DRMTLGY opportunity, the Salesforce sabotage, and the broader control and reporting failures described herein.

[21]

166.	Plaintiff's protected activity included disclosures to management, HR, Legal, the CEO, the CLO, Board and Audit Committee channels, OSHA, and the SEC.

167.	Defendants knew of Plaintiff's protected activity. The May 21, 2025 letter from outside counsel expressly acknowledged that Plaintiff's communications raised SOX and SEC Rule 13a-15 issues and alleged securities violations or other financial crimes.

168.	Defendants subjected Plaintiff to adverse actions, including pretextual discipline, denial of accommodations, leave interference, territory sabotage, communication rerouting, administrative leave, access revocation, the June 4 organizational-data removal, concealment of that event, extortion-smear tactics, benefits coercion, termination, and post-termination SIU/local-authority intimidation.

169.	The protected activity was a contributing factor in Defendants' adverse actions, as shown by timing, direct notice, shifting explanations, escalating hostility after each disclosure, and the sequence from the May 20 Audit Committee escalation to the May 21 threat letter, the May 22 lockout, the June 4 wipe, the June 5 concealment, and the June 18 termination.

170.	Defendants are covered persons within the meaning of SOX because FCBI is the public-company parent and FCB is the consolidated banking subsidiary whose financial information is included in FCBI's consolidated reporting.

171.	Plaintiff suffered damages including lost wages, lost benefits, reputational harm, emotional distress, special damages, and fees and costs.

172.	Plaintiff is entitled to all relief authorized by 18 U.S.C. § 1514A, including reinstatement or front pay, back pay with interest, special damages, fees, and costs.

[22]

**COUNT II**

**ADA Discrimination, Failure to Accommodate, Retaliation, and Parallel FEHA Disability**

**Discrimination, Failure to Accommodate, Failure to Engage, and Retaliation**

**42 U.S.C. § 12101 et seq.; Cal. Gov't Code § 12940 et seq.**

**(Against Defendant FCB)**

173.     Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

174.     Plaintiff is a qualified individual with a disability, had a record of disability, and/or was regarded as disabled within the meaning of the ADA and FEHA.

175.     Furthermore, Plaintiff was associated with an individual with a known disability (his son, who has Type 1 Diabetes).

176.     Plaintiff disclosed his own protected medical information to Dana Lomas in early 2023 and to Carlos Gonzales in early April 2024, and later submitted formal ADA/FMLA-related notice to HR.

177.     Plaintiff requested reasonable accommodations, including scheduling-related accommodations, participation-related accommodations, and procedural accommodations for HR meetings.

178.     FCB denied, frustrated, or failed to engage in good faith regarding those accommodations, including by refusing advance questions, refusing recording or accuracy safeguards, threatening Code-of-Ethics discipline in response to accommodation requests, and forcing Plaintiff to miss medically necessary treatment for his clinical trial.

179.     FCB excluded Plaintiff from the work event tied to the missed clinical-trial infusion and then failed to provide equivalent access or meaningful remediation.

[23]

180.    Separate from Plaintiff's own disability, FCB engaged in associational disability discrimination and retaliation by weaponizing the March 4-7, 2025 ICU hospitalization of Plaintiff's son.

181.    FCB cited these family-medical emergency dates as grounds for discipline in the April 23, 2025 written warning, despite management's contemporaneous knowledge of the life-threatening nature of the absences.

182.    Plaintiff engaged in protected activity by requesting accommodation, disclosing disability-related needs, opposing disability discrimination, and complaining about retaliation.

183.    FCB retaliated against Plaintiff by escalating discipline, denying accommodations, imposing coercive meeting conditions, sabotaging Plaintiff's territory and communications, placing Plaintiff on leave, revoking access, and terminating Plaintiff.

184.    Plaintiff timely invoked CRD procedures and alleges that the administrative prerequisites to the FEHA claims are satisfied, excused, tolled, or otherwise may not be used to defeat these claims at the pleading stage in light of CRD's processing of the matter and CRD's direction regarding the EEOC Right-to-Sue notice.

185.    As a result, Plaintiff suffered lost wages, lost benefits, emotional distress, reputational harm, and other damages.

186.    Plaintiff is entitled to all relief authorized by the ADA and FEHA, including compensatory damages, equitable relief, fees and costs, and punitive damages to the extent authorized by California law.

