Jared Ashcraft, Pro Se
PO Box 363242
North Las Vegas, NV 89036
legal@ashcraft.me

FILED

CLERK, U.S. DISTRICT COURT

5/4/26

CENTRAL DISTRICT OF CALIFORNIA

BY _____CS_____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

JARED ASHCRAFT,

         PLAINTIFF,

v.

FIRST-CITIZENS BANK & TRUST
COMPANY, A NORTH CAROLINA
CORPORATION; AND
FIRST CITIZENS BANCSHARES, INC.,
A DELAWARE CORPORATION,

         DEFENDANTS.

Case No.: 2:26-cv-02251-JLS-JDE

**TABLE OF AUTHORITIES
PLAINTIFF'S OPPOSITION TO ANY
APPLICATION FOR PRO HAC VICE
ADMISSION BY LISA M.
WILLIFORD**

# Cases

City & Cnty. of San Francisco v. Cobra Sols., Inc., 38 Cal. 4th 839 (2006) .............. 9

Colyer v. Smith, 50 F. Supp. 2d 966 (C.D. Cal. 1999) ................................. 9

In re Bundy, 840 F.3d 1034 (9th Cir. 2016) ................................. 8

Leis v. Flynt, 439 U.S. 438 (1979) ................................. 8

People ex rel. Dept. of Corps. v. SpeeDee Oil Change Sys., Inc.,
20 Cal. 4th 1135 (1999) ................................. 9

United States v. Ries, 100 F.3d 1469 (9th Cir. 1996) ................................. 8

United States v. Walters, 309 F.3d 589 (9th Cir. 2002) ................................. 8

[1]

Wheat v. United States, 486 U.S. 153 (1988) ................................................... 10

## Local Rules and Standing Orders

C.D. Cal. L.R. 83-2.1.1.2 ................................................................................ 8

C.D. Cal. L.R. 83-2.1.3.1-.3 ........................................................................... 8

C.D. Cal. L.R. 83-2.1.3.3(c) ........................................................................... 8

C.D. Cal. L.R. 83-2.1.3.4-.5 ........................................................................... 9

C.D. Cal. L.R. 83-3.1.2 .................................................................................. 8

Judge Josephine L. Staton Initial Standing Order ......................................... 14

## California Rules of Professional Conduct

California Rule of Professional Conduct 1.7 ................................................. 10

California Rule of Professional Conduct 1.9 ................................................. 10

California Rule of Professional Conduct 1.10 ............................................... 10

California Rule of Professional Conduct 3.7 ................................................. 10

[2]

Jared Ashcraft, Pro Se
PO Box 363242
North Las Vegas, NV 89036
legal@ashcraft.me

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

JARED ASHCRAFT,

      PLAINTIFF,

v.

FIRST-CITIZENS BANK & TRUST COMPANY, A NORTH CAROLINA CORPORATION; AND
FIRST CITIZENS BANCSHARES, INC.,
A DELAWARE CORPORATION,

      DEFENDANTS.

Case No.: 2:26-cv-02251-JLS-JDE

**PLAINTIFF'S OPPOSITION TO ANY APPLICATION FOR PRO HAC VICE ADMISSION BY LISA M. WILLIFORD**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

1. PLEASE TAKE NOTICE that Plaintiff Jared Ashcraft, appearing pro se, opposes any application for pro hac vice admission by Lisa M. Williford in this action, and respectfully requests that the Court deny such application, or, if already granted, revoke such permission.

2. This opposition does not arise from sharp litigation tactics, ordinary advocacy misconduct, or routine discovery friction. It arises from the extraordinary circumstance that defense counsel themselves became actors in the operative facts. Jeremy R. Sayre personally executed or participated in core disputed acts; Lisa M. Williford did not cure that problem, but instead

[1]

ratified and extended it; and Fox Rothschild LLP converted an individual-lawyer conflict into an institutional one through supervisory nonintervention, internal substitution, and continued off-docket control. Because the challenged lawyers and firm are now witnesses, repositories, and participants with respect to concealment, contradiction, tribunal-facing misrepresentation, certification conduct, routing-control conduct, extortion framing, witness interference, docket manipulation, insurance-concealment representations, and appearance-without-notice conduct, Williford's admission pro hac vice would threaten fact development, witness integrity, preservation integrity, and public confidence.

3. This opposition is based on this Notice, the memorandum below, the records and files in this action, matters subject to judicial notice, any supporting declaration and exhibits filed concurrently herewith, and any further argument and evidence presented.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. ISSUES PRESENTED**

4. The Court need not resolve the full merits case to decide this opposition, but it must confront an extraordinary threshold problem: whether Lisa M. Williford should be admitted pro hac vice or allowed to continue acting as an advocate where she ratified and extended core disputed events, added tribunal-facing representations of her own, and now appears against a factual backdrop in which Fox Rothschild and her predecessor Jeremy R. Sayre are already embedded in the operative record. The question is whether Williford should be admitted pro hac vice or continue acting as an advocate after ratifying Sayre's conduct and adding disputed representations of her own.

[2]

5. Plaintiff seeks denial, or if necessary revocation, of Williford's pro hac vice status on that basis.

## II. OPERATIVE FACTS

6. On May 21, 2025, Jeremy R. Sayre expressly acknowledged alleged "corporate-related misconduct (e.g., securities violations or other financial crimes) under the Sarbanes-Oxley Act (SOX) and SEC Rule 13a-15" and referred to Plaintiff's asserted whistleblower disclosures.

7. On May 21, 2025, and in later routing emails, Sayre told Plaintiff not to contact Matt Martin and other Bank leaders, stated there was no reason to copy senior leaders and Bank representatives, and later characterized such copying as "unnecessary and improper." The record includes written directives dated May 21, May 22, and August 8, 2025, restricting service or communications to fiduciaries, executives, and insurers.

8. On June 4, 2025, while Plaintiff's device was subject to preservation demands and foreseeable litigation, Defendants executed a remote destruction or removal event against organization-controlled data on that device.

9. On June 5, 2025, after waiting more than twenty-four hours, switching email chains, and removing OSHA Investigator Anna Son from the communications, Sayre sent a written denial that the device had "NOT been wiped."

10. On June 6 and June 9, 2025, Plaintiff sent direct written notice to Fox General Counsel Rachelle Bin identifying Sayre's conduct, the investigator-removal and false-denial problem, and the resulting advocate-witness and supervisory concerns.

[3]

11. On June 17, 2025, Sayre framed Plaintiff's protected settlement communications as "extortion," invoking the Michael Avenatti prosecution.

12. On June 18, 2025, Sayre personally authored and transmitted the communication effectuating Plaintiff's termination, stating that the Bank would "reflect your employment status as terminated and advise Fidelity accordingly." The June 18 sequence also included written pressure concerning the characterization of separation as a "voluntary resignation" and associated access to vested Fidelity 401(k) retirement funds, as well as written withholding or delayed reporting to Fidelity concerning employment status used coercively in that sequence.

13. On July 31, 2025, weeks after the case had been docketed on June 12, 2025, Sayre sent an email to OALJ staff, copied to Plaintiff, expressly stating that he represented Defendants, invoking the docket, describing Defendants' objections to Plaintiff's filings and deposition notices, and seeking procedural guidance, without having filed a Notice of Appearance.

14. On July 28, 2025, Plaintiff had a neutral-imaging motion pending. During August 2025, including August 6, August 8, and August 14, Defendants sent SIU / local-authorities threat communications concerning the preserved laptop while that neutral-imaging request remained pending. On August 20, 2025, after Plaintiff raised the routing directives with the Chief Administrative Law Judge's office, Sayre represented through the Docket Clerk that Plaintiff's assertion that counsel had instructed him not to serve or copy certain fiduciary-level individuals was "false." Williford was copied on that denial despite the earlier August 8 directive.

15. On August 21, 2025, Plaintiff sent an urgent supplemental notice expressly naming Williford in connection with the August 20 contradiction. On September 17, 2025, Fox shifted from Sayre to Lisa M. Williford as counsel handling the matter. That September 17 shift was Fox's first internal

[4]

substitution step after Sayre's conduct had already become part of the operative record.

16. On September 30, 2025, at a conference before Judge Timlin, Williford stated on the record that every time Plaintiff served a document he emailed the CEO, Board, chief legal counsel, herself, Sayre, and Ms. Bin, and that "We've asked him not to do that."

17. At the same proceeding, Williford argued that the June 4 destruction/removal event was "post-employment" and therefore irrelevant, although the preserved record places termination on June 18, 2025.

18. After that September 30 conference, Sayre no longer appeared or took action in the matter and was effectively walled off, supporting the inference that Fox itself understood he had become too fact-embedded to continue as an advocate.

19. On January 12, 2026, Plaintiff stated on the record, on three separate occasions, that Jeremy R. Sayre had terminated him, had lied to the Chief Judge about him, and had accused him of extortion. Williford was given the opportunity to deny that assertion and did not do so, instead stating that "at all times, he was acting as legal counsel for First Citizens."

20. Later that same day, Williford initially acknowledged that Plaintiff had sent discovery to "an insurer of the bank." When Plaintiff pointed out that the only insurer to whom he had sent discovery was Chubb, Williford retreated into claimed uncertainty while simultaneously acknowledging that the requests had been directed to Chubb and labeled "D&O insurer."

21. On January 26, 2026, Williford signed the Answer certifying that Plaintiff had voluntarily resigned. That certification followed the January 12, 2026 conference, where Plaintiff stated on the record three times that Sayre had terminated him and Williford did not deny it.

[5]

22. That same Answer also certified that access had merely been suspended, that no data were deleted or destroyed, and that SIU/local-authorities follow-up was consistent with "standard practice."

23. On February 10, 2026, exactly seven days after Plaintiff served 25 interrogatories on Dana Lomas targeting SOX control failures, Williford filed a protective-order motion using evasive past-tense language concerning Lomas while Lomas's exact role was simultaneously posted as vacant.

24. On February 27, 2026, Williford's protective-order filings falsely quoted Plaintiff's Rule 408 communication by changing the substance of what Plaintiff had written and presenting the quotation as the opposite of Plaintiff's actual statement.

25. Those same filings also falsely certified that Plaintiff's retention of a powered-down, BitLocker-encrypted laptop posed an active data-security threat and omitted or minimized the significance of Defendants' own BitLocker/Azure key-control architecture and Plaintiff's neutral-forensic proposal.

26. On March 9, 2026, after defaulting on the Dana Lomas emergency motion by three days, Williford engaged in a reactive post-default filing sequence supported by forensic metadata. The record reflects that no opposition was filed by the March 6 deadline; that Plaintiff served default notice at 8:00 a.m. Pacific on March 9; that the response PDF was created at 12:40 p.m. Pacific, with a SourceModified timestamp corresponding to active preparation at approximately 12:26 p.m. Pacific; that Plaintiff then notified the OALJ at 1:06 p.m. Pacific that the matter was live in the Central District of California and that administrative jurisdiction had shifted; and that Williford docketed the response at 1:20 p.m. Pacific, fourteen minutes later. The same PDF carried Fox Rothschild's internal billing identifier, Client-Matter 195114-00213. This sequence supports the inference that the filing

[6]

was not a timely merits response, but a reactive effort to blunt an already-exposed default after notice of federal divestiture.

27. The federal complaint pleads that Fox Rothschild LLP, Jeremy Sayre, Lisa Williford, and Rachelle Bin are active, participating members of the "FCB-Fox-Chubb Enterprise," and that Fox did more than provide ordinary legal services. Those allegations do not prove themselves, but they underscore why these lawyers are not merely outside advocates observing the facts from a distance.

28. Fox's status as insurer-funded panel counsel for Chubb, combined with Plaintiff's notice to Chubb of intentional misconduct, spoliation, and fraud on the tribunal, creates an additional conflict because Fox's own insurer-facing communications, matter funding, and claims-control role are likely to become factually relevant.

29. On March 10, 2026, before any federal appearance, Williford stated that she "will be representing" First Citizens, demanded that communications be routed only through her, purported to forbid further communications to bank officers, and attempted to control federal case routing without a filed Notice of Appearance.

30. In the federal action, Williford thus demanded that communications be directed through her and objected to direct contact, yet for a period no formal federal appearance was on file. That off-docket control posture is itself part of the factual problem.

## III. LEGAL FRAMEWORK

31. Pro hac vice admission is a privilege, not a right. The Central District's Local Rules define who may apply and who is disqualified from appearing pro hac vice, require a formal application, and provide that approval is at the

[7]

discretion of the assigned judge. See C.D. Cal. L.R. 83-2.1.3.1-.3. Any attorney who appears for any purpose submits to the discipline of this Court, and a registered pro hac vice attorney likewise submits to the disciplinary authority of the Central District of California. See C.D. Cal. L.R. 83-2.1.1.2; 83-2.1.3.3(c). Attorneys appearing before this Court must comply with the standards of professional conduct required of California attorneys. See C.D. Cal. L.R. 83-3.1.2.