[24]

**COUNT III**

**FMLA Interference and Retaliation**

**29 U.S.C. § 2601 et seq.**

**(Against Defendant FCB)**

187.     Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

188.     Plaintiff gave FCB formal notice of the need for FMLA-related protection, including the April 24, 2025 written HR notice tied to Hartford Claim No. 50933394 and the family-medical circumstances already known to management.

189.     FCB failed to timely provide required FMLA eligibility and rights-and-responsibilities notices and failed to protect Plaintiff's leave rights.

190.     FCB instead escalated discipline, used leave-related absences against Plaintiff, and treated medically impacted scheduling and communications as investigatory or disciplinary problems rather than protected leave issues.

191.     FCB's conduct interfered with, restrained, and denied Plaintiff's exercise or attempted exercise of FMLA rights, and FCB also retaliated against Plaintiff for attempting to exercise those rights.

192.     Plaintiff suffered damages including lost wages, lost benefits, and other relief authorized by the FMLA.

193.     Plaintiff is entitled to damages, liquidated damages where applicable, equitable relief, fees, and costs.

**COUNT IV**

**ERISA § 510 Interference**

**29 U.S.C. § 1140**

**(Against Defendant FCB)**

[25]

194.    Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

195.    FCB interfered with Plaintiff's attainment and enjoyment of protected benefit rights by manipulating or withholding separation-status reporting and using access to vested 401(k) funds as leverage in the June 17-18, 2025 separation dispute.

196.    Plaintiff alleges that FCB's handling of the Fidelity status update was intentional, coercive, and designed to pressure Plaintiff into accepting a resignation narrative or other adverse characterization.

197.    FCB's conduct constituted interference with protected rights under 29 U.S.C. § 1140.

198.    Plaintiff is entitled to appropriate equitable and other relief authorized under ERISA, including surcharge, restitution, declaratory and injunctive relief, restoration of losses, fees, costs, and any other relief permitted by law.

**COUNT V**

**Declaratory Judgment**

**28 U.S.C. §§ 2201-2202**

**(Arbitrability, Delegation, Jury Waiver, E-SIGN, Labor Code § 925, Unconscionability, and No-Stay Relief)**

**(Against Defendants FCB and FCBI)**

199.    Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

200.    An actual controversy exists concerning whether Defendants may compel arbitration of Plaintiff's SOX claim, whether Defendants may invoke the MAA's delegation clause as to SOX gateway questions, whether the "original ink" clause is valid, whether the jury waiver is enforceable, whether the MAA's challenged provisions

[26]

are unconscionable and non-severable, and whether any non-SOX arbitration can stay the SOX claim.

201.     Plaintiff's SOX claim is excluded from predispute arbitration by 18 U.S.C. § 1514A(e)(2) and by the MAA's own exclusion for disputes that may not be arbitrated under Dodd-Frank or another controlling federal statute.

202.     Defendants may not use delegation to force a private arbitrator to decide whether Congress barred arbitration of SOX claims or whether the MAA's own carve-out excludes this claim.

203.     The MAA's "original ink" initiation requirement is void or unenforceable under the E-SIGN Act and public policy.

204.     The MAA's jury-waiver clause is adhesive and unenforceable as applied here.

205.     The MAA's interlocking fee, confidentiality, delegation, waiver, mass-arbitration, severability, and survival provisions are procedurally and substantively unconscionable and should not be enforced against Plaintiff.

206.     To the extent the MAA imposes out-of-state choice-of-law or forum-routing consequences on an employee who was working primarily in a California territory, such provisions are void or unenforceable under California Labor Code § 925.

207.     Plaintiff is entitled to declarations and injunctive relief confirming that the SOX claim remains in this Court, that SOX gateway issues may not be delegated, that the "original ink" clause is invalid, that the jury waiver is unenforceable, that the challenged provisions are unconscionable and non-severable, and that arbitration of any non-SOX claim may not stay the SOX claim.

[27]

**COUNT VI**

**California Wrongful Termination in Violation of Public Policy (Tameny)**

**(Against Defendant FCB)**

208.	Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

209.	California public policy, as embodied in SOX, Dodd-Frank, the ADA, FEHA, the FMLA, California Labor Code protections, and related anti-retaliation policies, prohibits employers from terminating an employee for making good-faith reports of unlawful conduct, requesting accommodation or protected leave, preserving evidence, and refusing coercive surrender of statutory rights.

210.	Plaintiff's work, territory, pipeline, and merchant relationships were centered in California, including Los Angeles and other California markets, giving California a strong interest in the wrongful-termination claim.