32. The Supreme Court has made clear that out-of-state attorneys do not possess a free-standing constitutional entitlement to appear pro hac vice. Leis v. Flynt, 439 U.S. 438, 442-43 (1979). In the Ninth Circuit, denial of a motion to appear pro hac vice is ordinarily reviewed for abuse of discretion. United States v. Walters, 309 F.3d 589, 591 (9th Cir. 2002). The Ninth Circuit has also recognized that out-of-state attorneys may be more difficult to reach or discipline than local counsel, and that a district court may reject a pro hac vice application where the attorney's behavior strongly suggests that he or she will not abide by the court's rules and practices, thereby impeding the orderly administration of justice. United States v. Ries, 100 F.3d 1469, 1471-72 (9th Cir. 1996).

33. The Ninth Circuit's PHV decisions make the standard concrete. A district court may deny pro hac vice admission on grounds reasonably related to the orderly administration of justice or other legitimate court policies, but it must articulate a reasonable basis for ethical doubts rather than act mechanically. See In re Bundy, 840 F.3d 1034, 1041-42, 1045-49 (9th Cir. 2016) (reaffirming Walters and Ries, and upholding denial of pro hac vice admission where the applicant's conduct showed disregard for ethical and procedural obligations).

34. The same conclusion is reinforced by this Court's inherent authority to protect the integrity of its proceedings. In the Central District, a non-client

[8]

may raise an ethics-based objection where the breach so infects the litigation that it impacts the moving party's interest in a just and lawful determination of the claims. See Colyer v. Smith, 50 F. Supp. 2d 966, 971-72 (C.D. Cal. 1999). Colyer also recognizes the Court's inherent obligation to manage the conduct of attorneys who appear before it and to ensure the fair administration of justice. Id. at 971. And California authority likewise explains that a court's power to control attorney conduct derives from its inherent power to control, in furtherance of justice, the conduct of its ministerial officers. See City & Cnty. of San Francisco v. Cobra Sols., Inc., 38 Cal. 4th 839, 846 (2006) (quoting People ex rel. Dept. of Corps. v. SpeeDee Oil Change Sys., Inc., 20 Cal. 4th 1135, 1145 (1999)).

35. The local-counsel requirements of the Central District further underscore why PHV admission is a threshold gatekeeping question, not a formality. Every attorney seeking to appear pro hac vice must designate Local Counsel meeting the District's requirements, and the assigned judge may additionally require designation of co-counsel with authority to act as attorney of record for all purposes. See C.D. Cal. L.R. 83-2.1.3.4-.5. In a case like this one, where the proposed nonresident attorney is already embedded in disputed facts and challenged certifications, those rules magnify rather than reduce the Court's responsibility to scrutinize whether admission would import a contaminated record into the case.

36. That is the proper frame here. Plaintiff is not asking the Court to collapse disqualification doctrine into pro hac vice doctrine. Plaintiff is asking the Court to exercise its threshold gatekeeping authority and deny or revoke pro hac vice status where the proposed nonresident attorney is already embedded in the operative facts, is a likely necessary witness, and presents concrete risks to the ethical and orderly administration of justice.

[9]

37. The California ethics rules adopted by this Court reinforce that answer. California Rule of Professional Conduct 3.7 provides that a lawyer shall not act as an advocate at trial in which the lawyer is likely to be a witness, absent limited exceptions. Rule 3.7(b) further provides that when another lawyer in the same firm is likely to be a witness, the analysis runs through Rules 1.7 and 1.9. Rule 1.10 addresses imputation of conflicts within a firm. See Cal. Rules of Prof'l Conduct 1.7, 1.9, 1.10, 3.7.

38. To be sure, Rule 3.7 is formally framed in terms of trial advocacy. But pro hac vice admission is a threshold, forward-looking gatekeeping decision. The Court need not wait until the eve of trial to admit nonresident counsel whose own conduct is already likely to be the subject of testimony, impeachment, credibility findings, preservation disputes, and sanctions-related fact development. Where the reason admission is opposed is that the applicant herself is in the facts, the Court may deny or revoke pro hac vice status now rather than import an avoidable integrity problem into the case.

39. Wheat v. United States confirms that courts have an independent interest in ensuring that proceedings are conducted within the ethical standards of the profession and appear fair to those who observe them, and that a court may act not only on an actual conflict but also on a serious potential for conflict. 486 U.S. 153, 160, 164 (1988). That principle fits this record. The question is not simply whether counsel might someday face an ordinary trial-stage advocate-witness objection. The question is whether this Court should admit or continue to permit Williford to appear when the record already shows that she is tied to likely witness testimony, direct factual participation, relevant communications, and challenged tribunal-facing representations.

[10]

## IV. BACKGROUND FACTS CONCERNING JEREMY R. SAYRE RELEVANT TO WILLIFORD'S APPLICATION AND FOX'S TAINTED APPEARANCE

**A. Sayre's Conduct Is Included as Background Showing Why Williford's Application Cannot Be Viewed in Isolation**

40. Sayre is not peripheral to the background of this dispute. He is a witness to, and actor in, the May 21 acknowledgment of SOX/SEC/internal-controls subject matter; the May 21 and later routing/control directives restricting communications to executives and fiduciaries; the June 5 chain-switch, investigator-removal, and "NOT been wiped" denial; the June 17 extortion framing; the June 18 termination communication and resignation/401(k)-pressure sequence; the July 31 email to OALJ staff asserting representation without a filed appearance; the August 20 Docket Clerk denial concerning his own routing directives; and the September 30 conference where Williford advanced a false post-employment timing argument he did not correct.

41. These are not incidental background facts. They are merits-significant facts that explain why Williford's application cannot be viewed in isolation.

42. Sayre crossed the line from legal advice into direct participant conduct bearing on obstruction, witness interference, tribunal-facing contradiction, retaliation, ERISA-related coercion, and employment termination. Plaintiff includes that conduct here not because Sayre is expected to be the present PHV applicant, but because Williford inherited, ratified, and extended a record already shaped by his actions, and Fox's internal shift from Sayre to Williford is itself part of the taint analysis.

[11]

**B. Additional Background Facts Showing Why Fox Could Not Cure the Problem Merely by Replacing Sayre with Williford**

43. The July 28 neutral-imaging motion, the August 6 / 8 / 14 SIU-local-authorities threat sequence while that motion was pending, and the post-September 30 walling off of Sayre all reinforce that Fox recognized the problem but did not solve it. Instead, the firm shifted the matter to Williford, who then ratified and extended the same factual narrative. Sayre therefore remains relevant as background evidence showing that Williford did not enter as clean substitute counsel and that Fox's attempted substitution did not remove the taint.

## V. GROUNDS TO DENY OR REVOKE PRO HAC VICE STATUS AS TO LISA M. WILLIFORD

**A. Facts Establishing Lisa M. Williford as a Necessary Witness and Improper Pro Hac Vice Applicant**

44. Williford independently crossed the line from advocate to fact witness. She ratified the routing-directive contradiction, including after being copied on the August 20 denial and being expressly named in the August 21 supplemental notice; she made the September 30 post-employment timing misrepresentation concerning the June 4 destruction/removal event; she failed to deny on January 12 that Sayre terminated Plaintiff; during the January 12, 2026 hearing, after acknowledging that Plaintiff had served discovery on "an insurer of the bank," she stated on the record, "I honestly don't know to what extent Chubb is or is not an insurer"; she certified the January 26 Answer's resignation narrative, "no deletion/destruction" narrative, and "standard practice" certification; she used evasive past-tense

[12]

language in the Dana Lomas witness-status sequence; she filed the February 27 selective-quotation and laptop-risk papers; and she attempted to control the federal action off-docket before filing an appearance.

45. Fox did not bring in Williford as clean substitute counsel; it inserted her after Sayre's conduct was already embedded in the operative record, making her part of the firm's internal ratification and extension of the same factual problem.

46. Williford formally certified the January 26, 2026 Answer characterizing the SIU / local-authorities threat sequence as "consistent with its standard practice," thereby ratifying the coercive evidence-recovery sequence as an institutional defense position rather than distancing the defense from it.

47. Williford personally filed the February 27, 2026 protective-order motion asserting the preserved laptop was an "unprotected data risk," while omitting or minimizing BitLocker / Azure key-control facts and Plaintiff's proposed neutral-forensic protocol, making her a witness to the construction of that narrative.

48. Williford directly facilitated the Dana Lomas concealment sequence: seven days after targeted discovery was served on Lomas, she filed a protective-order motion using evasive past-tense language while Lomas's exact role was simultaneously posted vacant.

49. Williford is a necessary witness on at least five discrete topics: the September 30 timing misrepresentation; the January 26 "standard practice" certification; the February 27 laptop-risk certification and selective quotation; the January 12 Chubb-insurer misrepresentation; and the February 10 Dana Lomas concealment sequence.

**B. Additional Facts Supporting Denial or Revocation as to Lisa M. Williford**

[13]

50. Additional Lisa-specific acts confirm that status. Comparator evidence concerning Stephanie Daughtridge showed ordinary offboarding without SIU, police threats, "FINAL NOTICE," or stolen-property framing, yet Williford later certified that the coercive escalation directed at Plaintiff was "standard practice."

51. On November 21, 2025, Williford transmitted an email stating that "all motions are denied pending Judge Timlin's decision on the pending Motion to Dismiss," and used that unwritten clerk-rejection language to characterize Plaintiff's meet-and-confer efforts as improper and to justify Respondent's refusal to engage on default and sanctions issues. The record further reflects that this language did not appear in any written order, but instead surfaced through clerk-level rejection messages later adopted by Williford as if they carried binding force. That episode supports the inference that Williford did not merely defend her client within existing procedural rules, but affirmatively exploited an unwritten procedural blackout to block docket access and shield Respondent from default and sanctions exposure.

52. The record also supports adding Williford's March 11, 2026 refusal to confer to the federal chronology. After asserting on March 10 that she "will be representing" First Citizens and demanding that communications be routed through her, Williford then refused on March 11 to confer unless and until a summons had been issued and the Complaint served. That sequence matters because it shows the same off-docket control posture migrating into the federal case: Williford sought to monopolize communications as counsel while declining to perform the conferral responsibilities that normally accompany that role. Judge Staton's Initial Standing Order states that "special appearances are not permitted, and only counsel of record may appear." Williford's attempt to impose litigation-control directives before

[14]

appearing therefore reinforces, rather than cures, the concern that she was attempting to function as ghost counsel while remaining formally off docket.

53. Finally, the timing of Williford's entry into the OALJ matter further undercuts any claim that she arrived as clean substitute counsel. The record reflects that Fox shifted the matter from Sayre to Williford on September 17, 2025, and that Plaintiff's motion to disqualify Sayre was itself dated and served that same day. On this record, Williford's entry is not fairly viewed as routine staffing; it is more reasonably viewed as a tactical substitution undertaken at the precise moment Sayre's conduct became the subject of a direct disqualification challenge.

54. The March 9 post-default metadata sequence further places Williford in the evidentiary lane and reinforces that she is not merely arguing about the facts, but participated in them.

## VI. FOX'S INSTITUTIONAL TAINT FURTHER CONFIRMS THAT WILLIFORD'S APPLICATION SHOULD BE DENIED

### A. Facts Establishing Firm-Wide Imputation and Institutional Taint

55. Internal substitution would merely repackage the same firm conflict under a different individual name. The conflict is imputed at the firm level because Fox leadership received direct supervisory notice on June 6 and June 9, 2025 through Rachelle Bin, did not intervene, later shifted the matter internally from Sayre to Williford, and then continued pressing positions that deepened the factual entanglement.

56. Once the firm itself participated in the operation and management of the enterprise or scheme at issue, the premise that it can simultaneously function as neutral counsel becomes unsustainable. Fox is itself a witness source

[15]

regarding supervision, substitution, insurer communications, internal matter handling, and the development of challenged tribunal-facing narratives.

**B. Additional Facts Supporting Denial of Any Attempted Fox Appearance Through Pro Hac Vice Counsel**

57. Fox's insurer-funded panel-counsel relationship with Chubb, the firm's continued off-docket control posture in the federal action, and the March 9 billing-code-linked filings all reinforce that the issue is not just individual-lawyer conflict. It is institutional taint. Williford's admission pro hac vice would not solve that problem; it would import it.

**VII. REQUEST FOR RELIEF**

58. WHEREFORE, Plaintiff respectfully requests that the Court enter an order denying Lisa M. Williford permission to appear pro hac vice in this matter, or revoking such permission if already granted.

**VIII. CONCLUSION**

59. Fox Rothschild cannot remain both witness source and clean advocate. Sayre's conduct is embedded in the merits facts as background showing how the taint arose. Williford then ratified and extended the challenged positions. Bin and Fox management had direct notice and did not intervene. The conflict is not curable through cosmetic substitution or pro hac vice packaging.

60. Williford's application should be denied because she did not arrive as clean substitute counsel but instead ratified and extended a challenged record already shaped by Sayre and Fox's nonintervention.