211.	FCB terminated Plaintiff and engaged in the retaliatory course of conduct described herein because Plaintiff reported internal-control failures, vendor diversion, securities/compliance issues, disability-related and leave-related problems, and because Plaintiff refused to accept coercive separation handling and evidence-control tactics.

212.	FCB's conduct violated fundamental California public policy and caused Plaintiff damages including lost wages, lost benefits, emotional distress, reputational harm, and related losses.

213.	Plaintiff is entitled to compensatory damages and punitive damages to the extent authorized by California law.

[28]

**COUNT VII**

**Civil RICO**

**18 U.S.C. § 1962(c) and (d)**

**(Against Defendants FCB and FCBI)**

214.    Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

215.    Defendants, together with nonparty enterprise participants including Fox Rothschild, individual Fox attorneys, Chubb-related actors, and others, formed or participated in an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).

216.    The enterprise's common purpose was to suppress whistleblower evidence, intimidate Plaintiff, preserve a false narrative around the June 4 event and the separation sequence, neutralize witnesses, preserve the enforceability of the MAA architecture, and protect Defendants from regulatory, judicial, disclosure, and financial consequences.

217.    Defendants conducted or participated in the enterprise's affairs through a pattern of racketeering activity.

218.    That pattern included, at minimum: misleading conduct, corrupt persuasion, concealment, or destruction conduct under 18 U.S.C. § 1512 arising from the June 4 wipe and June 5 concealment sequence; witness intimidation and retaliatory pressure arising from the August 2025 SIU/local-authorities threat sequence; corrupt persuasion and coercive conduct arising from the June 17-18 benefits and separation handling; witness-availability interference arising from the Dana Lomas February 2026 sequence; and related interstate wire-fraud conduct under 18 U.S.C. § 1343, including the Salesforce sabotage, communication rerouting, and materially false or misleading interstate communications about the wipe, witness status, and enterprise conduct.

[29]

219.    The predicate acts were related, had common purposes and participants, involved repeated use of interstate wires, and either constituted or threatened continued racketeering activity.

220.    Defendants also conspired to violate § 1962(c), in violation of § 1962(d), by agreeing with one another and with nonparty enterprise participants to carry out or facilitate the predicate acts and the overall concealment-and-intimidation scheme.

221.    Plaintiff was injured in business or property by reason of the RICO violations, including loss of employment compensation, loss of commissions and deal value, destruction of specifically identified business opportunities, harm to earning capacity, and other concrete economic injuries.

222.    Plaintiff is entitled to treble damages, fees, costs, and all relief authorized by 18 U.S.C. § 1964(c).

**COUNT VIII**

**Dodd-Frank Anti-Retaliation**

**15 U.S.C. § 78u-6(h)**

**(Against Defendants FCB and FCBI)**

223.    Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

224.    On May 29, 2025, Plaintiff submitted a TCR to the SEC reporting potential securities-law violations, internal-controls failures, books-and-records issues, retaliation, and Rule 21F-17 concerns.

225.    Plaintiff therefore qualifies as a whistleblower within the meaning of 15 U.S.C. § 78u-6.

[30]

226.	Plaintiff also engaged in protected acts described in § 78u-6(h), including providing information to the Commission and making SOX-related disclosures tied to securities and internal-controls issues.

227.	Defendants took adverse actions against Plaintiff because of that whistleblower activity, including continuing and intensifying the retaliatory sequence after the TCR, including the June 4 wipe, the June 5 concealment, the June 17 extortion-smear, the June 18 termination, and the August 2025 intimidation sequence.

228.	Plaintiff is entitled to all relief authorized by 15 U.S.C. § 78u-6(h)(1)(C), including reinstatement, double back pay with interest, fees, costs, and related relief.

**COUNT IX**

**Breach of the Implied Covenant of Good Faith and Fair Dealing (California Common Law)**

**(Against Defendant FCB)**

229.	Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

230.	Plaintiff and FCB were parties to an employment and compensation arrangement governing salary, commissions, bonuses, incentive compensation, territory credit, and pipeline/deal credit.

231.	Every contract includes an implied covenant of good faith and fair dealing.

232.	FCB breached that covenant by unfairly interfering with Plaintiff's right to receive the benefits of the employment and compensation arrangement, including by sabotaging Plaintiff's Los Angeles territory, altering Salesforce mappings, locking Plaintiff out of systems, diverting or reassigning account credit, and destroying Plaintiff's ability to close or receive credit for deals Plaintiff developed.