[16]

61. For those reasons, the Court should deny or revoke pro hac vice status as to Lisa M. Williford.

Dated:   May 04, 2026

/s Jared Ashcraft

Jared Ashcraft, Pro Se

Plaintiff

Jared Ashcraft

Digitally signed by Jared Ashcraft
Date: 2026.05.04 21:33:17 -04'00'

[17]

Jared Ashcraft, Pro Se
PO Box 363242
North Las Vegas, NV 89036
legal@ashcraft.me

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

JARED ASHCRAFT,

            PLAINTIFF,

v.

FIRST-CITIZENS BANK & TRUST
COMPANY, A NORTH CAROLINA
CORPORATION; AND
FIRST CITIZENS BANCSHARES, INC.,
A DELAWARE CORPORATION,

            DEFENDANTS.

Case No.: 2:26-cv-02251-JLS-JDE

**DECLARATION OF JARED ASHCRAFT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO ANY APPLICATION FOR PRO HAC VICE ADMISSION BY LISA M. WILLIFORD**

I, Jared Ashcraft, declare as follows:

1. I am the Plaintiff in this action and appear pro se. I have personal knowledge of the facts stated in this declaration, except as to matters stated on information and belief, and if called as a witness I could and would testify competently to them.

2. I submit this declaration in support of Plaintiff's Opposition to Any Application for Pro Hac Vice Admission by Lisa M. Williford.

3. The exhibits submitted with the opposition are compiled in a single exhibit packet. Unless otherwise stated, each exhibit is a true and correct copy of a document, email, screenshot, transcript excerpt, filing, or record that I personally sent, personally received, personally captured, personally maintained, or preserved in the ordinary course of documenting the events at issue in this matter and the related OALJ proceeding.

[1]

4. To the extent any exhibit consists of a filing by Respondent or its counsel, a tribunal transcript, a clerk communication, or a record generated by a third party, it is a true and correct copy of the document as I received it, downloaded it, or preserved it from the source reflected on the face of the exhibit.

5. Exhibit A is a true and correct copy of excerpts from Respondent's January 26, 2026 Response to the Pleading Complaint, including the paragraphs in which Respondent asserted that no data were deleted or destroyed and that the SIU / local-authorities follow-up was consistent with "standard practice."

6. Exhibit B is a true and correct copy of excerpts reflecting Respondent's "standard practice" position concerning SIU / false police report escalation.

7. Exhibit C is a true and correct copy of the June 4, 2025 screenshot showing the "Org data removal" notice on my device.

8. Exhibit D is a true and correct copy of the FCB service desk call transcript for ticket RITM0730529 reflecting that my account appeared as "revoked" / "disabled."

9. Exhibit E is a true and correct copy of my June 4, 2025 email documenting the spoliation event and requesting clarification.

10. Exhibit F is a true and correct copy of the June 5–6, 2025 email chain reflecting the chain swap, removal of OSHA Investigator Anna Son, and counsel's written denial that my mobile device had been wiped.

11. Exhibit G is a true and correct copy of my response after the investigator-removal and spoliation denial sequence.

12. Exhibit H is a true and correct copy of the June 17, 2025 correspondence in which Jeremy R. Sayre framed my protected settlement communications as "extortion," together with my response.

[2]

13. Exhibit I is a true and correct copy of my offer of neutral forensic imaging and related correspondence concerning preservation of the laptop and the need for a neutral protocol.

14. Exhibits J.1 through J.4 are true and correct copies of the June 18, 2025 401(k) / resignation / termination email sequence, including the coercive resignation framing, my statement that I was not resigning, Mr. Sayre's statement that the Bank would reflect my employment status as terminated and advise Fidelity accordingly, and my response.

15. Exhibit J is a true and correct copy of correspondence reflecting counsel's later demand for the laptop then under litigation hold.

16. Exhibit K is a true and correct copy of comparator evidence showing ordinary offboarding communications without SIU threats, police threats, "FINAL NOTICE" language, or stolen-property framing.

17. Exhibit L is a true and correct copy of Respondent's February 27, 2026 Motion for Entry of a Protective Order.

18. Exhibit M is a true and correct copy of my opposition to Respondent's February 27, 2026 protective-order motion.

19. Exhibit N is a true and correct copy of my March 5–6, 2026 meet-and-confer correspondence regarding the GLBA / encryption issue, together with Ms. Williford's boilerplate refusal to respond substantively.

20. Exhibit O is a true and correct copy of screenshots reflecting PDF metadata for the March 9, 2026 Dana Lomas response, including the document creation time, modification time, and custom metadata fields showing Fox Rothschild's internal billing identifier Client-Matter 195114-00213.

[3]

21. Exhibit P is a true and correct copy of my March 9, 2026 notice to OALJ chambers documenting that the Dana Lomas response was filed after the March 6 deadline and after notice that the matter was live in the Central District of California.

22. The September 30, 2025 hearing excerpts included in the exhibit packet are true and correct copies of the reporter-certified transcript as preserved by me. Those excerpts include the appearance page identifying Lisa M. Williford and Jeremy R. Sayre for Respondent, and the portion of the conference in which Ms. Williford characterized the June 4, 2025 wipe as "post-employment" and "wholly irrelevant."

23. The metadata exhibits relating to March 9, 2026 accurately reflect the screenshots and records I preserved concerning the timing of the post-default Dana Lomas filing sequence.

This opposition was drafted in March 2026 contemporaneously with the conduct described herein. Ms. Williford has since filed a Notice of Appearance in this action on May 04, 2026. The off-docket control conduct described below therefore reflects her pre-appearance posture, which is itself part of the factual record this Court should consider in evaluating the PHV application.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   May 04, 2026

/s Jared Ashcraft

Jared Ashcraft, Pro Se

Plaintiff

[4]

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**
**Washington, DC**

JARED ASHCRAFT,
            Complainant,

    v.

FIRST-CITIZENS BANK & TRUST COMPANY,
    Respondent.

**OALJ Case No: 2025-SOX-00035**
**OSHA Case No.: 301054553**

**RESPONSE TO THE PLEADING COMPLAINT**

Respondent First-Citizens Bank & Trust Company ("Respondent" or "FCB") pursuant to the Court's Orders of September 16, 2025 and January 15, 2026, responds to the allegations contained in the Pleading Complaint of Complainant Jared Ashcraft. As noted in the Court's Order of January 6, 2026, much of the Pleading Complaint is "unclear" and "too scattered to comprehend." Respondent has made its best effort to admit or deny the allegations that are clear enough for it to understand, and has otherwise noted in each paragraph where it denies allegations that are too unclear to provide Respondent sufficient information to admit or deny their contents.

## STATEMENT OF THE CASE

This paragraph appears to contain statements of the purpose of Complainant's action and the nature of his legal claim to which no response is required. To the extent a response is deemed required, denied.

## FINALITY AND PRECLUSION

This paragraph appears to contain requests for relief from this Court to which no response is required. To the extent a response is deemed required, denied.

Respondent informed Complainant that his email was unclear as to what specific "disclosures" he believed he had made and when, and asked him to clarify the particular facts he believed supported his accusations. Complainant never did, instead repeating his bare invocation of buzzwords like "SOX," "disclosure," and "whistleblower." Without information on any specific reports Complainant made regarding specific conduct he believed to violate federal securities law, Respondent was not, and could not have been, aware that Complainant engaged in any protected activity.

6.      On May 21, 2025, Complainant informed Ms. Green that he would be unable to continue performing his job duties until his internal complaints were resolved. As a result, Respondent agreed to place Complainant on an administrative leave of absence while it continued its investigation. Respondent advised Complainant that a portion of this leave would be paid in accordance with its paid leave policy, but that once the available paid leave was exhausted, any additional leave would be without pay if Complainant did not otherwise return to work.

PLAINTIFF'S EXHIBIT

7.      When an employee takes a leave of absence, Respondent's standard policy is to suspend that employee's access to its network to ensure that no work is conducted during the period of leave. Consistent with this practice, on May 22, 2025, Respondent suspended Complainant's network access. Upon information and belief, that suspension is what Complainant now refers to as a "system lockout." (*See* Pleading Compl. at 3, 5-8, 10-12). As part of that suspension, Complainant was unable to access his work Office 365 account through his mobile device during the period of administrative leave, which Complainant characterizes as Respondent having remotely "wiped" his mobile device.

8.      No data on Complainant's work laptop or mobile device were deleted or destroyed by Respondent. Those data exist in Respondent's internal systems in the same form in which they were created. Complainant's access to those data was merely suspended while he was on administrative leave, and would have been reinstated upon his return to work. Once his employment terminated,

PLAINTIFF'S EXHIBIT

Respondent's business and the sensitivity of financial data and related customer information in its possession, it is essential for Respondent to require strict control over this type of property.

20.    Consistent with that standard practice, Respondent issued multiple requests to Complainant to return his company-issued laptop following the separation of his employment. Despite these requests, Complainant refused to return his company-issued laptop, which resulted in multiple follow-up efforts from Respondent (also consistent with its standard practice). Upon information and belief, these efforts are what Complainant refers to as "SIU/Law enforcement involvement."

21.    To date, Complainant still has possession of his company-issued laptop.

22.    Based on the above, any protected activity in which Complainant engaged was not a contributing factor to Complainant's resignation. 29 C.F.R. § 1980.104(e)(2)(iv); 49 U.S.C. § 42121(b)(2)(B)(iii); *see also Murray v. UBS Sec., LLC*, 601 U.S. 23, 40 (2024) (Alito, J., concurring) (an employer must make an "intentional choice in which [the protected activity] plays some role in the employer's thinking"); *Murray v. UBS Sec., LLC*, 128 F.4th 363, 366 (2d Cir. 2025) (protected activity must "actually cause or help cause" the adverse action), *cert. denied*, No. 25-264, 2025 WL 3260202 (S. Ct. Nov. 24, 2025).

23.    On or around June 16, 2025, Complainant made a public post on his LinkedIn profile which included the entirety of a motion before this Court to disqualify counsel for Respondent. In his post, Complainant wrote: "Generative AI is revolutionizing the legal landscape, empowering pro se litigants to reshape power dynamics within the legal system. As a pro se litigant, I have utilized generative AI to independently investigate, file, and actively litigate a federal whistleblower retaliation case against a $100 billion+ bank, represented by a prominent law firm. Surpassing the procedural precision of elite law firms, this accomplishment was made possible through a meticulous integration of legal research, fact extraction, evidentiary modeling, and AI-powered drafting."

## GOOD FAITH CERTIFICATION

Respondent has conferred with Complainant in good faith to identify uncontroverted facts and legal issues to which the parties can stipulate and the parties have been unable to reach an agreement.

This the 26th day of January, 2026.

*s/Lisa M. Williford*
Lisa M. Williford
N.C. Bar No. 44184
lwilliford@foxrothschild.com
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
PO Box 21927 (27420)
Greensboro, NC  27401
Telephone: 336.378.5200
Facsimile: 336.378.5400

*Attorney for Respondent*

28

# Org data removal



**PLAINTIFF'S EXHIBIT**

Your organization is now removing its data associated with this app because your account Jared.Ashcraft@firstcitizens.com is disabled.

This app will now restart. Contact your organization's support team for help.

OK

Jared Ashcraft
Pro Se Complainant
Email: legal@ashcraft.me
Phone: (252)258-1535

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

| | | |
|---|---|---|
| Jared Ashcraft, | ) | |
|   Complainant, | ) | |
| | ) | Case No. 2025-SOX-00035 |
| v. | ) | |
| | ) | |
| First Citizens Bank, | ) | |
|   Respondent. | ) | |

PLAINTIFF'S
EXHIBIT

## EXHIBIT: FCB SERVICE DESK CALL TRANSCRIPT – RITM0730529

---

**EXHIBIT: FCB SERVICE DESK CALL TRANSCRIPT – RITM0730529**

**Date/Time:** June 4, 2025 (~05:27 PDT)
**Participants:** Jared Ashcraft (Complainant) and "Sudri" (FCB Service Desk Representative)
**Reference No.:** RITM0730529

---

**Transcript**

**Service Desk:** Hi, thank you for calling FCB service desk. My name is Sudri. Who do I have the pleasure to speak with?
**Ashcraft:** My name is Jared Ashcraft.
**Service Desk:** Hi, how are you today?
**Ashcraft:** I am doing okay, sir. How about yourself?
**Service Desk:** I'm doing good. Thank you… Can you please provide me with your ID before we continue?
**Ashcraft:** QWE45.
**Service Desk:** Okay. And a phone number in case we get disconnected.
**Ashcraft:** 252-███████

**Service Desk:** Thank you very much. Now, can you please tell me is this recording a new ticket or an existing one?

**Ashcraft:** It's a new ticket.

**Service Desk:** Can you please tell me more about your issue?

**Ashcraft:** I'm unable to log in. On May 22nd they put me on administrative leave that was supposed to end today. I tried to log in, but I still can't.