233.	This included, among other things, the April 22, 2025 Los Angeles HR-area manipulation, the diversion or misattribution of the 31 Jackson Hewitt accounts, and the

[31]

unexplained $2,581.71 payment modification used to obfuscate Plaintiff's earned compensation.

234.    As a direct result, Plaintiff suffered lost compensation, lost commissions, lost deal credit, lost pipeline value, and related damages.

**COUNT X**

**Conversion (California Common Law)**

**(Against Defendant FCB)**

235.    Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

236.    Plaintiff had a property right to specifically identifiable, vested compensation interests and account credits, including commissions and deal-credit attributable to identifiable merchant accounts and transactions.

237.    Specifically, Plaintiff had a vested property right to the commissions tied to the 31 recovered Jackson Hewitt accounts reflected in Defendants' systems.

238.    FCB intentionally and wrongfully exercised dominion and control over those specifically identifiable compensation interests and credits by diverting them, withholding them, misattributing them, or retaining them for the benefit of others.

239.    Plaintiff alleges that FCB's conduct went beyond a mere expectancy dispute and constituted interference with vested, identifiable commission credits traceable to actual, originated merchant accounts.

240.    As a direct result, Plaintiff suffered economic loss and is entitled to compensatory and punitive damages where authorized, together with interest and other relief allowed by law.

[32]

**COUNT XI**

**California Invasion of Privacy Act, Cal. Penal Code § 631 (with civil relief under § 637.2)**

**and Stored Communications Act, 18 U.S.C. § 2701 et seq.**

**(Against Defendant FCB)**

241.     Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

242.     Plaintiff used personal email accounts (including ProtonMail) and devices to communicate with Plaintiff's corporate account and to protect Plaintiff's whistleblower, accommodation, and leave communications.

243.     FCB intentionally rerouted, accessed, intercepted, or prevented Plaintiff's authorized access to those communications, including through the hidden or internal HRRedirect@firstcitizens.com mechanism.

244.     FCB thereby accessed or caused access to facilities through which electronic communication service is provided and obtained, altered, or prevented authorized access to communications while in electronic storage.

245.     FCB also willfully intercepted, read, or used communications in transit without Plaintiff's consent, in violation of California Penal Code § 631.

246.     As a direct result, Plaintiff suffered privacy injury, evidentiary prejudice, emotional distress, and related harm.

247.     Plaintiff is entitled to statutory damages, actual damages, punitive damages where authorized, injunctive relief, fees, and costs.

**COUNT XII**

**Intentional Interference with Prospective Economic Advantage (California Common Law)**

**(Against Defendant FCB)**

[33]

248.    Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

249.    Plaintiff had existing and prospective economic relationships with specific third parties, including Prasad Inampudi (Jackson Hewitt) and July Bocabeille (Neutraderm/DRMTLGY), which contained a probable future economic benefit to Plaintiff.

250.    FCB knew of those specific relationships and of Plaintiff's role in developing, recovering, or maintaining them.

251.    FCB intentionally engaged in independently wrongful conduct designed to disrupt those relationships.

252.    This independently wrongful conduct included CIPA/SCA violations via the covert rerouting of time-sensitive pricing proposals intended for July Bocabeille, statutory whistleblower retaliation, and defamation-like extortion framing.

253.    FCB's independently wrongful conduct directly disrupted or destroyed those relationships and caused Plaintiff to suffer the loss of the probable future economic benefits associated with them.

254.    Plaintiff suffered damages including lost economic opportunities, lost commissions, lost business relationships, and related harm.

255.    Plaintiff is entitled to compensatory and punitive damages where authorized.

**COUNT XIII**

**California Labor Code § 1198.5 (Personnel File Violations)**

**(Against Defendant FCB)**

256.    Plaintiff realleges and incorporates by reference paragraphs 1 through 163.

[34]

257.      California Labor Code § 1198.5 gave Plaintiff the right to inspect and receive copies of personnel records relating to Plaintiff's performance and grievances.

258.      Plaintiff made a written request for those materials, including the written warning and related records.

259.      FCB failed to permit inspection or provide a compliant production within the statutory time limits.

260.      FCB instead obstructed production through IT restrictions, refusals by HR, jurisdictional objections, delayed partial production, and withholding of core records including the warning and rebuttal materials.

261.      Plaintiff alleges that this violation was willful and part of the broader information-control and retaliation pattern pleaded here.