**Service Desk:** Okay. Are you trying to log into a specific app or your computer?

**Ashcraft:** I tried logging in to Outlook on my phone.

**Service Desk:** Sorry, can you repeat that?

**Ashcraft:** I was trying Outlook on my phone.

**Service Desk:** Okay. When was the last time you had access?

**Ashcraft:** May 21st, I believe.

**Service Desk:** Okay. Is your device an Apple?

**Ashcraft:** No, Android.

**Service Desk:** Thank you. I'll pull up some information. Please stay on the line. One more time, your user ID?

**Ashcraft:** QWE45WE.

**Service Desk:** Okay, thank you. One moment please.

**Ashcraft:** Mhm.

**Service Desk:** I'm seeing here that your account appears as **revoked**. In this case, you and your manager have to contact HR so it can be reactivated.

**Ashcraft:** So, my account status is revoked—that's correct?

**Service Desk:** Yes. The account for Jared Ashcraft with user ID QWE45 appears as revoked.

**Ashcraft:** Is that different than leave of absence?

**Service Desk:** Yes, that's different. It means your account has been **disabled**. You'll need HR to reactivate.

**Ashcraft:** Do you have a ticket number for me?

**Service Desk:** Yes, give me one moment… M0730529.

**Ashcraft:** 0730529. Got it. So I need HR to either unrevoke me or terminate me, one of the two?

**Service Desk:** That's correct. You must contact HR for reactivation or termination.

**Ashcraft:** Okay, thank you so much.

**Service Desk:** Thank you for calling FCB service desk. Have a great day.

---

**Evidentiary Note**

On June 4, 2025, at approximately **05:27 PDT**, Respondent's service desk confirmed Complainant's account status as **"revoked" / "disabled."** This contemporaneous admission directly contradicts Respondent's counsel's June 5, 2025 written denial that the device had "NOT been wiped." The transcript corroborates Complainant's screenshots and contemporaneous records of spoliation.



**Subject:** RE: [EXT] Urgent: Unexplained Compensation Increase & Bonus Clarification
**From:** "Jared Ashcraft" <Jared@ashcraft.me>
**Date:** 6/4/2025, 5:43 AM
**To:** "Sayre, Jeremy R." <JSayre@foxrothschild.com>
**CC:** "Son, Anna - OSHA" <Son.Anna@dol.gov>, "FCBDirectors@FirstCitizens.com" <FCBDirectors@FirstCitizens.com>, "investor.relations@firstcitizens.com" <investor.relations@firstcitizens.com>
**BCC:** "legal@ashcraft.me" <legal@ashcraft.me>

Dear Mr. Sayre,

This morning, I spoke with FCB technical support and was assigned RITM:0730529. I was explicitly informed that I am not listed as being on administrative leave—instead, my account access has been formally revoked. Additionally, FCB remotely wiped my mobile device without prior notice or confirmation of separation.

These facts directly contradict the Bank's prior characterization of my status and reinforce the appearance of constructive discharge.

I am requesting immediate written clarification of:

1. My current employment status,

2. The legal basis for the device wipe,

3. The reason my account was revoked and initially blocked from standard support ticket creation.

Please respond by close of business today.

Sincerely,

Jared Ashcraft

On Tuesday, June 3rd, 2025 at 5:55 PM, Jared Ashcraft <Jared@ashcraft.me> wrote:

> Mr. Sayre
>
> This is a formal legal objection to your June 3, 2025 response and the Bank's continuing actions mischaracterizing the nature of my employment status, restricting protected communication, and reinforcing a pattern of retaliatory isolation following federally protected disclosures.
>
> ---
>
> I. Clarification Regarding Alleged Leave of Absence
>
> Your June 3 email inaccurately frames my May 21, 2025 communication as a voluntary leave of absence. That message was a formal declaration of Constructive Institutional Lockout triggered by:
>
> 1. Retaliatory legal threats issued by you that same morning;
>
> 2. Ongoing digital obstruction and communication suppression following my disclosures;
>
> 3. The Bank's failure to provide safeguards after escalating retaliation.
>
> As clearly stated, I remained—and continue to remain—a protected employee under SOX, ADA, FMLA, and related federal statutes. My system access was revoked without warning on May 22, effectively terminating my ability to work and finalizing a constructive discharge.

PLAINTIFF'S EXHIBIT

**Subject:** RE: [EXT] Demand for Immediate Compliance with California Labor Code §1198.5 and Notice of Legal Misrepresentation
**From:** "Sayre, Jeremy R." <JSayre@foxrothschild.com>
**Date:** 6/5/2025, 6:17 AM
**To:** "Jared Ashcraft" <Jared@ashcraft.me>

Mr. Ashcraft:

As I have previously said, I will not address each of the claims and allegations you have made in your many emails, as I do not believe it would be in any way productive.  I do, however, want to address the concerns raised yesterday regarding your account access and employment status.

I have confirmed that your official status as designated in the Bank's HR system (UKG) is "Admin LOA." Because you are an exempt associate of the Bank, the standard process is to terminate access in the Bank's User Access Portal (UAP).  The termination of this access was intended to be temporary for the duration of your administrative leave.  The Bank has confirmed that your access has been restored, and your Office 0365 account has been preserved; however, you still will not have access until you are returned to active status. The Bank also has confirmed that your mobile device has NOT been wiped and is connected to your Office 0365 account.  It is possible that, when you return to work, you may need to log back into the Office 0365 account and re-enroll the mobile device.

I also will address your request for Bank records and statements about the application of California Labor Code Sec. 1198.5.  The Bank's standard practice is not to produce Bank records except as required by law. Consistent with this, the Bank regularly complies with the requirements of California Labor Code Sec. 1198.5 for associates in California. My understanding is that you are a resident of Nevada and perform all work for the Bank remotely from Nevada.  As such, any rights you may have to the production of personnel records are governed by Nevada law.  I appreciate that you cited two cases in your email below which you contend support the position that California law should apply to employees whose work is primarily performed in California.  I was unable to locate either of the cases you cited to verify the holding or context; however, to the extent these cases may exist, my expectation is that work "primarily performed in California" refers to work that physically takes place in California.  Because you do not reside in California and are not physically working in California, the CA Labor Code section that you have cited does not apply.

Regards,
Jerry Sayre

Fox Logo

green bar

**Jerry Sayre**
Partner
301 Hillsborough Street
Suite 1120
Raleigh, NC 27603
Phone Icon  (919) 719-1252
 Phone Icon  (919) 607-0145
Fax Icon  (919) 755-8800
Phone Icon  jsayre@foxrothschild.com

green bar

PLAINTIFF'S EXHIBIT

**Subject:** Misrepresentation and Procedural Omission Regarding Device Wipe and OSHA Correspondence
**From:** "Jared Ashcraft" <Jared@ashcraft.me>
**Date:** 6/6/2025, 4:12 PM
**To:** "Sayre, Jeremy R." <JSayre@foxrothschild.com>
**CC:** "FCBDirectors@FirstCitizens.com" <FCBDirectors@FirstCitizens.com>, "investor.relations@firstcitizens.com" <investor.relations@firstcitizens.com>, "matt.martin@firstcitizens.com" <matt.martin@firstcitizens.com>, "frank.holding@firstcitizens.com" <frank.holding@firstcitizens.com>
**BCC:** "Son, Anna - OSHA" <Son.Anna@dol.gov>

Misrepresentation and Procedural Omission Regarding Device Wipe and OSHA Correspondence

Mr. Sayre,

I am formally documenting a **material misstatement** in your June 6, 2025 response regarding the condition of my mobile device and the status of the Office 365 connection. You stated:

> *"The Bank also has confirmed that your mobile device has NOT been wiped and is connected to your Office 0365 account. It is possible that, when you return to work, you may need to log back into the Office 0365 account and re-enroll the mobile device."*

This statement is demonstrably false. Attached are timestamped screenshots from my phone taken immediately following the revocation of access on June 4. They show that:

- All First Citizens Bank data and applications, including Outlook, Okta Verify, and Teams, were removed;
- The Office 365 account was disconnected;
- My phone prompted full re-enrollment, confirming an enterprise wipe had occurred.

Furthermore, I note that when responding to my original message—wherein I raised this device wipe issue and CC'd Ms. Anna Son of OSHA—**you removed the federal investigator from the recipient list before issuing your denial.** That exclusion appears designed to withhold your statement from federal review, despite it relating directly to a whistleblower retaliation matter under active investigation.

This conduct may implicate several legal provisions:

- **18 U.S.C. § 1514A (Sarbanes-Oxley Act – Whistleblower Protection):** Prohibits discrimination against employees for lawful acts done in providing information regarding conduct the employee reasonably believes constitutes a violation.
- **29 C.F.R. § 1980.102(e)(2):** Prohibits obstruction or delay of the Department of Labor's investigation or proceedings.
- **18 U.S.C. § 1001:** Criminalizes knowingly and willfully making materially false statements in any matter within the jurisdiction of the executive branch.

I assume I do not need to explain the legal ramifications of this action. Given these considerations, I will include this correspondence and the supporting evidence in my future evidentiary packages. The metadata on the screenshots is preserved and shows they were taken at 5:10am on June 4th, 2025 - more than 24 hours prior to your misrepresentation of the facts.

Respectfully,
**Jared Ashcraft**
Generative AI & Cybersecurity Specialist | ETA CPP

On Thursday, June 5th, 2025 at 6:17 AM, Sayre, Jeremy R. <JSayre@foxrothschild.com> wrote:

> Mr. Ashcraft:
>
> As I have previously said, I will not address each of the claims and allegations you have made in your many emails, as I do not believe it would be in any way productive.  I do, however, want to address the concerns raised yesterday regarding your account access and employment status.
>
> I have confirmed that your official status as designated in the Bank's HR system (UKG) is "Admin LOA."  Because you are an exempt associate of the Bank, the standard process is to terminate access in the Bank's User Access Portal (UAP).  The termination of this access was intended to be temporary for the duration of your administrative leave.  The Bank has confirmed that your access has been restored, and your Office 0365 account has been preserved; however, you still will not have access until you are returned to active status.  The Bank also has confirmed that your mobile device has NOT been wiped and is connected to your Office 0365 account.  It is possible that, when you return to work, you may need to log back into the Office 0365 account and re-enroll the mobile device.
>
> I also will address your request for Bank records and statements about the application of California Labor Code Sec. 1198.5.  The Bank's standard practice is not to produce Bank records except as required by law.  Consistent with this, the Bank regularly complies with the requirements of California Labor Code Sec. 1198.5 for associates in California. My understanding is that you are a resident of Nevada and perform all work for the Bank remotely from Nevada.  As such, any rights you may have to the production of personnel records are governed by Nevada law.  I appreciate that you cited two cases in your email below which you contend support the position that California law should apply to employees whose work is primarily performed in California. I was unable to locate either of the cases you cited to verify the holding or context; however, to the extent these cases may exist, my expectation is that work "primarily performed in California" refers to work that physically takes place in California.  Because you do not reside in California and are not physically working in California, the CA Labor Code section that you have cited does not apply.
>
> Regards,
>
> Jerry Sayre

**Subject:** Re: Recent Correspondence
**From:** "Jared Ashcraft" <Jared@ashcraft.me>
**Date:** 6/17/2025, 8:31 AM
**To:** "Sayre, Jeremy R." <JSayre@foxrothschild.com>

**Re: Your Correspondence of June 17, 2025**

Mr. Sayre,

I acknowledge receipt of your email dated June 17, 2025. I will address your assertions in sequence.

**1. On the Matter of Spoliation**

Your attempt to reframe the remote deletion of all corporate data from my personal device as a mere "unenrollment" is a distinction without a difference and fails to address the material issue: destruction of evidence subject to active litigation holds.

The undisputed facts are these:

- First Citizens Bank was under a legal duty to preserve all relevant communications and digital records, as established by five separate litigation hold notices.

- The Bank's action—whether termed a "wipe," "unenrollment," or otherwise—permanently removed discoverable records from my device, including Outlook emails, Teams chats, and associated metadata.

- Your present explanation contradicts your June 6, 2025 statement: "The Bank also has confirmed that your mobile device has NOT been wiped."

These contradictions independently establish scienter. Alongside your publicly emphasized background in software engineering—which you have repeatedly cited as affording you a 'distinct edge'—your attempt to draw a false technical distinction only amplifies the appearance of bad faith. You have now offered two conflicting exculpatory narratives for the same underlying event—both provably inaccurate, and both made in response to an active judicial inquiry. That is a matter the Court will undoubtedly weigh in evaluating your credibility and intent.

**2. On the Matter of Artificial Intelligence**

Your criticism of my use of AI-assisted research tools is irrelevant and disingenuous.

- The standing order you reference from the Western District of North Carolina has no jurisdictional bearing on this administrative proceeding before the U.S. Department of Labor – Office of Administrative Law Judges.

- Notably, that same order expressly exempts legal research platforms such as Westlaw and LexisNexis—AI-enhanced systems your firm uses daily. Your selective citation reflects both hypocrisy and a clear intent to intimidate.

- My filings are entirely compliant with Rule 11. As a pro se complainant, I have personally reviewed and verified each factual assertion and legal argument. The supporting exhibits are irrefutable, and your client's continued silence on the factual record speaks volumes.

- Finally, your insinuation that I have misused proprietary bank information is unfounded. The materials used in my filings derive solely from public records and my own documentation— unless the Bank is now claiming ownership rights to my personal cell phone and the voluminous records and screenshots created therein.