262.      For this pre-suit violation, Plaintiff is entitled to the statutory penalty of $750, fees, costs, and any other monetary relief authorized by § 1198.5.

## VIII. RESERVED ALLEGATIONS FOR RULE 37(E), INHERENT-AUTHORITY, AND RELATED MOTION PRACTICE

263.      Plaintiff expressly preserves the right to seek sanctions and evidentiary relief under Fed. R. Civ. P. 37(e) based on the June 4, 2025 organizational-data removal, the June 5 concealment sequence, the August 2025 coercive recovery threats, the comparator evidence, and related spoliation facts pleaded herein.

264.      Plaintiff further preserves the right to seek inherent-authority relief and remedies tied to fraud-on-the-tribunal, concealment, or abuse-of-process conduct by motion after further record development, including based on the June 5 denial, the January 26, 2026 certified Answer positions, witness-status concealment, and related conduct.

[35]

265.     Plaintiff further preserves the right to seek counsel-witness, disqualification, or related protective relief if Defendants place the conduct, testimony, or credibility of Fox counsel materially at issue in a manner that affects the integrity of these proceedings.

**IX. PRAYER FOR RELIEF**

266.     WHEREFORE, Plaintiff respectfully requests judgment in Plaintiff's favor and against Defendants, jointly and severally where applicable, and requests that the Court award:

267.     On Count I, all relief authorized by 18 U.S.C. § 1514A, including reinstatement or front pay, back pay with interest, special damages, emotional-distress damages, reputational damages, fees, and costs.

268.     On Count II, all relief authorized by the ADA and FEHA, including compensatory damages, equitable and injunctive relief, fees, costs, and punitive damages to the extent authorized by California law.

269.     On Count III, all relief authorized by the FMLA, including damages, liquidated damages where applicable, equitable relief, fees, and costs.

270.     On Count IV, all relief authorized by ERISA, including surcharge, restitution, declaratory and injunctive relief, restoration of losses, fees, costs, and other appropriate relief.

271.     On Count V, declarations that the SOX claim is not arbitrable, that SOX gateway issues may not be delegated, that the MAA's "original ink" clause is invalid, that the jury waiver is unenforceable, that the challenged provisions are unconscionable and non-severable, that Labor Code § 925 and California public policy bar contrary enforcement to the extent applicable, that no arbitration may stay the SOX claim, and related injunctive relief.

[36]

272. On Count VI, compensatory damages, emotional-distress damages, back pay, front pay, lost commissions and compensation to the extent recoverable, and punitive damages to the fullest extent permitted by California law.

273. On Count VII, treble damages under 18 U.S.C. § 1964(c), fees, costs, and all other relief authorized by RICO.

274. On Count VIII, all relief authorized by 15 U.S.C. § 78u-6(h)(1)(C), including reinstatement, double back pay with interest, fees, costs, and related relief.

275. On Count IX, compensatory damages, contract damages, interest, and all other relief allowed by law.

276. On Count X, compensatory damages, punitive damages where authorized, interest, and all other relief allowed by law.

277. On Count XI, statutory damages, actual damages, punitive damages where authorized, injunctive relief, fees, and costs.

278. On Count XII, compensatory damages, punitive damages where authorized, interest, and all other relief allowed by law.

279. On Count XIII, the statutory penalty under Labor Code § 1198.5 for the pre-suit violation, fees, costs, and related monetary relief.

280. Punitive damages under California law on all claims for which such damages are authorized, based on malice, oppression, fraud, and managing-agent authorization or ratification, including by Frank B. Holding, Jr., Matthew G.T. Martin, and other managing agents or officers as discovery may further establish.

[37]

281.   Reservation of the Court's authority to impose Rule 37(e), inherent-authority, evidentiary, issue, adverse-inference, monetary, and fee-shifting remedies upon motion and proper proof.

282.   Prejudgment and postjudgment interest as permitted by law.

283.   Costs of suit and reasonable attorneys' fees wherever authorized by statute or law.

284.   Such other and further relief as the Court deems just and proper.

## X. DEMAND FOR JURY TRIAL

285.   Plaintiff demands trial by jury on all issues so triable.

I, Jared Ashcraft, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on March 26, 2026 Las Vegas, Nevada

Dated: March 26, 2026

/s Jared Ashcraft

Jared Ashcraft, Pro Se

Plaintiff

Jared Ashcraft

Digitally signed by Jared Ashcraft
Date: 2026.03.26 02:02:37 -07'00'

[38]