**3. On the Matter of Your "Extortion" Allegation**

This is your most egregious and legally indefensible assertion. Your attempt to compare a protected, confidential settlement communication to the criminal prosecution of Michael Avenatti is not only a gross distortion—it is a defamatory and retaliatory act against a whistleblower engaged in protected activity under federal law.

- The record reflects multiple good-faith settlement proposals from my end, including my June 6th communication which I explicitly framed as my "third documented good-faith proposal." Offering to resolve legal claims—including withdrawing lawful press initiatives and regulatory complaints in exchange for a remedy—is the very definition of a settlement discussion protected under Federal Rule of Evidence 408.

- Your attempt to reframe this standard litigation practice as criminal extortion is reckless, baseless, and a transparent attempt to intimidate and chill lawful advocacy. It will not succeed.

Your accusation will be filed as a supplemental exhibit to my pending Motion for Sanctions, where it will serve as further evidence of the intimidation, harassment, and professional misconduct that has characterized your conduct in this matter.

Your email is a transparent attempt to create legal and factual diversions where none exist. In doing so, you have shown your hand and revealed that your client has no substantive defense to the serious charges of spoliation and fraud currently before the Court. Given that your latest communication has only served to further incriminate your client and yourself, I understand your stated reluctance to engage further.

My pending motions for terminating sanctions and disqualification remain before the Court. I will await its ruling.

Sincerely,

Jared Ashcraft

Pro Se Complainant

On Tuesday, June 17th, 2025 at 7:21 AM, Sayre, Jeremy R. <JSayre@foxrothschild.com> wrote:

Mr. Ashcraft:

I am writing in response to the various communications you have sent over the past week.  As I have noted previously, I will not attempt to address all of your AI-generated arguments, as I do not believe it would be productive to do so.  However, I do feel it is necessary to address a few issues you have raised.

First, you claim that I made a "material misstatement" concerning the fact that your mobile device had not been "wiped" by the Bank. This is incorrect. In fact, I have confirmed that the Bank-related data on your mobile device is maintained and protected in Outlook, Teams and the M365 application.  I will reiterate that when your access was disabled, your device was effectively unenrolled from the Bank's Authenticator. This effectively caused you to lose access to the data within the Bank's Office 365 applications.  This is why I stated in my original email that "you may need to log back into the Office 365 account and re-enroll the mobile device." Make no mistake, the data is retained, and nothing has been lost.  Accordingly, your claim that the Bank has engaged in "willful spoliation" of evidence is, again, incorrect.

Second, you have confirmed what we suspected – that is, your voluminous correspondence, which frequently include vague, ambiguous, and/or inapplicable allegations, as well as inapposite legal arguments, are AI-driven. This is problematic on a number of fronts, specifically including the fact that AI is unreliable and inappropriate to use in this context where you have no independent ability to verify the soundness of the legal positions you are taking. Indeed, we have already identified at least one instance where you relied on legal precedents that do not exist.  For this very reason, courts have started to implement rules addressing concerns about the reliability and accuracy of filings prepared using AI platforms. For instance, in the United States District Court for the Western District of North Carolina, attorneys and pro se filers must file a certification with any memorandum submitted to the court stating that no AI was employed in the research for the preparation of the document, except for AI embedded in standard online legal research tools such as Westlaw and Lexis. Further, every statement and citation to authority in the document must be checked for accuracy by an attorney or paralegal, or by the party making the filing if acting pro se. (See Standing Order In Re- Use of Artificial Intelligence2.pdf.)  Moreover, please be advised that Federal Rule of Civil Procedure 11 imposes an affirmative duty on any party (including a pro se litigant) who signs a pleading, motion, or other paper to conduct a reasonable inquiry into the facts and the law before filing. The purpose of this rule is to curb abuses of the legal system by ensuring that anything filed is well-founded. Violations of Rule 11 can result in sanctions, which may include nonmonetary directives, orders to pay penalties into court, or payment of reasonable attorney's fees and other expenses directly resulting from the violation. These provisions underscore the importance of accuracy and reliability in court filings, which are particularly relevant when AI is used in document preparation. Finally, as you know, the Bank strictly prohibits any associate from inputting Bank information into any AI platform.  You must abide by this policy and refrain from misusing any information of the Bank.

Finally, in between sending the above baseless complaints and copying a variety of others on your

false allegations (including OSHA and the North Carolina State Bar), you sent two emails on June 6, 2025, proposing a "constructive and collaborative resolution" which consisted of the Bank agreeing to employ you in a carefully crafted role of your choice (referred to as a Strategic Role Proposal). In exchange for this new role, you offered to retract your regulatory complaints, withdraw your threatened press releases, and collaborate with the Bank to resolve the internal process issues which you contend exist. Given the significant volume of baseless threats you have made (including demands for a multi-million-dollar payment), your "strategic proposal" sounds more like extortion than it does a good faith effort to resolve the matter. In fact, the present circumstances are strikingly similar to a recent high-profile "negotiation" which resulted in an attorney being convicted for extortion. (See Southern District of New York | Michael Avenatti Sentenced To Over Two Years In Prison For Attempting To Extort Nike And For Defrauding His Client | United States Department of Justice ("AVENATTI stated that he would refrain from holding the press conference and harming Nike only if Nike made a payment of $1.5 million to Client-1, who was in possession of information potentially damaging to Nike, and further agreed to 'retain' AVENATTI and another individual to conduct a supposed 'internal investigation'".) Regardless, because the Bank is not interested in pursuing your "Strategic Role Proposal," your offer is respectfully declined.

If you require clarification of any of the above, I will do my best to do so. Otherwise, please understand that I am not likely to respond to further communications on this matter unless it appears necessary to do so, as any disagreement we have over the facts or legal authority may be decided by the appropriate regulatory and arbitrating bodies.

Regards,

Jerry Sayre

Fox Logo

green bar

**Jerry Sayre**
Partner

301 Hillsborough Street
Suite 1120
Raleigh, NC 27603

Phone Icon  (919) 719-1252

**Subject:** RE: [EXT] URGENT & FORMAL DEMAND: Immediate Action Required to Cease Obstruction of 401(k) Distribution
**From:** "Sayre, Jeremy R." <JSayre@foxrothschild.com>
**Date:** 6/18/2025, 8:46 AM
**To:** "Jared Ashcraft" <Jared@ashcraft.me>

Mr. Ashcraft:

I received your correspondence yesterday concerning your health insurance and retirement account with Fidelity.

As an initial matter, I will remind you that your employment with First Citizens Bank has not been terminated.  Rather, as you know, you were put on an administrative leave of absence after you informed the Bank that you were unable to continue performing your duties until the various complaints you raised with the Bank had been resolved.  Since then, despite your refusal to cooperate, the Bank has made all good faith efforts to investigate both your HR-related concerns as well as the whistleblower complaint you have raised.  That process is ongoing but is expected to be completed soon.

At the time your leave began, you were advised that you were eligible for a maximum of 2 weeks paid leave pursuant to the Bank's TAFW policy, and that any leave beyond that would be unpaid.  In accordance with this policy, the Bank has paid you the maximum benefit and, thus, your current leave is unpaid.  This does not, however, have any impact on your benefits including health insurance, which remain intact.

Finally, the communication we received from you late yesterday suggests that you would like the Bank to advise Fidelity of your "separation from service" so that you may access your vested retirement funds. To reiterate, the Bank has not reported this to Fidelity because your employment has not, in fact, been terminated at this time.  That said, if you maintain that your employment with the Bank has terminated, then the Bank will accept this and update your status with Fidelity immediately.  Please be advised that, under those circumstances, your health insurance will continue through the end of this month at which time you will become eligible for COBRA.

Please advise how you wish to proceed.

Regards,

Jerry Sayre


Fox Logo

green bar

**Jerry Sayre**
Partner
301 Hillsborough Street
Suite 1120
Raleigh, NC 27603
Phone Icon  (919) 719-1252
 Phone Icon  (919) 607-0145
Fax Icon  (919) 755-8800
Phone Icon  jsayre@foxrothschild.com
green bar

**Learn about our new brand.**

2/17/2026, 9:08 PM

**Subject:** RE: [EXT] URGENT & FORMAL DEMAND: Immediate Action Required to Cease Obstruction of 401(k) Distribution
**From:** "Jared Ashcraft" <Jared@ashcraft.me>
**Date:** 6/18/2025, 1:07 PM
**To:** "Sayre, Jeremy R." <JSayre@foxrothschild.com>, "FCBDirectors@FirstCitizens.com" <FCBDirectors@FirstCitizens.com>, "matt.martin@firstcitizens.com" <matt.martin@firstcitizens.com>, "investor.relations@firstcitizens.com" <investor.relations@firstcitizens.com>
**CC:** "legal@ashcraft.me" <legal@ashcraft.me>

**Mr. Sayre,**

I am in receipt of your email dated June 17, 2025. This communication confirms and escalates the pattern of retaliatory conduct by First Citizens Bank and its legal counsel.

Let the record be clear on the following points:

1. **Rejection of Your Premise:** I reject your characterization that I am "refusing to cooperate." My cooperation has been made impossible by the Bank's actions, including but not limited to denying me access to essential work systems, intercepting communications, and your own documented misrepresentations which have broken the trust required for a good-faith process. I remain willing to cooperate with an independent, unconflicted party once retained by the Bank.

2. **Unpaid Leave as Constructive Discharge:** The Bank's decision to place me on an involuntary, unpaid administrative leave constitutes a constructive discharge. This action, which severed my income stream, was a direct and foreseeable consequence of the hostile and unlawful retaliatory environment created by the Bank—an environment I formally declared was untenable in my "Protected Workload Suspension Declaration" of May 22, 2025.

3. **3. Coercive Resignation Offer & Documentation of Bad Faith:** Your offer to "accept" my resignation in exchange for releasing my vested retirement funds is a transparently coercive and bad-faith tactic. Withholding my salary and then leveraging my access to my own vested retirement savings to induce a resignation is further evidence of retaliation. I thank you for this correspondence, as it will serve as a primary exhibit of the Bank's retaliatory animus and will be cited as such in all current and future regulatory and legal proceedings. For the avoidance of all doubt, I am not resigning.

4. **Demand to Cease Unlawful Pressure:** I demand the Bank cease this unlawful pressure campaign. Your email is now Exhibit A of the ongoing retaliation.

Given that you have now undeniably confirmed the Bank's hostile position, you have left me with no alternative but to escalate my actions. This correspondence will be immediately appended to my complaints with the EEOC, the Department of Labor OIG, the SEC, and the North Carolina State Bar.

Best regards,

**Jared Ashcraft**
**Sr. Merchant Services Specialist**

On Wednesday, June 18th, 2025 at 8:47 AM, Sayre, Jeremy R. <JSayre@foxrothschild.com> wrote:

> Mr. Ashcraft:
>
> I received your correspondence yesterday concerning your health insurance and retirement account with Fidelity.

**Subject:** <mark>RE: [EXT] URGENT & FORMAL DEMAND: Immediate Action Required to Cease Obstruction of 401(k) Distribution</mark>

**From:** "Sayre, Jeremy R." <JSayre@foxrothschild.com>

**Date:** <mark>6/18/2025, 2:36 PM</mark>

**To:** "Jared Ashcraft" <Jared@ashcraft.me>

Mr. Ashcraft:

Thank you for your prompt response.  I assure you there is no effort or desire to leverage your access to your retirement savings in order "to induce a resignation." Rather, my sole intention was to confirm I correctly understood your position before the Bank advised Fidelity of the change in your employment status. Based on your response, I understand your position to be that your employment with the Bank has been constructively terminated. <mark>Accordingly, the Bank will reflect your employment status as terminated and advise Fidelity accordingly.</mark>  With tomorrow being a federal holiday, the Bank is closed and I expect Fidelity will be as well. As such, please understand that Fidelity may not receive notice of the change in your employment status until Friday.

Regards,

Jerry

[Fox Logo]

green bar

**Jerry Sayre**
Partner
301 Hillsborough Street
Suite 1120
Raleigh, NC 27603
Phone Icon  (919) 719-1252
 Phone Icon  (919) 607-0145
Fax Icon  (919) 755-8800
Phone Icon  jsayre@foxrothschild.com
green bar

**Learn about our new brand.**

---

**From:** Jared Ashcraft <Jared@ashcraft.me>
**Sent:** Wednesday, June 18, 2025 4:08 PM
**To:** Sayre, Jeremy R. <JSayre@foxrothschild.com>; FCBDirectors@FirstCitizens.com; matt.martin@firstcitizens.com; investor.relations@firstcitizens.com
**Cc:** legal@ashcraft.me
**Subject:** RE: [EXT] URGENT & FORMAL DEMAND: Immediate Action Required to Cease Obstruction of 401(k) Distribution

**Subject:** RE: [EXT] URGENT & FORMAL DEMAND: Immediate Action Required to Cease Obstruction of 401(k) Distribution
**From:** "Jared Ashcraft" <Jared@ashcraft.me>
**Date:** 6/18/2025, 2:40 PM
**To:** "Sayre, Jeremy R." <JSayre@foxrothschild.com>

**Mr. Sayre,**

I am in receipt of your email below.

Let the record be unequivocally clear: I reject your disingenuous framing. I did not state my employment had terminated. I stated that the Bank's actions constituted an unlawful constructive discharge.

Your email, however, now explicitly confirms that **the Bank is terminating my employment status.** I accept this as the Bank's formal, final act of termination, effective today, June 18, 2025.

This action, taken immediately after I protested your coercive tactics and in the midst of multiple federal whistleblower complaints, is a clear and final act of retaliation. It will be treated as such and will serve as the cornerstone of all current and future legal proceedings, including the pending motion for sanctions and the formal ethics complaint against you.

You have now provided the final piece of evidence required.

Regards,

**Jared Ashcraft**

On Wednesday, June 18th, 2025 at 2:36 PM, Sayre, Jeremy R. <JSayre@foxrothschild.com> wrote:

> Mr. Ashcraft:
>
> Thank you for your prompt response.  I assure you there is no effort or desire to leverage your access to your retirement savings in order "to induce a resignation." Rather, my sole intention was to confirm I correctly understood your position before the Bank advised Fidelity of the change in your employment status. Based on your response, I understand your position to be that your employment with the Bank has been constructively terminated. Accordingly, the Bank will reflect your employment status as terminated and advise Fidelity accordingly.  With tomorrow being a federal holiday, the Bank is closed and I expect Fidelity will be as well. As such, please understand that Fidelity may not receive notice of the change in your employment status until Friday.
>
> Regards,

RE: [EXT] FORMAL NOTICE Regarding Preservation of Evidence and Status of Company-Issued Equipment (Case No. 2025SOX00035)

Case 2:26-cv-02251-JLS-JDE   Document 52   Filed 05/04/26   Page 42 of 65   Page ID #:1197

PLAINTIFF'S EXHIBIT

**Subject:** RE: [EXT] FORMAL NOTICE Regarding Preservation of Evidence and Status of Company-Issued Equipment (Case No. 2025SOX00035)
**From:** "Jared Ashcraft" <Jared@ashcraft.me>
**Date:** 7/11/2025, 5:00 AM
**To:** "Sayre, Jeremy R." <JSayre@foxrothschild.com>
**CC:** "legal@ashcraft.me" <legal@ashcraft.me>, "FCBDirectors@FirstCitizens.com" <FCBDirectors@FirstCitizens.com>, "matt.martin@firstcitizens.com" <matt.martin@firstcitizens.com>, "rbin@foxrothschild.com" <rbin@foxrothschild.com>, "Joseph.Wayland@chubb.com" <Joseph.Wayland@chubb.com>

Receipt of correspondence dated July 10, 2025, is hereby acknowledged. Note has been taken of Respondent's recently articulated willingness to consent to the forensic imaging of the company-issued laptop computer.

Prior to addressing the proposals set forth therein, it is imperative to establish the factual predicate, which stands in direct contradiction to the position currently advanced by Respondent. The evidentiary record demonstrates that Respondent was the recipient of, and subsequently disregarded, five distinct litigation hold notices. Furthermore, Respondent was furnished with a benchmark exemplar of a compliant litigation hold response from a non-party entity (Worldpay), an exemplar that was likewise disregarded. The spoliation of the mobile device at issue was undertaken by Respondent only subsequent to the disregard of the aforementioned notices. The record will further substantiate that, following the act of spoliation, counsel for Respondent altered the chain of electronic correspondence, after a delay exceeding twenty-four hours, from which a federal investigator had been conspicuously removed. It was within this newly initiated communication that a verifiably false statement concerning the device was promulgated—a statement to which counsel for Respondent continues to adhere. It would appear that this sequence of actions was predicated upon the supposition that direct evidence of the spoliation event, such as the contemporaneously captured screenshot of the 'Org data removal' log, had not been secured.

In light of this documented history of apparent misconduct, it is incumbent that the subsequent points be addressed to ensure all future actions are conducted in strict conformity with the Federal Rules of Civil Procedure and the duty of candor owed to the tribunal.

**Concerning the Litigation Hold and Spoliation of Evidence:** The assertion that an "appropriate litigation hold" is in effect has been noted. Nevertheless, the contention that "all relevant information has been preserved" is fundamentally erroneous and legally untenable. This position improperly conflates server-side data with the unique, device-specific electronically stored information (ESI) that resided on the mobile device which Respondent remotely wiped on or about June 4, 2025. Pursuant to the standards established under Federal Rule of Civil Procedure 37(e), where a party fails to undertake reasonable measures to preserve ESI that cannot be restored or replaced through other means, and the loss thereof results in prejudice to another party, the court is empowered to order measures no greater than necessary to cure said prejudice, including, but not limited to, adverse inference instructions or other sanctions. The factual circumstances of this matter fall squarely within the purview of this rule.

It is a well-established principle of digital forensics that the evidentiary value of a device extends

RE: [EXT] FORMAL NOTICE Regarding Preservation of Evidence and Status of Company-Issued Equipment (Case No. 2025SOX00035)

Case 2:26-cv-02251-JLS-JDE   Document 52   Filed 05/04/26   Page 43 of 65   Page ID #:1198

beyond the mere content of its files. Such value encompasses critical metadata—including file creation dates, modification histories, access logs, and, of paramount importance, the digital artifacts of the remote wipe action itself—none of which can be replicated by any form of server-side backup. Judicial precedent has consistently affirmed that server-side data is not an adequate substitute for device-specific evidence, and that the destruction of such unique data constitutes spoliation. (See, e.g., *Nuvasive, Inc. v. Kormanis*, M.D.N.C. 2019; *EEOC v. Formel D USA, Inc.*, E.D. Mich. 2024). The destruction of this device-specific evidence has caused irreparable prejudice to the Complainant's ability to substantiate claims and rebut defenses advanced by Respondent. The judiciary has demonstrated no reluctance to impose remedies such as adverse inference instructions, cost-shifting, or even terminating sanctions under analogous circumstances. The actions undertaken by Respondent and its counsel have resulted in the destruction of the most probative, direct evidence of the device's state and contents.

Consequently, the retention of the subject laptop computer does not constitute an interference with Respondent's property rights; rather, it represents a necessary and legally mandated measure to prevent the further spoliation of the sole remaining piece of original, unaltered evidence in this proceeding.

**Concerning Counsel's Participation as a Material Witness:** The factual predicate, as established herein, indicates that counsel for Respondent is a necessary fact witness to disputed, material events, including the alteration of electronic correspondence and the promulgation of statements concerning the spoliation of evidence. Pursuant to the Rules of Professional Conduct, including but not limited to Rule 3.7, a lawyer is precluded from acting as an advocate in a matter where they are likely to be a necessary witness. The continued adversarial engagement by counsel in this matter is therefore procedurally improper and presents an irreconcilable conflict of interest. Be advised that this continued breach is the subject of Complainant's pending Motion to Disqualify Respondent's Counsel. All rights to seek formal disqualification of counsel and the associated firm are hereby expressly reserved.

**Concerning the Proposed Third-Party Vendor:** The unilateral selection of Epiq to serve as the forensic vendor is procedurally improper. This action may be construed as a further act of bad faith, consistent with the aforementioned spoliation of evidence by Respondent. In the context of an adversarial proceeding, especially one in which allegations of spoliation and obstruction are central, the engagement of a forensic expert necessitates unimpeachable neutrality. This requirement is not a matter of mere preference but constitutes a widely adopted best practice. The Sedona Principles, a leading authority on electronic discovery, stipulate that a court "usually should provide that either a special master or a neutral forensic examiner undertake the inspection," rather than an expert selected exclusively by the party accused of misconduct. It is impermissible for Respondent to be granted the authority to select the entity that will be tasked with the examination of what is now the most critical item of evidence in this matter.

**Concerning the Demand for Personal Property and Information:** The demand for the delivery of "exhibits," information from personal electronic mail accounts and personal computers, and other materials to Respondent's chosen vendor constitutes a significant and legally unfounded overreach. This action represents an improper attempt to circumvent the formal discovery procedures prescribed by Federal Rules of Civil Procedure 26 and 34.

The demand for wholesale access to personal devices and accounts is contrary to established jurisprudence. It appears to be motivated less by a legitimate need for discovery and more by an

RE: [EXT] FORMAL NOTICE Regarding Preservation of Evidence and Status of Company-Issued Equipment (Case No. 2025SOX00035)

Case 2:26-cv-02251-JLS-JDE    Document 52    Filed 05/04/26    Page 44 of 65   Page ID #:1199

exploratory effort to ascertain the extent of evidence preserved subsequent to Respondent's spoliation of the mobile device. The judiciary imposes strict limitations on compelled access to personal devices, mandating a specific, non-speculative demonstration of necessity, as opposed to broad or generalized requests (see *In re Weekley Homes, L.P.*, Tex. 2009; *Carlson v. Jerousek*, Ill. App. Ct. 2016). Moreover, it is settled law that employers possess no inherent right to compel the production of information from an employee's personal email accounts or devices absent legal control and the observance of proper legal process (*Int'l Longshore and Warehouse Union v. ICTSI Oregon, Inc.*, D. Ore. 2018).

It is of particular note that these broad demands for documents are being made while Respondent remains in violation of its own unambiguous legal obligations. Specifically, First Citizens Bank has failed to furnish copies of performance evaluations, a direct contravention of the rights afforded under California Labor Code § 1198.5. This failure substantially undermines any assertion that the demands are made in good faith. Respondent's ongoing violation of its statutory duties further implicates the clean hands doctrine, which would preclude it from demanding extraordinary compliance or seeking equitable relief while it remains in breach.

The aforementioned request is, for these reasons, rejected in its entirety. Any and all such requests must be propounded through formal discovery channels, which afford the opportunity for objections to be raised on the grounds of relevance, proportionality, and privilege.

**Concerning the Demand for Proprietary Information:**

Any documents in Complainant's possession that Respondent might attempt to classify as "proprietary" are, in fact, **evidentiary materials** lawfully retained pursuant to Complainant's duty to preserve evidence for this federally protected whistleblower proceeding. Their retention and use for the purpose of prosecuting this action are protected under federal law, including the Sarbanes-Oxley Act. Therefore, your demand for the "return" of these materials is improper. These items are not "property" to be returned upon request but **evidence** to be handled strictly according to the formal discovery procedures of the OALJ.

Your attempt to re-characterize evidence as proprietary information—in order to compel its turnover outside the formal discovery process—is a transparently bad-faith tactic. It amounts to a speculative "fishing expedition" and is consistent with the pattern of harassment previously documented in this matter.

Based on its procedural impropriety and your mischaracterization of federal law, the demand is rejected.

**Counter-Proposal:** Accordingly, to facilitate the advancement of this matter in a manner consistent with the principles of good faith, the following counter-proposal is set forth:

1. A list of three (3) reputable, certified forensic electronic discovery firms shall be provided to Respondent.

2. Respondent shall be afforded a period of five (5) business days to either concur with the selection of one of the proposed firms or, in the alternative, to consent to the filing of a joint motion requesting the appointment of a neutral forensic expert by the Honorable Judge Henley.

RE: [EXT] FORMAL NOTICE Regarding Preservation of Evidence and Status of Company-Issued Equipment (Case No. 2025SOX00035)

Case 2:26-cv-02251-JLS-JDE    Document 52    Filed 05/04/26    Page 45 of 65   Page ID #:1200

3. All BitLocker recovery keys and any other encryption keys necessary to access the hard drive of the subject laptop must be provided forthwith. The provision of these keys is an absolute prerequisite to the commencement of any forensic imaging.

4. As an integral component of the agreed-upon protocol, a written certification, executed under penalty of perjury, is required. This certification must affirm that all potentially relevant ESI—including but not limited to server-side backups, system logs, and Mobile Device Management (MDM) records—has been, and will continue to be, preserved in an unaltered state pending the completion of the forensic process.

5. The mutually agreed-upon protocol must stipulate that the neutral expert shall create a complete, bit-for-bit forensic image (i.e., a "forensic clone") of the entire hard drive. This image must encompass all allocated and unallocated space, any hidden partitions or operations, any surreptitious corporate surveillance software, and must capture all logs pertaining to both inbound and outbound communications to and from the device. Furthermore, the protocol must incorporate a privilege review process designed to ensure that any privileged, personal, or otherwise non-responsive information is properly segregated and withheld from review by Respondent or its agents, in a manner consistent with the principles articulated in *Carlson v. Jerousek* and The Sedona Principles. A verbatim copy of this complete forensic image shall be provided to the Complainant.

6. All costs and fees associated with the forensic imaging shall be borne exclusively by First Citizens Bank, as this undertaking constitutes a remedial measure necessitated by the aforementioned acts of spoliation.

7. The subject laptop shall not be relinquished until such time as a mutually agreed-upon protocol has been executed and a neutral, court-approved expert has been formally retained.

It is hoped that this matter can be resolved without resort to unnecessary motion practice. Nevertheless, in the event of a refusal to agree to a verifiably neutral process, preparations have been made to file the appropriate motions to compel and for sanctions. Should an agreement on these terms not be reached within the stipulated five (5) business days, an immediate motion for judicial intervention will be filed, seeking sanctions and an adverse inference instruction. The instant correspondence will be submitted as an exhibit evidencing continued bad faith.

Nothing contained herein shall be construed as a waiver of any rights or remedies, whether legal or equitable. All such rights and remedies are hereby expressly reserved, including the right to seek any and all available sanctions, the shifting of costs, and any such further relief as the tribunal may deem just and proper.

A response is awaited.

Respectfully submitted,

Jared Ashcraft Complainant, Pro Se

Case No. 2025-SOX-00035

On Thursday, July 10th, 2025 at 3:43 PM, Sayre, Jeremy R. <JSayre@foxrothschild.com> wrote:

Mr. Ashcraft:

I am writing in response to your message below concerning the Bank's laptop computer which remains in your possession.

PLAINTIFF'S EXHIBIT

I have confirmed on multiple occasions that the Bank has implemented an appropriate litigation hold to ensure all information relevant to any potential litigation is preserved. Separate and apart from this litigation hold, federal law requires that the Bank take appropriate action to ensure its proprietary information and that of its customers is safeguarded. For that reason, the Bank's standard protocol upon any separation of employment is to provide the former employee with shipping boxes and labels to facilitate the return of all Bank assets including proprietary information. I understand you have refused to comply with the Bank's request in this regard.

You attempt to justify this refusal by relying on the baseless allegation that the Bank "cannot be entrusted with the preservation of this device" due to its alleged spoliation of evidence.  Again, I have confirmed on multiple occasions that all relevant information has been preserved; thus, your allegations of spoliation are unfounded. Likewise, your refusal to return the Bank's property serves to interfere with the Bank's legal obligations and constitutes a violation of the Bank's legal rights. Accordingly, on behalf of the Bank, I hereby demand that you relinquish possession of any Bank property in your possession.

In light of the aforementioned litigation hold, the Bank's intention always has been to image the computer upon receipt and otherwise sequester it for the duration of any relevant legal dispute that may continue. In the interest of avoiding any dispute and minimizing further delay, the Bank has arranged for a third-party vendor (Epiq) to fulfill this function. Upon receipt, Epiq's forensics division will image the computer, effectively preserving all information for the duration of this matter.  Please deliver the computer and any other property in your possession directly to Epiq at your earliest possible opportunity, using the following contact information:

**Attention: Epiq Forensics Re: Project # FCB0047**

**Epiq**

**3255 E. Elwood Street, Suite 110**

RE: [EXT] FORMAL NOTICE Regarding Preservation of Evidence and Status of Company-Issued Equipment (Case No. 2025SOX00035)

Case 2:26-cv-02251-JLS-JDE    Document 52    Filed 05/04/26    Page 47 of 65   Page ID #:1202

**Phoenix, Arizona 85034**

**Main Phone: 602.258.6469**

To facilitate this process, we will arrange for an updated shipping label to be sent to your attention.

To reiterate, we require confirmation that all property of the Bank has been returned and no copies remain in your possession. In previous communications, you have referenced various "exhibits" and other Bank-related information that you have preserved. To the extent these materials include or reflect the proprietary information of the Bank or its customers, you are not permitted to retain possession of them.  Rather, these items should be delivered along with your computer to Epiq at the address listed above. This includes information contained in any documents or other written materials, as well as your personal email and any personal computers. Please confirm that you have reviewed the relevant materials in your possession or control (including without limitation on any personal computers or email) and have returned all materials containing or reflecting the proprietary information of the Bank or its customers.  For the avoidance of doubt, all information turned over to Epiq will be preserved, so there is no legitimate concern about potential spoliation of evidence.

Regards,

Jerry Sayre

[Fox Logo](#)

green bar

**Jerry Sayre**
Partner

301 Hillsborough Street
Suite 1120
Raleigh, NC 27603

Phone Icon  (919) 719-1252
Phone Icon  (919) 607-0145
Fax Icon  (919) 755-8800

RE: [EXT] FORMAL NOTICE Regarding Preservation of Evidence and Status of Company-Issued Equipment (Case No. 2025SOX00035)

Case 2:26-cv-02251-JLS-JDE    Document 52    Filed 05/04/26    Page 48 of 65    Page ID #:1203

Phone Icon  jsayre@foxrothschild.com

green bar

**Learn about our new brand.**

---

**From:** Jared Ashcraft <Jared@ashcraft.me>
**Sent:** Monday, July 7, 2025 1:51 PM
**To:** Sayre, Jeremy R. <JSayre@foxrothschild.com>; matt.martin@firstcitizens.com; Green, Queena <Queena.Green@firstcitizens.com>; Bin, Rachelle <RBin@foxrothschild.com>; FCBDirectors@FirstCitizens.com
**Cc:** legal@ashcraft.me
**Subject:** [EXT] FORMAL NOTICE Regarding Preservation of Evidence and Status of Company-Issued Equipment (Case No. 2025SOX00035)

PLAINTIFF'S EXHIBIT

**FORMAL NOTICE Regarding Preservation of Evidence and Status of Company-Issued Equipment (Case No. 2025SOX00035)**

Mr. Sayre and Mr. Martin,

This letter serves as a formal update regarding the status of all company-issued equipment and a demand for a protocol to preserve critical evidence in the above-referenced matter.

**1. Company-Issued Laptop (Evidence Subject to Litigation Hold)**

The company-issued laptop computer remains in my possession. It is being held in a secure, powered-off state pursuant to the multiple litigation hold notices I have served upon you and your client since April 23, 2025.

Your client's recent action of sending unsolicited return boxes, despite my prior communication on this matter, is viewed as an attempt to take possession of a key piece of evidence. Given the documented spoliation of evidence via the remote wipe of my mobile device on June 4, 2025, your client cannot be entrusted with the preservation of this device.

Therefore, I demand that we agree upon a neutral, third-party forensics expert to create a bit-for-bit, forensically sound image of the laptop's hard drive before it is returned. As this procedure is a remedial measure made necessary by your client's prior misconduct, all costs associated with the forensic imaging shall be borne by First Citizens Bank.

Please provide a written response to this demand for a forensic imaging protocol within five (5) business days.

## 2. Company-Issued Monitors

To assist in the reconciliation of your asset inventory:

- Two (2) of the monitors previously assigned to me were removed from my Greenville medical plaza office by another employee, Will Franklin, without a formal requisition process or my authorization. I cannot account for their current whereabouts and they are not in my possession.
- One (1) monitor is in my possession. I will use the return materials you have provided to ship this non-evidentiary asset back to the Bank promptly.

## 3. Preservation and Compliance

My actions are guided by my legal duty to preserve all potentially relevant evidence. Your client's attempt to retrieve the laptop without agreeing to a preservation protocol is inconsistent with its own legal obligations.

I await your response regarding the forensic imaging protocol.

Sincerely,

Jared Ashcraft *Pro se* Complainant Case No. 2025-SOX-00035 (252) 258-1535 jared@ashcraft.me

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

2/11/2026, 9:17 AM

**UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES**

In the Matter of:

JARED ASHCRAFT,                    )
                                   )
    Complainant,                   )
v.                                 )    Case No.   2025-SOX-00035
                                   )    OHSA No.   301054553
FIRST CITIZENS BANK,               )
                                   )
    Respondent.                    )

Telephonic Conference

Tuesday,
September 30, 2025

        The above-entitled matter came on for hearing

pursuant to notice, at 3:00 p.m.


        BEFORE:   HONORABLE THERESA C. TIMLIN
                  Administrative Law Judge



**Bayley Reporting, Inc.**
**(727)585-0600**

2

A P P E A R A N C E S

On behalf of the Complainant:

JARED ASHCRAFT, (Pro se)

On behalf of the Respondent:

LISA WILLIFORD, ESQ.
Fox Rothschild LLP
230 N. Elm Street
Suite 1200
Greensboro, NC 27401

JEREMY SAYRE, ESQ.
Fox Rothschild LLP
301 Hillsborough Street
Suite 1120
Raleigh, NC 27603

3

I N D E X

COMPLAINANT'S WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS

None

RESPONDENT'S WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS

None

E X H I B I T S

EXIIIBIT            IDENTIFIED   IN EVIDENCE   WITIIDRAWN

COMPLAINANT'S

None

RESPONDENT'S

None

DIRECTOR'S

None

ALJ'S

None

MR. ASHCRAFT:    The only reason I ask is because --- oh, sorry.

JUDGE TIMLIN:    Let's do one issue at a time. So, yes, you can respond to this issue about conferring with Ms. Williford.

MR. ASHCRAFT:    Thank you, Your Honor.  I noted for the record that I have a pending Motion to Strike Ms. Williford's late notice.  I will follow any instruction that Your Honor gives, but she did not file a Notice until September 19th.  Mr. Sayre has acted as representative counsel from the beginning of this case.  Mr. Sayre's candor and conduct has been an issue and it is my belief that Ms. Williford was brought in to taper over the bad faith actions of Mr. Sayre that are already on the record. I am more than happy to confer with Ms. Williford, but again, I believe both of them are fact witnesses which would make them both advocate and witness at the same time which, I'm a lay person, but I believe that is against EMB rules.

MS. WILLIFORD:    And, Your Honor, if I may respond to that.  We are all bound by a code of civility. I understand that Mr. Ashcraft is not an attorney, but Your Honor, if he's going to participate in this court, I would expect that he be civil with me as I would be civil with him.  In addition, his inference of all of these bad acts

10

between myself and my partner, Mr. Sayre, is not founded at all in what has occurred here.  I am certainly allowed to notice an appearance after Your Honor is assigned to this case as our ALJ which is exactly what I did.  There's nothing unethical about that.  There's nothing wrong about that and so I would encourage an instruction going forward particularly given what has transpired over the past couple of months.  There have been repeated allegations and written communications even going so far as to file a bar complaint against my colleague.  I think that we really need a reset, Your Honor, going forward in this case in terms of how we address one another in communications.  I really do.

MR. ASHCRAFT:    Your Honor, I don't believe that I have said or acted in any way anything other than polite and with candor.  Mr. Sayre from his very first email insulted my intelligence, told me I wasn't able to understand laws and I responded and from that point on, there's been three threats.  He claimed that I was trying to extort SCV.  He lied to the CALJ in writing and did it to impugn my character.  So, I wholly disagree with Ms. Williford's framing of what has happened so far and the record is already supplied to Your Honor so you can see every email that's been back and forth.  Every email that I've sent them has been nothing but polite except for the

11

very first time that we interacted after he insulted my intelligence.

JUDGE TIMLIN:    Okay.  So ---

MR. ASHCRAFT:    And --- I'm sorry.

JUDGE TIMLIN:    Okay.  I'm going to stop here because I want to make it clear.  One of the other things that administrative law judges do is I have what's called de novo review which means I start the case --- the case starts from the day I get it.  It doesn't --- and what happened before usually it's what happened before in front of OSHA.  I did not get the OSHA file.  I do not have access to any of the things that happened when the case was at OSHA, if there was an investigation or anything like that.  I don't get access to any of that.  I don't get access to anything that you brought to OSHA's attention or anything that you brought to or anything that Citizens brought to OSHA's attention.  It's new.  It's a fresh case.  I am going to tell you right now that I am going to also--- I know this case was unassigned for a while and that's not my call.  That's the Chief ALJ's call when he gets around to sending cases out to be assigned.  I am going to take this case as this case exists in front of me right now and I don't really care what happened in front of the Chief ALJ.  I don't care what happened in front of OSHA.  I care what happens in front of me and I'm going to rule on the

12

case based on the evidence that gets presented to me and the testimony that I hear if we get to the point of having a hearing.  That and with that, I am going to say that I do have expectations.  I expect counsel to act as required under the professional rules of attorney conduct and I also expect that you, Mr. Ashcraft, to act as Ms. Williford characterized it with civility.

So, we're starting with a blank slate with me. Right now, my understanding is that counsel of record in this case for Citizens is Ms. Williford as lead counsel and she is correct.  There's no such thing as coming into the case late.  Citizens has the right to choose who's going to represent them and they can decide and if they pick a firm, the firm has the right to make decisions about which attorneys in that particular firm are going to work on which specific cases at which time.  They can make --- that can change during the life of a case.  So, she's not late in coming into the case, but she is lead counsel and Mr. Sayre is working on the case with her.  The only people --- so I'm going to treat them as lead counsel.  That being said, they are counsel of record.  Ms. Williford is the person that you need to talk to when motions are being filed and there's reasons for conference.  She is the person you need to talk to if you get into discussions about settlement.  She is the person to talk to about

15

that will be the time to make decisions about how much time we need for discovery and how much discovery we're actually going to do.  Mr. Ashcraft, did you want to --- yes, ask your question now.

MR. ASHCRAFT:   I apologize.  I just want to be very clear so that I'm not violating any rules.  That's why I have such an issue in these formats because of my high functioning autism, I'm also trying to parse how I'm presenting myself, not being too blunt, not sounding like I'm being disrespectful when I'm not intending to.  So, I do apologize if anything comes off incorrectly.

JUDGE TIMLIN:   You're fine so far.  Go ahead.

MR. ASHCRAFT:   Am I to understand that the things that happened before you took over the case are irrelevant such as the spoilation, the threats of law enforcement, etc.?

JUDGE TIMLIN:   Yes.  I am going to operate from a blank slate.  I want this case to be --- this case needs to be focused on what happened.  So, in a SOX case, there are certain things that have to --- in order for someone to prevail in a SOX case, the Complainant has to show certain things.  They have to show that they engaged in protected activity which means that they made some kind of a report, some kind of conduct that implicated security rules or other things from Sarbanes-Oxley that protected activity---

16

that the company knew about the protected activity, that there was --- so that this report or disclosure that was made was made to people at the Employer, that some adverse action happened. Often times in these cases, that's the easiest thing to prove because it proved that something bad happened. These cases don't usually come in front of an ALJ unless somebody has been demoted or lost their job or had some other bad thing happen to them at work. That's usually the easiest element to prove.

The fourth element is proving that the reason that the bad thing happened is because of the protected activity. So, there's four things that have to be shown: Protected activity, knowledge on the part of the Employer, an adverse action and that the adverse action was because of the protected activity. That's all I want to know about, frankly.

MR. ASHCRAFT:    Sorry.

JUDGE TIMLIN:    Go ahead.

MR. ASHCRAFT:    Well, that's why I brought up the spoliation. So, I was a decorated employee. I was three years of key expectations. At the time of my termination, I was rated number 3 nationwide for the amount of volume. I had never been written up before. I had never been counseled or had a verbal warning before. When they spoliated by phone, they removed my access to all the

files that I had on there that proved all of this.  So, that's why I feel like the spoliation of my phone and the remote wipe that Mr. Sayre unqualified denied is a major portion of this.

MS. WILLIFORD:    And, Your Honor, if I may respond to Mr. Ashcraft?  Our understanding is this case is about as Your Honor articulated, whether he engaged in protected activity while he was employed by First Citizens Bank.  The spoliation allegations, alleged actions that occurred between the end of his employment and today are wholly irrelevant to Your Honor's analysis and in addition to our request that Your Honor per our Motion to Dismiss, a second piece of that request for Your Honor relates to Mr. Ashcraft's use of AI.  So, as Your Honor has seen in this case, his use of AI generates a significant number of documents typically through the form of motions practiced.  Our review of those documents is that they are not supported largely by the cases that are cited in them.  There have been inaccurate citations.  There have been cases that don't actually support the proposition.

So, Your Honor, from our standpoint, I think to the extent that additional motions practice is allowed which it would be our position that nothing should be allowed until the Motion to Dismiss is heard, we would ask Your Honor provide some --- well, we would ask that Your

Honor provide a stay until Your Honor can fully hear the Motion to Dismiss because the burden in resources and financial impact of responding to these very large motions, I mean, we're talking hundreds of pages and in order to respond to these, we obviously have to read that. It's just astronomical at this stage of the case. So, Your Honor, we would renew our request for a stay on any additional motion practice for discovery until our Motion to Dismiss is able to be considered and then to the extent that the case goes forward, we would ask for Your Honor's guidance on perhaps limitations to additional practice that's within the scope of the case.

MR. ASHCRAFT:    Can I respond to that?

JUDGE TIMLIN:    Go ahead.

MR. ASHCRAFT:    I don't understand how deleting evidence off my phone would not relate when I intend or anticipate that after their Motion to Dismiss, they are going to frame me as a bad employee. My phone held the records to prove that I was nothing but an exemplary employee. So, the deletion of all the records off my phone and the refusal to allow imaging of the laptop where all these files and evidence reside would be directly reflective of my entire case. So, spoilating the evidence, removing an OSHA investigator and then making a false denial about it seems to me like it would be directly

19

related to this case.  If I'm misunderstanding, then I apologize.

JUDGE TIMLIN:    Okay.  So, the issue about the phone and the issue about the laptop, those really are discovery issues and we're not there yet.  So, we can revisit it when we get to discovery.  We can revisit whether or not there's a remedy, whether or not that happened, whether or not there's a remedy for that happening in terms of documents that you can request from the company through discovery.  Removing the OSHA inspector, again, that's something that happened at OSHA and this is a brand new case to me.  Everything, you have to develop that evidence and put it in front of me.  I have nothing to do with the OSHA investigator or the OSHA inspector, but I do think Ms. Williford's point is well taken that before we get into discovery issues, I really do need to have time to review their Motion to Dismiss and your response to the Motion to Dismiss.

So, I think that's where we're going to leave the case right now.  The instruction that I'm going to give you is no discovery is to take --- even though the order on the website from the administrative law judge is going to say that you guys can continue doing discovery, no discovery in this case is to take place until I've issued a ruling on the Motion to Dismiss.  The Motion to Dismiss and the

22

C E R T I F I C A T E

Case Name:      Jared Ashcraft

Case Number:    2025-SOX-00035

Date:           September 30, 2025

Location:       Telephonic Conference

          This is to certify that the attached proceedings before the United States Department of Labor, Office of Administrative Law Judges, were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

/s/Renee Carrasco                              9/30/25

Bayley Reporting, Inc.                          Date

Official Federal Reporters

Building 1, Suite 14

12945 Seminole Boulevard

Seminole, FL  33778

**Jared Ashcraft**
**Pro Se Complainant**
**Email: legal@ashcraft.me**
**Phone: (252)258-1535**

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

| | | |
|---|---|---|
| Jared Ashcraft, | ) | |
|   Complainant, | ) | |
| | ) | Case No. 2025-SOX-00035 |
| v. | ) | |
| | ) | |
| First Citizens Bank, | ) | |
|   Respondent. | ) | |

**COMPLAINANT'S CONSOLIDATED NOTICE OF COUNSEL'S KNOWING FALSE STATEMENT TO THE TRIBUNAL ON SEPT. 30, 2025 AND RECORD CLARIFICATION**

*(September 30, 2025 Pre-Hearing Conference)*

**To the Honorable Judge Timlin:**

Complainant files this Notice—not a motion—to correct a knowing, material false statement made by Respondent's counsel during the September 30, 2025 pre-hearing conference. Left uncorrected, the statement would operate as a fraud on the tribunal by excluding case-dispositive facts from the Court's threshold sufficiency analysis under 29 C.F.R. § 18.70(c). This Notice respects the Court's "clean slate" and current sequencing (motion to dismiss first), seeks no immediate relief beyond record correction, and preserves all rights.

**I. The Knowing False Statement Placed on the Record**

Immediately after the Court set expectations for candor, Ms. Lisa Williford framed core misconduct as "post-employment" and, on that basis, argued that the spoliation was "wholly irrelevant" to the Court's analysis. **On this record, that assertion was a purposeful and knowing misrepresentation designed to narrow the Court's threshold sufficiency analysis on Respondent's motion to dismiss and prejudice the outcome.** Critically, during the same conference, Ms. Williford acknowledged that the spoliation event occurred; her subsequent claim that the conduct was solely "post-employment" was therefore a knowing misstatement of timing rather than a disputed legal position. **Courts have long recognized that unequivocal**

Jared Ashcraft

Digitally signed by Jared Ashcraft
DN: cn=Jared Ashcraft, c=US, o=ADA | FMLA | SOX Whistleblower, email=legal@ashcraft.me
Date: 2025.10.02 08:44:07 -07'00'

**concessions by counsel may operate as binding judicial admissions that a tribunal may act upon. See** [Oscanyan v. Arms Co., 103 U.S. 261, 268–70 (1880)](#) *(affirming the court's right to act upon counsel's opening concession of facts dispositive of the claim).*

**This misstatement could not have been inadvertent. Mr. Jeremy Sayre—Respondent's outside counsel—personally authored and transmitted the June 18, 2025 termination notice.** As co-counsel, Ms. Williford appeared while working in concert with Mr. Sayre. The defense team therefore possessed actual, contemporaneous knowledge of the operative dates (the June 4, 2025 spoliation sequence and the June 18, 2025 termination). Given that knowledge, representing to the Court that the misconduct was "post-employment" was a **knowing and willful** misstatement calculated to exclude dispositive facts from the threshold analysis.

## II. Why Counsel's Statement Is False (and Material)

**A. Pre-termination spoliation while Complainant remained employed (June 4, 2025).**
The docketed materials reflect an organization data-removal/account-disable action on June 4, 2025, with contemporaneous "disabled" and "removing organizational data" notifications. These actions pre-dated termination and destroyed evidence bearing on performance and protected activity directly related to these proceedings. They are not post-employment events. See, e.g., JA-EXH-0001–0003 (screenshots reflecting org-data removal and disable state). Respondent's counsel acknowledged on the call that the spoliation occurred; only her timing characterization attempted to relocate that admitted event outside of employment, which the documentary record squarely contradicts.

**B. Termination executed by Respondent's outside counsel (June 18, 2025).**
On June 18, 2025 at 2:36 PM, Mr. Jeremy Sayre—Respondent's outside counsel—wrote: "the Bank will reflect your employment status as terminated." This was the Bank's formal termination act, executed and communicated by counsel. Mr. Sayre was therefore an actor in the adverse action, not a mere messenger.

**C. Regulatory Complaint Sequence and Proximity (OSHA).**
Complainant filed a SOX/OSHA complaint on **May 22, 2025**. Consistent with standard practice, OSHA initiated intake and outreach/notification to Respondent shortly thereafter. By **June 5, 2025**, counsel communications already reflected OSHA's involvement (including counsel's removal of the OSHA investigator from an email thread), confirming Respondent's awareness of the OSHA matter during this period. The **June 4, 2025** data-removal/disable sequence thus occurred **after the OSHA complaint and within the immediate OSHA-notification window**, supplying strong evidence of contemporaneous knowledge and retaliatory motive tied to protected activity.

**These facts are independently dispositive of timing. Ms. Williford's "post-employment" framing is contradicted by the record.**

## III. Materiality Under the Court's Four-Element Framework

The Court identified the governing test: protected activity, employer knowledge, adverse action, causation. The corrected timeline is material to each element:

Jared Ashcraft

Digitally signed by Jared Ashcraft
DN: cn=Jared Ashcraft, c=US, o=ADA | FMLA | SOX Whistleblower, email=legal@ashcraft.me
Date: 2025.10.02 08:44:07 -07'00'

• **Adverse action:** The June 4 wipe/disable during employment is an adverse action affecting terms and conditions; the June 18 counsel-executed termination is a separate adverse action.

• **Knowledge:** Execution of termination by outside counsel ties corporate knowledge and decision-making directly to the actor. Mr. Sayre's personal transmission of the June 18, 2025 termination constitutes actual knowledge of the termination date. Ms. Williford's acknowledgment that a spoliation event occurred places counsel on actual—and, at minimum, imputed—knowledge that the June 4, 2025 data-removal/disable sequence occurred during employment. Given this actual knowledge, any contrary representation to the Court as to timing is necessarily knowing and willful, not accidental.

• **Causation:** Protected activity (OSHA complaint on May 22, 2025) → OSHA notification/outreach to Respondent (late May–early June) → June 4 spoliation during employment → June 18 termination executed by counsel. This tight temporal sequence, combined with shifting explanations and targeted destruction of evidence, supplies sufficient circumstantial indicia of causation at the pleadings stage.

Labeling these events "post-employment" to render them "wholly irrelevant" is a material falsehood aimed at influencing the Court's analysis.

## IV. Pattern Evidence — This Is the Third Discrete Fraud on the Tribunal

To situate today's misconduct within the case history (without seeking sanctions here), Complainant notes this instance is the third discrete fraud on the tribunal:

1. **June 5, 2025:** A categorical denial surrounding the June 4 device-wipe sequence—issued after counsel shifted email threads and removed the OSHA investigator from the chain—misrepresented core preservation facts already reflected in system notices and screenshots (see JA-EXH-0001–0003 and companion service-desk/email records).

2. **August 8/20, 2025:** Directive–Denial Contradiction. Mr. Sayre issued multiple written directives (May 21, May 22, Aug. 8) prohibiting service on fiduciaries and insurers. On Aug. 20, he denied these directives existed before OALJ and accused Complainant of fabrication. **CALJ Henley's Aug. 21 Order preserved this contradiction in the record as potential fraud on the tribunal, to be adjudicated upon assignment of a presiding ALJ.** This event was especially egregious in that it was designed not only to mislead the tribunal, but also to impugn Complainant's credibility in the very proceeding where candor had been emphasized.

3. **September 30, 2025 (this filing):** Ms. Williford's "post-employment" framing—**a knowing and willful false statement**—attempted to erase pre-termination spoliation and counsel-executed termination from the Court's threshold sufficiency analysis under 29 C.F.R. § 18.70(c), despite counsel's on-the-call acknowledgment that the spoliation occurred.

Jared
Ashcraft

Digitally signed by Jared Ashcraft
DN: cn=Jared Ashcraft, c=US,
o=ADA | FMLA | SOX
Whistleblower,
email=legal@ashcraft.me
Date: 2025.10.02 08:44:07 -07'00'