# Exhibit B

Jared Ashcraft, Pro Se
PO Box 363242
North Las Vegas, NV 89036
legal@ashcraft.me

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

JARED ASHCRAFT,

        PLAINTIFF,

v.

FIRST-CITIZENS BANK & TRUST
COMPANY, A NORTH CAROLINA
CORPORATION; AND
FIRST CITIZENS BANCSHARES, INC.,
A DELAWARE CORPORATION,

        DEFENDANTS.

Case No.: 2:26-cv-02251-JLS-JDE

**DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION**

Related Hearing on Defendants' Motion to Dismiss:

Date: June 26, 2026

Time: 10:30 a.m.

Courtroom: 8A

Judge: Hon. Josephine L. Staton

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[1]

# Table of Contents

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION ......................................1

Introduction and Personal Knowledge .................................................................................................................1

I. The Quinto Declaration ....................................................................................................................................4

II. California / Pacific / Los Angeles Branch Network, Personnel, Customers, and Referral Channels .............11

III. The Mills Declaration ...................................................................................................................................18

IV. Salesforce / CRM / Los Angeles Referral Restrictions ...............................................................................24

V. Communications with Ted Bush, Dana Lomas, and Jason Mills .................................................................28

VI. OALJ Protective-Order Position Concerning FCB Customers ...................................................................31

VII. West Ludwig and Human Resources Escalation Context ..........................................................................35

VIII. The Hodge Declaration and BancShares-Related Channels .....................................................................36

IX. May 20, 2025 Audit Committee and FCBDirectors Notices ......................................................................40

X. May 21, 2025 Sayre Letter and Routing / Preservation Issues ...................................................................43

XI. April 26, 2026 FI5939 / Pasadena / Mills Preservation Notice ..................................................................46

XII. Public California Footprint Materials...........................................................................................................48

XIII. Record Categories Relevant to the Disputed Jurisdictional Facts ...........................................................51

XIV. Exhibit Foundation.....................................................................................................................................53

XV. Additional Exhibit Identifications ...............................................................................................................54

XVI. Additional Notice Emails to BancShares-Related Channels .....................................................................57

Phase I: Pre-Filing Whistleblower Disclosures, Vendor Fraud, and Institutional Lockout................................58

Phase II: Constructive Discharge, Data Spoliation, and Fraud-on-the-Tribunal Notices .................................60

Phase III: OALJ Discovery, Witness-Intimidation Notices, and Insurer-Related Notices ................................62

Phase IV: Pre-Federal Transfer, Rule 408 Communications, and Notice of De Novo Action...........................63

Phase V: Central District of California Federal Action and Rule 37 / Local Rule Conferral...............................64

Related Additional Packet B Exhibit Identifications ..........................................................................................65

**Introduction and Personal Knowledge**

I, Jared Ashcraft, declare as follows:

1. I am the Plaintiff in this action and am proceeding pro se.

2. Unless otherwise stated, I have personal knowledge of the facts stated in this declaration based on my employment with First-Citizens Bank & Trust Company ("FCB"), my communications with FCB personnel, my California / Pacific / Los Angeles Merchant Services work, my use of FCB systems, records I sent or received, records I accessed during my employment, records I preserved, records I reviewed, public materials I reviewed and preserved, and litigation records identified below.

3. If called as a witness, I could and would testify competently to the facts stated in this declaration.

4. Where I identify emails, screenshots, Salesforce / CRM records, Teams communications, hotel folios, corporate-card records, public records, governance documents, court filings, webpages, or other written materials, I identify them based on one or more of the following: sender, recipient, date, subject line, title, source, visible identifying information, contents, business context, file characteristics, and my own sending, receiving, accessing, maintaining, preserving, or review of the record.

5. Where I cite communications from third parties, I cite them to show that the communications were made, the information provided to me, notice, context, my state of mind, or Defendants' treatment of the records, not to prove every third-party assertion for its truth unless I separately state a fact from my own

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[2]

knowledge. I am not a corporate records custodian for Defendants, and I do not claim to authenticate every internal FCB system as a business-record custodian. I do identify records that I recognize from my employment, communications that I sent or received, and records that I preserved or later reviewed in connection with this litigation.

6. I submit this declaration in response to Defendants' federal motion papers filed on the Central District of California docket, including Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss filed as Dkt. 45-1, the Declaration of Matthew R. Follett regarding Local Rule 7-3 conferral filed as Dkt. 45-2, the Declaration of Luis Quinto filed as Dkt. 45-3, the Declaration of Jason Mills filed as Dkt. 45-4, the Declaration of Leonor Hodge filed as Dkt. 45-5, and Defendants' proposed order filed as Dkt. 45-6.

7. Unless otherwise stated, when I refer in this declaration to Defendants' motion, motion papers, declarations, filings, or supporting papers, I refer to those filed materials by their Central District of California docket numbers. Where I discuss the July 19, 2021 offer letter or the August 16, 2021 Employment Agreement, I refer to the copies Defendants themselves filed on the federal docket as Exhibits A and B to Dkt. 45-3, and I incorporate those docketed copies by reference. For clarity, I refer to First-Citizens Bank & Trust Company as FCB or the Bank. I refer to First Citizens BancShares, Inc. as BancShares. Dana Lomas was my FCB manager in Merchant Sales. Jason Mills was a senior FCB Merchant Services executive. Lisa Williford and Matthew Follett are Fox Rothschild attorneys who appeared for Defendants in this federal case. The facts stated below concern matters not

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[3]

addressed, or only partially addressed, by those filed materials, including my actual California / Pacific / Los Angeles market work, FCB-controlled customer and banker-referral channels, Salesforce / CRM activity, California business travel, California branch and banker coverage, BancShares-related notice, routing, and preservation channels, and contradictions or omissions reflected in Defendants' docketed motion papers.

## I. The Quinto Declaration

8. I reviewed the Declaration of Luis Quinto filed as Dkt. 45-3.

9. Mr. Quinto states that he is a Principal Human Resources Business Partner for FCB and that he is familiar with FCB personnel files.

10. I do not see any statement in the Quinto Declaration that Mr. Quinto participated in my 2021 recruitment, hiring, offer, onboarding, relocation, Merchant Services work, California / Pacific / Los Angeles customer activity, Pasadena business travel, Salesforce / CRM activity, California branch coverage, or California banker-referral work.

11. I do not see any statement in the Quinto Declaration identifying a review of FCB travel records, expense records, corporate-card records, Westin Pasadena records, FI5939 / First Citizens Bank Pacific Area records, Salesforce records, CRM records, referral records, Merchant Services records, Teams chats, calendar records, customer records, Area Executive approval records, branch-assignment records, banker-assignment records, or Merchant Services management communications.

12. Mr. Quinto states that I "never worked for FCB in the state of California."

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[4]

13. That statement does not address my California / Pacific / Los Angeles market work, California customer and banker-referral activity, Salesforce / CRM activity, California Teams chats, California customer opportunities, assigned branch and banker coverage, or my February 2025 Pasadena business travel. I do not dispute that Defendants' offer and employment documents identified a Greenville, North Carolina location. My point is that the hiring sequence also involved FCB communications directed to me while I lived in California, FCB's coordination of my relocation from California to North Carolina, and later California market work reflected in the records discussed below.

14. At the time FCB offered me employment in July 2021, I lived in Fremont, California.

15. FCB's July 19, 2021 offer letter, which Defendants filed on the federal docket as Exhibit A to Dkt. 45-3, was addressed to me at my Fremont, California address.

16. The offer letter identified the position as Senior Merchant Sales Specialist.

17. The offer letter identified Dana Lomas as Manager Merchant Sales and the person to whom I would report.

18. The offer letter contained a signing-bonus provision and repayment language referring to the signing bonus and / or relocation expenses, if applicable.

19. In connection with my hiring, Dana Lomas, who was identified in the offer letter as Manager Merchant Sales and the manager to whom I would report,

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[5]

told me that the $5,000 payment was being provided to relocate me from California to North Carolina for the FCB position.

20. After accepting the offer, I moved from California to North Carolina for the FCB position. The $5,000 relocation payment was not paid at the time I accepted the offer but was later paid through my first paycheck.

21. I also received and preserved a series of pre-hire emails from FCB while I was still living in California. For clarity in this declaration, those pre-hire emails are included as Exs. B-57 through B-69.

22. Ex. B-57 is a true and correct copy of June 29 and July 7, 2021 email communications in which Dana Lomas, identifying herself as the hiring manager for the Business and Commercial Merchant Sales Specialist position in Greenville, North Carolina, contacted me to schedule interviews while I was in California.

23. Ex. B-58 is a true and correct copy of Dana Lomas's July 7, 2021 follow-up email stating that the next interview would be by phone and that she also wanted to set up a WebEx interview with leaders of the business and commercial team and the Area manager.

24. Ex. B-59 is a true and correct copy of Dana Lomas's July 8, 2021 "Touchbase with Jared" email.

25. Ex. B-60 is a true and correct copy of Dana Lomas's additional July 8, 2021 "Touchbase with Jared" email.

26. Ex. B-61 is a true and correct copy of the July 8, 2021 Interview WebEx invitation sent by Dana Lomas to me and copied to FCB business and commercial leaders and the Area manager.

27. Ex. B-62 is a true and correct copy of Dana Lomas's July 19, 2021 email welcoming me to the FCB team and congratulating me after I completed hiring-stage communications.

28. Ex. B-63 is a true and correct copy of Dana Lomas's July 26, 2021 automatic reply generated during the same pre-hire period.

29. Ex. B-64 is a true and correct copy of Dana Lomas's July 27, 2021 follow-up email stating, "So exciting!!" and "Let's touchbase on Friday," together with the chain reflecting that my pre-employment checks were clear and that I was free to submit notice.

30. Ex. B-65 is a true and correct copy of Dana Lomas's July 30, 2021 "Touchbase with Jared" email.

31. Ex. B-66 is a true and correct copy of Dana Lomas's July 30, 2021 automatic reply generated during that same transition period.

32. Ex. B-67 is a true and correct copy of Dana Lomas's August 10, 2021 email concerning my office address, first day, and move, including her statement, "I hope the move is going well," and her transmission of my Greenville office address.

33. Ex. B-68 is a true and correct copy of Dana Lomas's August 20, 2021 follow-up email concerning the same office-address and move communication.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[7]

34. Ex. B-69 is a true and correct copy of FCBOnboarding's August 22, 2021 email reminding me to bring my I-9 documents on my first day.

35. Together, Exs. B-57 through B-69 show that FCB knowingly recruited, interviewed, cleared, onboarded, and relocated me while I was still living in California.

36. They also show that Dana Lomas knew she was communicating with me while I was in California. I responded using a 510 telephone number and referred to Pacific time in setting interview availability, and FCB then coordinated additional interviews, pre-employment clearance, onboarding, and the move.

37. I identify these pre-hire communications because they show that California was part of FCB's recruitment and formation of the employment relationship, not merely a unilateral location chosen by me after the fact.

38. They also show that FCB expected my move from California to North Carolina, coordinated that transition through FCB personnel before my start date, and helped fund that move through the $5,000 payment discussed above.

39. My Employment Agreement, which Defendants filed on the federal docket as Exhibit B to Dkt. 45-3, also listed my California notice address.

40. That docketed Employment Agreement states that FCB is a bank with a presence in numerous states.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[8]

41. The docketed Employment Agreement required me to perform assigned duties and other duties customarily performed by someone in my position, subject to FCB policies, standards, and procedures.

42. The docketed Employment Agreement states that I was subject to the supervision of FCB managing officers and required to comply with FCB orders, advice, directions, policies, standards, procedures, and Code of Ethics.

43. The docketed Employment Agreement states that FCB was entitled to rights, benefits, emoluments, and profits arising from work, services, and advice I performed or rendered in the course of employment.

44. The docketed Employment Agreement provides for reimbursement of reasonable and necessary expenses incurred in employment in accordance with FCB policies, standards, and procedures.

45. The docketed Employment Agreement states that, during employment, I would be given, obtain, and develop substantial knowledge of and familiarity with FCB customers and prospective customers, FCB's dealings with them, and other information concerning FCB's business.

46. The docketed Employment Agreement defines "Customer" and "Prospective Customer" as customers and prospective customers of FCB.

47. The docketed Employment Agreement defines "Material Contact" to include circumstances where I was provided or obtained information concerning a person or entity, or had personal dealings with that person or entity, in the

normal course of employment for the purpose of engaging or attempting to engage in matters related to FCB's business.

48. The docketed Employment Agreement states that customer records, files, lists, information, data, forms, notes, or questionnaires, whether written, printed, or electronically stored, including information collected from any source within or by any means from FCB, were the sole property of FCB.

49. Those provisions are consistent with my actual work. The California customer, referral, Salesforce / CRM, and Merchant Services materials I worked with were FCB business records and FCB customer / referral contacts. They were not my personal contacts outside FCB.

50. HR work-location coding, a first paystub address, and later Nevada remote coding did not determine my actual market assignment, assigned branch coverage, customer referral source, Salesforce / CRM territory, business travel, or Merchant Services customer work.

51. My personnel records may reflect Greenville, North Carolina or Nevada-Remote for HR administration purposes, but those records do not negate the California / Pacific / Los Angeles work I performed for FCB through FCB-controlled systems, California bankers, California customers, California branch coverage, and Merchant Services channels.

**II. California / Pacific / Los Angeles Branch Network, Personnel, Customers, and Referral Channels**

52. During my employment in Merchant Services, I was assigned to support FCB's California / Pacific / Los Angeles Merchant Services market activity.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION
[10]

53. Attached as Exs. A-40 through A-53 are public First Citizens / BancShares / SVB materials that I reviewed and preserved concerning First Citizens' California branch, banker, office, associate, commercial, wealth, and market footprint.

54. I also reviewed and preserved a public First Citizens branch-locator map showing California branch locations, attached as Ex. A-1.

55. Ex. A-1 is a true and correct screenshot of First Citizens' public branch-locator map for California that I reviewed and preserved.

56. The map reflects numerous First Citizens locations across California, including Southern California locations relevant to the Los Angeles market and Northern California locations relevant to the Pacific market.

57. I identify Ex. A-1 because it is consistent with the California branch and banker footprint reflected elsewhere in this declaration and in the public California materials attached as Exs. A-40 through A-53.

58. The California branch network shown in Ex. A-1 was part of the FCB market structure through which California bankers and Merchant Services opportunities were routed to me.

59. The specific branches shown in Ex. A-1 were the branches assigned to me through FCB. Referrals from those branches were routed to me through Salesforce. I worked those California opportunities through FCB-assigned branches, FCB banker referrals, and FCB-controlled Salesforce and Merchant Services channels. I was not operating a personal merchant pipeline outside FCB.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[11]

60. The public California banker and market-footprint materials discussed below are consistent with the California branch footprint shown in Ex. A-1.

61. I identify Ex. A-1 because it reflects the FCB-controlled California market structure in which I worked.

62. The public First Citizens banker page included in Ex. A-52 identifies Patrick Rodriguez as a First Citizens Vice President, Business Banker in Glendale, California.

63. Based on FCB communications and my work with him during my employment, Patrick Rodriguez was promoted into a Los Angeles district-manager role.

64. Patrick Rodriguez contacted me frequently in connection with California / Los Angeles banker referrals, customer opportunities, and Merchant Services activity.

65. I identify the Patrick Rodriguez public banker page because Patrick Rodriguez appears repeatedly in my preserved LA / Pacific Merchant Services chat records and communications.

66. Patrick Rodriguez's role and involvement reflect FCB California personnel using FCB channels to coordinate California customer and merchant opportunities.

67. One preserved LA Merchant Chat screenshot identifies "LA Merchant Chat" with 37 participants and includes communications concerning Salesforce referral issues affecting bankers' ability to send referrals. That screenshot is included as Ex. A-25.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[12]

68. A preserved LA Merchant Chat screenshot reflects Aisha Enriquez and David Moradkhani referral activity, including my message stating that David had "2" and Aisha had "10." That screenshot is included as Ex. A-9.

69. Preserved LA Merchant Chat screenshots reflect Brennan Penney communications concerning ████████, ██████, an MPA correction, client approval, DDA / CIS issues, and Salesforce relationship issues. Those screenshots are included as Exs. A-11 and A-13.

70. A preserved Patrick Rodriguez chat reflects his question about "movement on the ████████ stuff," my response that six agreements were ready, and his instruction to email and copy him so he could follow up. That screenshot is included as Ex. A-12.

71. A preserved LA Merchant Chat screenshot reflects Patrick Rodriguez communicating with California bankers and customer-opportunity personnel concerning Los Angeles / Pacific opportunities, including ████████████████████████████████, and related banker / customer activity. That screenshot is included as Ex. A-18.

72. The same screenshot also reflects Patrick Rodriguez thanking personnel for their partnership with me and discussing multiple Los Angeles opportunities. In that same screenshot, I stated that once certain LA deals were completed, "LA will be the #1 market in the bank for both deals signed and processing Volume."

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[13]

73. I identify that screenshot because it reflects California FCB personnel, California customer opportunities, Los Angeles / Pacific market activity, and Merchant Services work occurring through FCB channels.

74. A preserved screenshot of my communications with Carlos Gonzales reflects me reporting the disposition of banker-referred clients in my Los Angeles and Pacific pipeline at that time. The list visible within that screenshot is a partial list and includes Los Angeles Valerie Badoian, Los Angeles Karolin Gregorian, Los Angeles Malinda Fernando, Los Angeles John Evans Jr., Pacific Farooq Ganatra, Pacific Rufo Fabricante Jr., Pacific Verona Fannizadeh, Pacific Kristine Ben, Pacific Carissa Sinclair-Lissy, Pacific Leo Reynoso, Los Angeles Sherry Edalatpisheh, Los Angeles Aisha Enriquez, Los Angeles David Moradkhani, Los Angeles Brennan Penney, Los Angeles Robert Villasenor, Los Angeles Hovsep Kartshyan, Pacific Mike Win, Pacific Karen Carver, and others. That screenshot is included as Ex. A-27.

75. A preserved LA Merchant Chat screenshot reflects the same list of Los Angeles and Pacific leads or opportunities and my message that I was suddenly unable to convert leads in Salesforce and could not get planned agreements out until at least Monday. That screenshot is included as Ex. A-28.

76. A preserved Pacific Merchant Chat screenshot reflects my message that a Salesforce system issue was blocking the Southern California region from being able to submit referrals. That screenshot is included as Ex. A-26.

77. The California businesses and merchant opportunities I worked on came through FCB channels, including FCB customer relationships, California

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION
[14]

banker referrals, Salesforce / CRM records, FCB Teams chats, FCB email threads, Pacific / Los Angeles market personnel, and Merchant Services management channels.

78. Based on my training, instructions, experience, and ordinary Merchant Services workflow, Merchant Services employees were not free to operate an independent personal merchant pipeline outside FCB.

79. Merchant opportunities had to proceed through FCB-controlled channels, including existing FCB customer relationships, banker referrals, Salesforce / CRM entries, customer records, formal referral processes, or management approval.

80. If a business did not already bank with FCB, my understanding from training, practice, and instruction was that management or Area Executive approval was required before proceeding with a Merchant Services opportunity.

81. As I understood and applied FCB's Merchant Services workflow, merchant-processing deposits generally had to settle into FCB bank accounts unless written approval was obtained for another arrangement.

82. Even when a California business did not yet have an FCB deposit account, the opportunity could still be an FCB banker-led, FCB market-based, FCB-controlled business-development opportunity.

83. My California / Pacific / Los Angeles work included California customer and merchant opportunities involving medical, dental, automotive, retail,

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[15]

professional-services, distribution, and other California businesses reflected in my exhibit materials.

84. Based on my personal knowledge, ███████████, a Los Angeles business, was referred to me through the FCB branch referral chain, and I worked with it in my FCB Merchant Services role and assisted with its merchant-services account.

85. I received and preserved a letter from ████████ stating that I was its representative at First Citizens Bank and that I helped set up its merchant account. That letter is included as Ex. A-4.

86. After Defendants terminated me, Miguel, a representative of ███████, contacted me on my cellphone regarding the status of the ███████ merchant-services account. After I told him that Defendants had terminated me, he offered to send me a letter regarding my role with ███████.

87. I later received and preserved that letter, which is attached as Ex. A-4.

88. I identify this sequence to explain how I came to receive and preserve Ex. A-4. I do not offer that communication to prove the truth of every statement made during that communication.

89. I identify ████████ because it is an example of a California FCB customer relationship and my role as an FCB representative in connection with California Merchant Services work.

90. I created the LA and Pacific Merchant chats so I could remain in communication with FCB bankers in the Los Angeles and Pacific markets,

receive and manage referrals, coordinate customer opportunities, answer questions, and generate Merchant Services business for FCB.

91. The LA Merchant Chat had numerous FCB participants and included California / Pacific / Los Angeles referral and agreement issues.

92. Those chats were FCB communications involving FCB personnel and FCB customer opportunities. They were not personal communications outside FCB.

93. A preserved calendar screenshot shows scheduled work on April 25, 2025 for contract creation, ██████████████████████████, and ██████ Merchant Proposal. That screenshot is included as Ex. A-7.

94. A preserved calendar screenshot shows April 28, 2025 activity for ████ ██████████████████. and Merchant Services / ████████. That screenshot is included as Ex. A-8.

95. A preserved email chain concerning ████████████████████ reflects a Beverly Hills client, FCB personnel, management involvement, agreements, and Patrick Rodriguez being copied or kept informed. Those records are included as Exs. A-14 and A-15.

96. A preserved email from Malinda Fernando identifies him as Vice President / Financial Sales Manager II at FCB's Encino Branch, located at 16055 Ventura Blvd. #110, Encino, California 91436. That record is included as Ex. A-17.

97. A preserved LA South Merchant Chat reflects a Dr. Edalat customer opportunity, an existing relationship, and FCB personnel discussing whether

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[17]

the merchant-services process could proceed without a call. That record is included as Ex. A-22.

98. A preserved inbox screenshot reflects active California / Pacific / Merchant Services communications and Salesforce-generated opportunities, including ████████████ and ██████████ . That screenshot is included as Ex. A-21.

99. A preserved email chain for a "Merchant & Pacific Area Partner Touch Base Call" includes Ryan Wiese, Senior Vice President, Manager Retail Banking, with a Downey, California office address, and includes Pacific Area personnel and meeting information. That record is included as Ex. A-6.

## III. The Mills Declaration

100. I reviewed the Declaration of Jason Mills filed as Dkt. 45-4. A copy of the Mills Declaration is included as Ex. A-2.

101. Mr. Mills states that he is the Executive Director of Merchant Services for FCB.

102. Mr. Mills states that he manages and supervises members of FCB's Merchant Sales division.

103. Mr. Mills states that he has experience and personal familiarity with the duties and responsibilities of the Merchant Sales Specialist position and with FCB policies and procedures relevant to that position.

104. Mr. Mills states that the principal function of the Merchant Sales division is to sell electronic payment-processing services to new and existing FCB customers.

105.     Mr. Mills states that my main duties included making sales calls to potential customers, soliciting potential customers interested in purchasing FCB's payment-processing products, coordinating with other FCB employees to prepare pricing proposals, and supplying, executing, and collecting documents to effectuate sales.

106.     Mr. Mills states that, in the course of my employment, I identified and directed sales efforts to potential customers using leads and information supplied by FCB through customer relationship management software provided to me as part of my employment.

107.     Mr. Mills states that I was compensated in part with incentive payments based on the amount of revenue generated by my sales activity.

108.     Mr. Mills states that I worked with customers in many states, including some in California.

109.     Those statements identify FCB customer relationships, FCB leads, FCB customer relationship management software, FCB personnel, sales activity, compensation-bearing Merchant Services work, and California customers as part of my job duties.

110.     Mr. Mills also states that, to his knowledge, I never attended a meeting in California or traveled to California for business purposes on behalf of FCB during my employment. The Mills Declaration does not state what travel, expense, corporate-card, hotel, calendar, FI5939, Teams, Outlook, Salesforce, or Merchant Services records Mr. Mills reviewed before making that statement.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[19]

111. In February 2025, I traveled to Pasadena, California for FCB Merchant Services business connected to the Pacific Market.

112. I stayed at The Westin Pasadena for the February 19-20, 2025 trip.

113. The Westin Pasadena records identify the Pasadena hotel, the dates of the stay, and records associated with my stay.

114. A Westin Pasadena email sent on April 24, 2026 transmitted electronic folios for my February 19-20, 2025 stay and attached Folio A and Folio C. That email is included in Packet A at page 11.

115. Westin Pasadena Folio A identifies The Westin Pasadena at 191 North Los Robles Avenue, Pasadena, California 91101; my name; Guest Number 1728772; Room Number 836; arrival on February 19, 2025; departure on February 20, 2025; and "FI5939 - First Citizens Bank Pacific Ar." Folio A is included in Packet A at pages 12 and 13.

116. Folio A reflects Visa card activity ending in 7192 and includes payment activity for restaurant and room-dining charges.

117. My FCB corporate card ended in 7192. A copy or image of my FCB corporate card identifying Jared Thomas Ashcraft, First Citizens Bank, and 7192 is included in Packet A at page 16.

118. Westin Pasadena Folio C identifies the same stay, Guest Number 1728772, Room Number 836, and "FI5939 - First Citizens Bank Pacific Ar." Folio C is included in Packet A at pages 14 and 15.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[20]

119.    Folio C reflects a "Room Chrg - Grp - Corporate," occupancy / tourism charges, and "XFER To FI5939."

120.    I understood the FI5939 / First Citizens Bank Pacific Area reference to be an FCB Pacific Area business identifier.

121.    I used my FCB corporate card ending in 7192 for the Pasadena stay.

122.    The Pasadena trip was not personal travel.

123.    At that time, I was assigned to FCB's Pacific Market and Los Angeles Market for Merchant Services.

124.    The Pasadena trip was for Pacific Market FCB business activity, including Pacific Market team activity involving FCB bankers, managers, and market personnel.

125.    Stephanie Daughtridge coordinated with me concerning the Pasadena / LAX travel and related business activity.

126.    My contemporaneous communications with Ms. Daughtridge from February 19-22, 2025 included travel and meeting logistics concerning LAX, Pasadena, arrival, business activity, and the morning meeting. Those communications are included in Packet A at pages 8 and 9.

127.    Those communications also included discussion of active Merchant Services work while traveling, including expectations for an account, client timing, and follow-up.

128.    Ms. Daughtridge traveled to California for the same general Pasadena / Pacific Market business meeting.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE
DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2)
MOTION
[21]

129.	On March 3, 2025, after the Pasadena trip, Stephanie Daughtridge sent an internal FCB email to me, Dana Lomas, and Jason Mills. That email is included as Ex. A-3.

130.	In that March 3 email, Ms. Daughtridge referred to "seeing" my engagement with the Pacific Market.

131.	In that same email, Ms. Daughtridge referred to Pacific and LA doing great things.

132.	In that same email, Ms. Daughtridge referred to my impact with those teams.

133.	Jason Mills was copied on that March 3, 2025 internal FCB communication before he signed his declaration.

134.	The March 3 email concerned my Pacific market engagement and business work. It did not concern personal travel or personal contacts.

135.	The records concerning the February 2025 Pasadena trip include Westin Pasadena records, FI5939 / First Citizens Bank Pacific Area records, FCB corporate-card records, Daughtridge travel communications, and the March 3, 2025 internal FCB email copied to Mills.

136.	Those records existed before Defendants filed the Mills Declaration.

137.	Those records concern the same Merchant Services management structure and California business-travel issue addressed in Mr. Mills's declaration.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[22]

138.	I also reviewed the 2025 Merchant Sales Plan. That plan identifies Jason Mills as Executive Sponsor. The 2025 Merchant Sales Plan is included in Packet A at page 17.

139.	The 2025 Merchant Sales Plan states that the plan's objective was to incent and reward eligible participants who met and exceeded performance objectives and, in doing so, enhanced the Bank's growth and profitability.

140.	The 2025 Merchant Sales Plan identifies eligible Merchant Sales positions, including Senior Merchant Sales Specialist.

141.	I identify the Merchant Sales Plan because it concerns the Merchant Services compensation-bearing sales structure, the same Merchant Sales role addressed in the Mills Declaration, and Jason Mills's executive-sponsor role for the plan.

142.	I received and preserved a written reference from Stephanie Daughtridge concerning my Merchant Services work. That reference is included in Packet A at page 18.

143.	In that reference, Ms. Daughtridge stated that I transitioned to a Southern California market.

144.	In that reference, Ms. Daughtridge stated that I engaged with team members and clients in that region.

145.	In that reference, Ms. Daughtridge stated that I established team chats for each new area I covered.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION
[23]

146.     In that reference, Ms. Daughtridge stated that I made myself readily available to bankers and clients.

147.     I identify that reference because it concerns my Southern California markets assignment and client / banker work. I also have personal knowledge of my Southern California market assignment and client / banker work from my FCB employment, communications, chats, Salesforce / CRM activity, and Pasadena business travel.

## IV. Salesforce / CRM / Los Angeles Referral Restrictions

148.     My California / Pacific / Los Angeles work was controlled through FCB systems and FCB channels, including Salesforce, CRM, banker referrals, Area Executive involvement, Merchant Services approval processes, FCB email, and FCB internal chats.

149.     I was not permitted to operate an independent personal merchant pipeline outside FCB.

150.     When I worked California opportunities, I did so through FCB customer relationships, FCB bankers, FCB Salesforce / CRM records, FCB internal chats, or FCB management channels.

151.     I preserved records showing Los Angeles / Pacific Salesforce and referral issues affecting California Merchant Services opportunities.

152.     Those records include Los Angeles HR Area / restricted-picklist problems, lead-conversion problems, referral problems, agreement-creation problems, and contract-generation problems.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[24]

153.    I preserved communications showing FCB personnel discussing issues that affected the ability to send referrals, convert leads, create agreements, and generate client contracts tied to the Los Angeles HR Area field.

154.    A preserved LA Merchant Chat screenshot reflects my message that there appeared to be an ongoing Salesforce issue where bankers were unable to select their branch when trying to send me a referral. That screenshot is included as Ex. A-25.

155.    A preserved Pacific Merchant Chat screenshot reflects my message that a Salesforce system issue was blocking the Southern California region from being able to submit referrals. That screenshot is included as Ex. A-26.

156.    A preserved communication with Carlos Gonzales reflects that I was suddenly unable to convert referrals in Salesforce and that my bankers were also suddenly unable to send me referrals. That screenshot is included as Ex. A-27.

157.    That same screenshot lists numerous Los Angeles and Pacific referrals or opportunities I needed to create or process.

158.    A preserved communication with Ashley Roff reflects that I asked when the change was made, stated that no one informed me or my bankers, referenced approximately 60 active leads, and stated that I was working approximately 57 referrals that week and had more than 20 agreements to get out. That screenshot is included as Ex. A-32.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[25]

159.    The same Ashley Roff communication reflects that Dana Lomas had sent an email about the changes to Ashley Roff and a few others who made changes in the systems, and that the change was not communicated to my market.

160.    A preserved Merchant Services Salesforce communication reflects that Salesforce did not recognize "Los Angeles" as a valid value in the Area / HR Area field. That screenshot is included as Ex. A-29.

161.    I preserved an escalation concerning a Salesforce market restriction affecting both my ability to receive referrals and my ability to generate client contracts within Salesforce, specifically tied to the "Los Angeles" HR Area field.

162.    That escalation is reflected in Ex. A-30 and the related screenshot at Ex. A-31.

163.    I also requested preservation of Salesforce configuration logs, HR Area field metadata, change history tied to my user profile and HR Area, and records identifying who had access to adjust HR Area field logic or restrict contract generation.

164.    A separate May 1, 2025 preservation request to Ted Bush requested preservation of Salesforce system logs related to my user account, including referral submission, assignment, visibility activity, assignment-rule changes, permission changes, activity logs, and other systems impacting referral flow. That email is included as Ex. A-24.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[26]

165. A May 1, 2025 email to Ted Bush reported that I was no longer receiving referrals through Salesforce, that Brennan Penney of the Beverly Hills branch reviewed the issue with me directly, and that referrals that should route to me were not routing unless I bypassed the standard flow using a workaround. That email is included as Ex. A-23.

166. The Salesforce / CRM records identified above reflect FCB team members discussing and working to address the errors affecting referral submission, lead conversion, and agreement creation.

167. These Salesforce / CRM records reflect that the California referral and contract-generation process operated through FCB systems, FCB communications, and FCB referral channels.

168. Mr. Mills's declaration does not identify whether he reviewed Salesforce / CRM records, referral records, Los Angeles HR Area records, lead-conversion logs, agreement-creation logs, or contract-generation logs before signing his declaration.

169. Mr. Quinto's declaration does not identify whether he reviewed Salesforce / CRM records, referral records, Los Angeles HR Area records, lead-conversion logs, agreement-creation logs, or contract-generation logs before signing his declaration.

## V. Communications with Ted Bush, Dana Lomas, and Jason Mills

170. Before sending the April 30, 2025 communication described below, I told Ted Bush that I was uncomfortable continuing to work through Dana Lomas and asked whether operational communications and task-related

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[27]

requests should be redirected to someone else or whether I should continue engaging with Ms. Lomas.

171.    My April 29, 2025 request for guidance to Ted Bush is included in Packet A at page 66.

172.    Mr. Bush responded that, during the warning appeal process, I was still expected to perform in my role and report to and work with my manager. That response is included in Packet A at page 68.

173.    On or about April 30, 2025, I emailed Dana Lomas concerning ██████████, Neutraderm / DRMTLGY, banker-submitted statements, Salesforce entry, referral protocol, and whether Merchant Services employees could proceed with banker-referred opportunities outside formal Salesforce referral channels. That communication is included in Packet A at pages 53 and 54.

174.    I copied Jason Mills and Ted Bush on that April 30 communication.

175.    In that communication, I explained that I understood deals should not be worked unless properly entered into Salesforce.

176.    In that communication, I explained that I had not worked the Neutraderm account, initiated contact, or taken action beyond reviewing a statement sent to me by a banker.

177.    I asked for clarification about whether Merchant Services employees were permitted to analyze or respond to banker-submitted statements unless a referral already existed in Salesforce.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[28]

178. I also asked whether qualified opportunities outside formal FCB referral channels could be brought into a banking relationship.

179. A separate March 2025 email from Dana Lomas stated that there should never be client interaction until a client is in Salesforce and that she expected I was not managing a separate pipeline or working deals outside Salesforce. That enlarged email is included in Packet A at page 55.

180. I identify the March 2025 Dana Lomas email because it concerns FCB's Salesforce / referral requirements, customer-interaction rules, and management control over whether opportunities could be worked outside Salesforce.

181. On or about May 1, 2025, I emailed Dana Lomas concerning Neutraderm / DRMTLGY, a banker request, Salesforce / referral handling, and a stalled high-value California merchant opportunity. That email is included as Ex. A-35.

182. Jason Mills was copied on that May 1, 2025 communication.

183. The May 1, 2025 email described Neutraderm and DRMTLGY as involving approximately $126 million in annual processing volume and $200 million in potential deposit value to the bank.

184. The April 30 and May 1 communications concerned California merchant opportunities, banker-referral handling, Salesforce issues, and Merchant Services revenue opportunities.

185. Mr. Mills's declaration does not mention those April 30 or May 1 communications, the March 3 Daughtridge email, the Pasadena travel

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[29]

records, the FI5939 records, the FCB corporate-card records, or the Salesforce / CRM records described above.

186.     On May 8, 2025, I created Neutraderm / DRMTLGY pricing-analysis materials on personal time and emailed them to my FCB-provided email address. The initial transmission is included as Ex. A-36. The later HR Redirect response and forwarded thread reflecting the routing and handling of that communication within FCB systems are included as Ex. A-37.

187.     I identify Exs. A-36, A-37, B-81, and B-82 to show the preserved record category concerning the same Neutraderm / DRMTLGY opportunity referenced in the May 1 communication and the routing or handling of that communication within FCB systems.

188.     The routing reflected in those records occurred after Ted Bush had assured me that FCB was not intercepting my email communications. This was not an isolated communication. During the written warning appeal process, I observed that emails I sent from my personal email address to my FCB-provided email address were repeatedly intercepted and re-routed within FCB systems.

189.     After the May 8, 2025 email was re-routed to HRredirect@firstcitizens.com, Queena Green of FCB Human Resources responded to it during the written warning appeal process. I identify the response and routing reflected in Ex. A-37 and the related HR Redirect records at Exs. B-81 and B-82 as examples of that pattern.

190.     On May 15, 2025, Ted Bush sent me an appeal update stating that the information I submitted related to my appeal was being reviewed. That

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[30]

communication is included in Packet A at page 69. I identify that record because it relates to the internal review process occurring after my Salesforce, referral, and retaliation-related escalations.

## VI. OALJ Protective-Order Position Concerning FCB Customers

191.    I reviewed Defendants' OALJ Motion for Entry of Protective Order. That motion is included in Packet A at pages 19 and 20.

192.    In that motion, FCB characterized certain materials I had retained as confidential records belonging to Defendants.

193.    In that motion, FCB described materials as sensitive commercial information identifying or belonging to Defendants' clients and customers.

194.    In that motion, FCB stated that it had an interest and an obligation to protect information on its customers and employees from public disclosure.

195.    I identify that filing because it describes the same general categories of customer and merchant-opportunity materials as records belonging to FCB or involving FCB clients and customers. I also identify it because the ███████ letter that I include here as Ex. A-4 was also attached by Defendants as an exhibit to that OALJ protective-order motion, where Defendants treated it as part of their customer and confidential business materials.

196.    I also identify that filing because Defendants' Rule 12(b)(2) declarations place at issue whether the California opportunities were FCB customer, referral, Salesforce / CRM, and Merchant Services contacts or merely my unilateral personal contacts. Defendants previously treated the

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[31]

█████ letter as customer or confidential business material in the OALJ protective-order context, while Defendants' current Rule 12(b)(2) declarations characterize █████ and similar California opportunities as merely my unilateral personal contacts.

197. I also received and preserved the February 24, 2026 meet-and-confer emails concerning Defendants' contemplated protective-order motion. Those communications are included in Packet B as Exs. B-70, B-71, B-72, B-73, and B-74.

198. Ex. B-70 is a true and correct copy of my February 24, 2026 meet-and-confer email titled "Meet-and-Confer — Request for Affidavit Regarding Dana Lomas Employment Status," sent to Lisa Williford, Jeremy Sayre, and OALJ recipients.

199. In Ex. B-70, I set out the then-existing sequence concerning Dana Lomas's public-facing Merchant Services role, discovery served to her, the posting of what appeared to be her former position on the FCB Careers website, Defendants' use of past-tense language in a protective order related to her employment, and my request that Defendants provide a sworn affidavit concerning whether Ms. Lomas remained employed and available for discovery.

200. In Ex. B-70, I also stated that if Respondent declined to provide that affidavit, I would proceed accordingly in that forum and in any subsequent Article III proceeding.

201. Ex. B-71 is a true and correct copy of Lisa Williford's February 24, 2026 response stating that Defendants would not substantively respond to

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[32]

what she characterized as improper motions practice, that Defendants would be asking the Court to enter a protective order to govern designation and use of confidential or sensitive information, and that if I elected to file the motion as attached or in substantially similar form, she asked that I refrain from doing so until a protective order was in place; otherwise, Defendants would move to strike the motion.

202.    Ex. B-72 is a true and correct copy of my February 24, 2026 3:58 PM response to Lisa Williford and Jeremy Sayre.

203.    In Ex. B-72, I retracted an earlier "file away" statement, stated that I did intend to file the motion when I saw fit, and stated that it would also be attached with other materials to the federal complaint if I was forced to kick out on the 16th.

204.    In Ex. B-72, I also stated that I was willing to accommodate a reasonable confidentiality concern, but asked counsel to identify with specificity — by exhibit, page number, and the nature of the claimed confidentiality — any specific content they contended was confidential.

205.    Ex. B-73 is a true and correct copy of my February 24, 2026 4:33 PM follow-up to counsel.

206.    In Ex. B-73, I stated that I had proactively redacted sensitive personal identifiers, but did not believe the remaining substantive content of the exhibits met the high bar for confidential treatment under a protective order, and I gave Defendants 24 hours to identify any specific portion they claimed should be filed under seal.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[33]

207.    In Ex. B-73, I further stated that, absent a specific and legally supported objection, I would proceed with filing the materials as public, non-confidential documents to ensure the official record was complete and ready for the impending Article III transfer.

208.    Ex. B-74 is a true and correct copy of my February 24, 2026 10:22 PM email to Lisa Williford and other recipients.

209.    In Ex. B-74, I stated my federal complaint was fully prepared and ready for immediate filing, that I had proactively offered reasonable redactions on all exhibits, and that, once the Dana Lomas emergency motion related to the apparent termination or removal of Ms. Lomas after I had served discovery upon her had been docketed and was part of the complete record, I did not feel I needed to file anything further in the OALJ before kick-out. I further stated that the core evidence at issue contained no legitimate confidential customer information and that, if Defendants moved forward with a protective-order motion in the OALJ seeking to restrict that evidence, I would immediately withdraw the settlement invitation, initiate the SOX kick-out, and e-file in the Central District of California that day.

210.    I identify Exs. B-70, B-71, B-72, B-73, and B-74 because they reflect a concrete sequence in which Respondent raised confidentiality and protective-order objections to prevent or delay the filing of materials I was preparing to preserve for the record and for anticipated Article III proceedings.

211.    I also identify those communications because they show that I responded by offering targeted redactions and asking counsel to identify any

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[34]

specifically claimed confidential material, rather than refusing to address legitimate confidentiality concerns.

212.    I do not offer the February 24, 2026 settlement-related communications to prove liability or the amount of any claim. I cite that sequence to show the chronology, notice, the confidentiality dispute, Defendants' treatment of the customer and jurisdictional records before this motion, and my response to the attempt to restrict those records before filing my federal complaint.

213.    From my perspective as the person who worked the California Merchant Services records, the same categories of materials Defendants previously sought to restrict are now part of the factual record concerning California contacts, California customers, California branches, and the relationship between my claims and California.

## VII. West Ludwig and Human Resources Escalation Context

214.    I reviewed and preserved a public LinkedIn page identifying West Ludwig as Chief Human Resources Officer at First Citizens Bank. That record is included as Ex. A-5.

215.    I identify that page because West Ludwig was copied on my May 2025 Salesforce / Los Angeles HR Area / contract-and-referral restriction escalation, and the recipient's role is relevant to the routing of that escalation within FCB.

216.    My May 5, 2025 escalation concerning the Salesforce market restriction is reflected in Ex. A-30 and the related screenshot at Ex. A-31.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[35]

## VIII. The Hodge Declaration and BancShares-Related Channels

217.    I reviewed the Declaration of Leonor Hodge filed as Dkt. 45-5.

218.    Ms. Hodge states that she is Senior Counsel for FCB and is familiar with the corporate formation and structure of FCB and First Citizens BancShares, Inc. ("BancShares").

219.    Ms. Hodge states that FCB operates approximately 55 locations in California.

220.    I identify that statement because it concerns FCB's California presence.

221.    Ms. Hodge also states that BancShares is the parent holding company of FCB.

222.    Ms. Hodge states that BancShares does not have offices in California.

223.    The Hodge Declaration addresses corporate formation, office location, and branch-count facts.

224.    I do not see any statement in the Hodge Declaration identifying a review of BancShares-related governance, Audit Committee, legal, investor-relations, Corporate Secretary, Board, or FCBDirectors notice, routing, preservation, review, or escalation records.

225.    My BancShares-related facts are not based on parent-company status alone.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[36]

226.    My BancShares-related facts include governance documents, Audit Committee notice, investor-relations / legal / Corporate Secretary / Board-channel notice, FCBDirectors communications, consolidated reporting / internal-control context, and the absence of any declaration explaining how those notices were routed, preserved, reviewed, escalated, or acted upon.

227.    I reviewed the Joint Audit Committee Charter approved April 29, 2025, attached as Ex. A-56.

228.    The Joint Audit Committee Charter identifies the Audit Committee as the joint Audit Committee of the Board of Directors of BancShares and the Board of Directors of FCB.

229.    The Joint Audit Committee Charter states that the Audit Committee is responsible for oversight of the companies' financial reporting and internal controls related to finance and accounting.

230.    The Joint Audit Committee Charter states that the Audit Committee monitors the integrity of the financial reporting process and systems of internal controls of the companies.

231.    The Joint Audit Committee Charter defines Securities Regulations to include the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002, SEC regulations, and Nasdaq listing standards, to the extent applicable.

232.    The Joint Audit Committee Charter states that each Audit Committee member must be a member of the Board of Directors of both BancShares and FCB.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[37]

233.    The Joint Audit Committee Charter states that the Audit Committee has direct access to, and complete and open communication with, independent auditors, management, the Internal Audit Department, and the Boards.

234.    The Joint Audit Committee Charter states that the Audit Committee establishes procedures for receipt, retention, and treatment of complaints received by the companies related to accounting and financial processes and reporting, internal controls, and auditing matters.

235.    The Joint Audit Committee Charter provides for confidential and anonymous submissions by employees of the companies concerning questionable accounting, financial, internal-control, or auditing matters.

236.    The Joint Audit Committee Charter states that the Audit Committee may seek information from the companies' employees, all of whom are directed to cooperate with the Committee's requests.

237.    I identify these Charter provisions because my notices were directed to BancShares-related Audit Committee, Board, legal, investor-relations, and Corporate Secretary channels and concerned internal controls, accounting / audit-adjacent records, sales results, compensation records, suspected account diversion, Salesforce / referral controls, preservation, and retaliation.

238.    I reviewed the First Citizens Code of Ethics and Board Supplement, attached as Ex. A-55. I also reviewed my New Hire Acknowledgment of First Citizens' Code of Ethics, Policies, and Standards, attached as Ex. B-120.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[38]

239.    The Code states that it applies to associates of FCB and its subsidiaries and to directors of BancShares, subject to the Board Supplement.

240.    The Code uses collective terms including "First Citizens," "the bank," and "the company" to refer to BancShares and its subsidiaries.

241.    The Code includes reporting, internal-control, financial-record, investigation, preservation, and anti-retaliation provisions.

242.    The Board Supplement states that directors should strive to ensure full, fair, accurate, timely, and understandable disclosures in reports and documents BancShares files with the SEC and in other public communications.

243.    The Board Supplement states that directors should report accounting or audit concerns regarding the company's books, records, financial statements, and reports to the Audit Committee.

244.    I identify these provisions because my notices concerned internal-control issues, sales-practice issues, revenue-credit and compensation-record issues, false revenue inflation reported to Dana Lomas, customer / account diversion, vendor / account routing, Salesforce / referral controls, IT-level communications manipulation, record preservation, and retaliation. I also identify Ex. B-120 because it confirms that, as an associate of a subsidiary of BancShares, I acknowledged Code of Ethics reporting channels that included reporting directly to any member of the Audit Committee of the Board of Directors of First Citizens BancShares, Inc.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE
DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2)
MOTION
[39]

## IX. May 20, 2025 Audit Committee and FCBDirectors Notices

245.    On May 20, 2025, I sent a written disclosure from legal@ashcraft.me to investor.relations@firstcitizens.com and legal@firstcitizens.com.

246.    I copied Matthew G.T. Martin and Frank B. Holding Jr.

247.    The subject of the May 20, 2025 email was "Formal Whistleblower Disclosure - Audit Committee Escalation under SEC Rule 10A-3, SOX §1514A, ADA §12203."

248.    The body of the email was addressed to the Office of the Corporate Secretary and Audit Committee Members of First Citizens BancShares, Inc.

249.    The May 20, 2025 disclosure stated that it was a formal whistleblower disclosure made under SEC Rule 10A-3(b)(3), SOX § 1514A, SOX § 1107, SEC Rule 13a-15, the CFAA, and 18 U.S.C. § 1001.

250.    The May 20, 2025 disclosure concerned, among other things, internal controls, vendor / account routing, preservation, retaliation, and Audit Committee escalation.

251.    The May 20, 2025 disclosure requested Audit Committee action, including acknowledgment of receipt, confirmation of routing to the independent Audit Committee, escalation outside the chain of individuals named in the disclosure, preservation of documents, metadata, and communication logs, and removal of HR from jurisdiction over the matter.

252.    On May 20, 2025, I also forwarded or sent related Audit Committee and whistleblower materials to FCBDirectors@FirstCitizens.com.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[40]

253.    The forwarded disclosure again identified the Office of the Corporate Secretary and Audit Committee Members of First Citizens BancShares, Inc.

254.    The forwarded disclosure again requested Audit Committee routing, preservation, independent escalation, and removal of HR from control over the matter.

255.    On May 20, 2025, I also sent or forwarded a supplemental disclosure concerning vendor / account diversion and Worldpay / Fifth Third issues to FCBDirectors@FirstCitizens.com and investor.relations@firstcitizens.com, copying Frank B. Holding Jr., Matthew G.T. Martin, and Lorie Rupp.

256.    The supplemental disclosure concerned, among other things, Jackson Hewitt / PI Tax Prep account routing, Worldpay, Fifth Third Bank, account routing, vendor oversight, internal controls, and attribution of customer-account credit.

257.    I do not see any statement in the Hodge Declaration identifying whether FCBDirectors@FirstCitizens.com, investor.relations@firstcitizens.com, legal@firstcitizens.com, the Office of the Corporate Secretary, the Audit Committee, the Board, or shared legal / governance channels received, routed, preserved, reviewed, escalated, or acted upon my notices.

258.    I do not see any statement in the Hodge Declaration identifying what BancShares-related records were searched before Defendants asserted that BancShares was improperly named.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[41]

259.    I also reviewed and preserved an unofficial transcript of the September 30, 2025 pre-hearing conference in OALJ Case No. 2025-SOX-00035, attached as Ex. B-75. I also reviewed and preserved additional transcript copies included as Exs. B-79 and B-80, including the official September 30, 2025 transcript at Ex. B-80. Ex. B-75 was prepared from the recording of that conference. It differs from the official court-reporter transcript because, during the call, Judge Timlin acknowledged that she had not placed the conference on the record at the outset, and the court reporter confirmed that she had been waiting to be told they were on the record.

260.    As a result, the initial portion of the conference was not captured by the court reporter. I have a true recording of that call, and I identify Ex. B-75 as a true and correct transcript prepared from that recording.

261.    In Ex. B-75, Ms. Williford stated that I had served documents on First Citizens' CEO and Chief Legal Officer individually and further stated that, every time I attempted to serve a document on First Citizens, I would email "our CEO, our Board of Directors, our Chief Legal Counsel, myself, Mr. Sayre, and Ms. Ben at our law firm."

262.    I identify Ex. B-75 because it is Defendants' counsel's own statement, on the record, confirming that my communications were going to the CEO, the Board of Directors, and the Chief Legal Officer.

263.    When considered together with the May 20, 2025 and other notices described above, including notices I directed through FCBDirectors@FirstCitizens.com to the Board, the Audit Committee, and the Risk Committee, Ex. B-75 is consistent with my position that

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[42]

BancShares-related governance recipients were receiving, or were being sent, those notices.

264.    I also reviewed and preserved BancShares' corporate-governance webpages titled "Contact the Board" and "Committee Composition," attached as Exs. B-76 and B-77. Ex. B-76 identifies FCBDirectors@FirstCitizens.com as the governance email contact reflected on BancShares' Board-contact page. Ex. B-77 identifies the Audit Committee and the Risk Committee as Board committees. Based on those governance materials and my use of that address, I identify FCBDirectors@FirstCitizens.com as the direct email channel through which my notices to the Audit Committee were sent, and as a governance contact channel through which my notices to the Board, the Audit Committee, and the Risk Committee were directed.

## X. May 21, 2025 Sayre Letter and Routing / Preservation Issues

265.    On May 21, 2025, Jeremy R. Sayre of Fox Rothschild sent me a letter on behalf of First Citizens Bank.

266.    I reviewed that May 21, 2025 letter. A true and correct copy of that letter is attached as Ex. B-78.

267.    The letter was labeled "CONFIDENTIAL RULE 408 COMMUNICATION." I do not identify that label as establishing that the letter was, in substance, a settlement response. The letter did not offer any consideration, propose settlement terms, or otherwise substantively engage any settlement demands.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[43]

268.    Instead, as reflected in the letter itself, Mr. Sayre stated that his firm represented the Bank, stated that the purpose of the letter was to clarify my concerns, requested that future correspondence regarding the matter be directed only to him, sought clarification of my disclosures, warned that I must safeguard the Bank's confidential information and the confidential information of its customers and prospective customers, and directed me to refrain from contacting other Bank leaders concerning the matters addressed in the letter.

269.    The letter stated that Fox Rothschild represented First Citizens Bank in connection with concerns I had addressed to the Bank's Chief Legal Officer, Matt Martin, and other Bank leadership.

270.    The letter stated that my communications referenced alleged violations of state and federal laws, including employment laws such as the ADA and FMLA.

271.    The letter stated that my recent communications raised allegations suggesting that the Bank had engaged in corporate-related misconduct, including securities violations or other financial crimes, under the Sarbanes-Oxley Act and SEC Rule 13a-15.

272.    The letter stated that I had alluded to disclosures I believed qualified me as a whistleblower under those federal laws.

273.    The letter requested information concerning my disclosure about diversion of 31 Jackson Hewitt merchant accounts, including how those accounts were allegedly misappropriated, what actions I contended the Bank

should have taken, what law I contended was violated, and what control and oversight failures I contended occurred.

274. The letter requested clarification concerning my allegation of the willful sabotage of a $200 million merchant-processing opportunity.

275. The letter referenced my concerns about credit for revenue-generating accounts I originated that I believed were intentionally stripped or reassigned.

276. The letter referenced my claim that the Bank engaged in deliberate IT-level manipulation of my electronic communications.

277. The letter stated that Mr. Sayre would ensure my communications were shared appropriately within the Bank's established communication channels and that, provided I acted in good faith, I was permitted to report misconduct that I reasonably believed constituted a violation of law.

278. At the same time, the letter directed me to route future communications only through counsel and to refrain from contacting other Bank leaders. As I understood it, that directive raised a serious concern under SEC whistleblower-protection rules, including Rule 21F-17, because I understood it as attempting to impede my communications as a whistleblower, including communications with the Commission concerning possible securities-law violations.

279. I identify the May 21, 2025 letter not to prove the validity or amount of any claim, but because it states that my concerns had reached the Chief Legal Officer and Bank leadership, confirms that my communications

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[45]

concerned SOX, SEC Rule 13a-15, internal controls, customer / account diversion, revenue-credit issues, IT-level communication manipulation, Code of Ethics issues, whistleblower status, customer / prospective-customer information, and preservation obligations, and reflects what I understood from the letter as a warning and communication-control effort rather than a substantive settlement response.

280.     The Hodge Declaration does not address the May 21, 2025 Sayre letter, Mr. Sayre's routing representation, who received my communications after that letter, whether any communications reached BancShares-related channels, whether any documents were preserved, or whether the Audit Committee received the disclosures.

## XI. April 26, 2026 FI5939 / Pasadena / Mills Preservation Notice

281.     After Defendants filed the Mills Declaration in this case, I sent an April 26, 2026 preservation notice to FCBDirectors@FirstCitizens.com and Matthew G.T. Martin, copying defense counsel and other recipients.

282.     The subject of that notice identified FI5939, February 2025 Pasadena travel, the Mills Declaration, and counsel's reasonable inquiry.

283.     The notice attached or identified Westin Pasadena folios, Stephanie Daughtridge February 2025 communications, and the Mills Declaration.

284.     The notice identified records to preserve, including travel and expense records, corporate-card records, FI5939 / Pacific Area billing records, Westin Pasadena records, Merchant Services records, meeting schedules and agendas, calendar records, Daughtridge communications, Mills

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[46]

communications, records concerning preparation or review of the Mills Declaration, and records showing whether Defendants or counsel searched for or reviewed California-travel records before filing the Mills Declaration.

285.    I identify the April 26, 2026 notice for the limited purpose of showing that I sent a preservation notice to FCBDirectors@FirstCitizens.com and Matthew G.T. Martin concerning the Mills Declaration, FI5939, Pasadena travel, and records bearing on Defendants' Rule 12(b)(2) jurisdictional filing.

286.    The April 26, 2026 preservation notice is included as Ex. A-38.

287.    The Hodge Declaration does not address this April 26, 2026 notice, the FI5939 issue, the Mills Declaration issue, or whether any BancShares, Board, Audit Committee, Corporate Secretary, investor-relations, legal, governance, insurance, or defense-management recipient received, preserved, routed, escalated, or acted upon that notice.

288.    On May 14, 2026, I also communicated with defense counsel concerning, among other things, the Mills Declaration and whether Defendants would withdraw, correct, or supplement it. That communication is included as Ex. A-39.

## XII. Public California Footprint Materials

289.    I reviewed and preserved public First Citizens / BancShares / SVB materials concerning First Citizens' California branch, office, associate, commercial, wealth, and market footprint.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[47]

290.     The public First Citizens banker page for Patrick Rodriguez identifies him as a Vice President, Business Banker in Glendale, California. That page is included as Ex. A-52.

291.     A public First Citizens banker page for Erik Langeland identifies him as Managing Director, Market Leader, Middle Market Banking in San Francisco, California, and states that his team delivers the entire suite of First Citizens products and solutions to the Northern California market. That public page is included as Ex. A-40.

292.     A First Citizens public release dated November 14, 2023 states that First Citizens announced an expanded commitment to communities in Northern California and Eastern Massachusetts following its acquisition of Silicon Valley Bank. That release is included as Ex. A-41.

293.     The November 14, 2023 release states that Silicon Valley Bank was an important component of the California economy and was continuing to support the economy as a division of First Citizens Bank.

294.     A First Citizens / BancShares investor-relations release dated January 23, 2025 concerns Southern California wildfire relief. That release is included as Ex. A-44.

295.     The January 23, 2025 release states that Southern California was home to more than 1,000 First Citizens associates and 30 branches and offices serving clients across the company.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[48]

296.     The January 23, 2025 release also states that First Citizens associates continued to work with customers to understand their needs and develop flexible solutions to support their recovery.

297.     A public First Citizens newsroom page reflecting First Citizens' expanded Middle Market Banking support for midsize businesses across Southern California and the Southwest region is included as Ex. A-48 at Packet A page 87.

298.     A First Citizens release dated September 13, 2023 states that First Citizens Wealth launched a new wealth advisory team to serve individuals and institutions in Southern California. That release is included as Ex. A-50.

299.     The September 13, 2023 release states that the Southern California team worked from offices serving the Los Angeles, San Diego, and Orange County submarkets.

300.     The September 13, 2023 release states that First Citizens had done business in the Southern California area for two decades.

301.     The September 13, 2023 release states that First Citizens operated more than 60 branches statewide, most of them in Southern California, and had an active middle-market banking and commercial lending practice across California.

302.     Public First Citizens / SVB materials identify Silicon Valley Bank as a division of First Citizens Bank, founded in San Jose, California, serving clients from Silicon Valley to Los Angeles and beyond. That public SVB material is included as Ex. A-51.

303.  Public First Citizens materials dated November 19, 2025 state that First-Citizens Bank & Trust Company, the wholly owned banking subsidiary of BancShares, purchased a downtown San Francisco building in support of the company's large and growing client base in the region. Those materials are included as Ex. A-46.

304.  The November 19, 2025 public materials state that San Francisco is a key market within the innovation economy and that the acquisition underscored First Citizens' long-term plans to grow in the Bay Area.

305.  The November 19, 2025 public materials state that First Citizens Bank had six branches in the Bay Area, as well as Business, Commercial, and Wealth teams that provide banking services for individuals and companies in many industries.

306.  The November 19, 2025 public materials state that the company had more than 500 associates in San Francisco and more than 1,000 in the greater Bay Area.

307.  A First Citizens Wealth public release dated November 12, 2025 states that First Citizens appointed a Northern California Market Leader based in San Francisco and that he would serve clients across Northern California. That release is included as Ex. A-49.

308.  The November 12, 2025 release states that First Citizens Bank had six branches in the greater Bay Area region and that First Citizens' Silicon Valley Bank division had a presence in Northern California for more than 40 years.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[50]

309.    The November 12, 2025 release states that First Citizens Bank had more than 1,000 employees across the Bay Area, including more than 80 First Citizens Wealth employees.

310.    I identify the public California footprint materials because they concern First Citizens' California branch, office, associate, customer, commercial, wealth, and market presence.

311.    I do not rely on those public materials alone to establish my individual market assignment. My individual assignment, branch coverage, banker communications, Salesforce / CRM work, California customer work, and Pasadena business travel are based on my personal knowledge and the records described elsewhere in this declaration.

XIII. Record Categories Relevant to the Disputed Jurisdictional Facts

312.    The disputed jurisdictional facts include whether my California contacts were unilateral personal contacts or arose through FCB-controlled California / Pacific / Los Angeles market assignments, assigned branch coverage, customer relationships, banker referrals, Salesforce / CRM systems, Merchant Services systems, business travel, and governance channels.

313.    The records most directly related to those disputed facts include FCB travel records, expense records, corporate-card records, FI5939 / First Citizens Bank Pacific Area records, Westin Pasadena records, calendar records, Merchant Services records, Pacific / Los Angeles market records, Salesforce / CRM records, referral records, Teams chats, customer records, banker-referral records, Area Executive approval records, branch-

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[51]

assignment records, banker-assignment records, and management communications involving Dana Lomas, Stephanie Daughtridge, Jason Mills, Patrick Rodriguez, Ryan Wiese, Brennan Penney, Carlos Gonzales, Ashley Roff, Ted Bush, West Ludwig, and California / Pacific / Los Angeles personnel.

314.     The records most directly related to the BancShares routing and preservation issues include records concerning FCBDirectors@FirstCitizens.com, investor.relations@firstcitizens.com, legal@firstcitizens.com, Corporate Secretary channels, Audit Committee channels, Board channels, shared legal / governance channels, and records showing receipt, forwarding, review, routing, escalation, preservation, deletion, or discussion of my notices.

315.     During my employment, the full records concerning my California market assignment, California customer work, Salesforce routing, Merchant Services opportunities, Pasadena travel, FI5939, corporate-card charges, expense approvals, calendars, Teams messages, Outlook emails, and related management communications were maintained in FCB systems. I used some of those systems while employed, but I no longer have access to them. The records I preserved and cite here are only part of the full record. I cannot obtain the complete versions of those FCB-side records without discovery because they are maintained by FCB, BancShares, their vendors, their counsel, or third-party systems not available to me after my separation.

316.     If the Court permits jurisdictional discovery, those categories of records would address the factual issues omitted from the Quinto, Mills, and Hodge declarations.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[52]

## XIV. Exhibit Foundation

317.   The exhibits submitted with this declaration are true and correct copies of records I sent, received, accessed, maintained, preserved, reviewed, obtained from public sources, or obtained from litigation records.

318.   Where an exhibit is an email, screenshot, folio, Salesforce / CRM record, Teams communication, public record, governance document, court filing, webpage, public First Citizens / BancShares / SVB material, or correspondence, I identify it based on the sender, recipient, date, subject, title, source, contents, visible identifying information, business context, and my sending, receiving, accessing, maintaining, preserving, or review of the record.

319.   Where an exhibit contains a screenshot, image, email capture, folio, webpage capture, or system record, I identify it based on the visible text, metadata or contextual information available to me, source, surrounding communications, and my preservation or review of the record.

320.   Any redactions are limited to personal, private, confidential, or irrelevant information and do not alter the cited substance.

321.   If any exhibit is digitally enlarged or enhanced for readability, the enlargement or enhancement was made only to improve readability, and no substantive content was added, removed, or changed.

322.   For each exhibit relied on in this declaration, I cite or will cite the exhibit number and, where applicable, the relevant page, Bates number, or visible page reference. Where I refer to Defendants' federal motion papers,

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[53]

declarations, or supporting filings, I identify them by their Central District docket numbers, including Dkt. 45-1 through Dkt. 45-6, so those materials may be incorporated by reference directly from the federal docket.

## XV. Additional Exhibit Identifications

323. I also identify additional exhibits in the packet that are not otherwise separately discussed above but that I reviewed and preserved and that relate to the same California / Pacific / Los Angeles market work, Salesforce / referral issues, or California footprint issues.

324. Ex. A-10 is a true and correct screenshot of a Teams message concerning Karen Carver and a ██████████████ call request.

325. Ex. A-16 is a true and correct screenshot of my April 30, 2025 email concerning the ██████████████████████ lead-assignment request for clarification.

326. Ex. A-19 is a true and correct May 9, 2025 Teams screenshot reflecting follow-up concerning John Evans, ██████████, and Neutraderm-related work.

327. Ex. A-20 is a true and correct May 9, 2025 Teams screenshot reflecting follow-up communications with Yegishe Nahabedian concerning Neutraderm pricing and related California merchant work.

328. Ex. A-24 is a true and correct screenshot of my May 1, 2025 preservation request to Ted Bush concerning Salesforce system logs, referral assignment, user permissions, visibility activity, and other systems affecting referral flow.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[54]

329. Ex. A-26 is a true and correct screenshot of a Teams communication reflecting Brennan Penney's referral-routing confirmation and related Los Angeles market referral issues.

330. Ex. A-31 is a true and correct screenshot of the May 5, 2025 Outlook transmission of my Salesforce market-restriction escalation.

331. Ex. A-33 is a true and correct screenshot of an April 30, 2025 email concerning LBC Foundation / IRS form / chat-correction follow-up.

332. Ex. A-34 is a true and correct screenshot of an April 30, 2025 email forwarding Malinda Fernando's response to Ted Bush.

333. Ex. A-42 is a true and correct copy of a public Commercial Property Executive article concerning First Citizens' Bay Area office acquisition that I reviewed and preserved.

334. Ex. A-43 is a true and correct copy of a public First Citizens LinkedIn post concerning expansion in Northern California that I reviewed and preserved.

335. Ex. A-45 is a true and correct copy of a public Silicon Valley Business Journal article concerning First Citizens' expansion following the SVB acquisition that I reviewed and preserved.

336. Ex. A-47 is a true and correct copy of a public CommercialCafe article concerning First Citizens' San Francisco office acquisition that I reviewed and preserved.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[55]

337.    Ex. A-48 is a true and correct copy of a public First Citizens newsroom page that I reviewed and preserved as part of my collection of public California-footprint materials.

338.    Ex. A-53 is a true and correct copy of a public February 10, 2026 First Citizens release concerning Frank B. Holding Jr.'s appointment to the Federal Reserve Board of Governors' Federal Advisory Council that I reviewed and preserved.

339.    Ex. A-54 is a true and correct copy of the Joint Risk Committee Charter approved April 29, 2025, which I reviewed and preserved and which concerns joint BancShares / FCB board-level risk oversight.

340.    For clarity, Exs. B-57 through B-69 are the pre-hire emails included in Packet B and identified above in paragraphs 21 through 35.

341.    For further clarity, Exs. B-70, B-71, B-72, B-73, and B-74 are the February 24, 2026 protective-order meet-and-confer emails identified above in paragraphs 197 through 209.

342.    Exs. B-75 and B-79 are true and correct copies of unofficial transcripts of the September 30, 2025 pre-hearing conference in OALJ Case No. 2025-SOX-00035, prepared from or concerning the recording of that conference, which I reviewed and preserved. Ex. B-80 is a true and correct copy of the official September 30, 2025 transcript that I reviewed and preserved.

343.    Ex. B-76 is a true and correct copy of BancShares' corporate-governance webpage titled "Contact the Board," which I reviewed and

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[56]

preserved. Ex. B-77 is a true and correct copy of BancShares' corporate-governance webpage titled "Committee Composition," which I reviewed and preserved.

344. Ex. B-78 is a true and correct copy of the May 21, 2025 letter from Jeremy R. Sayre of Fox Rothschild, which I reviewed and preserved. Exs. B-81 and B-82 are true and correct copies of May 8, 2025 HR Redirect / Neutraderm pricing communications that I reviewed and preserved.

345. Where I refer to emails, screenshots, public webpages, press releases, LinkedIn posts, governance documents, or other records containing statements by others, I identify the record to show the fact the communication or publication was made, the timing and routing of the communication, the existence of the underlying business or governance record, the notice conveyed, the California market structure reflected, or another non-hearsay purpose unless I separately state a fact based on my own personal knowledge.

## XVI. Additional Notice Emails to BancShares-Related Channels

346. In addition to the specifically attached BancShares-related notices discussed above, I also sent, copied, or caused to be transmitted numerous additional written notices to BancShares-related channels, including FCBDirectors@FirstCitizens.com, investor.relations@firstcitizens.com, and Frank B. Holding Jr.

347. The underlying email records are voluminous. The paragraphs below provide a chronological summary list compiled from my preserved records

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[57]

to identify additional communications, their dates, their general subject lines, and the BancShares-related channels included.

348.    I identify this summary for the limited purposes of showing the existence, timing, routing, and repeated nature of notice to BancShares-related channels. Unless a listed email is separately attached as an exhibit, I do not offer this summary as a substitute for the underlying email itself. The underlying native .eml and .pdf records referenced in this summary are preserved intact within my master file and can be made available for inspection if required.

349.    I identify the listed communications based on my sending, forwarding, copying, directing transmission, receipt, preservation, and review of the relevant email records.

**Phase I: Pre-Filing Whistleblower Disclosures, Vendor Fraud, and Institutional Lockout**

350.    On May 20, 2025, at 12:58 PM and 10:19 PM, I sent communications titled "Formal Whistleblower Disclosure – Audit Committee Escalation under SEC Rule 10A-3, SOX §1514A, ADA §12203," with BancShares-related channels included, including Investor Relations, FCBDirectors, and Frank B. Holding Jr. The original 12:58 PM transmission appears in Packet B at page 6, and the 10:19 PM FCBDirectors forwarding is attached as Ex. B-83.

351.    On May 20, 2025, at 10:27 PM, I sent a communication titled "Supplemental Disclosure – Exhibit BB (Vendor Fraud Disclosure, March 24, 2025)," with BancShares-related channels included, including

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[58]

FCBDirectors, Investor Relations, and Frank B. Holding Jr. That communication is attached as Ex. B-121.

352. On May 22, 2025, at 7:05 PM, I sent a communication titled "Re: First Citizens Bank - Formal Record of Retaliation, Procedural Misconduct, and Legal Contradictions – Immediate Escalation," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr. That communication is attached as Ex. B-85.

353. On May 27, 2025, at 9:02 AM, I sent a communication titled "Formal Notice of Dual EEOC Filings – ADA, FMLA, and Retaliation Claims," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr.

354. On May 28, 2025, at 9:00 AM, I sent a communication titled "Request for Directors & Officers (D&O) Insurance Carrier Information – Pending Legal and Regulatory Proceedings," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr.

355. On May 28, 2025, at 9:00 AM, I sent a communication titled "URGENT FOLLOW-UP: Non-Response to Onboarding Documentation Request – Formal Notice of Escalation," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr.

**Phase II: Constructive Discharge, Data Spoliation, and Fraud-on-the-Tribunal Notices**

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[59]

356.    On June 2, 2025, at 2:51 PM, I sent a communication titled "Urgent: Unexplained Compensation Increase & Bonus Clarification," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr.

357.    On June 4, 2025, at 12:51 PM, I sent a communication titled "Demand for Immediate Compliance with California Labor Code §1198.5 and Notice of Legal Misrepresentation," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr.

358.    On June 6, 2025, at 7:12 PM, I sent a communication titled "Misrepresentation and Procedural Omission Regarding Device Wipe and OSHA Correspondence," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr. That communication is attached as Ex. B-87.

359.    On June 12, 2025, at 9:50 AM, I sent a communication titled "FORMAL NOTICE: Unlawful Retaliation, Willful Wage Violation, and Constructive Termination," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr.

360.    On June 17, 2025, at 11:39 AM, I sent a communication titled "Formal Notice Regarding Counsel's Communication of June 17, 2025 and The Bank's Ratification of Misconduct," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr. That communication is attached as Ex. B-90.

361.    On June 17, 2025, at 5:40 PM, I sent a communication titled "URGENT & FORMAL DEMAND: Immediate Action Required to Cease

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[60]

Obstruction of 401(k) Distribution," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr. That communication is attached as Ex. B-92.

362. On June 18, 2025, at 4:07 PM, I sent a communication titled "RE: [EXT] URGENT & FORMAL DEMAND: Immediate Action Required to Cease Obstruction of 401(k) Distribution," with BancShares-related channels included, including FCBDirectors and Investor Relations. That communication is attached as Ex. B-94.

363. On July 7, 2025, at 7:00 AM and 1:50 PM, I sent communications titled "Formal Service of SOX Whistleblower Disclosure" and "FORMAL NOTICE Regarding Preservation of Evidence and Status of Company-Issued Equipment," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr. The 1:50 PM preservation-status communication is attached as Ex. B-100.

364. On July 24, 2025, at 11:40 AM, I sent a communication titled "FORMAL NOTICE of Multiple Procedural Defaults and Demand for Immediate Compliance," with BancShares-related channels included, including FCBDirectors.

**Phase III: OALJ Discovery, Witness-Intimidation Notices, and Insurer-Related Notices**

365. On August 6, 2025, at 12:04 PM, I sent a communication titled "URGENT: Formal Notice of Extrajudicial Threats and Witness Intimidation by First Citizens Bank," with BancShares-related channels included, including Frank B. Holding Jr.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[61]

366.     On August 6, 2025, at 12:34 PM and 5:13 PM, I sent communications titled "URGENT – Supplemental Notice: Threat of Witness Intimidation" and "SERVICE – Supplemental Notice of Witness Intimidation & Retaliation (With Exhibits)," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr. The 5:13 PM service email is attached as Ex. B-103.

367.     On August 15, 2025, at 10:53 AM and 11:19 AM, I sent communications titled "FORMAL SERVICE: Third Supplemental Notice of Aggravated Witness Intimidation" with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr.

368.     On August 24, 2025, at 10:46 PM, I sent a communication titled "Certified Evidentiary Record — Fraud on the Tribunal, Spoliation, and Malpractice Exposure," with BancShares-related channels included, including FCBDirectors, Investor Relations, and Frank B. Holding Jr.

369.     On September 6, 2025, at 4:47 AM, I sent a communication titled "Formal Red-Flag Notice — Judicial Precedent and Escalated Exposure...," with BancShares-related channels included, including FCBDirectors and Frank B. Holding Jr.

**Phase IV: Pre-Federal Transfer, Rule 408 Communications, and Notice of De Novo Action**

370.     On November 19, 2025, at 3:28 PM, I directed transmission of filings titled "Motions for Default Judgment on Liability and Sanctions for Fraud on the Tribunal" to the Board of Directors and D&O carriers.

371. On February 14, 2026, at 5:12 PM, I sent a communication titled "First Citizens BancShares, Inc. Board Notice - Certified Admission of Standard Practice in Federal Pleading - Ratification of Safety and Soundness Violation," with BancShares-related channels included, including FCBDirectors and Investor Relations. That FCBDirectors communication is attached as Ex. B-108. A related February 14, 2026 investor-relations board notice is attached as Ex. B-109.

372. On February 14, 2026, at 6:09 PM, I sent a communication titled "Supplemental Notice to First Citizens BancShares, Inc. Board and Audit Committee – Additional Potential Violations of SEC Rule 21F-17(a)," with BancShares-related channels included, including FCBDirectors and Investor Relations. That communication is attached as Ex. B-110.

373. On February 28, 2026, at 3:19 AM, I sent a communication titled "Service: COMPLAINANT'S MOTION TO NOTIFY COURT OF EXERCISE OF RIGHT TO DE NOVO FEDERAL ACTION...," with BancShares-related channels included, including FCBDirectors and Investor Relations.

**Phase V: Central District of California Federal Action and Rule 37 / Local Rule Conferral**

374. On March 5, 2026, at 12:27 PM, I sent a communication titled "MEET AND CONFER: Judicial Admission of GLBA Safeguards Rule Violations vs. Rule 3.3 Violation," with BancShares-related channels included, including FCBDirectors and Investor Relations. That communication is attached as Ex. B-114.

375. On March 6, 2026, at 2:05 PM and 2:11 PM, I sent communications titled "FRCP 4(d) Notice of Lawsuit, Requests for Waiver of Service, and Preservation Demand," directed to the subsidiary and parent holding company, with BancShares-related channels included, including FCBDirectors and Investor Relations.

376. On March 8, 2026, at 11:45 AM, I sent a communication titled "Governance Notice Regarding Board-Level Notice, Evidence Suppression, Control Failures, and Later SEC / Offering Representations," with BancShares-related channels included, including FCBDirectors and Investor Relations. That communication is attached as Ex. B-116.

377. On March 8, 2026, at 6:37 PM, I sent a communication titled "Rule 37(e)(2) – Courtesy Copy of Spoliation Motion," with BancShares-related channels included, including FCBDirectors and Investor Relations.

378. On March 9, 2026, at 9:18 PM, I sent or forwarded a communication titled "Fw: Documenting your attempted cover-up of default and witness tampering" to BancShares-related channels, including FCBDirectors and Investor Relations. That communication is attached as Ex. B-117.

**Related Additional Packet B Exhibit Identifications**

379. Ex. B-118 is a true and correct copy of Respondent's Response to the Pleading Complaint in OALJ Case No. 2025-SOX-00035, which I reviewed and preserved.

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2) MOTION

[64]

380.     Ex. B-119 is a true and correct copy of a public LinkedIn page identifying Lorie Rupp as Chief Risk Officer at First Citizens Bank, which I reviewed and preserved.

381.     Ex. B-120 is a true and correct copy of my New Hire Acknowledgment of First Citizens' Code of Ethics, Policies, and Standards, which I reviewed and preserved.

382.     Ex. B-121 is a true and correct copy of my May 20, 2025 supplemental disclosure titled "Supplemental Disclosure – Exhibit BB (Vendor Fraud Disclosure, March 24, 2025)," which I reviewed and preserved.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed on ___May 31___, 2026

_____

Jared Ashcraft

Plaintiff, Pro Se

DECLARATION OF JARED ASHCRAFT IN RESPONSE TO THE QUINTO, MILLS, AND HODGE
DECLARATIONS AND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' RULE 12(b)(2)
MOTION

[65]

Jared Ashcraft, Pro Se
PO Box 363242
North Las Vegas, NV 89036
legal@ashcraft.me

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

JARED ASHCRAFT,

          PLAINTIFF,

v.

FIRST-CITIZENS BANK & TRUST
COMPANY, A NORTH CAROLINA
CORPORATION; AND
FIRST CITIZENS BANCSHARES, INC.,
A DELAWARE CORPORATION,

          DEFENDANTS.

Case No.: 2:26-cv-02251-JLS-JDE

**PLAINTIFF'S EXHIBIT PACKET A -
PERSONAL JURISDICTION
RECORDS**

**Judge: Hon. Josephine L. Staton**

**Hearing Date: June 26, 2026**

**Time: 10:30 a.m.**

**Courtroom: 8A**

**Case No.: 2:26-cv-02251-JLS-JDE**

**Motion: Defendants' Rule 12(b)(2) and 12(b)(6) Motion to Dismiss**

# Table of Contents

Personal Jurisdiction Exhibits.................................................................................5

    Ex. 1 - Branches Assigned to Jared Ashcraft by FCB.................................................6

    Ex. 2 - Dkt.45 Declaration of Jason Mills..................................................................7

    Ex. 3 - 03.03 Daughtridge Email.............................................................................12

    Ex. 4 - ST Distro Letter and Related Email.............................................................22

    Ex. 5 - West Ludwig _ LinkedIn ............................................................................25

    Ex. 6 - 2025-05-12-13_14-Ashcraft__Jared-_Wiese-Re_Merchant___Pacific_Area_Partner_Touch_Base_Call.eml ............................................28

    Ex. 7 - Apr 25 2025 00_22_42_Calendar_Screenshot_HR_Inquiry███████_MAC_█████.jpg ........................30

    Ex. 8 - Apr 28 2025 13_26_11_Calendar_███████████_Proof_of_Attendance.jpg ....31

    Ex. 9 - Apr 28 2025 15_52_00_Teams_Message_Enriquez_Aisha_10_Referrals_Gif.jpg.....34

    Ex. 10 - Apr 29 2025 14_45_44_Teams_Message_Karen_Carver_██████_Call_Request.jpg ...............................35

    Ex. 11 - Apr 29 2025 16_22_08_Teams_Message_Brennan_█████████_MPA_Correction.jpg ..........................36

    Ex. 12 - Apr 29 2025 17_29_48_Teams_Message_Patrick_██████████_Escalation_Request.jpg ...................37

    Ex. 13 - Apr 30 2025 15_19_22 - TeamsChat_██████████████ErrorExplanation_ClarificationThread.png......................38

    Ex. 14 - Apr 30 2025 16_04_44 - Email_████████████████_ResponseEscalation_StakeholderThread2.png....................32

    Ex. 15 - Apr 30 2025 16_08_02_Email_Yeghishe_Patrick_Not_Needed_Beverly_Hills_Client.jpg.......................26

    Ex. 16 - Apr 30 2025 21_22_41 - Email_LeadAssignment_██████████_RequestForClarification.png .............................47

    Ex. 17 - Apr 30 2025 21_22_50 - Email_LeadAssignment_Response_MalindaFernando_ProposalOnly.png...........................48

    Ex. 18 - Screenshot_20250505_100523_Teams.jpg .................................................41

    Ex. 19 - Screenshot_20250509_103553_Teams.jpg .................................................39

    Ex. 20 - Screenshot_20250509_104153_Teams.jpg .................................................40

    Ex. 21 - Screenshot_20250512_101138_Outlook.jpg................................................27

    Ex. 22 - Screenshot_20250508_163004_Teams.jpg .................................................49

    Ex. 23 - May 01 2025 10_48_40 - Email_SalesforceRoutingSuddenBreakdown_toTedBush.png ...............................50

    Ex. 24 - May 01 2025 11_30_43 -

Email_SalesforceLogsPreservationRequest_toTedBush.png......................................................51

Ex. 25 - May 01 2025 11_57_47 - TeamsChat_LAMerchantChat_SalesforceIssueBroadcast.png..................................................33

Ex. 26 - May 01 2025 11_59_00 - TeamsChat_ReferralRoutingConfirmation_BrennanPenney.png ............................................43

Ex. 27 - May 02 2025 15_04_38 - TeamsChat_SFConversionError_Request_CarlosGonzales.png ............................................42

Ex. 28 - May 02 2025 15_12_06 - TeamsChat_LastRead_SalesforceConversation.png ........44

Ex. 29 - May 03 2025 17_30_57 - TeamsChat_SFConversionError_InvalidAreaField_CarlosG_ErikW.png .............................46

Ex. 30 - 2025-05-05-12_08-Ashcraft__Jared-_Bush-Re_Escalation__Salesforce_Market_Restriction_Block.eml......................................52

Ex. 31 - Screenshot_20250505_090900_Outlook.jpg......................................................55

Ex. 32 - Ashley roff resize.png.......................................................................................45

Ex. 33 - Apr 30 2025 20_31_26 - Email_LBCFoundation_IRSForm_ChatCorrectionFollowup.png...........................................57

Ex. 34 - Apr 30 2025 21_30_24 - Email_FYI_MalindaResponseForwarded_toTedBush.png.................................................56

Ex. 35 - May 01 2025 10_40_21 - Email_Escalation_CriticalOpportunityDelay_toDanaJasonPlus3.png................................59

Ex. 36 - 2025-05-08-10_47-J-_Ashcraft-Neutraderm_Pricing.eml .......................................60

Ex. 37 - 2025-05-08-11_52-Jared_Ashcraft-_J_-Re_Neutraderm_Pricing.eml......................60

Ex. 38 - 2026-04-26-09_16-Jared_Ashcraft-_FCBDirectors_FirstCitizens_com_-Preservation_Notice_Regarding_FI5939__February_202.eml................................................63

Ex. 39 - 2026-05-14-12_06-Jared_Ashcraft-_Follett-Re__EXT__L_R__7-3_Conference_Request_re_Contemplat.eml ...........................................................67

Ex. 40 - Erik Langeland_ Managing Director, Market Leader, Middle Market Banking in San Francisco, CA.mhtml.................................................................................................74

Ex. 41 - First Citizens Announces Expanded Commitment to Communities in Northern California and Eastern Massachusetts - Nov 14, 2023.mhtml ...............................................76

Ex. 42 - First Citizens Bank Buys Bay Area Building - Commercial Property Executive.mhtml...............................................................................................................79

Ex. 43 - First Citizens Bank CEO talks expansion in Northern California _ First Citizens Bank posted on the topic _ LinkedIn.mhtml .........................................................................81

Ex. 44 - First Citizens Bank Commits $2 Million to Support Relief Efforts for Southern California Wildfires _ First Citizens BancShares.mhtml .....................................................82

Ex. 45 - First Citizens Bank expands presence after SVB acquisition - Silicon Valley Business Journal.mhtml...............................................................................................84

Ex. 46 - First Citizens Bank Purchases Office Building in San Francisco - Nov 19,

2025.mhtml.............................................................................................................86

Ex. 47 - First Citizens Buys San Francisco Office Building _ CommercialCafe.mhtml .........88

Ex. 48 - First Citizens Newsroom - Latest Press Releases.mhtml ..........................................90

Ex. 49 - First Citizens Wealth Expands California Bay Area Team, Appoints Lee Erby
Region Head - Nov 12, 2025.mhtml........................................................................................91

Ex. 50 - First Citizens Wealth Launches New Wealth Advisory Team to Serve Individuals
and Institutions in Southern California - Sep 13, 2023.mhtml.................................................94

Ex. 51 - Silicon Valley Bank Client FAQs.mhtml .................................................................96

Ex. 52 - Small Business Bankers in Glendale, CA _ First Citizens Bank.mhtml ...................73

Ex. 53 - First Citizens Bank Chairman and CEO Frank B. Holding Appointed to Federal
Reserve Board of Governors' Federal Advisory Council - Feb 10, 2026.................................97

Ex. 54 - Risk-Committee-Charter_approved-04-29-25_remediated-5bfc30...........................98

Ex. 55 - FCB Code_of_Ethics 2025-C-C .............................................................................101

Ex. 56 - Audit-Committee-Charter_approved-04-29-25_remediated-fd4fec.........................115

# EXHIBIT

**EXHIBITS IN RESPONSE TO
QUINTO, HODGE AND MILLS
1 - 56**

FirstCitizensBank

Search

## Find a Location

California, United States

50 locations near "California, United States"

**1**  **La Verne** >

**Lobby Closed** - Opens at 9 AM

2111 Bonita Avenue

(909) 450-2140

See Details & Services →

**2**  **Anaheim** >

**Lobby Closed** - Opens at 9 AM

704 S State College Blvd

(714) 776-0991

See Details & Services →

**3**  **Los Angeles** >

**Lobby Closed** - Opens at 9 AM

Drive Thru Closed

8750 Sepulveda Boulevard

(310) 670-0150

See Details & Services →



Search This Area

Case 2:26-cv-02251-JLS-JDE    Document 61-9    Filed 06/05/26    Page 74 of 259   Page
Case 2:26-cv-02251-JLS-JDE    Document 45-9    Filed 04/23/26    Page 1 of 4   Page ID
#:1095

Matthew R. Follett (SBN 325481)
Email: mfollett@foxrothschild.com
Fox Rothschild LLP
Constellation Place
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone: 310.598.4150
Facsimile: 310.556.9828

Attorneys for Defendants
First-Citizens Bank and Trust Company and
First Citizens BancShares, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

JARED ASHCRAFT,

                Plaintiff,

      vs.

FIRST-CITIZENS BANK AND TRUST
COMPANY and FIRST CITIZENS
BANCSHARES, INC.

                Defendants.

Case No.: 2:26-cv-02251-JLS-JDE

**DECLARATION OF JASON MILLS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.    I have personal knowledge of the following and, if called upon as a witness, could competently testify to each of the facts set forth below. I execute this declaration in support of the accompanying Motion to Dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

Case 2:26-cv-02251-JLS-JDE    Document 70-2    Filed 06/30/26    Page 75 of 259    Page
Case 2:26-cv-02251-JLS-JDE    Document 45-1    Filed 04/23/26    Page 2 of 4   Page ID
#:1096

2.      I am currently the Executive Director of Merchant Services for Defendant First-Citizens Bank & Trust Company ("FCB"). I have worked for FCB since December of 2021.

3.      In my position, I manage and supervise members of FCB's Merchant Sales division. I have experience and personal familiarity with the duties and responsibilities of the Merchant Sales Specialist position and with FCB policies and procedures relevant to that position. The principal function of the Merchant Sales division is to sell electronic payment processing services to new and existing FCB customers.

4.      I have knowledge of Plaintiff's duties in his role as Senior Merchant Sales Specialist during his employment with FCB. Plaintiff's main job duties included making sales calls to potential customers to market FCB's payment processing products, soliciting potential customers interested in purchasing those products, coordinating with other FCB employees to prepare pricing proposals to present to potential customers, and supplying, executing, and collecting the necessary documents to effectuate sales.

5.      In the course of his employment, Plaintiff would identify and direct sales efforts to potential customers via leads and information supplied to him by FCB through customer relationship management software provided to him as part of his employment.  Like other members of the Merchant Sales division, Plaintiff was compensated in part with incentive payments based on the amount of revenue generated by Plaintiff's sales activity.

6.      Plaintiff worked with customers in many states, including some in California. Plaintiff conducted his work almost entirely by remote communications through telephone, email, and computer-based video conference. On a few occasions, Plaintiff met in-person with potential customers near the Greenville, North Carolina location.

DECLARATION OF JASON MILLS
CASE NO. 2:26-CV-02251-JLS-JDE

Case 2:26-cv-02251-JLS-JDE    Document 70-2    Filed 06/30/26    Page 76 of 259    Page
Case 2:26-cv-02251-JLS-JDE    Document 45-2    Filed 04/23/26    Page 3 of 4    Page ID
#:1097

7.    On certain occasions, Plaintiff and other members of the Merchant Services division were directed by FCB management to travel to a centralized location to attend in-person conferences. To my knowledge, Plaintiff never attended any such meeting in California or traveled to California for business purposes on behalf of FCB during his employment.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 21 day of April, 2026 at Raleigh, North Carolina.

Jason Mills

- 3 -

DECLARATION OF JASON MILLS
CASE NO. 2:26-CV-02251-JLS-JDE







**Re: FARWELL UNTIL WE MEET AGAIN**

🛡 Internal

**Daughtridge, Stephanie**     Mar 3
To You, Lomas, Dana, Mills, Jason

Jared,

Thank you for your kind words. It has truly been a privilege to be your manager, even for this short time. It was a joy to see your engagement with the Pacific Market. I know this year Pacific and LA will do great things. You have already made an effective and positive impact with these teams. Even though our time together was brief, and you know how much I treasure my Target Markets, I know they are in good hands as your drive them home not only with achieving goals but already making long last impactful relationships.

Goodbye for now and will reach out during my travels in Las Vegas!!!!

Best,

↩ ⌄  Reply

**From:**     The Westin Pas LAXPW
**Sent on:**  Friday, April 24, 2026 3:02:00 PM
**To:**       jared@ashcraft.me
**Subject:**  Your Wednesday, Feb 19, 2025 - Thursday, Feb 20, 2025 Stay at The Westin Pas LAXPW
**Attachments:** 1728772Folio-A_319135.pdf (129.89 KB), 1728772Folio-C_319918.pdf (127.93 KB)



Thank you for choosing our hotel for your recent stay. If you have any questions, please contact the hotel at the phone number in the attached folio. Bring the Westin experience home with you. Visit our official retail store, WestinStore.com for all of your favorite Westin Heavenly Bed, bedding and White Tea products.

**Important Information**

Do Not Reply to This Email.
This email is an auto-generated message. Replies at automated messages are not monitored.

Availability
Electronic versions of your hotel bill are emailed to you upon check-out. These email messages reflect changes made to your bill prior to that instant. Any adjustments after check out may not be shown.

Authenticity of Bills
Marriott retains official records of all charges and credit to your account and will honor only those records.

Privacy
Your privacy is important to Marriott. For full details of our privacy policy, please visit our Privacy Statement.

Not a member of Marriott Bonvoy?
Join now to earn points on your recent eligible stay, and get free Wi-Fi, Mobile check-in, and our lowest member rates on future stays.

Inquiries About Products
For any questions about products used during your stay, please visit WestinStore.com

*Earn more points on purchases at hotels participating in Marriott Bonvoy® when you use your Marriott Bonvoy Credit Card. Learn more at https://www.marriott.com/loyalty/earn/credit-card-rewards.mi?SCID=app:departurefolio_cobrand.*

Terms of Use::Privacy Statement © 1996-2019 Marriott International, Inc. All rights reserved. Marriott proprietary information.

The Westin Pasadena
191 North Los Robles Avenue
Pasadena, CA  91101
United States
Tel: 626-792-2727 Fax: 626-795-7669

# WESTIN®
## HOTELS & RESORTS

Jared Ashcraft
191 North Los Robles
Pasadena, CA, 91101
United States Of America
FI5939 - First Citizens Bank Pacific Ar

| | | |
|---|---|---|
| Page Number : | 1 | |
| Guest Number : | 1728772 | |
| Folio ID : | A | |
| Arrive Date : | 19-FEB-25 | 22:45 |
| Depart Date : | 20-FEB-25 | 21:38 |
| No. Of Guest : | 1 | |
| Room Number : | 836 | |
| Marriott Bonvoy Number : | | |

The Westin Pas LAXPW  24-APR-26  12:01  YSETI701

| Date | Reference | Description | Charges/Credits (USD) |
|---|---|---|---|
| 20-FEB-25 | 41887 | Casual Restaurant | 65.13 |
| 20-FEB-25 | 20264 | In Room Dining | 76.76 |
| 20-FEB-25 | VI | Visa-7192 | -141.89 |

***For Authorization Purpose Only***
xxxxxx7192

| Date | Time | Code | Authorized |
|---|---|---|---|
| 19-FEB-25 | 22:44 | 020184 | 100.00 |
| 20-FEB-25 | 13:17 | 020519 | 41.89 |

Approve EMV Receipt for VI - 7192: Signature Captured
TC:93A15F977E58BA94   IAD:06011203A03000   TVR:8080008000
AID:A0000000031010   Application Label:VISA CREDIT

| | |
|---|---|
| ** Total  Charges | 141.89 |
| ** Total  Credits | -141.89 |
| *** Balance | 0.00 |

Continued on the next page

The Westin Pasadena
191 North Los Robles Avenue
Pasadena, CA  91101
United States
Tel: 626-792-2727 Fax: 626-795-7669

# WESTIN®
## HOTELS & RESORTS

| | | | | |
|---|---|---|---|---|
| Jared Ashcraft | | Page Number | : | 2 |
| 191 North Los Robles | | Guest Number | : | 1728772 |
| Pasadena, CA, 91101 | | Folio ID | : | A |
| United States Of America | | Arrive Date | : | 19-FEB-25  22:45 |
| FI5939 - First Citizens Bank Pacific Ar | | Depart Date | : | 20-FEB-25  21:38 |
| | | No. Of Guest | : | 1 |
| | | Room Number | : | 836 |

I agreed to pay all room & incidental charges.



Stay well, no matter where you travel. Reconnect with your well-being and find your next destination at westin.com.

Tell us about your stay. www.westin.com/reviews

EXPENSE SUMMARY REPORT

Currency: USD

| Date | Room/Tax | Food/Bev | Telephone | Other | Total | Payment |
|---|---|---|---|---|---|---|
| 02-20-2025 | 0.00 | 0.00 | 0.00 | 141.89 | 141.89 | -141.89 |
| | ------------ | ------------ | ------------ | ------------ | ------------ | ------------ |
| Total | 0.00 | 0.00 | 0.00 | 141.89 | 141.89 | -141.89 |

Bring the Westin experience home. Shop WestinStore.com.

The Westin Pasadena
191 North Los Robles Avenue
Pasadena, CA  91101
United States
Tel: 626-792-2727 Fax: 626-795-7669

# WESTIN®
## HOTELS & RESORTS

Jared Ashcraft
191 North Los Robles
Pasadena, CA, 91101
United States Of America
FI5939 - First Citizens Bank Pacific Ar

| | | |
|---|---|---|
| Page Number | : | 1 |
| Guest Number | : | 1728772 |
| Folio ID | : | C |
| Arrive Date | : | 19-FEB-25     22:45 |
| Depart Date | : | 20-FEB-25     21:38 |
| No. Of Guest | : | 1 |
| Room Number | : | 836 |
| Marriott Bonvoy Number : | | |

The Westin Pas LAXPW  24-APR-26  12:02  YSETI701

| Date | Reference | Description | Charges/Credits (USD) |
|---|---|---|---|
| 19-FEB-25 | RT836 | Room Chrg - Grp - Corporate | 209.00 |
| 19-FEB-25 | RT836 | Occupancy/Tourism | 35.53 |
| 19-FEB-25 | RT836 | Occupancy/Tourism Tax | 0.42 |
| 20-FEB-25 | 1728772 | XFER To FI5939 | -244.95 |

| | |
|---|---|
| ** Total  Charges | 244.95 |
| ** Total  Credits | -244.95 |
| *** Balance | 0.00 |

Stay well, no matter where you travel. Reconnect with your well-being and find your next destination at westin.com.

Tell us about your stay. www.westin.com/reviews

Continued on the next page

The Westin Pasadena
191 North Los Robles Avenue
Pasadena, CA  91101
United States
Tel: 626-792-2727 Fax: 626-795-7669

**WESTIN®**

HOTELS & RESORTS

Jared Ashcraft
191 North Los Robles
Pasadena, CA, 91101
United States Of America
FI5939 - First Citizens Bank Pacific Ar

| | | |
|---|---|---|
| Page Number | : | 2 |
| Guest Number | : | 1728772 |
| Folio ID | : | C |
| Arrive Date | : | 19-FEB-25    22:45 |
| Depart Date | : | 20-FEB-25    21:38 |
| No. Of Guest | : | 1 |
| Room Number | : | 836 |
| Marriott Bonvoy Number : | | |

EXPENSE SUMMARY REPORT

Currency: USD

| Date | Room/Tax | Food/Bev | Telephone | Other | Total | Payment |
|---|---|---|---|---|---|---|
| 02-19-2025 | 0.00 | 0.00 | 0.00 | 244.95 | 244.95 | 0.00 |
| 02-20-2025 | 0.00 | 0.00 | 0.00 | -244.95 | -244.95 | 0.00 |
| Total | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Bring the Westin experience home. Shop WestinStore.com.

U.S. 1.888.514.6849 | Int'l Collect 1.540.561.4707 | firstcitizens.com     3939-10-000-07

Card users are subject to the terms of the issuer's cardholder agreement.

306





**JARED THOMAS ASHCRAFT**
**FIRST CITIZENS BANK**
7192

GOOD
THRU

IDEMIA 4 A00056705A 9/23



| 2025 Variable Compensation Plan  Merchant Sales Plan  ("Plan") | ☐ Monthly  ☒ Quarterly  ☒ Annually |
|---|---|

### Section 1:  PLAN SUMMARY

**Objective:**  First Citizens Bank ("Bank") has established the Plan to incent and reward eligible Plan participants who meet and exceed their Plan performance objectives and in so doing, enhance the Bank's growth and profitability.  The Plan is designed to align with measures that will help the Bank achieve its Competitive Path goals and True North financial objectives.

**Eligible Positions:**  Only regular associates, of full or part-time status, with the following job codes/titles, and who satisfy the eligibility criteria detailed in the Terms and Conditions, may participate in the Plan:

| Job Title | Job Code |
|---|---|
| Merchant Sales Specialist | 7782 |
| Sr. Merchant Sales Specialist | 7781 |
| Merchant Sales Team Lead | 7422 |

**Performance Period:**  January 1, 2025 – December 31, 2025

**Payment Frequency:**  Monthly calculated awards will be paid on or prior to 30 days after the close of the performance period, in accordance with the Bank's payroll schedule and the provisions of this Plan document. Quarterly calculated awards will be paid on or prior to 60 days after the close of the performance period, in accordance with the Bank's payroll schedule and the provisions of this Plan document. Annually calculated awards will be paid on or prior to 75 days after the close of the performance period, in accordance with the Bank's payroll schedule and the provisions of this Plan document.

**Plan Administrator:**  The Human Resources Incentive Compensation Team administers the Plan and is responsible for all Plan calculations and record keeping.

**Executive Sponsor:**  Senior Director Merchant Services, Jason Mills

**From:** Stephanie Daughtridge
**Sent on:** Thursday, May 1, 2025 7:26:13 PM
**To:** jared.ashcraft@proton.me
**Subject:** Jared Ashcraft


As his former Merchant Sales Manager, Jared was a true asset to the merchant services team at First Citizens Bank. Jared continued to demonstrate exceptional performance measures. Although he is not new to Merchant, he embraced the challenges of transitioning to his new Southern California market with enthusiasm and dedication. His proactive approach and willingness to engage with both team members and clients significantly contributed to the success in that region. Jared quickly established team chats for each new area he covered, fostering collaboration and open communication. This initiative did not only streamlined information sharing but also enhanced team morale as members felt more connected and supported. Jared made himself readily available to bankers and clients alike, demonstrating his commitment to customer service. His responsiveness and attentiveness to client needs allowed him to build strong relationships and trust, positioning the team as a reliable resource in the market. By utilizing chat platforms, Jared stayed ahead of potential issues and opportunities. His ability to initiate discussions and gather insights helped him capitalize on market trends and provided valuable information that benefited both clients and the internal team. Jared's deep knowledge and expertise in procurement have been invaluable. He consistently showcased an understanding of market dynamics and best practices, earning him respect from colleagues and clients alike.

It was a pleasure working with Jared. He was able to bring value added content to each communication. I would consider Jared into a mentorship role for new hires. His experience and knowledge would greatly benefit newcomers and further solidify his leadership presence.

Best Regards,

Former Merchant Sales Manager of Target Market at First Citizens Bank
Stephanie Daughtridge

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**
**Washington, DC**

JARED ASHCRAFT,
          Complainant,

    v.

FIRST-CITIZENS BANK & TRUST
COMPANY,
          Respondent.

**OALJ Case No: 2025-SOX-00035**
**OSHA Case No.: 301054553**

**RESPONDENT'S MOTION FOR ENTRY**
**OF A PROTECTIVE ORDER**

Respondent First Citizens Bank & Trust Company ("Respondent") respectfully moves the Court for the entry of the Protective Order included as Exhibit A to this Motion. In support of this Motion, Respondent respectfully shows the Court as follows:

1. As noted in Respondent's pending Motion for Sanctions and Motion for a Protective Order relating to discovery, Complainant's abusive AI practices have continued since those filings at an increased pace, including extensive improper motions practice with voluminous attachments.

2. When Complainant was separated from employment with Respondent, he refused to return his company-issued laptop and "preserved" confidential records belonging to Respondent for use in this (and potentially additional) litigation.

3. In his earlier filings with OSHA and before this Court, Complainant utilized information that he had collected from Respondent's records to make assertions and arguments related to his own employment. This practice has continued through the date of this Motion.

4. But Complainant's recent filings and threatened filings represent a more troubling development: instead of attaching documents relating only to his own employment, Complainant is now attaching sensitive commercial information identifying or belonging to Respondent's clients and customers, or other third parties not named as parties to this proceeding. These documents are

confidential and should not be disclosed on the public record in this, or any, lawsuit without first undergoing redaction of any private, confidential, identifying, or sensitive commercial information. Respondent has not had an opportunity to designate these materials as confidential and seek redaction, since these documents have not been produced in the normal course of discovery (Complainant having retained possession of them unilaterally outside of the judicial process).

5.    Specifically, on Saturday, February 21, 2026, Complainant sought to meet and confer on a motion which included the names of some of Respondent's customers. Although the potential disclosure of this commercial information and sensitive information regarding Respondent's customers is troubling in itself, it may be just the tip of the iceberg. Respondent does not know the full universe of confidential or sensitive company information Complainant has taken from his company-issued laptop and intends to use in this proceeding. Respondent has an interest and an obligation to protect information on its customers and employees from public disclosure.

6.    On Monday, February 23, 2026, Complainant sent an email to the general addresses for Respondent's Board of Directors and Investor Relations department,[1] in addition to individuals at a non-party insurance company. (*See* Exhibit B hereto). Although styling this email as a "settlement" communication, Complainant threatens to file several of his motions and pleadings from this proceeding as attachments to a complaint in federal district court if Respondent does not accede to his demands. In his communication, Complainant states:

> Upon docketing in the Central District of California, the de novo complaint, attached exhibits, agency evaluations, and the complete repository of currently unadjudicated OALJ motions will enter the public record via PACER and remain permanently accessible. At that juncture, the opportunity to resolve and contain this liability confidentially will be irrevocably extinguished.

(Ex. B at 1).

---

[1] This Court has previously instructed Complainant to restrict his communications to the undersigned counsel, as Respondent's representative. (*See* 9/30/25 Hearing Tr. at 13).

2

Case 2:26-cv-02251-JLS-JDE    Document 60-2    Filed 06/30/26    Page 90 of 259    Page ID #:2606

**Subject:** Letter
**From:** "miguel chico" <miguel███████████████>
**Date:** 6/3/2025, 4:31 PM
**To:** <jared@ashcraft.me>

Hey Jared,

Here you have the letter you requested. I hope it helps your case, but do me a favor. If you think it is going to come back to us and bite us, please don't submit. Wish you the best of luck brother.

Best regards,
Miguel S.

─Attachments:────────────────────────────────────────────

  FCB Letter.pdf                                                      128 KB

 ıs Angeles, CA 90012

**RE: Merchant Services Setup**

**For: Jared Ashcraft**

To whom it may concern:

This letter is to confirm that Jared Ashcraft was our representative at First Citizen Bank and helped us set up our merchant account. Jared was very helpful and he was able to show us and save us a good amount of money by transitioning from our previous merchant account over to FCB. We were working very closely with him but unfortunately they transferred our account over to someone else. We are in the process of setting up 1 more account with FCB but it is stalled. I hope this letter helps and shows that Jared is a person of great character and is willing to go above and beyond for FCB customers.

Sincerely,



If any questions, ... ee to contact the Accounting Department at:





## West Ludwig · 2nd

**Chief Human Resources Officer at First Citizens Bank**

Raleigh, North Carolina, United States · **Contact info**

500+ connections

  

 First Citizens Bank

 University of Florida

## Highlights

 **You both worked at First Citizens Bank**
You both worked at First Citizens Bank from August 2021 to June 2025

✦ Ask about experience

**1 mutual group**
You and West are both in Linked:HR (#1 Human Resources Group)

## Activity

837 followers

**+ Follow**

**West has no recent posts**
Recent posts West shares will be displayed here.

Show all →

## Experience

**Chief Human Resources Officer**
First Citizens Bank



4:08

Re:

🛡 Internal

**Nahabedian, Yegishe**
To You, Villasenor, Robert, + 4

4:05 PM

There is no need for Patrick to be involved in this deal since this is a Beverly Hills client. As far as management being involved, I have been involved with ▮▮▮▮▮▮ merchant deal for several months now but we are stalled again. Does 2:00 tomorrow work for you?

Internal

**From:** Ashcraft, Jared <Jared.Ashcraft@firstcitizens.com>
**Sent:** Wednesday, April 30, 2025 4:02 PM
**To:** Nahabedian, Yegishe <Yegishe.Nahabedian@firstcitizens.com>; Villasenor, Robert <Robert.Villasenor@firstcitizens.com>
**Cc:** Rezaie, Maryam <Maryam.Rezaie@firstcitizens.com>; Lomas, Dana <Dana.Lomas@firstcitizens.com>; Sarantos, George

↩ ⌄  Reply all



| From: | Ashcraft, Jared |
|---|---|
| Sent on: | Monday, May 12, 2025 1:14:43 PM |
| To: | Wiese, Ryan; Lomas, Dana; Halliday, Katie; Delicata, Stephanie; Habtu, Kedest |
| CC: | Green, Queena; Rhea, Glenn; legal@ashcraft.me |
| Subject: | Re: Merchant & Pacific Area Partner Touch Base Call |
| Attachments: | 1000004250.jpg (272.91 KB), 1000004248.jpg (317.42 KB), 1000004249.jpg (562.12 KB) |

I would have let you know I was not able to attend, Ryan, but I show this meeting was cancelled by you on Friday. Being that I just met with you an last week I assumed that is why it was cancelled.

Internal

Internal

---

**From:** Wiese, Ryan <Ryan.Wiese@firstcitizens.com>
**Sent:** Monday, May 12, 2025 10:02:54 AM
**To:** Lomas, Dana <Dana.Lomas@firstcitizens.com>; Ashcraft, Jared <Jared.Ashcraft@firstcitizens.com>; Halliday, Katie <Katie.Halliday@firstcitizens.com>; Delicata, Stephanie <Stephanie.Delicata@firstcitizens.com>; Habtu, Kedest <Kedest.Habtu@firstcitizens.com>
**Cc:** Green, Queena <Queena.Green@firstcitizens.com>; Rhea, Glenn <Glenn.Rhea@firstcitizens.com>
**Subject:** RE: Merchant & Pacific Area Partner Touch Base Call

Hello Dana,

Let's keep the call today.   See you all shortly.

**Ryan Wiese**
Senior Vice President, Manager Retail Banking
**FIRST CITIZENS BANK**
7320 Firestone Blvd Suite 101
Downey, CA 90241

m: 714-943-8128
Firstcitizens.com



Internal

---

**From:** Lomas, Dana <Dana.Lomas@firstcitizens.com>
**Sent:** Monday, May 12, 2025 9:50 AM
**To:** Wiese, Ryan <Ryan.Wiese@firstcitizens.com>; Ashcraft, Jared <Jared.Ashcraft@firstcitizens.com>; Halliday, Katie <Katie.Halliday@firstcitizens.com>; Delicata, Stephanie <Stephanie.Delicata@firstcitizens.com>; Habtu, Kedest <Kedest.Habtu@firstcitizens.com>
**Cc:** Green, Queena <Queena.Green@firstcitizens.com>; Rhea, Glenn <Glenn.Rhea@firstcitizens.com>
**Subject:** RE: Merchant & Pacific Area Partner Touch Base Call

Hello,

Jared is Out of the Office today. Would you like to reschedule?

Thanks,

Dana

Internal

-----Original Appointment-----
**From:** Wiese, Ryan <Ryan.Wiese@firstcitizens.com>
**Sent:** Wednesday, March 12, 2025 1:28 PM
**To:** Wiese, Ryan; Ashcraft, Jared; Lomas, Dana; Halliday, Katie; Delicata, Stephanie; Habtu, Kedest
**Subject:** Merchant & Pacific Area Partner Touch Base Call
**When:** Monday, May 12, 2025 11:00 AM-11:45 AM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting

_____

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: 246 534 300 560

Passcode: Yo6Fq6jm

_____

### Dial in by phone

+1 984-444-7403,,891222155# United States, Raleigh

Find a local number

Phone conference ID: 891 222 155#

### Join on a video conferencing device

Tenant key: firstcitizens@m.webex.com

Video ID: 116 763 465 0

More info

For organizers: Meeting options | Reset dial-in PIN



Org help | Privacy and security

_____

This electronic mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient or the person responsible for delivering the electronic mail to the intended recipient, be advised that you have received this electronic mail in error and that any use, dissemination, forwarding, printing, or copying of this electronic mail is strictly prohibited. If you have received this electronic mail in error, please immediately notify the sender by return mail. Visit us online at www.firstcitizens.com or call







Yegishe,

I would be more than happy to. I have carbon copied Patrick as well since he asked to be kept informed on this situation. The initial 6 agreements have been ready to send for over a week, and the multiple days of back and forth trying to procure documents needed have added significant and unnecessary time to what should have been completed already. These 10 locations would have been a very nice addition to the numbers for April. I only wish management involvement would have happened sooner.

Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 | 2406 Stantonsburg Rd | Greenville, NC 27834
P: xxx.xxx.xxxx | O: xxx.xxx.xxxx | F: xxx.xxx.xxxx
Jared.Ashcraft@firstcitizens.com

Firstcitizens.com

Merchant Assist Team: 24/7
Technical Support & General Service Questions (Statement, Billing, Chargeback, Interchange)
(Worldpay) xxx.xxx.xxxx | Phone
(Fiserv/Clover) xxx.xxx.xxxx | Phone

Merchant Activation Team (for initial setup only)
Equipment Installation/Training
(Worldpay) xxx.xxx.xxxx | Phone 8am-8pm M-F EST
(Fiserv/Clover) xxx.xxx.xxxx | Phone 8am-8pm M-F EST

Partner Assist Team: (Internal use only)
(Worldpay) xxx.xxx.xxxx | Phone  partner@worldpay.com | Email 8am – 8pm EST
(Fiserv/Clover) xxx.xxx.xxxx (option 1) | Phone partnerpriority@fiserv.com | Email 8am – 7pm EST

PCI Compliance
(Worldpay via Safer Payments) xxx.xxx.xxxx | Phone
(Fiserv/Clover) xxx.xxx.xxxx | Phone
support@firstdatapci.clover.com | Email

Internal

**From:** Nahabedian, Yegishe <Yegishe.Nahabedian@firstcitizens.com>
**Sent:** Wednesday, April 30, 2025 3:55 PM
**To:** Villasenor, Robert <Robert.Villasenor@firstcitizens.com>; Ashcraft, Jared <Jared.Ashcraft@firstcitizens.com>
**Cc:** Rezaie, Maryam <Maryam.Rezaie@firstcitizens.com>; Lomas, Dana <Dana.Lomas@firstcitizens.com>; Sarantos, George <George.Sarantos@firstcitizens.com>
**Subject:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Jared,

We need to get on a call so that we can finally finish this transaction up. Caesar is not responding, we can get everything we need from the doctor directly, but we need to know everything that is needed so that we don't go back and forth anymore with the doctor.

Are you available tomorrow afternoon for a call? Let's get on a call and come up with the final list of what is missing so we can book these.

Thanks

Internal

**From:** Villasenor, Robert <Robert.Villasenor@firstcitizens.com>
**Sent:** Monday, April 28, 2025 9:30 AM
**To:** Cesar Landeros <clanderos@cffhas.org>
**Cc:** Daryoush Kashani <dkashani@cffhas.org>; Nahabedian, Yegishe <Yegishe.Nahabedian@firstcitizens.com>; Ashcraft,

Document 61-70-2 Filed 06/05/26/26 Page 100 of 259 Page Page ID #2416







Document 61-20-2 Filed 06/06/26 Page 103 of 259 Page ID: 62419



Document 61-70-2 Filed 06/05/26 Page 104 of 259 Page
Page ID #18520



Document 61-2 Filed 06/05/26 Page 105 of 259 Page ID 421





Document 61-70-2 Filed 06/05/26 Page 107 of 259
Page ID #2423





Gonzales, Carlos
Available

Today 10:33 AM

Hey man, I have not needed to call Fiserv Sales support in forever (months) and I can not find my sales code. I had it on document but can't remember the file name. Do you still have it?

Disregard, found it

Today 1:10 PM

Sorry. Been in meting purgatory today. Just seeing this. Hope you have a good weekend.

👍

Today 2:34 PM

No need to apologize, I know you are busy and always do what you can for the team.

You're appreciated.
👍

Team, I had planned to spend the rest of the evening (and weekend) creating contracts for our customers. Unfortunately I am suddenly unable to convert leads in Salesforce. I will not be able to get the agreements I had planned out until atleast monday, please update clients as such

Funny you mention purgatory, currently reading Dante.
😂

Haven't seen that SF issue today. So you're getting that error message on ALL leads? Have you emailed Ashley yet? If not, I can ask her to look into it for you.

Every single one. I have a ton I need to create:

| | |
|---|---|
| Los Angeles | Valerie Badoian |
| Los Angeles | Karolin Gregorian |
| Los Angeles | Malinda Fernando |
| Los Angeles | John Evans JR |
| Pacific | Farooq Ganatra |
| Pacific | Rufo Fabricante JR |
| Pacific | Verona Fannizadeh |
| Pacific | Verona Fannizadeh |
| Pacific | Kristine Ben |
| Pacific | Rufo Fabricante JR |
| Pacific | Carissa Sinclair-Lissy |
| Pacific | Farooq Ganatra |
| Los Angeles | Malinda Fernando |
| Los Angeles | Karolin Gregorian |
| Los Angeles | Saurabh Patel |
| Pacific | Farooq Ganatra |
| Pacific | Leo Reynoso |
| Los Angeles | Sherry Etash |
| Pacific | Leo Reynoso |
| Los Angeles | Aisha Enriquez |
| Los Angeles | David Moradkhani |
| Los Angeles | Brennan Penney |
| Los Angeles | Aisha Enriquez |
| Los Angeles | Robert Villasenor |
| Los Angeles | Hovep Kartshyan |
| Pacific | Mike Win |
| Los Angeles | David Moradkhani |
| Pacific | Karen Carver |
| Los Angeles | David Moradkhani |
| Los Angeles | John Eveans Jr |
| Los Angeles | Malinda Fernando |

All the ones that say SOLD essenttially.

My bankers are also suddenly unable to send me referrals



Document 61-20-2 Filed 06/05/26 Page 111 of 259 Page Page #D1:72427

Team, I had planned to spend the rest of the evening (and weekend) creating contracts for our customers. Unfortunately I am suddenly unable to convert leads in Salesforce. I will not be able to get the agreements I had planned out until atleast monday, please update clients as such

Patrick R.
Great job David

👍

| Region | Relationship Manager |
| --- | --- |
| Los Angeles | Valerie Badoian |
| Los Angeles | Karolin Gregorian |
| Los Angeles | Malinda Fernando |
| Los Angeles | John Evans JR |
| Pacific | Farooq Ganatra |
| Pacific | Rufo Fabricante JR |
| Pacific | Verona Fannizadeh |
| Pacific | Verona Fannizadeh |
| Pacific | Kristine Ben |
| Pacific | Rufo Fabricante JR |
| Pacific | Carissa Sinclair-Lissy |
| Pacific | Farooq Ganatra |
| Los Angeles | Malinda Fernando |
| Los Angeles | Karolin Gregorian |
| Los Angeles | Saurabh Patel |
| Pacific | Farooq Ganatra |
| Pacific | Leo Reynoso |
| Los Angeles | Sherry Etash |
| Pacific | Leo Reynoso |
| Los Angeles | Aisha Enriquez |
| Los Angeles | David Moradkhani |
| Los Angeles | Brennan Penney |
| Los Angeles | Aisha Enriquez |
| Los Angeles | Robert Villasenor |
| Los Angeles | Hovep Kartshyan |
| Pacific | Mike Win |
| Los Angeles | David Moradkhani |
| Pacific | Karen Carver |
| Los Angeles | David Moradkhani |
| Los Angeles | John Eveans Jr |
| Los Angeles | Malinda Fernando |

Type a message





Document 61-70-2 Filed 06/30/26 Page 114 of 259 Page ID #773430

Internal

**From:** Ashcraft, Jared
<Jared.Ashcraft@firstcitizens.com>

**Sent:** Wednesday, April 30, 2025 11:53 AM

**To:** Fernando, Malinda
<Malinda.Fernando@firstcitizens.com>

**Subject:** RE: [EXTERNAL] New Lead for ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ has been created and assigned to you

Did Lee to talk to this customer or only send the proposal?

Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 | 2405 Stantonsburg Rd |
Greenville, NC 27834
C:(252)258-1535 | O:(252)321-6401 | F:(984)867-3587
jared.ashcraft@firstcitizens.com

Firstcitizens.com

**Merchant Assist Team:** 24/7

Technical Support & General Service Questions (Statement, Billing, Chargeback, Interchange)

Reply all



FYI.

Internal

**From:** Fernando, Malinda <Malinda.Fernando@firstcitizens.com>

**Sent:** Wednesday, April 30, 2025 11:53:12 AM

**To:** Ashcraft, Jared <Jared.Ashcraft@firstcitizens.com>

**Subject:** RE: [EXTERNAL] New Lead for ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ has been created and assigned to you

Only did the proposal

**Malinda Fernando** | Vice President | Financial Sales Manager II

Encino Branch | First Citizens Bank

FCB Mail Code: FCC-607 | 16055 Ventura Blvd #110 | Encino, CA 91436

Direct: 818-668-9702

↰ ⌄ Reply all



**Ashcraft, Jared**
Jared.Ashcraft@firstcitizens.com

To   Bush, Ted  Ted.Bush@firstcitizens.com

Cc   You Jared.Ashcraft@firstcitizens.com

Thursday, May 1 at 10:47 AM

🛡 Internal

✉ RE: Neutraderm Inc Follow Up.eml
    EML - 164 KB

Ted,

I wanted to make you aware of a sudden and concerning issue.

As of this morning, I am no longer receiving referrals through Salesforce—despite having multiple submissions that would route correctly to any other market across the company. Brennan Penney of the Beverly Hills branch reviewed this with me directly and witnessed the issue firsthand. He also provided documentation confirming the anomaly.

We tested this together. Referrals that should be routed to me were not—unless I bypassed the standard flow using a workaround. This change appears to have occurred immediately following the appeal I filed on the 23rd.

Prior to that date, referrals were coming through normally.

Given the timing, the breakdown, and the fact that Dana directly contacted me about Salesforce activity after this issue began—using documentation I had already submitted—it appears there may be a deliberate attempt to create a procedural failure.

At minimum, this pattern raises serious concerns. It's no longer hypothetical, and it cannot be ignored.

Please advise on next steps.

Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 | 2405 Stantonsburg Rd |
Greenville, NC 27834
C:(252)258-1535 | O:(252)321-6401 | F:(988)867-4587
jared.ashcraft@firstcitizens.com

Firstcitizens.com

**Merchant Assist Team:** 24/7

Technical Support & General Service Questions (Statement, Billing, Chargeback, Interchange)

(Worldpay) 844-826-6489 | Phone
(Fiserv/Clover) 800-385-6137 | Phone

↩ ⌄ Reply all



Ted,

In light of the ongoing referral routing issues I've experienced since April 23, I'm requesting that all Salesforce system logs related to my user account—including referral submission, assignment, and visibility activity—be preserved from April 16 onward.

This includes, but is not limited to:

- Referral assignment rule changes
- User permission changes
- Activity logs tied to my Salesforce profile
- Any internal comments or notes associated with my visibility/access
- Any other system that would impact referral flow

This request is made in good faith to ensure an accurate and complete review of the timeline, access behavior, and functionality issues noted in my previous communications.

Please confirm receipt and preservation.

Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 | 2405 Stantonsburg Rd | Greenville, NC 27834
C:(252)258-1535 | O:(252)321-6401 | F:(984)867-3587

**From:** Ashcraft, Jared
**Sent on:** Monday, May 5, 2025 12:08:42 PM
**To:** Bush, Ted; HRSC (HR Service Center)
**CC:** Ludwig, West; N A; Ashcraft, Jared; Jared Ashcraft
**Subject:** RE: Escalation: Salesforce Market Restriction Blocking Contracts & Referrals – Retaliation Risk
**Urgent:** High

Dear Ted / HR Advisory Team,

This message supplements my earlier escalation regarding a systems-level issue that has now taken a more serious turn. After further investigation and confirmation from Ashley Roff this morning, it is now evident that a change made to the Salesforce HR Area field—initiated at Dana Lomas's direction—directly impacted my market's ability to generate contracts and referrals. This restriction, which blocked "Los Angeles" from being recognized as a valid value in Salesforce, was not communicated to me or my market despite Dana's role in instructing Ashley to make the update. Critically, this change was implemented and propagated silently, going into effect on or just before April 22—but was not disclosed during the disciplinary call on April 23. Dana had full awareness of this change and had the opportunity to clarify the cause of the system issue. Her failure to do so directly contributed to the narrative used to justify formal disciplinary action.

This creates a serious concern of pretext: a failure of leadership to disclose a known, manager-instigated system change that directly influenced system functionality and productivity, timed immediately before and after protected ADA/FMLA activity and formal appeal proceedings.

Clarifications received from Ashley Roff on May 5, 2025:
- The change to the HR Area field was made per Dana Lomas's direction.
- Dana communicated this update to a select few, but not to the impacted market (myself or any of my bankers).
- The change impacted the ability to convert leads and generate contracts across more than 30 affected referrals.
- Dana had the opportunity to disclose the change during or before the April 23 disciplinary process and failed to do so.

Given these material facts, I formally request this matter be appended to the existing record of my appeal and included in the legal and risk escalation already underway. Specifically:
1. Confirmation of all metadata tied to Salesforce HR Area field changes.
2. All internal communications between Dana Lomas and Ashley Roff referencing this change.
3. Investigation into why this system change was not disclosed during a compliance-related disciplinary call.
4. Addition of this timeline to the official retaliation chronology.

I am requesting immediate formal review.


Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 | 2405 Stantonsburg Rd | Greenville, NC 27834
C:(252)258-1535 | O:(252)321-6401 | F:(984)867-3587
jared.ashcraft@firstcitizens.com


Firstcitizens.com

**Merchant Assist Team: 24/7**
Technical Support & General Service Questions (Statement, Billing, Chargeback, Interchange)
(Worldpay) 844.826.8489 | Phone
(Fiserv/Clover) 800.365.9137 |Phone

**Merchant Activation Team (for initial setup only)**
Equipment Installation/Training
(Worldpay) 866.622.2907 | Phone 8am-8pm M-F EST
(Fiserv/Clover) 800.365.9137 | Phone  8am-5pm M-F EST

**Partner Assist Team: (internal use only)**
(Worldpay) 800.805.0636 | Phone   vest-rpt@servicingteam.com| Email  8am – 8pm EST
(Fiserv/Clover)  800.262.1991 (option 1) | Phone   fcbpartnerpriorityteam@fiserv.com | Email  8am – 7pm EST

**PCI Compliance**
(Worldpay via Safer Payments) 866.493.8756 | Phone

(Fiserv/Clover) 866-957-1807 | Phone | support@clover.com | Email



Internal

Internal

**From:** Ashcraft, Jared <Jared.Ashcraft@firstcitizens.com>
**Sent:** Saturday, May 3, 2025 8:09 PM
**To:** Bush, Ted <Ted.Bush@firstcitizens.com>; HRSC (HR Service Center) <hrsc@firstcitizens.com>
**Cc:** Ashcraft, Jared <Jared.Ashcraft@firstcitizens.com>; Ludwig, West <West.Ludwig@firstcitizens.com>
**Subject:** Escalation: Salesforce Market Restriction Blocking Contracts & Referrals – Retaliation Risk
**Importance:** High

Dear Ted / HR Advisory Team

I'm writing to escalate an urgent systems-level issue that has now been confirmed to affect both my ability to receive referrals and generate client contracts within Salesforce—specifically tied to the "Los Angeles" HR Area field.  This issue was not present prior to my formal appeal submission. In fact, referrals were working as expected until shortly after Dana Lomas inquired about a referral being in Salesforce. The sudden emergence of this metadata error—where Salesforce no longer recognizes "Los Angeles" as a valid AREA value—occurred immediately after that exchange, during my ADA/FMLA-protected appeal process.  This development materially impacts the timeline and context surrounding the April 23, 2025

disciplinary action and must be viewed not only as a system failure but as potential act of retaliation especially given that:

- The system disruption began after protected disclosures and preservation notices were issued
- It uniquely targeted my market ("Los Angeles") and blocked contract generation
- It was not go into effect until after disciplinary action was imposed and appealed

Accordingly, I am requesting:

- Preservation of Salesforce configuration logs, AREA field metadata, and change history tied to my user profile and HR Area
- Confirmation of who had access to adjust AREA field logic or restrict contract generation
- A formal statement clarifying whether management was aware of this system issue prior to issuing disciplinary action
- Immediate correction of the metadata conflict to restore full system functionality

Given the compounding pattern of access blocks, record suppression, and now market-specific system sabotage, I ask that this incident be added to the ongoing appeal record and escalated for legal review.



Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 | 2405 Stantonsburg Rd | Greenville, NC 27834
C:(252)258-1535 | O:(252)321-6401 | F:(984)867-3587
jared.ashcraft@firstcitizens.com

Firstcitizens.com

**Merchant Assist Team: 24/7**
Technical Support & General Service Questions (Statement, Billing, Chargeback, Interchange)
(Worldpay) 844.826.8489 | Phone
(Fiserv/Clover) 800.365.9137 |Phone



High Importance    Internal

**Ashcraft, Jared**
Jared.Ashcraft@firstcitizens.com

To    Bush, Ted Ted.Bush@firstcitizens.com
HRSC (HR Service Center) hrsc@firstcitizens.com

Cc    Ludwig, Wess wess.ludwig@firstcitizens.com
N A jtashcraft12@gmail.com
You Jared.Ashcraft@firstcitizens.com
Jared Ashcraft jared.ashcraft@protonmail.com

Monday, May 5 at 9:08 AM

High Importance    Internal

Dear Ted / HR Advisory Team,

This message supplements my earlier escalation regarding a systems-level issue that has now taken a more serious turn. After further investigation and confirmation from Ashley Roff this morning, it is now evident that a change made to the Salesforce HR Area field—initiated at Dana Lomas's direction—directly impacted my market's ability to generate contracts and referrals. This restriction, which blocked "Los Angeles" from being recognized as a valid value in Salesforce, was not communicated to me or my market despite Dana's role in instructing Ashley to make the update. Critically, this change was implemented and propagated silently, going into effect on or just before April 22—but was not disclosed during the disciplinary call on April 23. Dana had full awareness of this change and had the opportunity to clarify the cause of the system issue. Her failure to do so directly contributed to the narrative used to justify formal disciplinary action.

This creates a serious concern of pretext: a failure of leadership to disclose a known, manager-instigated system change that directly influenced system functionality and productivity, timed immediately before and after protected ADA/FMLA activity and formal appeal proceedings.

Clarifications received from Ashley Roff on May 5, 2025:

- The change to the HR Area field was made per Dana Lomas's direction.
- Dana communicated this update to a select few, but not to the impacted market (myself or any of my bankers).
- The change impacted the ability to convert leads and generate contracts across more than 30 affected referrals.
- Dana had the opportunity to disclose the change during or before the April 23 disciplinary process and failed to do so.

Given these material facts, I formally request this matter be appended to the existing record of my appeal and included in the legal and risk escalation already underway. Specifically:

1. Confirmation of all metadata tied to Salesforce HR Area field changes.
2. All internal communications between Dana Lomas and Ashley Roff referencing this change.
3. Investigation into why this system change was not disclosed during a compliance-related disciplinary call.
4. Addition of this timeline to the official retaliation chronology.

I am requesting immediate formal review.

Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 | 2405 Stantonsburg Rd | Greenville, NC 27834
C: 252.228.1234 | O: 252.321.1234 | F: 888.367.1234
jared.ashcraft@firstcitizens.com

FirstCitizens.com

**Merchant Assist Team: 24/7**
Technical Support & General Service Questions (Statement, Billing, Chargeback, Interchange)
(Worldpay) 833.628.5876 | Phone
(Fiserv/Clover) 800.551.1234 | Phone

Merchant Activation Team (for initial setup only)



Ashcraft, Jared
To Lomas, Dana, You, + 2

Dana,

As you appear to still be out of office and have not yet responded to my previous inquiry, I've again included Glenn Rhea on a communication related to accounts (Priority Medical) within the market he will soon be managing. If continued inclusion is not appropriate, I would appreciate clear direction when you have a moment.

Additionally, I now better understand your recent question regarding whether Neutroderm had been entered into Salesforce, and the very obvious reason you asked. To clarify: I have not worked the account, initiated contact, or taken any action beyond a brief review of the statement, which was sent to me by a banker. My only observation was that it represents a clear opportunity—if proper procedures are followed.

For the record, I am fully aware that deals should not be worked unless properly entered into Salesforce. In this case, I did not engage the client, present pricing, or initiate a proposal. I simply reviewed a statement that was sent to me and, in full alignment with policy, reached out to you for clarification before proceeding. **If raising a potential opportunity and waiting for leadership guidance is now being recharacterized as a compliance violation, that would mark a troubling precedent—particularly when I've taken every step to ensure transparency.**

**Given the timing and the selective focus of the recent inquiry, I can only assume my adherence to protocol is being scrutinized for reasons unrelated to process itself. I trust leadership will recognize the distinction between a policy breach and a good-faith request for direction—especially when made in writing.**

If the current expectation is that we are no longer permitted to analyze or respond to banker-submitted statements unless a referral already exists in Salesforce, that would reflect a significant shift in our current SOP. I ask this only because, when Brennan made a direct request that would have circumvented referral protocol, I alerted you immediately.

Given the prior situation where it was assumed I was working deals outside of my assigned pipeline without any prior conversation, I felt it necessary to be direct and transparent. **Unfortunately, it has now been nearly fourteen days since I requested clarification on whether I am permitted to submit a proposal without first speaking to the client, despite the banker's repeated insistence. I have held off on doing so out of respect for your prior coaching, which I've made a point never to disregard. That said, I can only assume senior leadership would be surprised to learn that we are being advised to delay—or potentially forgo—opportunities that could yield significant revenue and multiple new banking relationships, purely to satisfy a procedural interpretation of Salesforce usage.**

I ask this for clarity because, as you are aware, the physician overseeing the clinical trial I've participated in for nearly two years has recently sent me statements from his medical practice and requested a review. Are you stating for the record that we are no longer permitted to source deals independently, and that if we identify qualified opportunities outside of formal FCB referral channels, we are prohibited from attempting to bring those businesses into a banking relationship? If so, this would represent a significant departure from established expectations and deserves explicit clarification.

Given the broader implications of this discussion I have CC'd Jason Mills and Ted Bush on this email.

I look forward to your guidance.



Ashcraft, Jared
Apologies, I have deleted the messages in chat. Thanks.

Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 | 2:05 Stantonsburg Rd |
Greenville, NC 27834

8:31 🌐 48

Given the broader implications of this discussion I have CC'd Jason Mills and Ted Bush on this email.

I look forward to your guidance.



**From:** Lomas, Dana <Dana.Lomas@firstcitizens.com>
**Sent:** Wednesday, April 30, 2025 12:35 PM
**To:** Ashcraft, Jared <Jared.Ashcraft@firstcitizens.com>; Penney, Brennan <Brennan.Penney@firstcitizens.com>
**Cc:** Rhea, Glenn <Glenn.Rhea@firstcitizens.com>
**Subject:** RE: Neutraderm Inc Follow Up

Hello,

Has the referral been entered for this opportunity. I can not find it in salesforce.

Thanks,

Dana

Lomas, Dana
Hi Jared... I ask that we hold off on the press increment until he has full system access and the formal announcement is reviewed to be on the corporate announcement schedule which is next week and Series will be handling the announcement.

**Ashcraft, Jared** 12:44 PM
Apologies. I have deleted the messages in chat. Thanks.

Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank

↩ ∨ Reply all

Digitally Enlarged for Readability Only

This page enlarges the email shown on the preceding page for readability only. No substantive content has been added, removed, or changed.



Re: Pac East Self reported Pipeline

Ashcraft, Jared
To ● Lomas, Dana

Reply | Reply All | Forward
Wed 3/12/2025

Internal

I think there is a bit of a misunderstanding. I have not worked with or called on any of these clients. I was confused as to why they were reported in the pipeline and the only explanation I could come up wth is that they were sent during Lee's tenure. Ryan wanted me to label as though I had never made contact with them in some fault of my own.

From: Lomas, Dana <Dana.Lomas@firstcitizens.com>
Sent: Wednesday, March 12, 2025 7:35:00 AM
To: Ashcroft, Jared <Jared.Ashcroft@firstcitizens.com>
Subject: RE: Pac East Self reported Pipeline

I can transfer leads to you from Salesforce. There should never be any interaction with a client until it is in Salesforce. It is my expectation that you are not managing a separate pipeline and working leads outside of salesforce for obvious reasons...

You are killing me here... Have you forgot everything from when you worked directly for me? I'm crying here...

Dana

blank

From: Ashcroft, Jared <Jared.Ashcroft@firstcitizens.com>
Sent: Tuesday, March 11, 2025 4:30 PM
To: Wiese, Ryan <Ryan.Wiese@firstcitizens.com>
Cc: Lomas, Dana <Dana.Lomas@firstcitizens.com>
Subject: RE: Pac East Self reported Pipeline

For clarification - if it says 'NO EZ FORM SUBMITTED' it means that the client is not listed in my pipeline in salesforce. It is possible that an EZ form was submitted to Lee Powers before I took over the market, but I would not have access to them.

**Ashcraft, Jared**   10:36 AM
To Lomas, Dana, Mills, Jason, + 3

DRMTLGY · Finances summary · Sho...
PDF · 203 KB

2 attachments (367 KB)   ⤓ Save attachments

Dana,

This is to clarify the time-sensitive client situation that has been stalled, awaiting your guidance. The opportunity involves Neutraderm and DRMTLGY, **representing approximately $126 million in annual processing** volume and **$200 million in potential deposit value to the bank.**

You were out of office from the 16th to the 23rd, though you were CC'd on all communications regarding this opportunity. We spoke about it on the 23rd, and I informed you that the banker was requesting I move forward with a proposal—despite not having attended the meeting or spoken directly with the client—given the scale of the potential relationship. You never gave me firm direction. That was eight days ago, and your only response since has been an attempt to redirect the conversation toward a Salesforce procedural issue—while the client remained on hold without guidance.

That's not prioritization. That's obstruction.

Yesterday, I disregarded your first directive. Today, I'm disregarding a second and I'm documenting both intentionally.

Your very first directive to me, on my first day at FCB, was:

"Never go over my head."

At the time, I took it as direction and I followed it for far longer than I should have. In hindsight, it reads more like a threat. Either way, it no longer applies.

This isn't insubordination—it's accountability. When a high-value opportunity is left inactive due to internal silence, protecting the bank's interest becomes a responsibility, not a negotiation.

I'm moving forward by providing Brennan with whatever is needed from me to advance the opportunity.

Best regards,

**Jared Ashcraft |** ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 | 2405 Stantonsburg Rd |
Greenville, NC 27834
C: (252) 258 3535 | O: (252) 321 6401 | F: (984) 867 3537
jared.ashcraft@firstcitizens.com

**From:** J

**Sent on:** Thursday, May 8, 2025 10:47:51 AM

**To:** Ashcraft, Jared; Jared.Ashcraft

**Subject:** Neutraderm Pricing

**Attachments:** Internal Profitability Brief — DRMTLGY + Neutraderm.pdf (125.01 KB), Neutraderm DRMTLGY Pricing analysis 210.pdf (106.37 KB)

Create on personal time.

Case 2:26-cv-02251-SHDE Document 61-90-2 Filed 06/05/26 Page 64 of 118 259 Page ID#632444

**Subject:** RE: [EXTERNAL] Re: Neutraderm Pricing
**From:** "HR Redirect" <HRRedirect@firstcitizens.com>
**Date:** 5/8/2025, 3:41 PM
**To:** "Jared Ashcraft" <jared.ashcraft@protonmail.com>

Ok, I understand now. I will discuss further with you when we meet next week. I will look for time on our calendars shortly.

Thanks,
Queena

Internal

Internal

**From:** Jared Ashcraft <jared.ashcraft@protonmail.com>
**Sent:** Thursday, May 8, 2025 3:06 PM
**To:** Green, Queena <Queena.Green@firstcitizens.com>
**Subject:** RE: [EXTERNAL] Re: Neutraderm Pricing

Hi Queena,

Thank you for your note. Since this was sent to my personal email, I want to be sure I understand the nature of your request before proceeding.

Are you seeking clarification about the substance of the materials I forwarded into my work account, or about how they were prepared? I'm happy to follow up, but would appreciate clarity on what type of context you're asking for.

Best regards,
**Jared Ashcraft**

On Thursday, May 8th, 2025 at 11:40 AM, Green, Queena <Queena.Green@firstcitizens.com> wrote:

> Hi Jared,
>
> I am in receipt of this and several emails from you over the past couple of days, relating to your work such as this one. For each email, please provide some context for me as to the relevancy of the document and how it relates to the concerns you have raised that I will be investigating.
>
> Thanks,
> Queena Green
> Manager, HR Advisory Services

Internal

Internal

---

**From:** Jared Ashcraft <jared.ashcraft@protonmail.com>
**Sent:** Thursday, May 8, 2025 11:52 AM
**To:** J <jared.ashcraft@proton.me>
**Cc:** Ashcraft, Jared <jared.ashcraft@firstcitizens.com>
**Subject:** [EXTERNAL] Re: Neutraderm Pricing

NOTICE: External Sender. Please exercise caution when opening attachments or clicking links.

Kind Regards,

Jared Ashcraft
jared.ashcraft@proton.me
(510)760-2550

Sent with Proton Mail secure email.

On Thursday, May 8th, 2025 at 7:47 AM, J <jared.ashcraft@proton.me> wrote:

> Create on personal time.

---

This electronic mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient or the person responsible for delivering the electronic mail to the intended recipient, be advised that you have received this electronic mail in error and that any use, dissemination, forwarding, printing, or copying of this electronic mail is strictly prohibited. If you have received this electronic mail in error, please immediately notify the sender by return mail. Visit us online at www.firstcitizens.com or call 1-888-FC DIRECT (1-888-323-4732). First Citizens Bank. Forever First®. Member FDIC.
-------------------------------------------------------------------------------------------------

4/27/2026, 3:36 PM

| | |
|---|---|
| **From:** | Jared Ashcraft |
| **Sent on:** | Sunday, April 26, 2026 9:16:45 AM |
| **To:** | FCBDirectors@FirstCitizens.com; matt.martin@firstcitizens.com |
| **CC:** | Follett, Matthew; tallison@chubb.com; Joseph.Wayland@chubb.com; rbin@foxrothschild.com |
| **Subject:** | Preservation Notice Regarding FI5939, February 2025 Pasadena Travel, Mills Declaration, and Counsel's Reasonable Inquiry - Jared Ashcraft v. First-Citizens Bank and Trust Company et al - 2:26-cv-02251-JLS-JDE |
| **Attachments:** | WESTIN - 1728772Folio-A_319135.pdf (129.89 KB), WESTIN - 1728772Folio-C_319918.pdf (127.93 KB), Stephanie Chat Feb 19-22.pdf (3.28 MB), Dkt.45 Declaration of Jason Mills.pdf (484.09 KB) |

**Mr. Martin, Ms. Bin, Board recipients, insurers, and counsel:**

Defendants' first merits filing in this federal action has now created a governance-level problem. Fox Rothschild placed Jason Mills, a senior First Citizens executive, before Judge Staton with a sworn declaration denying California business travel by Plaintiff. Attached are Defendants' own FI5939 / Westin Pasadena / Merchant Services records and contemporaneous Stephanie Daughtridge communications proving that statement false. The issue is no longer whether Plaintiff can prove California business contacts. The issue is why Fox Rothschild allowed a senior executive to submit a false sworn declaration on a jurisdictional fact that was directly testable through the Bank's own travel, expense, corporate-card, calendar, meeting, approval, and Merchant Services records.

**This is not merely a litigation mistake. Fox Rothschild was retained to protect Defendants and their officers, not to create avoidable sworn-statement exposure for a senior bank executive. By presenting the Mills Declaration without first reconciling it against the Bank's own FI5939, Westin Pasadena, Merchant Services, travel, expense, corporate-card, calendar, approval, and Daughtridge communication records, Fox Rothschild created substantial and unnecessary risk for Mr. Mills personally, including credibility destruction before a federal judge, potential perjury implications, and future examination into what he knew, what he reviewed, and what counsel told him before he signed. That is a client-protection failure, a governance problem, and an insurer-relevant defense-management issue.**

Attached are The Westin Pasadena folios for Plaintiff's February 19–20, 2025 Pasadena, CA stay for a Merchant Services meeting held in the Los Angeles/Pacific Markets. Those folios identify "FI5939 - First Citizens Bank Pacific Ar" and show a corporate/group room charge transferred to FI5939.

Attached also are contemporaneous February 19–22, 2025 communications between Plaintiff and Stephanie Daughtridge confirming that Plaintiff and Ms. Daughtridge coordinated travel to California for the same Pasadena / Pacific Area / Merchant Services meeting, discussed active Merchant Services work while traveling, coordinated arrival in Pasadena, and coordinated meeting logistics for the morning of February 20, 2025. These communications independently confirm that the trip was for FCB business and further prove that the Mills Declaration's denial of California business travel is false.

Those records directly contradict the Mills Declaration filed in Ashcraft v. First-Citizens Bank & Trust Company, et al., Case No. 2:26-cv-02251-JLS-JDE, which states that, to Mr. Mills's knowledge, Plaintiff never attended any meeting in California or traveled to California for FCB business.

This is no longer an abstract preservation issue. The attached folios establish that the sworn denial was false. The remaining preservation issues concern who knew it was false, what records were reviewed or ignored before the declaration was filed, what Fox Rothschild did or did not request from its client before presenting the declaration, and whether Defendants now attempt to correct, explain, conceal, or continue relying on that false sworn statement.

This preservation notice concerns the February 2025 Pasadena / Pacific Area / Merchant Services meeting, the FI5939 billing/account code, Plaintiff's and Stephanie Daughtridge's related travel and expense records, Plaintiff's assigned corporate card, Stephanie Daughtridge's assigned corporate card, the Mills Declaration, and all records bearing on the factual basis and reasonable pre-filing inquiry for the statement that Plaintiff never traveled to California for FCB business.

Defendants, Fox Rothschild LLP, Jason Mills, and all preservation recipients are now on actual notice that the Mills Declaration contains a materially false sworn statement and that the filing of that declaration reflects a failure to conduct the reasonable pre-filing inquiry required by Federal Rule of Civil Procedure 11(b). The false statement was central to

Case 2:25-cv-02251-SB-DTB   Document 1-30   Filed 06/06/26   Page 131 of 259   Page ID #:244

Defendants... expense, corporate-card, calendar, meeting, attendee, approval, ... Pacific Area, and Merchant Services records.

**Jason Mills's sworn statement that, to his knowledge, Plaintiff never attended any meeting in California or traveled to California for FCB business is provably false. Mr. Mills had personal knowledge, or at minimum access to information establishing such knowledge, because Plaintiff and Stephanie Daughtridge traveled to the same February 2025 Pasadena / Pacific Area / Merchant Services meeting, Ms. Daughtridge was in Mr. Mills's reporting chain, her travel was paid through Merchant Services channels, and she communicated with Mr. Mills while she was in California.**

Please immediately preserve all documents, ESI, metadata, logs, audit trails, communications, approvals, calendars, financial records, and system records concerning:

1. FI5939, "First Citizens Bank Pacific Ar," "First Citizens Bank Pacific Area," "Pacific Area," and any related cost center, business unit, department code, general-ledger code, project code, billing code, master account, group account, corporate account, travel account, meeting account, event account, or hotel master-bill account.

2. Plaintiff's February 2025 California travel, including all records concerning his February 19–20, 2025 stay at The Westin Pasadena, 191 North Los Robles Avenue, Pasadena, California.

3. Plaintiff's assigned corporate card, including all statements, charges, credits, authorizations, declines, reimbursements, expense submissions, receipts, approvals, audit logs, account metadata, cardholder records, manager/approver records, billing records, payment records, card-administration records, and any records showing the relationship between Plaintiff's corporate card, FI5939, Merchant Services, Pacific Area travel, or the February 2025 Pasadena meeting.

4. Stephanie Daughtridge's February 2025 California travel, including all airfare, hotel, expense, reimbursement, corporate-card, approval, calendar, meeting, attendee, agenda, invitation, travel-system, and Merchant Services billing or cost-center records.

5. Stephanie Daughtridge's assigned corporate card, including all statements, charges, credits, authorizations, declines, reimbursements, expense submissions, receipts, approvals, audit logs, account metadata, cardholder records, manager/approver records, billing records, payment records, card-administration records, airfare charges, hotel charges, ground-transportation charges, meal charges, and any records showing the relationship between Stephanie Daughtridge's corporate card, FI5939, Merchant Services, Pacific Area travel, or the February 2025 Pasadena meeting.

6. All communications concerning Plaintiff's and/or Stephanie Daughtridge's February 2025 California travel, including emails, Teams messages, text messages, chats, calendar invitations, meeting notes, agendas, travel approvals, expense-approval communications, reimbursement communications, accounting communications, corporate-card communications, and communications with Marriott, The Westin Pasadena, travel agencies, finance, accounting, Merchant Services, Pacific Area personnel, or any approver.

7. All communications between Plaintiff and Stephanie Daughtridge from February 1–28, 2025, including, Teams messages, emails, Teams call logs, travel-status messages, meeting-logistics messages, arrival/departure messages, and communications concerning Merchant Services work performed while traveling to, from, or during the Pasadena / Pacific Area / Merchant Services meeting.

8. All calendars and scheduling records for Plaintiff and Stephanie Daughtridge for February 2025, including native calendar entries, meeting invitations, acceptances, declines, updates, cancellations, attachments, organizer records, attendee lists, location fields, Teams/Outlook metadata, and any calendar entries or invitations concerning Pasadena, Los Angeles, Pacific Area, Merchant Services, FI5939, First Citizens Bank Pacific Area, or any related meeting.

9. All records identifying who attended, organized, approved, funded, budgeted, hosted, presented at, spoke at, received materials for, or had responsibility for the February 2025 Pasadena / Pacific Area / Merchant Services meeting, including attendee lists, agendas, decks, meeting notes, sign-in records, rooming lists, travel itineraries, presentations, expense reports, corporate-card records, approval records, and post-meeting communications.

10. All records showing Jason Mills's approval authority, reporting visibility, supervisory authority, budget authority, expense authority, corporate-card visibility, travel-approval visibility, meeting visibility, calendar visibility, or

knowledge concerning Plaintiff's February 2025 California travel, Plaintiff's assigned corporate card, Stephanie Daughtridge's February 2025 California travel, Stephanie Daughtridge's assigned corporate card, and any Pasadena / Pacific Area / Merchant Services meeting.

11. All records bearing on whether Jason Mills knew, was told, approved, reviewed, discussed, received notice of, or had reporting, supervisory, budget, travel, expense, corporate-card, meeting, calendar, Salesforce, Merchant Services, or Pacific Area visibility into Plaintiff's February 2025 California travel, Stephanie Daughtridge's February 2025 California travel, the Pasadena / Pacific Area / Merchant Services meeting, FI5939, or any communications with Stephanie Daughtridge while she was in California.

12. All communications between Jason Mills and Stephanie Daughtridge during February 2025, including communications while Ms. Daughtridge was in California, and all communications between Jason Mills and any FCB, Merchant Services, Pacific Area, finance, travel, expense, corporate-card, HR, legal, or Fox Rothschild personnel concerning Plaintiff's California travel, Stephanie Daughtridge's California travel, the Pasadena meeting, FI5939, or the Mills Declaration.

13. All records concerning the preparation, review, drafting, factual investigation, source checking, client inquiry, record search, custodian inquiry, approval, revision, signing, or submission of the Mills Declaration, including communications among Fox Rothschild, Jason Mills, First Citizens legal, HR, Merchant Services, finance, accounting, travel/expense personnel, corporate-card personnel, or any person consulted about Plaintiff's California travel, Stephanie Daughtridge's California travel, corporate-card records, expenses, calendars, business meetings, or the factual basis for the declaration.

14. All records showing whether Fox Rothschild, Defendants, Jason Mills, or any custodian searched for, requested, reviewed, ignored, received, failed to request, failed to review, or failed to preserve records concerning Plaintiff's California travel, Stephanie Daughtridge's California travel, corporate cards, expenses, calendars, meeting records, travel records, FI5939, or business meetings before filing the Mills Declaration.

15. All records that tend to prove, disprove, explain, qualify, or contradict the statement that Plaintiff never attended any meeting in California or traveled to California for FCB business, including but not limited to travel records, expense records, corporate-card records, approval records, airfare records, hotel records, calendar records, Salesforce records, territory-assignment records, meeting records, management communications, and Merchant Services reporting records.

16. All records bearing on the falsity of the Mills Declaration, Jason Mills's knowledge of the February 2025 Pasadena / Pacific Area / Merchant Services meeting, the basis for his sworn denial, and Fox Rothschild's failure to conduct the reasonable inquiry required before presenting that declaration to the Court.

17. All preservation notices, litigation holds, custodian notices, search terms, collection logs, deletion logs, access logs, audit logs, retention schedules, system-administration records, corporate-card administration records, travel-system records, expense-system records, finance/accounting preservation steps, and legal-hold steps concerning the records described above.

18. All records concerning any effort after this notice to correct, supplement, withdraw, explain, defend, preserve, conceal, limit, or continue relying on the Mills Declaration, including drafts, communications, internal analyses, privilege logs, custodian inquiries, client communications, insurer communications, and communications with any person involved in preparing, reviewing, approving, or filing the declaration.

The relevant period is January 1, 2025 through the present, including all later-created records, communications, searches, reviews, investigations, drafts, meetings, notes, explanations, preservation decisions, or discussions concerning FI5939, the Westin Pasadena folios, the Pasadena meeting, Plaintiff's California travel, Plaintiff's assigned corporate card, Stephanie Daughtridge's California travel, Stephanie Daughtridge's assigned corporate card, Jason Mills's knowledge, the Mills Declaration, and Fox Rothschild's Rule 11(b) reasonable inquiry.

This preservation demand includes native files, metadata, email headers, attachments, calendar metadata, expense-system metadata, corporate-card metadata, travel-system data, accounting-system records, Salesforce/CRM records, Teams records, audit trails, version history, access history, approval routing, payment routing, billing-transfer data, and any structured data fields sufficient to identify account ownership, approvers, cost-center coding, billing transfers, corporate-card charges, and payment or expense allocation.

Please suspend any automatic deletion, overwriting, auto-purge, retention-policy deletion, Salesforce/CRM deletion, Teams retention deletion, travel-system purge, expense-system purge, corporate-card-system purge, accounting-system purge, or alteration process that may affect these materials. This includes any deletion or alteration of later-created records concerning the Mills Declaration, the factual basis for that declaration, Jason Mills's knowledge, or Fox Rothschild's pre-filing inquiry.

This is a preservation notice, not a discovery request. No privilege is waived, and no production is demanded by this email. However, destruction, alteration, loss, failure to preserve, failure to suspend routine deletion, or creation of incomplete or misleading preservation records after this notice will be treated as knowing preservation misconduct.

**If Defendants attempt to correct, supplement, withdraw, or explain the Mills Declaration after this notice, this email and its attachments establish that the correction came only after Plaintiff identified the contradiction using Defendants' own records. If Defendants do not correct, supplement, withdraw, or explain the Mills Declaration after this notice, then Defendants will have knowingly left a false sworn declaration on the federal docket after receiving the attached proof.**

Please confirm that this notice has been transmitted to all relevant custodians and systems administrators, including Jason Mills, Stephanie Daughtridge, Merchant Services, Pacific Area personnel, travel and expense personnel, finance/accounting, corporate-card administration, Salesforce/CRM administrators, Outlook/Exchange administrators, Teams administrators, legal, records management, outside counsel, and any employee or department with access to FI5939, Westin Pasadena records, February 2025 California travel records, Plaintiff's assigned corporate-card records, Stephanie Daughtridge's assigned corporate-card records, Jason Mills communications, or the Mills Declaration investigation and drafting record.

**Regards,**

**Jared Ashcraft**
**Plaintiff, Pro Se**
**legal@ashcraft.me**

**From:** Jared Ashcraft
**Sent on:** Thursday, May 14, 2026 12:06:29 PM
**To:** Follett, Matthew
**CC:** Williford, Lisa M.
**Subject:** RE: RE: [EXT] L.R. 7-3 Conference Request re Contemplated Motion to Disqualify Fox Rothschild LLP

Mr. Follett,

To narrow the dispute, Plaintiff clarifies that he is not asking Defendants to withdraw the Motion to Dismiss at this stage. Plaintiff requests only a limited sequencing stipulation extending Plaintiff's deadline to oppose the Motion to Dismiss until after Plaintiff's disqualification and pro hac vice objections are fully briefed.

Plaintiff's position is that he should not be forced to litigate a dispositive motion, disclose merits strategy, and respond to Defendants' attorney-framed factual narrative against counsel whose authority to appear, conflict status, advocate-witness role, candor obligations, and Rule 11/reasonable-inquiry compliance are the subject of timely challenge.

Please state Defendants' position on the following:

Do Defendants agree to stipulate that Plaintiff's deadline to oppose the Motion to Dismiss will be continued until after Plaintiff's motion to disqualify Fox Rothschild LLP and related pro hac vice objections are fully briefed?

If Defendants will not agree, Plaintiff will present the issue to the Court as a limited scheduling/sequencing request, not as a request to adjudicate the merits of the disqualification motion before Defendants are heard.

Regards,

Jared Ashcraft
Plaintiff, Pro Se

On Thursday, May 14th, 2026 at 11:58 AM, Jared Ashcraft <Jared@ashcraft.me> wrote:

Mr. Follett,

I acknowledge receipt of Defendants' email and written positions.

Defendants' reliance on Ms. Williford's pro hac vice admission does not resolve Plaintiff's objection. Plaintiff submitted an opposition to Ms. Williford's pro hac vice application through EDSS within approximately 45 minutes of the application's filing. Because Plaintiff is pro se and did not have CM/ECF access, Plaintiff's opposition was subject to Clerk processing and was not docketed before the Court ruled on the application.

Plaintiff's position is that the pro hac vice order was entered on an incomplete adversarial record, before Plaintiff's timely EDSS-submitted opposition appeared on the docket or could be considered. Plaintiff will seek appropriate relief from that order, including reconsideration, vacatur, revision, revocation, or an order deeming Plaintiff's EDSS-submitted opposition timely for purposes of deciding the pro hac vice issue on a complete record.

For Local Rule 7-3 purposes, please state Defendants' position on the following additional issue:

Do Defendants agree to withdraw the pro hac vice application, or not oppose reconsideration, revision, vacatur, or revocation of the order granting Ms. Williford's pro hac vice application, so the Court may decide the application after considering Plaintiff's timely EDSS-submitted opposition?

Case 2:25-cv-02351-SJB-DFM Document 61-30 Filed 06/26/26 Page 64 of 118 Page ID #:6241

Defendants' suggestion that the Court must decide the Motion to Dismiss before any disqualification or pro hac vice issues is also incorrect. Plaintiff's position that disqualification, pro hac vice admission, counsel-control, candor, Rule 11, reasonable-inquiry, and professional-conduct issues are threshold or collateral matters concerning who may appear before the Court and whether the proceedings may continue through conflicted or tainted counsel. Those issues do not require merits adjudication of Defendants' Motion to Dismiss.

The Ninth Circuit recognizes that district courts have inherent authority to reconsider, rescind, or modify interlocutory orders before final judgment. City of Los Angeles v. Santa Monica BayKeeper, 254 F.3d 882 (9th Cir. 2001). The Ninth Circuit also recognizes that local filing mechanics should not be applied as traps defeating access to the Court when a filing reached the Clerk within the relevant time. Loya v. Desert Sands Unified School District, 721 F.2d 279 (9th Cir. 1983).

The Court has independent authority and responsibility to supervise attorneys appearing before it and to protect the ethical integrity of proceedings. Gas-A-Tron of Arizona & Coinoco v. Union Oil Co. of California, 534 F.2d 1322 (9th Cir. 1976); Wheat v. United States, 486 U.S. 153 (1988). Pro hac vice admission is discretionary, not an entitlement. Leis v. Flynt, 439 U.S. 438 (1979). Collateral attorney-conduct and Rule 11 issues may be addressed apart from merits adjudication. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990); Willy v. Coastal Corp., 503 U.S. 131 (1992). ==The Supreme Court has rejected rigid sequencing rules for threshold, non-merits issues. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574 (1999); Sinochem International Co. v. Malaysia International Shipping Corp., 549 U.S. 422 (2007).==

Plaintiff understands Defendants' current Local Rule 7-3 positions to be as follows:

Defendants will not agree to withdraw Fox Rothschild LLP from representation in this action.

Defendants contend there is no factual or legal basis to disqualify Fox Rothschild LLP.

Defendants contend Ms. Williford may continue participating based on the pro hac vice order, notwithstanding Plaintiff's timely EDSS-submitted opposition and Plaintiff's anticipated request for relief from that order.

Defendants will not agree to substitute conflict-free counsel before proceeding with the Motion to Dismiss.

Defendants will not agree to continue or stay the Motion to Dismiss hearing until the Court resolves Plaintiff's disqualification and pro hac vice objections.

==Defendants will not withdraw, correct, or supplement the Mills Declaration at this time.==

Defendants contend Fox Rothschild LLP may continue litigating the Motion to Dismiss despite Plaintiff's advocate-witness, conflict, candor, pro hac vice, Rule 11, and reasonable-inquiry objections.

Defendants contend the Court must decide the Motion to Dismiss before addressing Plaintiff's disqualification motion or related pro hac vice objections.

If any of the above summary is inaccurate, please correct it in writing.

Plaintiff continues to request written conferral, or alternatively a mutually recorded telephone conference, as an accommodation and record-integrity safeguard. If Defendants will not agree to written or mutually recorded conferral, Plaintiff will still participate in a scheduled telephone conference solely to avoid any claimed Local Rule 7-3 defect, without waiving the accommodation request or any objection. Plaintiff will send a same-day written memorialization of the conference, and Defendants may identify any claimed inaccuracies.

Nothing in this email waives Plaintiff's objections concerning Fox Rothschild LLP's continued representation, Ms. Williford's pro hac vice admission, Plaintiff's timely EDSS-submitted opposition, advocate-witness issues, conflicts, imputed disqualification, the Mills Declaration, Rule 11, Rule 37(e), reasonable inquiry, candor, jurisdiction, service, accommodation, or the adequacy of prior conferral efforts.

Regards,

Jared Ashcraft
Plaintiff, Pro Se

**From:** Ashcraft, Jared
**Sent on:** Tuesday, April 29, 2025 4:51:26 PM
**To:** Bush, Ted
**CC:** Ashcraft, Jared; Jared Ashcraft; N A
**Subject:** Request for Guidance on Operational Communication During Appeal

Hi Ted,

As I continue to participate in the active appeal process, I wanted to ask for clarification on one specific point. Given that many of the concerns raised involve Dana directly — and considering the seriousness of the documented claims — would it be more appropriate at this stage for operational communications and task-related requests to be redirected to someone else (e.g., Carlos), or should I continue engaging with Dana as usual?

I'm aiming to maintain full professionalism and transparency throughout this process and simply want to ensure I'm following the most appropriate path forward.

Appreciate your guidance.

Best,
Jared Ashcraft
Employee ID: 058606

Internal

Internal

This electronic mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient or the person responsible for delivering the electronic mail to the intended recipient, be advised that you have received this electronic mail in error and that any use, dissemination, forwarding, printing, or copying of this electronic mail is strictly prohibited. If you have received this electronic mail in error, please immediately notify the sender by return mail. Visit us online at www.firstcitizens.com or call 1-888-FC DIRECT (1-888-323-4732). First Citizens Bank. Forever First®. Member FDIC.
-------------------------------------------------------------------------------------------------





**Ashcraft, Jared**
Jared.Ashcraft@firstcitizens.com

To   Bush, Ted   Ted.Bush@firstcitizens.com

Cc   You   Jared.Ashcraft@firstcitizens.com

Wednesday, April 30 at 9:51 PM

🛡 Internal

Ted,

I want to follow up ahead of tomorrow's scheduled meetings to formally document a growing concern. Given the pattern of behavior I've experienced in recent weeks—including the nature and timing of yesterday's Salesforce inquiry—I believe it's necessary to make my discomfort clear.

Despite my continued efforts to comply with policy and clarify procedure in writing, I've now encountered multiple instances where my transparency has either gone unanswered or been used as a basis for scrutiny. As you know, I raised a policy clarification nearly two weeks ago regarding proposal protocol. I've still received no response. Yet this week, I was questioned in a way that appears to presuppose wrongdoing—without first acknowledging the context I documented.

Additionally, I want to be transparent in saying that I am increasingly uncomfortable being required to appear in two meetings with Dana tomorrow, given that I have already documented what I believe to be three separate instances of retaliatory behavior. Emails I have include you yourself on or forwarded to you. These include a clear attempt to box me in on Salesforce procedure, and prior selective scrutiny of deals I wasn't even working. All were escalated or documented, and none have been addressed with meaningful follow-up or safeguards.

If the Salesforce inquiry was intended to evaluate procedural compliance, I trust it will be reviewed alongside the written documentation I provided weeks ago—where I asked for direct guidance and chose not to act without it. My adherence to protocol was intentional.

I also want to note that others within my department have expressed concern about similar patterns of selective enforcement and retaliation, and willingness to speak if engaged. While I've handled this professionally and through the proper channels, I want to be clear: I do not feel isolated in these experiences.

If my continued presence in these meetings is required, I will of course attend. But I believe it's important that leadership be fully aware that these conditions are, at this point, documented and increasingly difficult to ignore.

Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 | 2405 Stantonsburg Rd | Greenville, NC 27834
C:(252)215-1535 | O:(252)215-6461 | F:(984)867-6587
Jared.ashcraft@firstcitizens.com

Firstcitizens.com

**Merchant Assist Team:** 24/7
Technical Support & General Service Questions (Statement, Billing, Chargeback, Interchange)
(Worldpay) 844.526.8169 | Phone

↩ ⌄   Reply all



**Re: Request for Guidance on Operational Communication During Appeal**

🛡 Internal

**Bush, Ted**                    2:04 PM
To You

Jared,

At this point during the warning appeal process, you are still expected to perform in your role and report to and work with your manager.

Thank you,

**Ted Bush, MSHRM, SPHR**

VP, HR Advisor

HR Advisory Services

Mobile: (904) 415-3496

10201 Centurion Parkway North

Jacksonville, FL 32256

↩ ⌄ Reply

**From:** Ashcraft, Jared
**Sent on:** Thursday, May 15, 2025 5:12:14 PM
**To:** Bush, Ted
**CC:** legal@ashcraft.me
**Subject:** Re: Appeal Update

Hi Ted,

Thank you for the update.

<mark>At this point, I believe the facts and documentation speak for themselves. Given the pattern of procedural inconsistencies and the conduct that preceded this appeal, I don't expect much from this internal review. While I appreciate your note, the appearance of objectivity has already been severely undermined.</mark>

Nonetheless, I will await the final determination and continue documenting accordingly.

Best regards,
Jared Ashcraft
Sr. Merchant Services Specialist
ETA Certified | ADA-Protected

Internal

Internal

---

**From:** Bush, Ted <Ted.Bush@firstcitizens.com>
**Sent:** Thursday, May 15, 2025 1:31:18 PM
**To:** Ashcraft, Jared <Jared.Ashcraft@firstcitizens.com>
**Subject:** Appeal Update

Good afternoon Jared,

<mark>I wanted to give you an update on your appeal. Please know that the information you submitted related to your appeal is being reviewed, and that we will provide an update as soon as it is completed. If you have any questions in the meantime, please let me know.</mark>

Thank you,

Ted

**Ted Bush, MSHRM, SPHR**
VP, HR Advisor
HR Advisory Services
Mobile: (904) 415-3496

10201 Centurion Parkway North
Jacksonville, FL 32256



**First Citizens Bank**

MORTGAGE   SMALL BUSINESS   COMMERCIAL   🔍 Search

All Bankers / Small Business / CA / Glendale

Search by Address   Search by Banker Name

FIRST CITIZENS BANK

# 2 Small Business Bankers in Glendale

Search by city and state or ZIP code 🔍



## Patrick Rodriguez ›

VICE PRESIDENT, BUSINESS BANKER

**Contact Me**

⌄



## Narineh Amirian ›

VP & ASST SEC, BUSINESS BANKER



First Citizens Bank

MORTGAGE     SMALL BUSINESS     COMMERCIAL     Search

All Bankers / Commercial / CA / San Francisco / Erik Langeland

# Erik Langeland

MANAGING DIRECTOR, MARKET LEADER, MIDDLE MARKET BANKING



**Email** Erik.Langeland@firstcitizens.com

**Contact Me**

## Office Information

**Office Phone** (650) 270-9890

**Get Directions →**

## Areas Served

Northwest

NorCal

# Get to know me

As a First Citizens middle market relationship manager, it's important to invest in understanding your business, strategies and key objectives. An established process and a skilled team of specialists help me tailor solutions to fit you and your organization. Clients appreciate our trusted partnership and collaboration in planning for long-term success.

After graduating the University of Iowa with a major in Finance and emphasis in accounting, I completed a formal credit training program with a large international bank. As part of an expansion focus, I moved to California to start several greenfield offices. My career has been focused on mid-sized companies to help them grow and prosper by accessing capital markets, debt solutions, treasury services and other

traditional banking services. My team delivers the entire suite of First Citizens products and solutions to the Northern California market.

## Our approach

At First Citizens, our Bankers view business relationships with you through a long-term lens. This aligns with our brand ethics, business philosophies and statement of purpose for building a long, lasting alliance. We make recommendations and decisions based on what's best for your business and focus on your growth, expansion and success.

We take a collaborative approach to managing relationships. Our teams include relationship managers, credit professionals and product specialists. Our consulting and business strategy services include industry change optimization, business process management and financial management processes.

We pride ourselves on working together to bring positive results to your business, as we see your vision come to fruition.

## Industry Expertise

Middle Market Banking

## Education

University of Iowa, Finance and Accounting

## Personal Interests

Cooking, hiking, traveling, attending sporting events, and anything Chicago Cubs related.

# Resources

# First Citizens Announces Expanded Commitment to Communities in <mark>Northern California</mark> and Eastern Massachusetts

*Agreement adds $6.5 billion in community lending to First Citizens' longstanding legacy of community support*

RALEIGH, N.C., Nov. 14, 2023 /<u>PRNewswire</u>/ -- First Citizens Bank today announced an amendment to its existing Community Benefits Plan agreement with the National Community Reinvestment Coalition (NCRC) and its members that extends the bank's longstanding community support to Northern California and Massachusetts following its March acquisition of Silicon Valley Bank.



The additional commitment, which recognizes pre-existing Silicon Valley Bank relationships, establishes a new $6.5 billion community financial target with the following components:

- $2.25 billion in small business lending.
- $3.6 billion in Community Reinvestment Act (CRA) development lending and investing.
- $650 million in residential mortgages to low- and moderate-income (LMI) borrowers and in selected LMI census tracts.

First Citizens is also committing to $35 million in CRA grants or contributions, with $10 million of that sum dedicated to an affordable home mortgage subsidy program.

Case 2:20-cv-02523-STS-EDB Document 90-2 Filed 06/05/20 Page 144 of 259 Page ID 17360

The new commitment comes in addition to $3.1 billion that SVB had spent in furtherance of its Community Benefits Plan prior to First Citizens' acquisition of certain assets and liabilities of SVB from the Federal Deposit Insurance Corporation (FDIC) in March. This new First Citizens commitment also comes in addition to the $16 billion Community Benefits Plan that First Citizens announced in February 2021. That plan remains on track to meet its own financial targets.

Although First Citizens had no obligation to assume responsibility for SVB's prior Community Benefits Plan, it agreed to this addendum to further the bank's ongoing commitment to serve the communities where it does business. Some other banks recently acquired through FDIC receivership did not continue their Community Benefits Plan targets.

In formulating the addendum, First Citizens, NCRC, Rise Economy, The Greenlining Institute, the Massachusetts Affordable Housing Alliance (MAHA) and Massachusetts Association of Community Development Corporations (MACDC) worked together to identify the initiatives of greatest impact to LMI communities.

"For its entire 125-year history, First Citizens Bank has taken great pride in our continuing efforts to support clients, customers and associates, as well as the communities in which we live and work," said Frank B. Holding, Jr., chairman and CEO of First Citizens. "This addendum is a testament to that ongoing commitment as we extend our legacy of giving back to the cities and towns we serve, while also helping grow vibrant and diverse communities and businesses."

"This agreement is a huge relief for the communities that stood to lose out on new investments and programming when control of Silicon Valley Bank was assumed by the FDIC in March – and a testament to First Citizens' depth of commitment to the values we share," said Jesse Van Tol, President and CEO of NCRC. "First Citizens is honoring SVB's obligations where others might not have. Their eagerness to listen to and learn from our members, backed with this expansion of our previous community benefits agreement in 2021, should be an example to the industry. This is how you show you're serious about uplifting the most neglected communities in your service area."

"Silicon Valley Bank was an important component of the California economy and is now continuing to support the economy as a division of First Citizens Bank. We at Rise Economy are pleased to have played a significant role in ensuring that the bank's community investments, grants and other forms of support will continue as well," said Paulina Gonzalez-Brito, Chief Executive Officer of Rise Economy.

"We thank First Citizens Bank for this commitment to continue Silicon Valley Bank's investments in LMI communities and households in greater Boston and providing new resources to assist first-time homebuyers, small businesses, and nonprofits," said Symone Crawford, Executive Director of the Massachusetts Affordable Housing Alliance. "If we are to narrow the racial homeownership gap, we need financial institutions to do more in programs like ONE Mortgage and ONE+Boston. FCB's commitment is doing just that."

"In the wake of its acquisition of Silicon Valley Bank, First Citizens Bank has a critical responsibility to maintain SVB's commitments to equitably serve communities–particularly communities of color that have historically been excluded from financial services," said Debra Gore-Mann, President and CEO of The Greenlining Institute. "The Greenlining Institute is encouraged by the progress this agreement makes toward that goal: investments in affordable and rental housing alternatives, technical assistance for small businesses, a people-based special purpose credit program, and grants for BIPOC-led organizations are essential to quality of life in communities of color. Now it's about implementation – and we look forward to working with First Citizens to ensure these investments reach communities of color."

"We look forward to working with First Citizens Bank as they continue the commitments made by Silicon Valley Bank to support community development in the Commonwealth," said Emily Haber, President and CEO of the Massachusetts Association of Community Development Corporations. "We are pleased that the bank recognizes the role that small businesses play in the health and vitality of our Massachusetts communities and the critical need to support development of affordable housing and access to homeownership for Low and Moderate-Income residents."

After a competitive bidding process, First Citizens Bank announced in March 2023 that it had agreed to purchase out of FDIC receivership substantially all loans and certain other assets and assume all customer deposits and certain other liabilities of Silicon Valley Bridge Bank, N.A. This represented only a portion of SVB as it existed prior to receivership.

Now operating as a division of First Citizens Bank, Silicon Valley Bank has resumed serving some of the world's most innovative companies and investors. SVB provides commercial and private banking to individuals and companies in the technology, life science and healthcare, private equity, venture capital and premium wine industries. SVB operates in centers of innovation throughout the United States, serving the unique needs of its dynamic clients with deep sector expertise, insights and connections.

**Commercial Property Executive**

News    Property Types ⌄    Business ⌄    Markets ⌄    Research ⌄

Search...

# First Citizens Bank Buys Bay Area Building

By Mikayla Sciortino • November 20, 2025      🅵    ⭐ Add CPE to Google

Office    Investment    News    San Francisco    More

## This represents the company's second office acquisition in the market this year.

First-Citizens Bank & Trust Co., a First Citizens BancShares Inc. subsidiary, has acquired a 160,000-square-foot office property in San Francisco for $92 million, the company shared with *Commercial Property Executive*. Align Real Estate was the seller, according to Yardi Matrix information.

Align Real Estate purchased the six-story low-rise office building in 2017 for $64.6 million, the same source shows. The property features an 8,000-square-foot rooftop terrace that acts as an event space. Following the acquisition, First Citizens Bank plans to renovate the asset, which hasn't been done since 2009. The new owner is anticipating a move-in date sometime in 2027.

Once renovations are complete, the First Citizens Bank division will occupy a portion of the building and lease the remaining space. First Citizens' Silicon Valley Bank division has had a presence in the area for the last 25 years. The company currently has six branches in the metro.

The company employs more than 500 associates in San Francisco alone, with 1,000 employees in the greater Bay Area. As growth continues, First Citizens Bank is looking for opportunities to expand across the region.



667 Mission St. will be renovated under First Citizens Bank's ownership. *Image courtesy of Yardi Matrix*

**READ ALSO**: How Generative AI Is Reshaping Bay Area CRE

This represents the second Bay Area office acquisition for the company in 2025. In August, First Citizens Bank acquired 250 University Ave. in Palo Alto, Calif., a 38,000-square-foot office building for $82 million, the *Silicon Valley Business Journal* reported. The property is expected to undergo a renovation as well, with a similar opening date in 2027.

Located at 667 Mission St., the San Francisco building is under a mile from six public transit stations. The property is in proximity to Interstate 80, with access to the San Francisco-Oakland Bay Bridge. The San Francisco International Airport is within about 14 miles, with the San Francisco Museum of Modern Art around the block and the Ferry Building within 1 mile from the property.

Case 26-02-25251-SLJ EDE Document 61-20-2 Filed 06/05/30/26 Page 80 147 18 259age Page ID 770463

# San Francisco continues to rebound

The San Francisco office sector has struggled in recent years, but with the growth of AI, the market is picking up. According to a third-quarter report from Cushman & Wakefield, the vacancy rate continues to improve. The report shows that the vacancy rate dropped to 33.6 percent from 34.5 percent a year ago. This is also the first time since 2019 that the metro is on track for positive absorption, the report said.

In October, a Class A office tower in San Francisco known as The Spear, announced two tenants, coworking firm CANOPY and a retail tenant, Arsicault Bakery, both of whom will occupy the ground floor. The building is currently being renovated by its owner, Presidio Bay Ventures.

Also in September, Shorenstein Investment Advisers took a bite in the office sector with a $144.5 million acquisition of 110 Park Place and 1200 Park Place, part of a 209,000-square-foot mixed-use development. Both assets are fully leased and feature amenities including outdoor lounges, EV charging stations and covered parking.

Cushman & Wakefield, First Citizens Bank, Silicon Valley Bank

# Most Recent



### Flexential Acquires 2 Portland-Area Data Centers

May 28, 2026



### Transactions: June 2026

May 28, 2026



### The June Digital Issue of CPE Is Now Available!

May 28, 2026



### Your Untraditional Path Is Your Competitive Edge

May 28, 2026



### How Top CRE Brokers Hone Their Reputations

May 28, 2026



### How Trammell Crow Co. Is Leveraging Its Strengths in a Complex Market

May 28, 2026

**The latest CRE news, delivered every morning.**

 **Linked** in

**Top Content**    **People**    **Learning**    **Jobs**    **Games** | **Sign in**    **Join now**

## First Citizens Bank CEO talks expansion in Northern California

✦ This title was summarized by AI from the post below.

---

 **First Citizens Bank**
158,171 followers
8mo · Edited

First Citizens Bank Chairman and CEO Frank Holding, Jr. sat down recently with the San Francisco Business Times to discuss the bank's commitment to expand its presence and offerings in Northern California. A key area of focus for the Bay Area is growing First Citizens Wealth to support the long-term success of clients of Silicon Valley Bank, a division of First Citizens Bank.

Read the article (subscription required): https://bit.ly/48sVF24



> "While we have wealth capabilities already in SVB, we see an opportunity to better serve and expand in that space."
>
> — Frank B. Holding Jr., Chairman and CEO



 757 · 1 Comment

 Like      Comment      Share

---

**Maria D. Craig, MBA**     7mo
Wow    just wow Frank Holding, Jr. congrats !

![First Citizens BancShares logo]

**INVESTOR RELATIONS - NEWS & EVENTS**

# News Details

**VIEW ALL NEWS →**

## First Citizens Bank Commits $2 Million to Support Relief Efforts for ==Southern California Wildfires==

**01/23/2025**

RALEIGH, N.C., Jan. 23, 2025 /PRNewswire/ -- First Citizens Bank announced today that it has committed $2 million in donations and financial support to aid in critical humanitarian and small business relief efforts for those impacted by the Southern California wildfires.



This commitment is intended to bolster the mobilization of resources to impacted areas through a variety of organizations and support the longer-term revitalization and stabilization of the region. In addition, a portion will directly benefit the immediate and ongoing needs of First Citizens associates

who have been impacted by the wildfire devastation.

"Southern California is home to more than 1,000 of our associates, and we have 30 branches and offices in the region serving clients across our company," said Frank B. Holding, Jr., chairman and CEO at First Citizens Bank. "The impact of the wildfires has been devastating for many of our customers, colleagues and community members, and we assure them that they have our support now and in the days, months and years to come."

Bank associates continue to work with customers to understand their needs and develop flexible solutions to support their recovery.

For more information on First Citizens' commitment to supporting communities affected by the wildfires, visit Southern California Wildfires Relief on firstcitizens.com.

**About First Citizens Bank**
First Citizens Bank helps personal, business, commercial and wealth clients build financial strength that lasts. Headquartered in Raleigh, N.C., First Citizens has built a unique legacy of strength, stability and long-term thinking that has spanned generations. First Citizens offers an array of general banking services including a network of more than 500 branches and offices in 30 states; commercial banking expertise delivering best-in-class lending, leasing and other financial services coast to coast; innovation banking serving businesses at every stage; and a nationwide direct bank. Parent company First Citizens BancShares, Inc. (NASDAQ: FCNCA) is a top 20 U.S. financial institution with more than $200 billion in assets and a member of the Fortune 500™. Discover more at firstcitizens.com.

**MEDIA RELATIONS:**
Name: Angela English
Phone: 803-931-1854
Email: angela.english@firstcitizens.com

˙ View original content to download multimedia:https://www.prnewswire.com/news-releases/first-citizens-bank-commits-2-million-to-support-relief-efforts-for-southern-california-wildfires-302359106.html

SOURCE First Citizens BancShares, Inc.

**VIEW ALL NEWS →**

Case 2:26-cv-02251-JLS-JDE   Document 61-70-2   Filed 06/30/26   Page 151 of 259 Page ID #:2467




FLASH SALE    **OFFER ENDS TOMORROW**

**Banking & Financial Services**

# First Citizens says Silicon Valley remains central to growth after SVB acquisition

✉  f  in  X  🖨  📰

- 🔗 Unlock URL

- 📋 Order Reprints

- 🎁 Gift this Article



A First Citizens Bank branch on Cowper Street in Palo Alto. The bank acquired Silicon Valley Bank in 2023 and plans to expand First Citizens branding across the region.

HENRI BOULANGER



By Mark Calvey – Senior Reporter, San Francisco Business Times
May 26, 2026   **Updated** May 26, 2026 2:29pm PDT

▶ **Preview this article**   1 min                        ᵈⁱᵈ|ᵈ

==The bank acquired Silicon Valley Bank in 2023== and is maintaining its focus on startups and the innovation economy. The SVB division will take on the First Citizens name later this year.

---

THE REMAINDER OF THIS ARTICLE IS RESERVED FOR SUBSCRIBERS

## Don't Stop Here — Continue Reading For $1 Per Week

Secure 4 weeks of award-winning news and trusted insights

### Subscribe for only $4

**SUBSCRIBE NOW**

Already have a paid subscription? **Sign in**

---

📅 **WEDNESDAY, JUNE 24, 2026**

## Women of Influence Awards 2026

SVBJ is once again shining a spotlight on women driving meaningful change in Silicon Valley.

**Register now**

---

### RELATED ARTICLES

- First Citizens retires SVB name

- Salinas lender profit climbs sharply

- Editor's Notebook: Leadership lessons from the pitch

# First Citizens Bank Purchases Office Building in San Francisco

RALEIGH, N.C., Nov. 19, 2025 /PRNewswire/ -- First-Citizens Bank & Trust Company ("First Citizens Bank"), the wholly owned banking subsidiary of First Citizens BancShares, Inc. ("BancShares") (Nasdaq: FCNCA), today announced the purchase of a downtown San Francisco building in support of the company's large and growing client base in the region. Located at 667 Mission Street in downtown San Francisco, First Citizens will renovate the office space with an expected move-in date in 2027.



The six-story building comprises more than 160,000 square feet, including an 8,000 square foot rooftop terrace and event space.  Once complete, First Citizens Bank expects to occupy a portion of the building and will also seek tenants.

"San Francisco is a key market within the innovation economy, and this latest acquisition is evidence of our ongoing commitment to being a part of the local ecosystem," said Marc Cadieux, President of Silicon Valley Bank, a division of First Citizens Bank. "We're thrilled to announce this investment that underscores First Citizens' long-term plans to grow in the Bay Area."

First Citizens' Silicon Valley Bank division has had a presence in San Francisco for more than 25 years serving investors and innovation economy companies. Today, First Citizens Bank in total has six branches in the Bay Area as well as Business, Commercial, and Wealth teams that provide a host of banking services for individuals and companies in many industries. The company has more than 500 associates in San Francisco and more than

Case 3:23-cv-02223-JSC Document 90-2 Filed 06/06/24 Page 154 of 259

Case 3:20-02223-JSC-EDE Document-90-2-Filed 06/06/20 Pagege 154 of 259 age

Pag0 ID17 2470

1,000 in the greater Bay Area. The Bank has been steadily growing its presence in the region, and recently announced a Northern California Market Leader for First Citizens Wealth, also based in San Francisco.

667 Mission Street marks First Citizens Bank's second commercial real estate purchase in the Bay Area this year, following the acquisition of a 43,000 square foot, mixed use building in Palo Alto, California in August, also expected to open in 2027.

**About First Citizens Bank**

First Citizens Bank helps personal, business, commercial and wealth clients build financial strength that lasts. Headquartered in Raleigh, N.C., First Citizens has built a unique legacy of strength, stability and long-term thinking that has spanned generations. First Citizens offers an array of general banking services with branches and offices nationwide; commercial banking expertise delivering best-in-class lending, leasing and other financial services coast to coast; innovation banking serving businesses at every stage; and a nationwide direct bank. Parent company First Citizens BancShares, Inc. (NASDAQ: FCNCA) is a top 20 U.S. financial institution with more than $200 billion in assets and a member of the Fortune 500™. Discover more at firstcitizens.com.

**About Silicon Valley Bank**

Silicon Valley Bank (SVB), a division of First Citizens Bank, is the bank of some of the world's most innovative companies and investors. SVB provides commercial banking to companies in the technology, life science and healthcare, private equity, and venture capital industries. SVB operates in centers of innovation throughout the United States, serving the unique needs of its dynamic clients with deep sector expertise, insights, and connections. SVB's parent company, First Citizens BancShares, Inc. (NASDAQ: FCNCA), is a top 20 U.S. financial institution with over $200 billion in assets. First Citizens Bank, Member FDIC. Learn more at svb.com

**Media Contact**

Katie Ellis

Kellis@svb.com

SOURCE First Citizens Bank

 CommercialCafe



**Commercial Real Estate News**    **Featured**    **Office**

# First Citizens Bank Expands Bay Area Footprint

December 1, 2025 by Ioana Ginsac

Share on

Raleigh, N.C.-based First Citizens Bank & Trust Company — a wholly owned banking subsidiary of First Citizens BancShares, Inc. — recently announced the acquisition of an office property in San Francisco. The new owner expects to occupy a portion of the building and will reportedly also seek tenants.

Located at 667 Mission St., the asset puts First Citizen Bank in the cultural heart of downtown and will support the company's growing client base across the region. The six-story building incorporates more than 160,000 square feet of San Francisco office space and features an 8,000-square-foot rooftop terrace and event space that's home to one of just a few roof gardens in downtown, as well as skylights and large windows opening up expansive views of the city in every direction.

The property is easily accessible within walking distance of several transit stations and stops, and is also within walking distance of more than 70 nearby retail and dining establishments, hotels, and attractions, such as SFMOMA, Yerba

Buena Center for the Arts, and the Yerba Buena Gardens.

"San Francisco is a key market within the innovation economy, and this latest acquisition is evidence of our ongoing commitment to being a part of the local ecosystem," said Marc Cadieux, president of Silicon Valley Bank, a division of First Citizens Bank. "We're thrilled to announce this investment that underscores First Citizens' long-term plans to grow in the Bay Area."

The deal marks the bank's second commercial real estate purchase in the Bay Area since the start of the year. The firm's previous Bay Area acquisition closed in August, when First Citizens Bank reportedly bought the 250 University Ave. building in Palo Alto, Calif., for $82 million. Working out to about $1,969 per square foot, the transaction harkened back to the price tags of office sales in hot markets prior to 2020.

First Citizens Bank is set to renovate the office space in both properties with 2027 as the delivery date for each.

# California Markets Remain Among Priciest in Country

At the start of November, year-to-date office sales in the Bay Area totaled nearly $4.4 billion with sales closing at an average of $386 per square foot. During that same time, office spaces changing hands in the San Francisco market claimed a total of nearly $1.2 billion at $279 per square foot, on average. Although these represented some of the highest values in the country, their combined $5.6 billion in sales still fell short of Manhattan, N.Y.'s tally of $6.4 billion, as well as its sale price average of $523 per square foot.

Both of these California markets saw vacancy rates above 20% in October, but nevertheless commanded some of the highest asking rents in the country: San Francisco office space asked an average of $65.30 per square foot (second only to Manhattan's $67.97 per square foot), while office space in the Bay Area asked $51.59 per square foot, on average (the fourth-priciest in the country in October).



## Ioana Ginsac

Senior Content Writer, Industry News & Reports

Ioana is a content writer who has been covering all-things-CRE (and more) for several Yardi network publications since 2017. You will find her byline regularly in industry news and market reports, but also on articles covering sustainable development, green urbanism, and innovation, all of which she has been passionately learning about for more than a decade. Her work has been referenced by publications including AmericanInno, Bisnow, BusinessInsider, Commercial Property Executive, Curbed, Fast Company, Forbes, GlobeSt.

# Recommended Articles

**First Citizens Bank**

# First Citizens Expands Middle Market Banking to Southwestern U.S.

RALEIGH, N.C.—First Citizens Bank today announced the expansion of its Middle Market Banking unit to support the financial needs and goals of midsize businesses across Southern California and the Southwest region.

The expansion follows the official launch, of First Citizens Middle Market Banking in the Southeastern U.S. in September and the First Citizens Bank merger in January with CIT Group, a leading commercial lender with long experience in serving the middle market.

First Citizens Middle Market Banking is now serving clients across the Southwestern and Southeastern regions with offerings including senior secured loans, cash-flow loans, capital markets services, foreign exchange capabilities, asset-based lending and treasury and payment services. The middle market target clientele covers companies with $75 million to $750 million in annual sales.

"First Citizens is proud to expand Middle Market Banking to provide best-in-class relationship banking support to even more business owners, entrepreneurs and family offices in the middle market segment," said Brendan Chambers, an experienced banking executive who leads the Middle Market Banking team.

"We're leveraging our talented and knowledgeable team, as well as capabilities acquired in our merger with CIT, to deliver exceptional service to our clients throughout their entire business life-cycle," Chambers said. "Our relationship banking model sets us apart in this space, and we're excited to help middle market businesses in the Southwest grow and prosper."

First Citizens Middle Market Banking delivers a range of financial solutions to midsize clients through a relationship banking model. The business offers deposit solutions, loans, treasury services and other banking products to manufacturers, distributors and a wide variety of service industries.

# First Citizens Wealth Expands California Bay Area Team, Appoints Lee Erby Region Head

RALEIGH, N.C., Nov. 12, 2025 /PRNewswire/ -- First Citizens Wealth, a division of First Citizens Bank serving individuals and institutions, today announced the appointment of Lee Erby as Northern California Market Leader. Based in San Francisco, he reports to Art Saldivar, Senior Director of Regional Wealth for California, and he will lead a team of wealth consultants.



Erby is responsible for growing a team serving the needs of high-net-worth individuals and families; the entrepreneurs, founders, investors behind the innovation economy; businesses and corporations; and nonprofits across Northern California.  First Citizens Wealth offers a full range of capabilities, including wealth planning, investment services, trust and fiduciary services, banking and lending.

"As a lifelong Bay Area resident, Lee has deep local ties, and shares our strong commitment to this community," said Art Saldivar, Senior Director of Regional Wealth for California. "We

are thrilled to pair his extensive leadership experience in wealth management with our deep expertise working with the individuals behind the innovation economy via the larger Silicon Valley Bank ecosystem. We are confident this will be a powerful combination that will help propel client success for generations to come and further advance our growth in the region."

Lee has more than 20 years of wealth and private banking experience serving high net worth families and institutions. He has held senior positions at Bank of America Private Bank, Merrill Lynch, and Citi Private Bank.

Lee is a graduate of California Maritime Academy with a degree in business administration and an MBA from Saint Mary's College of California.

First Citizens Bank has six branches in the greater Bay Area region, and First Citizens' Silicon Valley Bank division has had a presence in Northern California for more than 40 years. Today, First Citizens Bank has more than 1,000 employees across the Bay Area, including more than 80 First Citizens Wealth employees.

## About First Citizens Wealth

First Citizens Wealth offers a full range of financial planning, asset management, private banking, brokerage, investment advisory, insurance and trust services to individuals and institutional clients. Learn more at https://www.firstcitizens.com/wealth.

## About First Citizens Bank

First Citizens Bank helps personal, business, commercial and wealth clients build financial strength that lasts. Headquartered in Raleigh, N.C., First Citizens has built a unique legacy of strength, stability and long-term thinking that has spanned generations. First Citizens offers an array of general banking services with branches and offices nationwide; commercial banking expertise delivering best-in-class lending, leasing and other financial services coast to coast; innovation banking serving businesses at every stage; and a nationwide direct bank. Parent company First Citizens BancShares, Inc. (NASDAQ: FCNCA) is a top 20 U.S. financial institution with more than $200 billion in assets and a member of the Fortune 500™. Discover more at firstcitizens.com.

## Disclosures

First Citizens Wealth™ (FCW) is a marketing brand of First Citizens BancShares, Inc., a bank holding company. The following affiliates of First Citizens BancShares are the entities through which FCW products are offered. Brokerage products and services are offered through First Citizens Investor Services, Inc. ("FCIS") , a registered broker-dealer, Member **FINRA** and **SIPC**. Advisory services are offered through FCIS, First Citizens Asset

Case 2:20-02223-SLS-LDE Document 20-29 Filed 06/05/20 Page 160 of 259 Page ID #172476

Management, Inc. and SVB Wealth LLC, all SEC registered investment advisers. Insurance products and insurance are offered through FCIS, a licensed insurance agency. Banking, lending, trust products and services, and certain insurance products and services are offered by First-Citizens Bank & Trust Company, Member **FDIC**, and an Equal Housing Lender and SVB, a division of First-Citizens Bank & Trust Company.

All loans provided by First-Citizens Bank & Trust Company and SVB are subject to underwriting, credit, and collateral approval. Financing availability may vary by state. Restrictions may apply. All information contained herein is for informational purposes only and no guarantee is expressed or implied. Rates, terms, programs, and underwriting policies are subject to change without notice. This is not a commitment to lend. Terms and conditions apply. NMLSR ID 503941

Consulting services including overseeing plan design, investment fiduciary services, investment selection and monitoring, and continuous benchmarking are offered through First Citizens Bank and Trust Company.  First Citizens Wealth is a registered trademark of First Citizens BancShares, Inc.

**Media Contact**
Liz Shapiro
Elizabeth.shapiro@firstcitizens.com



SOURCE First Citizens Bank

First Citizens Bank

# First Citizens Wealth Launches New Wealth Advisory Team to Serve Individuals and Institutions in Southern California

LOS ANGELES, Sept. 13, 2023 /PRNewswire/ -- First Citizens Wealth today launched a new wealth advisory business with a team of advisors across Southern California to better serve individuals, families, and institutions in growing, managing, and preserving their wealth.



Led by regional executive Art Saldivar, a financial services veteran, the Southern California team consists of seven experienced financial professionals working from three separate offices serving the Los Angeles, San Diego and Orange County submarkets.

"Our wide array of financial products and services, combined with First Citizens' long-time focus on personalized service, is a perfect fit for the needs of savers and investors across Southern California," Saldivar said. "We are excited to begin our journey and look forward to establishing a premier wealth management provider in the region."

Having done business in the Southern California area for two decades, First Citizens today operates more than 60 branches statewide, most of them in the Southern California region, and has an active middle market banking and commercial lending practice across in the state.

In addition, First Citizens recently acquired assets and assumed deposits of Silicon Valley Bank (SVB)'s private and commercial banks, adding even more regional knowledge,

financial talent, and client relationships to the organization's portfolio.

With assets under management exceeding $50 billion, First Citizens has built one of the nation's leading wealth management practices with a relentless focus on high-touch, personalized customer service. More than 900 First Citizens Wealth associates deliver a broad range of financial products and expertise to clients from coast to coast.

"We look forward to introducing high net-worth individuals and institutional clients across Southern California to the unique blend of service and support that is making First Citizens Wealth one of the industry's top providers of financial services and guidance," Saldivar concluded.

First Citizens Wealth empowers clients with a comprehensive set of services and solutions to meet their unique and evolving needs. The team's holistic approach, goals-based strategy and personalized service help ensure clients can make smart decisions at every stage of their financial journey.

**About First Citizens Bank and First Citizens Wealth**

First Citizens Bank helps personal, business, commercial and wealth clients build financial strength that lasts. Headquartered in Raleigh, N.C., and now celebrating the 125th anniversary of its founding, First Citizens has built a unique legacy of strength, stability and long-term thinking that has spanned generations. First Citizens offers an array of general banking services including a network of more than 500 branches and offices in 30 states; commercial banking expertise delivering best-in-class lending, leasing and other financial services coast to coast; innovation banking serving businesses at every stage; and a nationwide direct bank. Parent company First Citizens BancShares, Inc. (NASDAQ: FCNCA), is a top 20 U.S. financial institution with more than $200 billion in assets.  Discover more at firstcitizens.com.

First Citizens Wealth Management is a registered trademark of First Citizens BancShares Inc. First Citizens Wealth Management products and services are offered by First-Citizens Bank & Trust Company, member FDIC, Equal Housing Lender; First Citizens Investor Services Inc., member FINRA and SIPC, an SEC-registered broker-dealer and investment advisor; and First Citizens Asset Management Inc., an SEC-registered investment advisor. Brokerage and investment advisory services are offered through First Citizens Investor Services, Inc. First Citizens Asset Management Inc. provides investment advisory services. Bank deposit products are offered by First-Citizens Bank & Trust Company.

**MEDIA RELATIONS:**
John M. Moran



SVB | Santa Clara, CA

# Fueling growth across the innovation landscape

==Silicon Valley Bank, a division of First Citizens Bank, is dedicated to the success of the innovators and investors shaping the future. Founded in 1983 in San Jose, California, we specialize in serving investors, technology and life science companies from Silicon Valley to Boston, New York to Los Angeles and beyond. We're backed by the strength and stability of First Citizens Bank, a 125-year-old institution, as we continue our more than 40-year legacy fostering growth in the innovation economy.==

We serve a diverse range of industries and clients of all sizes:

- **Innovation:** From pre-seed startups to large, publicly traded companies in technology, life sciences and healthcare sectors.

- **Investment funds:** Venture capital and corporate venture


**First Citizens Bank**

# First Citizens Bank Chairman and CEO Frank B. Holding Appointed to Federal Reserve Board of Governors' Federal Advisory Council

RALEIGH, N.C., Feb. 10, 2026 /PRNewswire/ -- First-Citizens Bank & Trust Company ("First Citizens Bank"), the wholly owned banking subsidiary of First Citizens BancShares, Inc. (Nasdaq: FCNCA), announced today that Chairman and CEO Frank Holding has been appointed to the Federal Reserve Board of Governors' Federal Advisory Council (FAC) for 2026. Holding will represent the Fifth District on behalf of the Federal Reserve Bank of Richmond.



The FAC, which comprises 12 representatives of the banking industry, one from each Federal Reserve District, consults with and advises the Board of Governors of the Federal

**FIRST CITIZENS BANCSHARES, INC.**
**FIRST-CITIZENS BANK & TRUST COMPANY**

**CHARTER OF THE**
**JOINT RISK COMMITTEE**

**April 29, 2025**

This Charter sets forth the composition, authority, duties, and responsibilities of the joint Risk Committee (the "Committee") of the Board of Directors of First Citizens BancShares, Inc. (the "Corporation") and the Board of Directors of First-Citizens Bank & Trust Company (the "Bank" and together with the Corporation, the "Companies").

**Purpose**

The Committee is established as a joint committee of the Boards of Directors of the Corporation and the Bank (collectively, the "Boards"). The purpose of the Committee is to assist the Boards in their oversight of management's responsibility to: (a) implement the Companies' Risk Management Framework, including the policies, procedures, practices, and resources employed by the Companies reasonably designed to manage and assess their major risks and the governance structure that supports it; (b) implement the Companies' risk appetite statement ("RAS") and risk appetite framework ("RAF"); and (c) identify, plan for, respond to, and escalate the major risks that are inherent to the Companies' business activities including, without limitation, capital adequacy, compliance, credit, liquidity, market, operational (including technological), and strategic risks and the control processes with respect to such risks.

**Composition and Appointment**

The Committee will consist of at least three members who will be appointed annually by the Boards. Members of the Committee will serve at the pleasure of, and may be removed at any time by, the Boards. The Boards will appoint at least one of the members of the Committee to serve as Committee Chair. The Chair will be a director of the Companies who is determined to be independent director, as determined in the judgement of the Boards, under applicable laws, rules, and the listing standards adopted by The Nasdaq Stock Market (the "Nasdaq Listing Standards"). Each Committee member must (i) be a member of the Board of Directors of both the Corporation and the Bank and (ii) satisfy all other applicable requirements of law, rules, regulations, or other requirements of governmental or regulatory bodies (including, but not limited to, the Securities Regulations and laws and regulations applicable to financial institutions), all as in effect from time to time and applicable to Committee membership. "Securities Regulations" means, collectively, the following to the extent they are applicable to the Corporation and/or the Bank: (i) the Securities Exchange Act of 1934, (ii) the Sarbanes-Oxley Act of 2002, (iii) the regulations adopted by the Securities and Exchange Commission, and (iv) the Nasdaq Listing Standards, each as amended from time to time.

At least one Committee member will, in the judgement of the Boards, have experience in identifying, assessing, and managing risk exposures of large complex financial firms, and all members will have an understanding of relevant risk-management principles and practices.

**Meetings**

The Committee will meet at least once every quarter and may meet more frequently as the Committee and/or its Chair may consider necessary and when requested to meet by the Chair of the Boards or by

Internal

significant changes.

**F. Compliance Risk Oversight.** In performing compliance risk oversight, the Committee will:

1. Receive and review management reports related to compliance risk, including but not limited to Bank Secrecy and anti-money laundering risk.

2. Review and monitor the Compliance Risk Management Program, as well as the results of Compliance Monitoring Reviews and any related action items.

**G. Operational Risk Oversight.** In performing operational risk oversight, the Committee will:

1. Receive and review management reports related to the Companies' operational risk exposures, including but not limited to those attributable to financial loss or harmful reputational impacts resulting from inadequate or failed internal processes, people, and systems or technology or from external events.

2. Approve the Third-Party Management Policy. At least annually receive and review a Third-Party Management program update.

**H. Other Responsibilities**

1. Conduct a self-evaluation of the Committee's performance, at least annually, in coordination with the Joint Compensation, Nomination and Governance Committee of the Boards ("CNG Committee"), to include a review of the Committee's composition, responsibilities, structure, processes, and effectiveness, and report the results of the self-evaluation to the Boards.

2. Review and assess the adequacy of this Charter at least annually and recommend through the CNG Committee any proposed changes to the Boards for consideration.

**Authority**

The Committee is authorized to perform each of its duties and responsibilities set forth in this Charter, and to undertake such other duties and responsibilities within the scope of its primary functions outlined above as the Committee or the Boards may from time to time deem necessary or appropriate. The Committee also is authorized to, as it considers appropriate:

- Seek any information it requires from the Companies' employees, all of whom are directed to cooperate with the Committee's requests, or from external parties.

- Delegate any of its responsibilities to subcommittees or individual members of the Committee to the extent not inconsistent with other sections of this Charter or applicable laws or regulations.

- At its discretion and without the prior approval of management or the Boards, retain or obtain the advice of outside consultants or advisors (including legal counsel and other advisors), at the expense of the Companies, in accordance with procedures established from time to time by the Boards, and oversee and approve all terms of the engagement of such consultants or advisors, including, but not limited to, their fees or other compensation.

- Conduct such investigations and request and consider such information (from management or otherwise) as the Committee considers necessary, relevant, or helpful in its deliberations and

the formulation of its recommendations. In connection with any such investigation, the Committee may rely on information provided to it by management without further verification.

- Consult to the extent it deems appropriate with the Chair of the Boards, CEO of the Companies (if the Chair is not also the CEO), other officers or employees of the Companies, the Lead Independent Director (if a Lead Independent Director has been elected), and other directors.

- Certain matters within the scope of the Committee's oversight responsibilities also may fall within the scope of the oversight responsibilities of other committees of the Boards (such as the Audit Committee or the Compensation, Nominations and Governance Committee). To minimize the duplication of time and effort, the Committee may defer to those other committees with respect to such specific matters, but it will consult with, and may request reports or information from, those other committees in order to ensure that such matters are adequately addressed as part of the Companies' Risk Management Framework.

*[Remainder of page intentionally left blank]*



# First Citizens Code of Ethics

**February 7, 2025**

Approved by the Board of Directors on February 4, 2025



# Chairman's Message

At First Citizens, we make a simple promise: We will always live and work by the values that have been our hallmarks since the day we opened our doors.

While the past few years have been a transformational period for First Citizens given the transactions with CIT and Silicon Valley Bank, our relationship-based, client-centered approach focused on the long term remains as it has for more than a century. We put our clients first, embrace differences, respect and have empathy for one another, collaborate as a team and are forward thinking. These values unite our associates and guide them as they provide a positive experience for our clients, colleagues and communities.



When we live by these values, our culture really comes alive. While our Code of Ethics can't cover every potential situation you might face as a First Citizens associate, it's a great resource when you have questions, and certainly a worthwhile – and important – annual read.

We take the Code of Ethics seriously. That's why we ask you each year to acknowledge that you've read it, understand it, and will comply with it. If you have questions about anything you read in the Code, please contact your manager or your Human Resources partner.

Frank B. Holding Jr.
Chairman and Chief Executive Officer



# Introduction

## 1.1    Purpose and Scope

<mark>This Code of Ethics (Code) applies to all associates, including officers, of FCB and its direct and indirect subsidiaries and directors of First Citizens BancShares, Inc. (subject to the Board of Directors Supplement)</mark>

While this Code applies to all associates, those associates who are associated persons of the First Citizens broker-dealers or registered investment advisors must also comply with the provisions of their respective codes and policies specific to their responsibilities, which may be more restrictive in acceptable activities.

In addition, the FC India Code of Ethics Supplement applies to all FC Global Services India LLP associates.

First Citizens' continued success depends upon maintaining our reputation as a company of integrity. Our reputation in turn depends on your personal commitment to the highest professional standards of conduct and integrity, and your careful compliance with the spirit and letter of all laws and regulations both on the job and in your personal affairs. You have a duty to First Citizens, our customers and our shareholders to always act in a manner that ensures the continued trust and confidence of our customers, your fellow associates, our vendors and business partners, and the public. You must comply with all laws and regulations applicable to your role at First Citizens and avoid the perceived appearance or suspicion of wrongdoing, conflict of interest, or other improper conduct.

<mark>As part of our risk culture, you are expected to own and manage risks within defined areas of responsibility, considering risks to business strategy, operational risks, and risks associated with protection of First Citizens' reputation in accordance with the Risk Appetite Statement established by the Board of Directors (the "Board") and First Citizens' Risk Management Framework.</mark>

While common sense and good judgment will generally guide you to do the right thing, it is important that you understand and follow certain standards of conduct that apply particularly to our business. This Code addresses not only standards for your conduct on the job, but also standards for your conduct outside First Citizens and, in certain cases, standards that affect members of your family.

Please note that this Code is not intended to preclude or dissuade associates from engaging in activities protected by state or federal law, such as discussing wages, benefits, or other terms and conditions of employment, reporting potential violations of law, or raising complaints about working conditions for themselves or other associates.

## 1.2   Definitions

As used in this Code, unless otherwise specified:

- <mark>First Citizens BancShares, Inc. (BancShares) is a Delaware corporation registered as a financial holding company. BancShares has various subsidiaries including First-Citizens Bank & Trust Company and all of its respective direct and indirect subsidiaries. For ease of reference, the terms "First Citizens," "the bank," "the</mark>



# Introduction, cont.

<mark>company" and similar terms used throughout the Code refer to BancShares, and any of its direct or indirect subsidiaries.</mark>

- "First Citizens' associates" or "associates" includes all First Citizens' employees.

- "Immediate family" (including stepfamily members and in-laws): Parents, spouse, domestic partner, children (including the biological, adopted, or foster children of your spouse or domestic partner), siblings, grandparents, and grandchildren, and any other member of the associate's household.

- "Affiliates" include your immediate family members and businesses or other entities (including corporations, limited liability companies, partnerships, trusts, and estates) with respect to which you are a director, officer, member, partner, large equity owner, or trustee, or of which you otherwise have control.

- "Business Partners" include existing or prospective customers, associates, contingent workers, vendors, suppliers, or anyone else doing business with First Citizens.

- "Disciplinary Action" includes any of the possible consequences: oral warnings, written warnings, demotion, or other adverse employment actions including unpaid disciplinary leave or termination of employment, based on the severity of the behavior and/or performance issue. Associate discipline may not be limited to a progressive process.

- "Governance Documents" refers to all First Citizens' policies, standards and procedures to which associates are subject.



# Speak Up Culture

## 2.1 Duty to Report

It is the responsibility of all First Citizens associates to report ethical concerns or inappropriate business practices including acts of dishonesty, fraud, or other illegal activities. Reporting ethical concerns aligns with our values and demonstrates personal integrity and accountability. You must promptly report:

- Any act or omission you know or suspect to be illegal, dishonest, fraudulent, or unethical that may affect or involve First Citizens;

- Any act or omission you know or suspect to be in violation of this Code of Ethics or any First Citizens' Governance Documents to which you are subject; and

- Any concerns, complaints, or activities that are inconsistent with this Code or any First Citizens' Governance Documents, including, but not limited to questionable accounting, auditing matters, or sales practices.

Retaliation for reporting a concern is strictly prohibited and subject to Disciplinary Action. Refer to the additional information in the Anti-Retaliation section in this Code and in the Whistleblower Standards (IRIS > Manuals and Policies > Compliance).

All First Citizens' associates may make these reports to:

Your manager;

- Human Resources using the HR Portal (HR Help > HR Policies & Standards > Report a Concern) or in India contact your Human Resources Business Partner (HRBP) or Employee Relations (ER) team;

- EthicsPoint, the company's **anonymous** reporting hotline, using any of the following methods:
  - Internet
    https://secure.ethicspoint.com/domain/media/en/gui/14505/index.html
  - Telephone 1.800.UREPORT (1.800.873.7678) or in India 022 7127 9195
  - Scan this QR code:



Nothing prohibits an associate from reporting potential misconduct or noncompliance with laws and regulations by First Citizens directly to the applicable regulatory bodies or government agencies or authorities.



# Speak Up Culture, cont.

## 2.2    Who to Contact When in Doubt

It is impossible to address in this Code every situation that you may encounter. However, if a situation arises where it is difficult to determine the right choice or action or you feel you are being pressured to act improperly, discuss the matter at once with your manager. If you are uncomfortable discussing the situation with your manager or after the discussion are still uncomfortable with the situation, contact Human Resources using the HR Portal (HR Help > HR Policies & Standards > Report a Concern) or in India contact your HRBP or ER team.

Your report should be as detailed as possible including dates and times of events, names of witnesses, and other supporting evidence. When you make a report, you may choose to remain anonymous by reporting via EthicsPoint. Depending on the matter reported, investigation of a suspected violation may not be possible or may be very limited unless the person reporting the matter discloses their identity. If you make your identity known, investigators will take every reasonable precaution to keep your identity confidential, consistent with conducting a thorough and fair investigation.

Because we strive to maintain confidentiality in investigations, we may not be able to inform you of the outcome of an investigation. As detailed below, any associate who in good faith reports or assists in any investigation into a violation of the Code may do so without fear of harassment, retaliation, coercion, interference, or intimidation.



# Associate Responsibilities

## 3.1    Required Disclosures and Approvals

As indicated below, you may be required to disclose in StarCompliance and obtain approval of your participation in covered activities. Disclosure and approval as outlined below are necessary to help prevent even the perceived appearance of a conflict of interest, avoid legal or other exposure, and provide you guidance on the appropriateness of your participation in the activity.

If you are in doubt as to whether an activity or relationship requires written disclosure under this Code, you should complete and submit the appropriate disclosure for review. The disclosure review and approval process by Conduct Risk Compliance is usually provided within a week after management approval. Newly hired associates must disclose participation in covered activities within 30 business days after the employment start date. Existing associates must disclose and wait for approval prior to engaging in outside activities.

## 3.2    Violations of this Code

Your failure to meet the expectations and requirements described in this Code may result in Disciplinary Action, and, if you are a director, a request that you resign from the Board . Any determination regarding whether an associate has violated this Code will be based upon the facts and circumstances of the particular situation. If you are accused of violating this Code, you will be given an opportunity to present your version of the events at issue prior to any determination of appropriate discipline. Conduct that violates applicable criminal and civil laws could also subject you to personal fines and/or imprisonment.

## 3.3    Investigations and Litigation

If it is necessary for First Citizens or outside parties to undertake investigations into possible violations of law, regulations, or of First Citizens' Governance Documents to which you are subject, associates are expected to answer inquiries truthfully and to disclose all potentially relevant facts. Knowingly withholding, deleting, or destroying pertinent information, making a false accusation or statement to an investigator, or interfering or refusing to cooperate in a First Citizens' investigation will be considered a violation of this Code.

If you are subpoenaed to act as a witness at a trial or deposition on behalf of First Citizens or in a matter involving First Citizens, promptly follow the instructions found on the company's Internal Resource and Information Site (IRIS) at Legal Central for forwarding legal notices and notify your manager, who will engage Human Resources and others as necessary.

Nothing in this Code prohibits or limits any associate from initiating communications directly with, responding to any inquiry from, volunteering information to, or providing testimony before, the Department of Justice, the U.S. Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), any other self-regulatory organization, or any other governmental, law enforcement, or regulatory authority, in connection with any reporting of, investigation into, or proceeding regarding suspected violations of law, and no associate is required to advise or seek permission from First Citizens before engaging in any such activity.



# Safe Work Environment

## 4.1  Governing Documents

The company's Human Resources policies and standards described in this section are available in full in the Human Resources Policies & Standards Manual (IRIS > Manuals and Policies > Human Resources) or the HR Portal homepage under Quick Links.

## 4.2  Equal Employment Opportunity and Inclusion

First Citizens is an equal opportunity employer, committed to providing equal employment opportunities to associates and applicants, and to maintaining a diverse, equitable, and inclusive workforce free of discrimination, harassment, retaliation, coercion, interference, and intimidation. First Citizens hires well-qualified people to perform the many tasks necessary to provide high quality products and services to our customers.

An integral part of this process is to provide equal employment opportunity for all persons by administering recruitment, hiring, training, promotion, compensation, benefits and privileges of employment, appointments for advancement (including upgrading and promotion), transfers, relocations, social and recreation programs, Disciplinary Actions, and terminations of employment (including layoffs and recalls) for all associates without discrimination because of race (including traits historically associated with race, such as hair texture and protective hairstyles), color, religion, national origin, sex, age, disability, protected veteran status, sexual orientation, gender identity, genetic information, military membership, application, or obligation, or any other legally protected status established by applicable federal, state, or local laws.

To further the principle of equal employment opportunity at First Citizens, all employment decisions are based only on valid job-related requirements. For full details, refer to the Equal Employment Opportunity Policy and Standards, and the Inclusion Policy and Standards.

## 4.3  Anti-Harassment

First Citizens prohibits any form of sexual or other unlawful harassment involving any of its associates in the employment relationship. Harassment, discrimination, retaliation, coercion, interference, or intimidation of an associate due to the associate's race (including traits historically associated with race, such as hair texture and protective hairstyles), color, religion, national origin, sex, age, disability, protected veteran status, sexual orientation, gender identity, genetic information, military membership, application, or obligation, protected activity (e.g., opposition to prohibited discrimination), or any other legally protected status established by applicable federal, state, or local laws, or that of an associate's relatives, friends, or connections, is strictly forbidden.

This prohibition covers not only the relationships between associates of the company, but also each associate's relationships with Business Partners or with employees of other companies encountered in the course of performing the duties of the associate's job. This includes, but is not limited to, activities on First Citizens' property or systems, during remote work or business travel, at company-sponsored events, or otherwise in connection with company business. For full details, refer to the Sexual and Other Unlawful Harassment Policy and Standards.



# Safe Work Environment, cont.

## 4.4    Anti-Retaliation

First Citizens prohibits any retaliation against any associate who, in good faith, seeks help or reports known or suspected violations of this Code, any law or regulation, or any other policy or standard to which they are subject. The company also prohibits retaliation against any associate who assists or participates in an investigation, proceeding, or hearing, or exercises any right protected by law. Any reprisal or retaliation against an associate because the associate in violation of these standards will be subject to Disciplinary Action.

Retaliation is any negative action that would deter a reasonable associate from making a complaint. Retaliation may include demotion, discipline, termination, salary reduction, a negative performance evaluation, a change in job assignment, or a change in shift assignment, among other things. Retaliation can also include hostile behavior or attitudes.

If you believe that you are the subject of retaliatory action for having reported a matter under this Code or any other policy or standard to which you are subject, you should promptly report the matter following the procedures in this Code so that it can be investigated and addressed promptly and appropriately. Submitting reports that you know to be false or to lack any basis is improper conduct, not in good faith, and is not protected. For full details, refer to the Sexual and Other Unlawful Harassment Policy and Standards.

## 4.5    Weapons-Free Workplace

First Citizens provides a safe, healthy, and secure environment for associates, contingent workers as defined in the Human Resources Policies and Standards Manual, vendors, customers, and other individuals who visit our workplaces. As such, First Citizens is a weapons-free workplace and you are not permitted to bring weapons into company facilities. Such weapons or devices include but are not limited to all types of firearms, knives, dangerous chemicals, explosives including blasting caps, chains, and other objects carried for the apparent purpose of injuring or intimidating others. For full details, refer to the Safe Workplace Standards.



# Integrity: Vital to Success, cont.

If you have questions regarding the above information and prohibitions, their application to any proposed transaction, or the laws that apply to a transaction, please contact the Control Room at ControlRoom@svb.com.

## 6.9    First Citizens' Financial Reporting and Records

First Citizens must have honest and accurate information to ensure responsible business decisions and to meet its disclosure obligations to its shareholders and regulators. First Citizens is committed to ensuring full, fair, accurate, timely, and understandable disclosures in any periodic reports that it submits to any regulatory agencies and in its public communications. Accordingly, First Citizens' books and records must:

- Be accurately maintained;

- Accurately reflect First Citizens' financial position, results of operations, and cash flows; and

- Conform to both applicable legal requirements and First Citizens' internal controls and procedures.

Prompt reporting is required of any fraud (material or not) involving associates who have a significant role in the Company's internal controls over financial reporting or any observed or perceived violations of this Code, inaccurate financial reporting, public communications, or any questionable accounting or financial practices. Refer to the Duty to Report section in this Code for reporting options.

You must ensure that First Citizens' records for which you are responsible (including records of sales results, expense reports, and compensation) fully and accurately disclose the underlying facts. First Citizens' records also include time and attendance records, expense reports, and submissions such as benefits claim forms and resumes/applications, etc. Any intentional manipulation or misrepresentation of information in, or omission of material information from, First Citizens' records is prohibited. All First Citizens' records must be maintained in accordance with the applicable records management policies and procedures located (IRIS > Manuals & Policies > Compliance). All transactions with which you are involved must be properly and accurately recorded.

## 6.10  Repossessions, Foreclosures and Other Sales by First Citizens

In the normal course of its business, First Citizens may engage in the buying or selling of real estate or personal property in connection with foreclosures or repossessions or in its capacity as trustee, executor, or in some other fiduciary capacity where First Citizens is acting in a position of trust for another.

To avoid any question of First Citizens' integrity in conducting those transactions, sales to or purchases from associates and/or members of their immediate families are generally prohibited. You may not knowingly, directly or indirectly, buy or sell any property from or to any estate, trust, or other fiduciary relationship administered by First Citizens, including, but not limited to, purchases at an estate sale or foreclosure by the bank. Exceptions may be made in situations where no undue advantage arises from the associate's, and/or



# Closing Guidance

## 8.1  Amendments

The Code may be amended at any time as changes in law or circumstance require. Likewise, all other First Citizens' policies and procedures are subject to modification and discontinuance at any time. Although First Citizens will try to inform associates of any substantive changes as they occur, such changes may be implemented with or without prior notice. Changes to this Code and other First Citizens' policies, standards, and procedures to which you are subject will be effective on dates determined by First Citizens and associates may not rely on policies, standards, procedures or benefits that have been superseded. The most current version of this Code is published on IRIS (Manuals & Policies) and supersedes all prior versions.

## 8.2  Conclusion

While this Code is not exhaustive, it reflects the values of First Citizens and provides guidance to assist you with your responsibilities as an associate.

First Citizens takes these requirements very seriously. Failure to meet your responsibilities as outlined in this Code, First Citizens' Governance Documents to which you are subject, and applicable laws and regulations may result in Disciplinary Action, personal fines, and imprisonment.

As a First Citizens associate, your obligations under the Code include, but are not limited to, the following:

- Reading and complying with the Code and the related Governance Documents;

- Upon First Citizens' request, confirming in writing that you have received and read the Code and related policies and standards and that you comply with their provisions;

- Completing annual Learning about the Code of Ethics training;

- Ensuring that any required disclosures are submitted and approvals are obtained;

- Helping ensure that First Citizens complies with all applicable laws, rules, and regulations; and

- Reporting conflicts of interest, illegal or unethical activities in the workplace, and potential violations of the Code, so that issues can be addressed promptly and appropriately.

Effective February 7, 2025

Non-material updates made to section 4.2 after board approval on 04/28/2025.



# Board of Directors Supplement

## 9.1    Introduction

In addition to the standards previously outlined in the Code, each Director shall adhere to additional principles applicable to the Board. While the Board does not manage the company's day-to-day operations and cannot guarantee the company's success, it must oversee the company's policies and operations to help ensure safe and sound practices. In carrying out such responsibilities to the company and its shareholders, Directors will:

- Be honest and ethical;

- Ethically resolve all actual and apparent conflicts of interests;

- Strive to ensure that the Company makes full, fair, accurate, timely and understandable disclosures in reports and documents that BancShares files with the Securities and Exchange Commission ("SEC") and in its other public communications;

- Strive to ensure the Company's compliance with applicable laws, rules and regulations;

- Promptly report any illegal or unethical conduct or violations of this Code to the Board's Compensation, Nominations and Governance Committee; and

- Promptly report any accounting or audit concerns regarding the Company's books, records or financial statements and reports to the Audit Committee

The Board believes this Supplement represents an evolving set of principles to guide the conduct of Directors. The Supplement, as well as the Code, may therefore be modified by the Board from time to time, as circumstances warrant.

## 9.2    Reporting Ethics Violations

*Conflicts of Interest Reporting*

Any personal interest of a Director that may be perceived as being in competition with the company, or as potentially affecting or appearing to affect the Director's ability to exercise independent judgment in a Board decision or in the performance of the Director's duties, must be promptly disclosed to the Compensation, Nominations and Governance Committee, the Executive Committee, or the full Board of Directors. In Board actions in which the Director's independent judgment might be affected, the Director should abstain from participation and voting. Prompt and full disclosure to the Compensation, Nominations and Governance Committee, the Executive Committee or the full Board of Directors is always the proper first step in resolving any real or potential conflict of interest. The Compensation, Nominations and Governance Committee has primary responsibility for reviewing the relevant facts and determining whether the conflict is both real and material. If a conflict is both real and material, the conflict may be waived, but only if the proposed activity or the Director's participation will not substantially harm the company's interests. The Chairman of the Compensation, Nominations and Governance Committee will notify and consult with the Chairman of the Audit Committee with respect to any conflicts of interest that involve or may involve accounting or audit matters.

25



# Board of Directors Supplement, cont.

These conflicts policies are related to, but distinct from, the company's Related Person Transaction Policy. Directors must additionally comply with the requirements of the Related Person Transaction Policy, where applicable.

*Books and Records; Financial Reporting*

A Director who becomes aware of, or suspects, any material inaccuracy, misstatement, or omission of information in the company's books, records, accounts or financial statements, or in any filing, report or public release, should immediately disclose that fact or suspicion to the Audit Committee and, if applicable, to the company's independent auditors and legal advisors.

*Other Internal Reporting*

Directors should report any illegal or unethical behavior by associates, officers or Directors or violations of this Code to the Compensation, Nominations and Governance Committee, and any accounting or audit concerns to the Audit Committee. The report may be made through the Committee Chairman or to any Committee member and may be made anonymously. Directors are expected to cooperate in the internal investigations of any such issues and concerns. If an issue or concern has been reported to a Committee without reasonable resolution or investigation, the matter should be reported to the company's legal advisors.

## 9.3    Accountability

Any determination regarding whether a Director has violated this Code will be based upon the facts and circumstances of the particular situation. If a Director is accused of violating this Code, he or she will be given an opportunity to present his or her version of the events at issue prior to any determination regarding whether a violation has occurred. The Board will take appropriate action in the event that a Director is found to have violated the terms of this Code, which such action may include requesting such Director to resign from the Board

## 9.4    Insider Trading

All Directors are considered to be insiders of the company and are subject to various federal securities laws which apply to transactions by insiders in the company's stock. Directors are also subject to blackout periods and may only trade during applicable trading windows as notified to them by the company's Legal Department.

Effective February 7, 2025

Non-material updates made to section 4.2 after board approval on 04/28/2025.

Case 2:26-cv-02251-JLS-JDE    Document 70-9    Filed 06/05/26    Page 181 of 259
Page ID #:2492
Case 2:26-cv-02251-JLS-JDE    Document 43    Filed 04/23/26    Page 3 of 3    Page ID
#:953

## PROOF OF SERVICE

## STATE OF CALIFORNIA COUNTY OF LOS ANGELES

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 10250 Constellation Blvd., Los Angeles, California 90067.  On April 23, 2026, I served the within document as follows:

## DEFENDANTS' CORPORATE DISCLOSURE STATEMENT

☒  **(By Mail)**: As Follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing to the person(s) at the address(es) set forth below. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

Jared Ashcraft

PO Box 363242

North Las Vegas, NV 89036

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

  Executed on April 23, 2026, at Los Angeles, California.


/s/ Shamina Albano

Shamina Albano

DEFENDANTS CORPORATE DISCLOSURE STATEMENT
CASE NO. 2:26-CV-02251-JLS-JDE

**FIRST CITIZENS BANCSHARES, INC.**

**FIRST-CITIZENS BANK & TRUST COMPANY**

**CHARTER OF THE JOINT AUDIT COMMITTEE**

**April 29, 2025**

This Charter sets forth the composition, authority, duties, and responsibilities of the joint Audit Committee (the "Committee") of the Board of Directors of First Citizens BancShares, Inc. (the "Corporation") and the Board of Directors of First-Citizens Bank & Trust Company (the "Bank" and together with the Corporation, the "Companies").

**Purpose**

The Committee is established as a joint committee of the Boards of Directors of the Corporation and the Bank (collectively, the "Boards"). The Committee is responsible for (i) oversight of the Companies' financial reporting and internal controls related to finance and accounting, (ii) the appointment, compensation, and oversight of the independence and performance of the Companies' independent auditors, (iii) oversight of the Companies internal audit function and audit plans, (iv) review and approval of Related Person Transactions, and (v) review and approval of policies of the Companies and the Boards related to the foregoing. The Committee will have such other purposes, and such specific duties and responsibilities, as are described in this Charter or as may be assigned to it from time to time by the Boards of Directors.

**Composition and Appointment**

The Committee will consist of at least three members who will be appointed annually by the Boards. Members of the Committee will serve at the pleasure of, and may be removed at any time by, the Boards. The Boards will appoint one of the members of the Committee to serve as Committee Chairman. Each Committee member must (i) be a member of the Board of Directors of both the Corporation and the Bank, (ii) be an independent director, as determined in the judgment of the Boards, under the listing standards adopted by The Nasdaq Stock Market (the "Nasdaq Listing Standards"), including those applicable to members of the Committee, (iii) be able to read and understand fundamental financial statements, in the judgment of the Boards, and (iv) satisfy all other applicable requirements of law, rules, regulations, or other requirements of governmental or regulatory bodies (including, but not limited to, the Securities Regulations and laws and regulations applicable to financial institutions), all as in effect from time to time and applicable to Committee membership. "Securities Regulations" means, collectively, the following to the extent they are applicable to the Corporation and/or the Bank: (i) the Securities Exchange Act of 1934, (ii) the Sarbanes-Oxley Act of 2002, (iii) the regulations adopted by the Securities and Exchange Commission ("SEC"), and (iv) the Nasdaq Listing Standards, each as amended from time to time. No Committee member will simultaneously serve on the audit committees of more than two other public companies.

At least one Committee member must, in the judgment of the Boards, be an "audit committee financial expert," in accordance with the rules and regulations of the SEC. At least two members of the Committee (one of whom may also serve as the audit committee financial expert) must, in the judgment of the Boards, have banking or related financial management expertise required by the Federal Deposit Insurance Corporation Improvement Act of 1991 and applicable rules and regulations thereunder. At least one member of the Committee must have past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background which

is sufficient to comply with applicable requirements of the Nasdaq Listing Standards.

**Meetings**

The Committee will meet at least once every quarter and may meet more frequently as the Committee and/or its Chairman may consider necessary and when requested to meet by the Chairman of the Boards or by the Lead Independent Director (if a Lead Independent Director has been elected). Dates, times and locations of meetings will be determined by the Committee or its Chairman. A majority of the number of regular members then serving on the Committee will constitute a quorum. The Committee will determine who, if anyone, other than Committee members may be present during its deliberations or voting. The Committee will keep minutes of its meetings and, following each Committee meeting, the Chairman will make a report at the next scheduled meeting of the Boards regarding the deliberations of or actions taken by the Committee. The Committee will meet separately and independently, on a periodic basis, with management, the Companies' in-house or outside legal counsel, internal auditors, and independent auditors, as appropriate. The Committee will have access to its own outside counsel at its discretion without prior permission of the Boards or management. It will also meet periodically in executive session.

**Responsibilities**

The Committee will carry out the following duties and responsibilities:

**A. General**

1. Monitor the integrity of the financial reporting process and systems of internal controls of the Companies regarding finance, accounting, and associated legal compliance, including compliance with applicable accounting policies.

2. Have direct access to, and complete and open communication with the independent auditors, management, the Internal Audit Department, and the Boards.

3. Monitor the Companies' compliance with requirements of law, rules, regulations or other requirements of governmental or regulatory bodies (including, but not limited to, the Securities Regulations and laws and regulations applicable to financial institutions) to the extent such requirements affect accounting and financial processes and reporting, internal controls, and auditing matters.

4. Annually, review the First Citizens Code of Ethics; recommend to the Boards any changes to the Code of Ethics as the Committee may from time to time consider necessary or advisable; and oversee management's processes and procedures for enforcement of the Code of Ethics, including that any waivers for directors and executive officers are presented to the Boards for approval.

**B. Financial Statements**

1. Review and discuss with management and the independent auditors significant accounting and financial reporting issues, including:

   - All critical accounting policies and practices to be used;

   - All alternative treatments of financial information under generally accepted accounting principles ("GAAP") that have been discussed by the independent auditors with

management, ramifications of the use of such alternative treatments, and the treatment preferred by the independent auditors;

- Other written material communications between the independent auditors and management; and

- The effect of regulatory and accounting initiatives, including, but not limited to, off-balance sheet structures, on the financial statements.

2. Review and discuss analyses, including the Allowance for Credit Losses, prepared by management and/or the independent auditors setting forth significant financial reporting issues, complex or unusual transactions, and highly judgmental determinations made in connection with the preparation of the financial statements, including analyses of the effects of pro forma and alternative GAAP methods on the financial statements, press releases and presentations.

3. Review and discuss the Corporation's annual audited and quarterly unaudited financial statements with management and the independent auditors, including reviewing the Corporation's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Corporation's Form 10-K or Form 10-Q.

4. Review and discuss disclosures made by the Chief Executive Officer and the Chief Financial Officer during the Forms 10-K and 10-Q certification process about any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting or any fraud that involves management or other employees who have a significant role in the Corporation's internal controls.

5. Review, discuss and approve on behalf of the Corporation's Board of Directors the quarterly earnings press releases.

6. In connection with the annual audit of the Corporation's consolidated financial statements and the filing of its Form 10-K:

- Discuss with the independent auditors the critical audit matters required to be discussed by the Public Company Accounting Oversight Board;

- Receive written disclosures and the letter from the independent auditors required by applicable requirements of the Public Company Accounting Oversight Board, and actively engage in a dialogue with the independent auditors regarding their independence, including any disclosed relationships or services that may impact their objectivity and independence; and

- Based on its review of the Corporation's consolidated financial statements with management and the independent auditors, and the additional discussions described above, recommend to the Corporation's Board of Directors whether the financial statements be included in the Form 10-K.

## C. Internal Controls

1. Review, discuss and evaluate with management:

- The Companies' internal control over financial reporting;

- Any significant deficiencies in the design or operation of internal controls, which could adversely affect the Companies' ability to record, process, summarize and report financial data, and any material weaknesses in internal controls, disclosed by management to the Committee or the Companies' independent auditors; and

- Any fraud, whether or not material, that involves management or other employees who have a significant role in the Companies' internal controls.

## D. Internal Audit

1. Review with the Chief Internal Audit Officer the plans, budget, activities, staffing, risk assessment methodology and organizational structure of the Internal Audit function, and approve the Audit Plan, budget, and risk assessment methodology for each year and any significant changes to the Audit Plan, budget and risk assessment methodology as considered necessary or advisable.

2. Annually, review the Internal Audit Charter and approve any changes to the Internal Audit Charter as the Committee from time to time may consider necessary or advisable.

3. Determine there are no unreasonable restrictions or limitations on the internal audit function.

4. Review the effectiveness of the internal audit function.

5. Review and approve annually the performance objectives of the internal audit function.

6. Review all significant aspects of outsourcing or co-sourcing arrangements of the internal audit function to a third party. At all times, this work will be performed under the direction and oversight of qualified Internal Audit employees.

7. Review and discuss material or persistent Internal Audit and supervisory findings and the timeliness and progress of the related corrective action plans.

8. On a regular basis, meet separately with the Chief Internal Audit Officer to discuss any matters that the Committee or the Chief Internal Audit Officer believes should be discussed privately.

The Chief Internal Audit Officer will report for functional purposes to the Committee. Executive management will provide administrative oversight of the internal audit function after consultation and approval from the Committee, including (i) appointing, evaluating and goal setting, approving compensation, and replacing the Chief Internal Audit Officer, and in coordination with the Joint Compensation, Nominations and Governance Committee of the Boards ("CNG Committee"), succession planning for the Chief Internal Audit Officer, (ii) approving the Internal Audit Department's annual budget, and (iii) establishing the person to whom the Chief Internal Audit Officer reports administratively.

## E. Independent Audits

1. Appoint; determine the compensation and terms of engagement of; retain; and monitor and oversee the work, independence, and performance of the independent auditors and any other accounting firm engaged for the purpose of preparing or issuing an audit report or performing

Jared Ashcraft, Pro Se
PO Box 363242
North Las Vegas, NV 89036
legal@ashcraft.me

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

JARED ASHCRAFT,

　　　　　PLAINTIFF,

v.

FIRST-CITIZENS BANK & TRUST
COMPANY, A NORTH CAROLINA
CORPORATION; AND
FIRST CITIZENS BANCSHARES, INC.,
A DELAWARE CORPORATION,


　　　　　DEFENDANTS.

Case No.: 2:26-cv-02251-JLS-JDE



**PLAINTIFF'S EXHIBIT PACKET C
MEDICAL / DISABILITY / FAMILY-
MEDICAL RECORDS**


**Judge: Hon. Josephine L. Staton**

**Hearing Date: June 26, 2026**

**Time: 10:30 a.m.**

**Courtroom: 8A**

**Case No.: 2:26-cv-02251-JLS-JDE**

**Motion: Defendants' Rule 12(b)(2) and 12(b)(6) Motion to Dismiss**

# Table of Contents

Ex. 1 - Yes, we've never talked about it, but | have major medical issues | don't broadcast. | have doctors appointments every 3 months for blood draws. ...................................................................................................................................3

Ex. 2 - I've been asked to be involved in a clinical trial for a new drug..........................................................................3

Ex. 3 - Hey man, I'm at the doctor's like we talked about, | can see emails and message that come in but | am unable to respond

Ex. 4 - I'm actually at a doctor's appointment in Los Angeles ...........................................................................................6

Ex. 5 - For information regarding sales meeting in March, please add Jared to join via Teams meeting. He will be unable to attend in person due to a conflict. ...................................................................................................................................7

Ex. 6 - Upcoming TAFW: .................................................................................................................................................7

Ex. 7 - Amanda just closed her first deal from start to finish ...........................................................................................8

Ex. 8 - Jared Ashcraft $45,417,000 ................................................................................................................................8

Ex. 9 - 2025 April WW_Jared Ashcraft_Per™ ...............................................................................................................9

Ex. 10 - Written Warning .................................................................................................................................................10

Ex. 11 - Since February, | am aware of 10 occurrences of unscheduled absences that | want to bring to your attention. Unscheduled absences have not been properly communicated and lacking preparedness that been disruptive to the partnership, client acquisition, team capacity and reputational risk. ........................................................................11

Ex. 12 - That is great news! we are all praying for him ...................................................................................................23

Ex. 13 - She said | could attend remotely: ......................................................................................................................23

Ex. 14 - Formal Notification of FMLA Claim and ADA Accommodation – The Hartford Reference #50933394 .......24

Ex. 15 - I maintain that California law does not apply in this matter...............................................................................26

Ex. 16 - request for personnel records under California Labor Code § 1198.5. ............................................................26

Ex. 17 - RESPONDENT'S INITIAL DISCLOSURES ....................................................................................................27

Ex. 18 - COMPLAINANT'S FIRST SET OF INTERROGATORIES TO DANA LOMAS, Director of Merchant Services Sales...................................................................................................................................................................30

Ex. 19 - · 1st SVP, Director Merchant Sales at First Citizens Bank Dana Lomas, ETA CPP .....................................36

Ex. 20 - Director Merchant Sales Req ID: 33062 Address: 8540 Colonnade Center Dr Location(s): Raleigh, North Carolina; North Carolina, United States; South Carolina, United States; Georgia, United States Category: MERCHANT SALES Work Hours: Monday - Friday Posted Date: 02/10/2026..................................................................37

Ex. 21 - MOTION FOR PROTECTIVE ORDER FROM COMPLAINANT'S PENDING AND FUTURE DISCOVERY REQUESTS ABSENT COURT ORDER y ..................................................................................................................39

Ex. 22 - Meet & Confer: Correct Respondent's Feb. 10 PO Motion ¶4 (response due within 24 hours)....................42

Ex. 23 - Request for Affidavit Regarding Dana Lomas Employment Status Case No. 2025-SOX-00035 — Ashcraft v. First-Citizens Bank & Trust Company..............................................................................................................................43

Ex. 24 - COMPLAINANT'S EMERGENCY MOTION BASED ON INFORMATION AND BELIEF THAT RESPONDENT TERMINATED OR OTHERWISE ENDED DANA LOMAS'S EMPLOYMENT TO RENDER HER TESTIMONY UNAVAILABLE IN THIS PROCEEDING ...........................................................................................46

Ex. 25 - COMPLAINANT'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXHIBIT IN SUPPORT OF PENDING EMERGENCY MOTION FILED FEBRUARY 21, 2026...........................................................................59

Ex. 26 - "We've seen clients get shut down overnight by other payment providers, without warning and without a full understanding of what the business actually does," says Dana Lomas, Director of Merchant Sales at First Citizens. "They get labeled high risk, and that's the end of the relationship. That is fa...............................................................62

Ex. 27 - "Cannabis payment systems touch every part of the business," Lomas says. "If it's not built to support your other systems, it creates more work and more risk." .............................................................................................................63

Ex. 28 - RFP NO. 13 DANA LOMAS SEPARATION / OFFBOARDING, EXIT DECISION, AND ESI / ACCOUNT-RETENTION ARTIFACTS ........................................................................................................................................64

Ex. 29 - · 2nd Director Merchant Sales at First Citizens Bank Marcie Chabalko, CTP ...............................................71

Case 2:26-cv-02351-SDE Document 61-2 Filed 06/30/26 Page 318 of 259 Page ID #:19504

Ex. 30 - Director Merchant Sales, SVP Apr 2026 - Present - 2 mos..............................................................................................71

# EXHIBIT

# DEFENDANTS ADA/FMLA KNOWLEDGE

8:39

← D **Dave Lomas** 📞 ⋮

Tuesday, Jan 10, 2023 • 1:38 PM

Do you have a moment?

On a sales force call. Can call u after

Or can text

Should be done at 2

Ok, I have a doctors apt at 4, so I'll just give you the good news here. Prasad is getting Trisha and I and invite to the annual Jackson Hewitt conference in September.

Liked "Ok, I have a doctors apt at 4, so I'll just give y..."

That's awesome!!!

Yes, we've never talked about it, but I have major medical issues I don't broadcast. I have doctors appointments every 3 months for blood draws.

Call u after as I have a few questions for you

If I don't answer its because I am on with vest & will call you back

So I didn't look at my calendar and I'm booked till 4. Call me after your doctors apt

↓

⊕ RCS message ☺ 🖼











Clarity Surgical LLC. Seifert is still researching how it happened, but more importantly, the easiest way to switch customer to us and minimize headaches for them. Will let you know more as soon as she's ready.

Friday 8:32 AM

Hey man, thanks for reaching out. I'm actually at a doctor's appointment in Los Angeles. I'll follow up with you on Monday



Hope everything goes well at the doc. Have a great weekend!

**Jared Ashcraft - March Meeting**

🛡 Internal

**Daughtridge, Stephanie**                    Jan 29
To Lomas, Dana, You, + 1

Kathryn

For information regarding sales meeting in March, please add Jared to join via Teams meeting.  He will be unable to attend in person due to a conflict.

*Upcoming TAFW:*

**Stephanie Daughtridge** | Merchant Services | First Citizens Bank
Manager Merchant Sales | VP | Target Markets | ETA Certified Payments Professional
Mail Code: RVA01 | 110 Church Ave SW | Roanoke, VA 24011

540.561.4749 phone
540.793.1733 mobile
Firstcitizens.com

**Merchant Assist Team:  24/7**

Technical Support & General Service Questions (Statement, Billing,

↩ ⌄  **Reply**



| Row Labels | Sum of Gross Sales |
|---|---|
| Al Phillips | $9,779,200.00 |
| Amanda Leggett | $57,945,000.00 |
| Amanda Ostbloom | $20,473,000.00 |
| Amber Chilton | $3,778,688.00 |
| Andrew Gaunt | $14,752,000.00 |
| Andrew Gregosky | $26,470,402.00 |
| Angie Stowers | $40,077,500.00 |
| Anne Kennedy | $18,745,453.00 |
| Brian Pelaia | $22,775,000.00 |
| Christi Magruder | $41,837,956.30 |
| Christie Donaldson | $8,394,000.00 |
| Cindy Peterson | $12,070,000.00 |
| Dana Lomas | $100,000.00 |
| Dara Brownlow | $6,225,199.00 |
| Fabian Mercado | $39,210,000.00 |
| Jared Ashcraft | $45,417,000.00 |
| Josh Handy | $15,604,000.00 |
| Keith Elliott | $12,149,446.00 |
| Lee Powers | $88,347,000.00 |
| Linda Caporali | $26,044,100.00 |
| Martin Currin | $149,382,000.00 |
| Matticia Snead | $10,850,000.00 |
| Megan Lillis | $16,086,089.00 |
| Ramsey Mcbride | $33,151,900.00 |
| Richard Bingham | $25,020,000.00 |
| Robin D Stephenson | $4,431,000.00 |
| Robin Stephenson | $15,369,988.00 |
| Vicki Wood | $24,462,000.00 |



## Please sign and return

❗ **High Importance**    🛡 **Internal**

**Lomas, Dana**                              1:09 PM
To You

📄 2025 April WW_Jared Ashcraft_Per_...
PDF - 156 KB

Jared,

Based on our conversation today, please sign and return.

Thank you,


**Dana Lomas** | Director Merchant Sales I SVP

**ETA Certified Payments Professional**

Merchant Services First Citizens Bank

FCB Mail Code: 013 | 128 South Tryon Street | Charlotte, NC 28202


704.338.3840 office

412.303.8424 mobile


↩ ⌄  Reply


**First Citizens Bank**

DATE:      April 15, 2025
FROM:     Jared Ashcraft
TO:          Dana Lomas
CC:          Personnel File
RE:          Written Warning

Jared,

Per our prior conversations and most recently on <mark>Friday, April 4, 2025</mark> regarding your overall performance and attendance concerns, you are being placed on a written warning effective April 23, 2025, based on the following:

**Performance**
- o  Failure to complete mandatory compliance training.
  - o  Business Continuity Management Awareness 2025, CAN-SPAM Act 2025 & Infosec 2025
  - o  Multiple reminders to complete the training we sent via automated delivery as well as an email on 3/31/2025 at 12:00 PM EST to complete by end of business day. On 4/6/2025 you received an email from me that the Past Due Training must be completed by 4/2025.
- o  Failure to enter correct information related to sales process.
  - o  Contracts sent to the client utilizing the Link to online contract and not the Docusign process.
    - ▪  Jun Choeng
  - o  Failure to review the Clients website prior to submitting the application which led to a decline on WP system. Client was boarded through Hemp Team.
    - ▪  StrainFarmer
- o  Failure to follow sales process.
  - o  Distributing proposals/comparisons to bankers without having a conversation directly with the client and ultimately sending contracts for signature without direct contact with the client.
- o  Communication with leadership regarding availability
  - o  Monday, April 7
- o  Recording phone calls – risk
- o  On Camera for appointments

**Attendance**
- o  Since February, I am aware of 10 occurrences of unscheduled absences that I want to bring to your attention. Unscheduled absences have not been properly communicated and lacking preparedness that been disruptive to the partnership, client acquisition, team capacity and reputational risk.

In order to continue your employment with First Citizens Bank, you must improve your performance in the following areas:

- You are expected to improve your overall performance and sustain it and follow directives and suggestions given to you.
- You are expected to implement the marketing suggestions that have been provided to you to include the daily and weekly sales activities that will help you to yield results and gain new business.

11.2021

My hope is that we can continue to work together to improve your performance in these areas. If you do not meet these objectives, however, or if you violate any other Bank policy, standard, or procedure, you will be subject to further disciplinary action up to and including immediate termination. Also, please be aware disciplinary action may impact incentive compensation awards (if applicable).

_____          _____
Dana Lomas                                                          Date

_____          _____
Manager/Witness Signature (if applicable/optional)       Date

I have received, read and understand the content of the Written Warning and acknowledge that it was discussed with me by my Manager.

I understand that I may appeal this decision within 10 business days through the Bank's Appeals Procedure.

**Jared Ashcraft**
Digitally signed by Jared Ashcraft
DN: cn=Jared Ashcraft, c=US, o=First
Citizens Bank, ou=Merchant Services,
email=jared.ashcraft@firstcitizens.com
Date: 2025.04.23 15:40:09 -07'00'

_____          _____
Jared Ashcraft                                                      Date

ASSOCIATE'S COMMENTS:

_____

_____

_____

11.2021

Failure to review the Clients website prior to submitting the application which led to a decline on WP system. Client was boarded through Hemp Team.

- ▪ <span style="color:black">████</span>

<span style="color:red">████████</span> was an account added at the eleventh hour. We (FCB) secured this account as a direct result of the client's strong impression of the presentation and proposal I delivered for their two other businesses. As a result, FCB earned all three accounts, totaling over $15 million in processing volume, as well as the broader banking relationship—including multiple Business III checking accounts.

At the time, I was not made aware of the kratom involvement. I was also under significant pressure from both the banker and the banking-side manager to expedite the merchant account setup, as this was a newly launched business, and the client was eager to go live within the week.

Given that WP regularly declines deals, being written up for what would be considered routine due diligence does not seem justified. This is especially concerning considering I completed all the groundwork, delivered the presentation, structured the pricing, and ultimately closed the sale—yet was not credited accordingly, as this deal was awarded to the hemp team.

For context, I've included below messages from both the banker and my former manager, Stephanie Daughteridge, who was on the call when the deal was won, and the relationship manager expressing appreciation for my efforts.





Failure to follow sales process.

o Distributing proposals/comparisons to bankers without having a conversation directly with

the client and ultimately sending contracts for signature without direct contact with the client.



Call you in a bit, but short answer is that I am no longer allowed to provide proposal without speaking to the customer first. Per Dana Lomas.

Best regards,

As the attached email correspondence and additional documentation demonstrate, I ceased the practice of providing proposals to clients without direct communication as of March 12, 2024, following explicit instruction from my manager, Dana Lomas. Prior to that date, it was standard operating procedure (SOP) within our department for merchant representatives to prepare and send proposals to bankers based solely on statement analysis—often without any direct client engagement.

This longstanding practice was widely accepted and routinely followed, and I have multiple emails evidencing its consistent use across the team. In fact, I am copied on numerous communications involving another representative in my market who issued hundreds of proposals under the same

method. Despite this, that representative was recently promoted, while I am now being subjected to disciplinary action for ceasing a practice I was explicitly directed to stop.

In addition, I maintain a folder containing nearly 80 proposals I personally completed on behalf of other representatives at the request of both Jon Poulson and Dana Lomas. These proposals were for ABC liquor store locations across the state of North Carolina. I invested a substantial number of work hours into these efforts with no direct benefit or recognition—solely to support the team and ensure our collective success. Furthermore, I have email records showing that managers continued to request I complete such proposals as recently as January 2025.

Included below is one such email that further confirms this practice was institutional and commonly used as a sales strategy to highlight potential savings and secure client meetings.



| Name | | Date | Type | Size |
|---|---|---|---|---|
| Dare County | | 11/15/2024 7:22 AM | File folder | |
| Nash | | 11/15/2024 7:22 AM | File folder | |
| ████ | | 11/15/2024 7:22 AM | File folder | |
| 2024 W2 | | 4/23/2025 3:46 PM | PDF Document | 855 KB |
| | | 6/21/2023 8:55 AM | 7Z File | 61,846 KB |
| | | 8/10/2023 9:18 AM | Microsoft Excel W... | 22 KB |
| | | 8/2/2023 6:56 AM | Microsoft Excel W... | 19 KB |
| | | 6/21/2023 8:55 AM | 7Z File | 61,853 KB |
| | | 10/17/2023 7:59 AM | Microsoft Excel W... | 20 KB |
| | | 3/29/2023 9:33 AM | PDF Document | 106 KB |
| | | 5/8/2023 6:38 AM | PDF Document | 416 KB |
| | | 6/4/2024 9:45 AM | PDF Document | 107 KB |
| | | 6/19/2023 1:06 PM | Microsoft Excel W... | 21 KB |
| | | 8/28/2023 6:02 AM | PDF Document | 133 KB |
| | | 7/17/2023 12:35 PM | Microsoft Excel W... | 21 KB |
| | | 4/11/2023 1:55 PM | PDF Document | 122 KB |
| | | 7/3/2023 7:29 AM | Microsoft Excel W... | 21 KB |
| | | 6/26/2023 7:53 AM | Microsoft Excel W... | 41 KB |
| | | 8/22/2023 6:06 AM | Microsoft Excel W... | 20 KB |
| | | 8/28/2023 6:05 AM | PDF Document | 189 KB |
| | | 9/15/2023 11:41 AM | Microsoft Excel W... | 22 KB |
| | | 6/2/2023 12:00 PM | PDF Document | 114 KB |
| | | 6/1/2023 12:07 PM | Microsoft Excel W... | 22 KB |
| | | 6/1/2023 12:09 PM | PDF Document | 109 KB |
| | | 8/24/2023 7:03 AM | Microsoft Excel W... | 21 KB |
| | | 10/4/2023 10:37 AM | Microsoft Excel W... | 13 KB |
| | | 7/12/2023 7:01 AM | Microsoft Excel W... | 11 KB |
| | | 9/18/2023 12:10 PM | Microsoft Excel W... | 12 KB |
| | | 7/12/2023 6:43 AM | Microsoft Excel W... | 11 KB |
| | | 10/4/2023 7:40 AM | Microsoft Excel W... | 13 KB |
| | | 8/31/2023 11:00 AM | Microsoft Excel W... | 11 KB |
| | | 7/12/2023 7:20 AM | Microsoft Excel W... | 11 KB |
| | | 6/16/2023 8:36 AM | PDF Document | 105 KB |
| | | 6/19/2023 1:08 PM | Microsoft Excel W... | 21 KB |
| | | 7/14/2023 11:57 AM | PDF Document | 102 KB |
| | | 7/17/2023 12:37 PM | Microsoft Excel W... | 20 KB |
| | | 3/22/2023 6:24 AM | PDF Document | 120 KB |
| | | 8/14/2023 1:12 PM | Microsoft Excel W... | 20 KB |
| | | 3/16/2023 8:41 AM | PDF Document | 95 KB |
| | | 9/7/2023 6:26 AM | Microsoft Excel W... | 20 KB |
| | | 3/22/2023 7:49 AM | PDF Document | 125 KB |
| | | 8/21/2023 12:55 PM | Microsoft Excel W... | 20 KB |
| | | 8/30/2023 7:47 AM | Microsoft Excel W... | 21 KB |
| | | 6/1/2023 12:24 PM | Microsoft Excel W... | 21 KB |
| | | 5/1/2023 7:06 AM | PDF Document | 119 KB |
| | | 7/17/2023 12:15 PM | Microsoft Excel W... | 20 KB |
| | | 5/2/2024 7:18 AM | PDF Document | 118 KB |
| | | 5/2/2024 7:17 AM | Microsoft Excel W... | 23 KB |
| | | 7/30/2024 9:07 AM | Microsoft Excel W... | 21 KB |
| | | 8/3/2023 8:47 AM | Microsoft Excel W... | 19 KB |
| | | 3/2/2023 8:12 AM | PDF Document | 109 KB |
| | | 5/14/2024 12:31 PM | PDF Document | 108 KB |
| | | 5/14/2024 12:38 PM | PDF Document | 108 KB |
| | | 7/30/2024 9:08 AM | PDF Document | 109 KB |
| | | 7/30/2024 9:05 AM | PDF Document | 102 KB |





Communication with leadership regarding availability

o Monday, April 7

On Monday, April 7, 2024, at 8:48 AM PST, I notified my manager, Dana Lomas, via our official work communication platform (Microsoft Teams), that I had experienced a death in my family and would need to take a few days off. In that same message, I informed her that my first appointment of the day was scheduled for 12:00 PM PST—providing three hours and twelve minutes' notice.

Shortly after sending the message, I left in a rush to the airport to attempt to board a standby flight and inadvertently left my personal cell phone at home. Dana did not respond to my message until more than five hours later, well after the scheduled appointment had passed.

Upon my return, I was surprised to learn that it had been claimed I gave only 12 minutes' notice to secure coverage, which is inaccurate. I provided over three hours' advance notice. Furthermore, Dana asked whether I had contacted the team leads for coverage. However, in my experience and throughout my tenure at First Citizens Bank, team leads have only been involved in calendar coordination for pre-scheduled or future time-off requests—not for same-day or emergency situations. At no point have I been instructed or directed to involve team leads in urgent, short-notice absences



## Recording phone calls – risk

Management has been aware for well over a year that all calls received on my personal phone were automatically recorded. This practice was used strictly as a personal tool to review and refine my sales performance. It was not an occasional or selective action—every incoming and outgoing call on my personal device was subject to automatic recording.

My manager, Dana Lomas, has been specifically aware of this practice since at least April 1, 2024. Following a Teams meeting on that date, she requested that I discontinue the recordings. I acknowledged the request and immediately attempted to disable the feature. Upon doing so, I discovered that the service had already been deactivated months earlier.

In fact, I had changed cellular providers shortly before relocating to California in an effort to prevent my number from being flagged as spam due to the high volume of work-related calls I received. This transition inadvertently resulted in the automatic cancellation of the call recording service, which was managed through an app called "ACR." The associated billing was discontinued in September 2023, and I have documentation to verify this.

At no point between the time management became aware of the recordings and the date Dana asked me to stop was I informed that this practice was prohibited. No formal instruction, warning, or written policy was ever provided to that effect. Had I been informed earlier that this practice was not permitted, I would have immediately complied. To my knowledge, no policy prohibiting this was ever communicated to me until April 1, 2024.





On Camera for appointments

Since being coached by Dana Lomas on April 1, 2024, and informed that I was expected to appear on camera for all client appointments, I have made every reasonable effort to comply with that directive.

Prior to my relocation to this market in October 2024, I was never informed that appearing on camera for client appointments was a requirement. Any instances where I did not appear on camera—including during client-facing meetings—occurred before I received this guidance. Since the April 1 coaching conversation, I have consistently adhered to the expectation and have ensured that I am on camera for all scheduled client appointments.

Earlier today, I shared my calendar with Dana via screen share to demonstrate this compliance. During that discussion, I showed that all appointments since April 1 have been conducted as scheduled, and I have fulfilled my responsibilities in good faith.

o Since February, I am aware of 10 occurrences of unscheduled absences that I want to bring to your attention. Unscheduled absences have not been properly communicated and lacking preparedness that been disruptive to the partnership, client acquisition, team capacity and reputational risk.

From Tuesday, March 4 through Friday, March 7, 2025, my son—who has Type 1 Diabetes—went into Diabetic Ketoacidosis. I personally drove him to a MinuteClinic urgent care facility, where his condition escalated so severely that he was transported by ambulance to a university hospital. He was admitted to the ICU, where he remained for four days. Work records will show that I remained

responsive during this period—I continued managing my email and signed multiple clients despite the circumstances.

From April 7 to April 9, 2025, I took bereavement leave due to a death in my family, as covered earlier in this correspondence.

In addition, I now feel compelled to disclose personal medical information I have worked hard to keep private. ███████████. Dana Lomas has been aware of this since shortly after I joined the company in 2021, and Carlos Gonzales was informed shortly after assuming his management role. I have not previously filed FMLA paperwork—not because my condition is insignificant—but because I have done everything in my power to maintain privacy and continue performing without disruption. Unfortunately, I now feel I am being placed in a position where disclosing this is necessary to defend my integrity.

I am currently enrolled in a clinical research trial that provides me with lifesaving medication. Without this medication, I would not be here today. The trial was initially managed through East Carolina University, just minutes from my home in Greenville, NC. After relocating to Las Vegas and taking over the West Coast market, the closest participating clinic is now over five hours away by car. As a result, I occasionally miss work to attend mandatory in-person appointments. Even during those days, I remain in communication—responding to emails, managing client needs, and performing my duties to the best of my ability.

At one point, I even discussed leaving the trial with Dana, despite the very real risks that would pose to my health. I was under such stress from trying to meet work expectations that I considered discontinuing the treatment altogether. In fact, I have emails between myself and my doctors reflecting that I was considering withdrawing from the study because of the toll it was taking on my professional responsibilities. That kind of personal sacrifice should speak volumes about my dedication to this role.

Additionally, I suffer from diagnosed sleep apnea, a condition both Dana and Carlos are aware of. The use of my CPAP machine causes recurring sinus infections, which only compound the challenges of living with a compromised immune system. On days when I am unwell, I do not appear on camera—not out of defiance, but in an effort to maintain professionalism. Should I be expected to appear on video with visible symptoms like nasal discharge? That expectation disregards basic dignity and fails to consider the realities of someone managing multiple serious health conditions.

Despite all of this, the company demonstrated a clear recognition of my ability and reliability—so much so that I was asked to cover an additional major market, Austin, Texas, while another representative was out on leave of absence. This request was made during the very same period in which I was managing my own health challenges, family emergencies, and full responsibilities for the West Coast. I accepted without complaint and followed through with the same level of performance I've maintained throughout my tenure.

These are not excuses. These are the lived realities of balancing full-time work with medically complex, federally protected conditions. Both ████████████████ are covered under the Americans with Disabilities Act (ADA), and my efforts to continue contributing at a high level— despite these challenges—should be acknowledged, not penalized.

I have never missed a quarterly sales goal—including Q1 2025. I was honored at the FCB Awards in 2023 and was recognized with the "Highest Revenue Per Account" award for 2024. These outcomes are not incidental—they are the result of consistent, committed performance in the face of very real adversity.

To discipline me while disregarding the context of my protected health conditions and performance record would not only be deeply unjust—it would raise serious concerns regarding ADA compliance.







**Subject:** Formal Notification of FMLA Claim and ADA Accommodation – The Hartford
Reference #50933394
**From:** "Ashcraft, Jared" <Jared.Ashcraft@firstcitizens.com>
**Date:** 4/24/2025, 9:00 AM
**To:** "HRSC (HR Service Center)" <hrsc@firstcitizens.com>
**CC:** "N A" <jtashcraft82@gmail.com>, "Jared Ashcraft" <jared.ashcraft@proton.me>

To the Attention of HR Compliance and Leave Administration,
This correspondence serves as formal notification that I have submitted a request for ADA accommodation and intermittent leave under the Family and Medical Leave Act (FMLA), pursuant to 29 U.S. Code § 2601, through The Hartford on April 25, 2025. The claim reference number is 50933394.
This request relates to two ongoing medical conditions previously disclosed to management, both of which qualify as serious health conditions under the FMLA and are protected under the Americans with Disabilities Act (ADA), as amended. These conditions require ongoing clinical participation, medical supervision, and will result in intermittent incapacity or the need for leave in order to comply with prescribed treatment.
I respectfully request that all necessary coordination with The Hartford be completed in a timely manner and that any supporting documentation or employer-side paperwork be provided as required. I understand that all records related to this request will be maintained in accordance with HIPAA, FMLA, and ADA confidentiality standards.
For documentation purposes, and to ensure continuity of communication, I request that all related correspondence and documentation be sent to both of the following addresses:
Jtashcraft82@gmail.com
jared.ashcraft@proton.me

Please confirm receipt of this notification at your earliest convenience.

Best regards,

**Jared Ashcraft** | ETA Certified Payments Professional
Senior Merchant Services Specialist | First Citizens Bank
FCB Mail Code: 722 **|** 2405 Stantonsburg Rd | Greenville, NC 27834
C:(252)258-1535 **|** O:(252)321-6401 | F:(984)867-3587
jared.ashcraft@firstcitizens.com

Firstcitizens.com

**Merchant Assist Team:  24/7**
Technical Support & General Service Questions (Statement, Billing, Chargeback, Interchange)
(Worldpay) 844**.**826**.**8489 | Phone
(Fiserv/Clover) 800**.**365**.**9137 |Phone

**Merchant Activation Team (for initial setup only)**
Equipment Installation/Training
(Worldpay) 866**.**622**.**2907 | Phone **8am-8pm M-F EST**
(Fiserv/Clover) 800**.**365**.**9137 | Phone  **8am-5pm M-F EST**

**Partner Assist Team: (internal use only)**
(Worldpay) 800**.**805**.**0636 | Phone   vest-rpt@servicingteam**.**com| Email  **8am – 8pm EST**
(Fiserv/Clover)  800**.**262**.**1991 (option 1) | Phone   fcbpartnerpriorityteam@fiserv.com | Email  **8am – 7pm EST**

**PCI Compliance**
(Worldpay via Safer Payments) 866**.**493**.**8756 | Phone

| From: | Jerry Sayre |
|---|---|
| Sent on: | Friday, June 6, 2025 10:03:38 AM |
| To: | Legal Department |
| Subject: | RE: [EXT] Re: First Citizens Bank |
| Attachments: | Write up Appeal FCB 04_23 - Jared Ashcraft.pdf (71.79 KB), 2025 April WW_Jared Ashcraft_Per_Att With Responses.pdf (1.21 MB), WW_Jared Ashcraft_P1_2025-C.pdf (45.51 KB), WW_Jared Ashcraft_P2_2025-C.pdf (22.31 KB) |

Mr. Ashcraft,

For the reasons already stated, I maintain that California law does not apply in this matter. Nonetheless, given your specific request to receive copies of the April 2025 written warning and related documentation, I confirmed that the Bank has no objection to me producing these records. Accordingly, I have attached copies hereto.

Thank you,

Jerry Sayre



**Jerry Sayre**
Partner
301 Hillsborough Street
Suite 1120
Raleigh, NC 27603

 (919) 719-1252

 (919) 607-0145

(919) 755-8800

jsayre@foxrothschild.com

**Learn about our new brand.**

From: Legal Department <Legal@ashcraft.me>
Sent: Thursday, June 5, 2025 12:32 PM
To: Sayre, Jeremy R. <JSayre@foxrothschild.com>
Subject: [EXT] Re: First Citizens Bank

Mr. Sayre,

Thank you for your email regarding my employment status, account access, and request for personnel records under California Labor Code § 1198.5. While I acknowledge the Bank's stated position that it complies with this statute only for

associates located in California. I respectfully assert that California labor law—including § 1198.5—applies to my employment based on well-established legal principles and binding case law.

Case 2:26-cv-02251-SLJS-FDE Document 70-2 Filed 06/30/26 Page 214 of 259 Page Page ID #202530

Before proceeding, I would like to offer a clarification and a brief acknowledgment. Some of the legal case citations I previously referenced may not have been optimally presented, and I appreciate your patience. As context: I have recently built my own retrieval-augmented legal research system—an AI-based assistant designed to help pro se claimants like myself draft filings, research precedent, and structure arguments. While it is still developing and not without its imperfections, I'm encouraged by the results it has achieved in just over two weeks. Its ability to assist in drafting memoranda, surfacing precedent, and organizing facts has been invaluable—particularly in preparing for the regulatory filings I've submitted under Sarbanes-Oxley, ADA, and FMLA. I will continue refining it, and I appreciate your continued engagement in these discussions.

To clarify for both of our understanding: is it the Bank's position that I am not entitled to receive a copy of my April 15, 2025 written warning, the rebuttal I submitted in response, or any employment performance evaluations issued during my tenure? These documents would fall squarely within the scope of California Labor Code § 1198.5, and withholding them may carry both statutory and procedural consequences. I want to ensure there is no misunderstanding on either side.

In addressing your prior email, I want to make clear that I remain open to an amicable and constructive working relationship. However, I am not willing to be subjected—explicitly or implicitly—to personal attacks, character judgments, or disparagements of my tone or intelligence. Professional disagreement is entirely appropriate; personal denigration is not. That said, I also recognize that—based on my diagnosis—I may at times come across as more aggressive or direct than I intend. It is generally not my intention to be hostile, however, that I felt your prior message included remarks that were unnecessarily personal and disparaging to me and I responded as such.

It should also be noted that during my initial interactions with Ted Bush, I approached the internal investigation in a conciliatory and constructive manner. I genuinely believed, based on Mr. Bush's statements, that my concerns were being taken seriously and handled with integrity. However, once Ms. Queena Green assumed responsibility for the process, the situation deteriorated significantly. She declined to accommodate multiple reasonable requests related to my ADA-covered conditions—including advance access to questions, permission to record the meeting, and clarification protocols—which had been clearly communicated in writing. As someone with ███████████████████████ and other neurodivergent traits, I face unique cognitive challenges in high-stakes or adversarial settings. While trying to process questions, gather my thoughts, and respond meaningfully, I am also burdened with simultaneously regulating tone, managing perceived affect, and mitigating misunderstanding—an invisible cognitive load that significantly impacts my ability to navigate these discussions without proper accommodations.

For Ms. Green to outright refuse **all** of my reasonable, disability-related requests was not only unconscionable—it fundamentally altered the tone of the process and set an adversarial dynamic between myself and the Bank that I never sought. I began this process in good faith, offering my insights, time, and even my assistance to help clarify internal issues and fix the problems I was witnessing. At every step, I attempted to engage constructively, asking only for the basic accommodations I needed in order to meaningfully participate. Unfortunately, those efforts were met not with support, but with dismissal—undermining the integrity of the investigation and compounding the very harm I was trying to prevent.

I do not know you personally, sir, but I can tell you candidly that navigating these situations is not easy for someone like me. As a neurodivergent individual, I often have to manage multiple simultaneous thought processes—balancing clarity of communication, emotional regulation, and social perception—all while trying to respond meaningfully and remain composed. It takes a great deal of effort for me to police my tone, avoid unintended offense, and ensure that I'm not perceived as confused or incoherent simply because my mind processes complex issues differently than most. I say this not as an excuse, but as context I hope you will consider in good faith.

Additionally, While I understand that it may be strategically advantageous for you and your client to claim a lack of clarity regarding the nature of my Sarbanes-Oxley allegations, I believe we both recognize that such a position is more postural than substantive. In my **May 19th** communication—sent to the CEO, General Counsel, and Risk Officer—I unambiguously outlined the basis for my SOX-protected whistleblower claims, including but not limited to: internal control deficiencies, misappropriation of revenue credit, and conduct directly implicating SEC Rule 13a-15 and 18 U.S.C. § 1514A. (Email excerpt below for reference.)

Lastly, I would like to make one correction to an earlier statement. I did **not** first report the revenue credit misappropriation and related compliance failures surrounding Pi Tax Prep in March 2025, as previously mentioned. The original disclosure was made on **March 4, 2024**—I apologize for the earlier typo. This timeline clarifies that even six months later, as

PLAINTIFF'S
EXHIBIT

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**
**Washington, DC**

JARED ASHCRAFT,
         Complainant,

    v.

FIRST CITIZENS BANK & TRUST
COMPANY,
         Respondent.

**OALJ Case No: 2025-SOX-00035**
**OSHA Case No.: 301054553**

## RESPONDENT'S INITIAL DISCLOSURES

NOW COMES Respondent, by and through the undersigned counsel, and pursuant to Rules of Practice and Procedure for Administrative Hearings, C.F.R. § 18.50(c)(1), and hereby provides the following initial disclosures:

### PRELIMINARY STATEMENT

This disclosure is made based on the information reasonably available to Respondent as of the date of this disclosure and represents its good faith effort to identify information subject to the disclosure requirements of Rule § 18.50(c)(1). By making this disclosure, Respondent does not waive its right to object to production or use as evidence of any document or tangible thing on the basis of any privilege, the work product doctrine, relevancy, undue burden, or any other valid objection.

1.     **Section 18.50(c)(1)(i)(A) Witnesses:** The name, and if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

**RESPONSE:** Respondent objects to the provision of contact information for any of the listed individuals below who are employed by Respondent. Employees of Respondent may be contacted

1

through the undersigned counsel. Subject to and without waiving this objection, at this time, the following individuals are persons who are likely to have information relevant to Complainant's claims and/or Respondent's defenses in this case:

A. Jared Ashcraft: matters alleged in the complaint; Complainant's employment with Respondent; Complainant's job performance; Complainant's activities while employed by Respondent

B. Queena Green: matters alleged in the complaint; Complainant's employment with Respondent; Complainant's job performance; Complainant's activities while employed by Respondent.

C. Ted Bush: matters alleged in the complaint; Complainant's employment with Respondent; Complainant's job performance; Complainant's activities while employed by Respondent.

D. Dana Lomas: matters alleged in the complaint; Complainant's employment with Respondent; Complainant's job performance; Complainant's activities while employed by Respondent.

E. Ben Kornegay: matters alleged in the complaint; Complainant's employment with Respondent; Complainant's job performance; Complainant's activities while employed by Respondent.

F. Carlos Gonzales: matters alleged in the complaint; Complainant's employment with Respondent; Complainant's job performance; Complainant's activities while employed by Respondent.

G. Glenn Rhea: matters alleged in the complaint; Complainant's employment with Respondent; Complainant's job performance; Complainant's activities while employed by Respondent.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served in this action by

electronic mail and U.S. First Class mail to the following parties:.

Jared Ashcraft
4429 Cormorant Ave
Las Vegas, NV 89115
jared@ashcraft.me

This the 28th day of July, 2025.

/s/ *Jeremy R. Sayre*
Jeremy R. Sayre
N.C. State Bar No.32164
jerrysayre@foxrothschild.com
FOX ROTHSCHILD LLP
301 Hillsborough Street, Suite 1120
Raleigh, NC 27603
Telephone: (919) 755-8700
Facsimile: (919) 755-8800
*Attorneys for Respondent*

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES

**JARED ASHCRAFT,**
   Complainant,

v.

**FIRST-CITIZENS BANK & TRUST COMPANY**
**and**
**FIRST CITIZENS BANCSHARES, INC.,**
   Respondents.

## OALJ Case No. 2025-SOX-00035

**COMPLAINANT'S FIRST SET OF INTERROGATORIES TO DANA LOMAS, Director of Merchant Services Sales**

## INTERROGATORIES NOS. 1–25

**Interrogatory No. 1**
State the earliest date (month and year are sufficient if the exact day is unknown) on which you first became aware that approximately thirty-one (31) Jackson Hewitt / PI Tax Prep merchant accounts associated with your organization had been diverted, reassigned, mis-boarded, or otherwise not credited as expected.

**Interrogatory No. 2**
Describe in detail how you first learned of that issue, including:
a) the medium (email, Teams, meeting, dashboard anomaly, inquiry, or other);
b) the person(s) involved; and
c) the substance of what you were told.

**Interrogatory No. 3**
Identify each internal system, dashboard, report, or data source you reviewed (or contend you reviewed) upon learning of the issue, and state the approximate date range reviewed for each.

**Interrogatory No. 4**
If you did not review any system, dashboard, or report capable of resolving the status of the approximately 31 accounts, explain in detail why you did not.

**Interrogatory No. 5**
State the last date prior to September 14, 2024 on which you took any action to determine the disposition of the approximately 31 accounts, and describe each such action.

**Interrogatory No. 6**
Describe, step by step, every investigative action you took between March/April 2024 and September 14, 2024 to determine what happened to the approximately 31 accounts.

**Interrogatory No. 7**
Identify each person you contacted, or directed anyone else to contact, regarding the diverted accounts, stating for each:
a) name;
b) role;
c) approximate date(s) of contact; and
d) the specific task or inquiry assigned.

**Interrogatory No. 8**
If you delegated any portion of the investigation to another person (including Heather), identify:
a) the person;
b) the date of delegation;
c) the scope of responsibility assigned; and
d) what results, if any, were reported back to you.

**Interrogatory No. 9**
State the date on which you became aware that Heather resigned from her position and describe all actions you took, if any, to reassign responsibility for investigating the diverted accounts after her resignation.

**Interrogatory No. 10**
Explain how, after Heather's resignation, you ensured that investigation of the diverted accounts continued, including identification of any replacement investigator, escalation, or personal review you undertook.

**Interrogatory No. 11**
Identify all systems of record that could definitively show whether the approximately 31 accounts were:
a) approved;
b) assigned merchant identification numbers (MIDs); and
c) boarded under the expected sponsor path.

**Interrogatory No. 12**
For each system identified in Interrogatory No. 11, state whether you personally reviewed it. If not, explain why you did not.

**Interrogatory No. 13**
Describe how, in your role, you ensured the accuracy of internal segment-level reporting while approximately 31 accounts remained unaccounted for over several months.

**Interrogatory No. 14**
Explain what you meant when you described the accounts as having been "stolen," including what operational failure or process breakdown you believed occurred.

**Interrogatory No. 15**
Explain what you meant by "inadvertently moved," including:
a) what mechanism you believe could cause such movement; and
b) what controls existed to prevent or detect it.

**Interrogatory No. 16**
Explain what you meant by "original batches" and "list of original accounts," including where those records were maintained and how they were used.

**Interrogatory No. 17**
Identify, to the best of your ability, the accounts or batches you referenced in your September 14, 2024 message. If you cannot identify them now, explain in detail why you cannot.

**Interrogatory No. 18**
Describe your understanding of how multi-location contract values were intended to be entered into the Worldpay contract-creation workflow at the time these accounts were signed.

**Interrogatory No. 19**
State when you first became aware that a total portfolio value had been entered in a manner that caused the system to treat it as a per-location value, thereby overstating aggregate projected volume or revenue.

**Interrogatory No. 20**
Identify each communication in which you were informed of this overstatement, including date, participants, and substance.

**Interrogatory No. 21**
Describe the magnitude of the inflation as you understood it and whether you considered it material to internal reporting. If you contend it was not material, explain why.

**Interrogatory No. 22**
Describe every action you took after learning of the inflation to correct source inputs, correct internal reporting, or suspend reliance on the inflated figures.

**Interrogatory No. 23**
If you took no corrective action, identify all reasons, including whether you considered the impact on reported performance metrics or segment rankings.

**Interrogatory No. 24**
Identify each internal function or group to which you escalated the inflation issue. If you did not escalate to any function, explain why not.

**Interrogatory No. 25**
Identify all documents supporting your answers to Interrogatories 1–24.

# RFAs NOS. 1–25

**RFA No. 1**
Admit that you first became aware in or about March or April 2024 that approximately 31 Jackson Hewitt / PI Tax Prep accounts were not credited as expected.

**RFA No. 2**
Admit that you did not determine the final disposition of those accounts within 30 days of first learning of the issue.

**RFA No. 3**
Admit that more than six months passed without your obtaining a definitive accounting of what happened to those accounts.

**RFA No. 4**
Admit that as of September 14, 2024, the issue remained unresolved to your knowledge.

**RFA No. 5**
Admit that you delegated investigation of the diverted accounts to "Heather" Nowak.

**RFA No. 6**
Admit that Heather resigned from her position less than fifteen (15) days after you first became aware of the diverted accounts.

**RFA No. 6A**
Admit that, at the time the initial diversion of the Jackson Hewitt / PI Tax Prep accounts was reported to you in or about March or April 2024, Heather had already given notice of her resignation and her departure had been announced internally.

**RFA No. 7**
Admit that after Heather's resignation, you did not assign another person to investigate the diverted accounts.

**RFA No. 8**
Admit that you did not personally complete an investigation into the disposition of the diverted accounts.

**RFA No. 9**
Admit that you did not escalate the unresolved diversion to Internal Audit, Compliance, or Risk.

**RFA No. 10**
Admit that unresolved diversion of approximately 31 accounts is inconsistent with reliable segment-level reporting.

**RFA No. 11**
Admit that you described the Jackson Hewitt / PI Tax Prep accounts as having been "stolen."

**RFA No. 12**
Admit that the accounts were not boarded as originally expected.

**RFA No. 13**
Admit that mis-boarding affected attribution or internal reporting.

**RFA No. 14**
Admit that the mis-boarding of the Jackson Hewitt / PI Tax Prep accounts was not detected or resolved through internal controls prior to the customer complaint communicated by Prasad Inampudi to Mr. Ashcraft.

**RFA No. 15**
Admit that those controls did not resolve the issue for months.

**RFA No. 16**
Admit that you were informed that multi-location contract values had been overstated through the Worldpay workflow issue by Mr. Ashcraft.

**RFA No. 17**
Admit that Mr. Ashcraft informed you that this occurred for Jackson Hewitt / PI Tax Prep accounts directly.

**RFA No. 18**
Admit that the overstatement resulted from volume multiplication across multiple locations.

**RFA No. 19**
Admit that correcting the entries would significantly reduce reported performance metrics, including Mr. Ashcraft's personal annual sales volume.

**RFA No. 20**
Admit that the overstated Jackson Hewitt / PI Tax Prep volume and revenue figures were included in PowerPoint presentations used in company-wide or executive-level financial

reporting calls, and that you understood those presentations were prepared, presented, or relied upon through the Merchant Services reporting chain overseen by Jason Mills.

**RFA No. 21**
Admit that after being informed of the inflated values by Mr. Ashcraft, you did not direct correction of source inputs.

**RFA No. 22**
Admit that you did not direct correction of internal upward reports using inflated figures.

**RFA No. 23**
Admit that you did not suspend reliance on the inflated figures pending validation.

**RFA No. 24**
Admit that you did not escalate the inflation issue to Finance, Internal Audit, Compliance, or Risk.

**RFA No. 25**
Admit that inflated figures continued to be used in internal reporting after you were informed they were overstated.

# CERTIFICATE OF SERVICE

I hereby certify that on this **3rd day of February, 2026**, a true and correct copy of the foregoing **Complainant's First Set of Interrogatories and Requests for Admission to Dana Lomas** was served by electronic mail upon the following counsel of record:

**Lisa Williford, Esq.**
Fox Rothschild LLP
Email: lwilliford@foxrothschild.com

**Jeremy R. Sayre, Esq.**
Fox Rothschild LLP
Email: jsayre@foxrothschild.com

**Jared Ashcraft**
Complainant, Pro Se
OALJ Case No. 2025-SOX-00035

**Dana Lomas, ETA CPP** ✓ · 1st

SVP, Director Merchant Sales at First Citizens Bank

Greater Tampa Bay Area · **Contact info**

**500+ connections**

 **First Citizens Bank**

Ramsey, Anthony and 39 other mutual connections

✈ Message  ( ··· )

## Highlights

 **You both worked at First Citizens Bank**
You both worked at First Citizens Bank from August 2021 to June 2025

✦ Ask about experience

 **2 mutual groups**
You and Dana are both in High Risk Payment Processing and American Bankers Association (ABA) Group

## About

I currently serve as the Director of Merchant Sales at First Citizens Bank. I lead a team of sales leaders and sales professionals who provide innovative and customized payment solutions to small business, commercial and enterprise clients across the US. Responsible for strategic direction and daily oversight of the merchant ... more

## Activity

1,191 followers

**Posts**   Comments



FirstCitizensBank

☰

☐ Back

# Director Merchant Sales

**Req ID:** 33062

**Address:** 8540 Colonnade Center Dr

**Location(s):** Raleigh, North Carolina; North Carolina, United States; South Carolina, United States; Georgia, United States

**Category:** MERCHANT SALES

**Work Hours:** Monday - Friday

**Posted Date:** 02/10/2026

✉ Get future jobs matching this search     **Login**     or     **Register**

---

## Job Description

### Overview

This is a national leadership opportunity for a strategic sales leader who wants to build, grow, and shape a Merchant Services business — not just maintain one.  You'll lead a team driving new client acquisition, expand relationships across small business through middle market and enterprise clients, and partner closely with bank leadership, product and referral channels to accelerate growth.

### Responsibilities

We're looking for someone who:

- Has led high-performing sales teams with a strong track record of building, coaching and retaining sales talent.
- History of delivering results through data-driven sales management, pipeline, discipline, and performance accountability.
- Thrives in a relationship-driven, collaborative environment
- Brings experience in merchant services, payments, treasury or financial services
- Ability to influence leaders and collaborate across multiple business lines
- Understands pricing strategy and market competitiveness
- Enjoys coaching teams and influencing strategy

You'll have visibility with key stakeholders and senior leadership, real impact on revenue growth, and the ability to help modernize payment solutions for businesses across the U.S.

## Qualifications

Bachelor's Degree and 10 years of experience in Financial Services and Merchant Sales experience OR High School Diploma or GED and 14 years of experience in Financial Services and Merchant Sales experience

Preferred Qualifications:

- Certified Payments or Treasury Professional
- Advanced knowledge of merchant products and payments industry
- Ability to travel 2-3+ times per month, including overnight
- Preferred to reside in Southeastern, US

Benefits are an integral part of total rewards and First Citizens Bank is committed to providing a competitive, thoughtfully designed and quality benefits program to meet the needs of our associates. More information can be found at https://jobs.firstcitizens.com/benefits.

**Apply**

   

First Citizens Bank is an Equal Opportunity Employer. All qualified applicants will receive consideration for employment without regard to race (including traits historically associated with race, such as hair texture and protective hairstyles), color, religion, national origin, sex, age, disability, protected veteran status, sexual orientation, gender identity, genetic information, military membership, application, or obligation, or any other legally protected status.

Section 19 of the Federal Deposit Insurance Act prohibits First Citizens Bank from employing individuals convicted of certain criminal offenses. Offers of employment will be contingent upon a satisfactory background check. Consideration of your background and fingerprint records will be an individualized assessment based on your specific record and the duties and requirements of the specific job.

The Bank is committed to maintaining a safe workplace free from the influence of prohibited drugs and the misuse of alcohol and will not tolerate any prohibited drug use or alcohol misuse that jeopardizes the safety of associates, customers or others at the workplace, or threatens the Bank's operations or competitiveness.



PLAINTIFF'S EXHIBIT

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**
**Washington, DC**

JARED ASHCRAFT,
      Complainant,

    v.

FIRST-CITIZENS BANK & TRUST
COMPANY,
      Respondent.

**OALJ Case No: 2025-SOX-00035**
**OSHA Case No.: 301054553**

**MOTION FOR PROTECTIVE ORDER**
**FROM COMPLAINANT'S PENDING**
**AND FUTURE DISCOVERY REQUESTS**
**ABSENT COURT ORDER**

Respondent First Citizens Bank & Trust Company ("Respondent") respectfully moves the Court for entry of a protective order pursuant to 29 C.F.R. § 18.52. In support of this motion, Respondent shows the Court the following:

1.    The Court and the parties engaged in a discovery conference in this matter on January 12, 2026. On January 15, 2026, the Court entered an order ("the Order") that, among other things, established certain parameters governing discovery practice in this proceeding. The Order provided that:

    a.  Both parties are limited to 25 Interrogatories, 25 Requests for Production of Documents, and 25 Requests for Admission.

    b.  "Discovery requests are to be directed **only to actual parties** to the case (not third parties)."

Ord. at 3 (emphasis in original).

2.    After the discovery period began, Complainant served Respondent with his First Set of Requests for Production of Documents (the "Document Requests").[1] Although numbered as only

---

[1] Although styled his "First Set" of requests, Complainant served these requests piecemeal in three separate emails.

"twelve" requests, the Document Requests contain 255 subparts, most of which are themselves specific requests for particular documents. The Document Requests wildly exceed the limitations imposed in the Order. *See, e.g., Williams v. Bd. of Cnty. Comm'rs of Unified Gov't of Wyandotte Cnty. & Kan. City, Kan.*, 192 F.R.D. 698, 701-02 (D. Kan. 2000) (noting "[e]xtensive use of subparts . . . could defeat the purposes of the numerical limit" imposed by rule or order, and summarily finding "seven" discovery requests containing 117 total subparts exceeded that limit). Copies of the Document Requests are attached as Exhibit A.



3. In addition to the improper Document Requests, Complainant has also "served" the undersigned counsel with eight sets of Interrogatories and Requests for Admission[2] directed at Dana Lomas, Carlos Gonzalez, Queena Green, Ted Bush, Michael Raimo, Ashley Roff, Jon Poulsen, and Greg Smith (Chief Information & Operations Officer) in their individual capacities, none of whom are parties to this case and some of whom are no longer employed by Respondent. These sets of requests collectively contain 200 interrogatories and 200 requests for admission (25 each directed to each person), which again violates the directive in the Order. Copies of these requests are attached as Exhibit B.

4. Although some of the individual employees were employed by Respondent during the relevant period, they are not parties to this proceeding and are not proper recipients of discovery requests. *E.g., Downs v. Shinseki*, No. 3:10-0661, 2012 WL 5296164, at *1 (M.D. Tenn. Oct. 24, 2012) ("Individual employees of [an entity] do not become parties to an action merely because the [employer entity] is named as the defendant" and may not be served with interrogatories and requests for admission); *Killian v. Hagel*, No. 12cv00828-JLS (DHB), 2014 WL 12684498, at *3 (S.D. Cal. Sep. 17, 2014) (denying motion to compel responses to interrogatories directed to non-party

---

[2] Complainant served four of these sets of requests over the weekend immediately after the undersigned counsel sought to meet and confer regarding his improper discovery practices.

substantive responses to any discovery requests, to make any other arguments to contest Complainant's vexatious discovery attempts, and to seek other and further relief from this Court. Further, Respondent's decision not to respond to any discovery request pending a ruling on this motion is not an admission to the requested information, as the requests in their current form are improper. Respondent incorporates in this motion all future discovery requests served before the Court is able to rule on this motion as any additional discovery requests would only exacerbate Complainant's continued violation of the Order.

6. Complainant's abusive discovery practices, in addition to his improper motions and communications practices, continue to impede the efficient resolution of this proceeding and have imposed extraordinary costs on Respondent in having to respond to all of Complainant's filings and communications. This cannot continue if Respondent is to be given a fair opportunity to engage in meaningful discovery efforts.

7. Counsel for Respondent has conferred in good faith in an effort to resolve this dispute, but the parties did not reach agreement.

This the 10th day of February 2026.

s/Lisa M. Williford
Lisa M. Williford
N.C. Bar No. 44184
lwilliford@foxrothschild.com
FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
PO Box 21927 (27420)
Greensboro, NC 27401
Telephone: 336.378.5200
Facsimile: 336.378.5400

Attorney for Respondent

4

PLAINTIFF'S EXHIBIT

**Subject:** Meet & Confer: Correct Respondent's Feb. 10 PO Motion ¶4 (response due within 24 hours)

**From:** "Jared Ashcraft" <Jared@ashcraft.me>

**Date:** 2/18/2026, 4:07 PM

**To:** "Williford, Lisa M." <LArthur@foxrothschild.com>, "Sayre, Jeremy R." <JSayre@foxrothschild.com>

Counsel,

Meet and confer in good faith: ¶4 of Respondent's Feb. 10 Motion for Protective Order asserts that "some" of the listed individuals are "no longer employed by Respondent." As of today (Feb. 18, 2026), the attached saved public LinkedIn profiles show the key custodians are current First Citizens employees, including Carlos Gonzales (his profile displays the First Citizens flag at the top despite an outdated job-history entry).

Attached: Exhs. A–G (Dana Lomas, Ashley Roff, Ted Bush, Mike Raimo, Gregory L. Smith, Queena Green, Carlos Gonzales).

Because ¶4 is being used to justify refusing discovery, please confirm within 24 hours whether Respondent will:

1. **correct/withdraw the factual claim in ¶4; and**

2. **stipulate Respondent will serve party responses (after inquiry of these custodians) to the outstanding discovery concerning them within fourteen (14) days of the Court's PO ruling (or sooner by agreement).**

If not, identify which individuals you contend are not current employees so I can supplement the record and seek appropriate relief. All rights reserved.

Regards,
Jared Ashcraft
Pro Se Complainant

**Attachments: Exhs. A–G (saved LinkedIn profiles, Feb. 18, 2026)**

──Attachments:──────────────────────────────────

| | |
|---|---|
| Ashley Roff _ LinkedIn.pdf | 137 KB |
| Gregory L Smith _ LinkedIn.pdf | 119 KB |
| Mike Raimo _ LinkedIn.pdf | 113 KB |
| Ted Bush, MSHRM, SPHR _ LinkedIn.pdf | 94.1 KB |
| Dana Lomas, ETA CPP _ LinkedIn.pdf | 99.0 KB |

Case 2:26-cv-02251-SJS-EDE Document 61-70-2 Filed 06/30/26 Page 231 of 259 Page ID#: 2547

**Subject:** Meet-and-Confer — Request for Affidavit Regarding Dana Lomas Employment Status Case No. 2025-SOX-00035 — Ashcraft v. First-Citizens Bank & Trust Company
**From:** "Jared Ashcraft" <Jared@ashcraft.me>
**Date:** 2/24/2026, 12:57 PM
**To:** "Williford, Lisa M." <LArthur@foxrothschild.com>, "Sayre, Jeremy R." <JSayre@foxrothschild.com>, "OALJ-CherryHill" <OALJ-CherryHill@dol.gov>, "Soriano, Johanna - OALJ" <Soriano.Johanna@dol.gov>

**Counsel,**

I write to meet and confer in good faith regarding a narrow, time-sensitive factual issue that Respondent can resolve immediately and without litigation.

The following sequence is established by publicly verifiable documents and the OALJ record:

1. January 29, 2026 (Thursday): First Citizens Bank published a public-facing marketing guide titled "Cannabis Merchant Services Guide for CFOs and Finance Leads," in which Ms. Dana Lomas was quoted three times by name and identified as "Director of Merchant Sales at First Citizens." The Bank held her out as its national expert and thought leader on merchant services compliance.

2. February 3, 2026 (Tuesday): Complainant served Respondent discovery for Ms. Lomas, in her capacity as Director of Merchant Sales, with Complainant's First Set of Interrogatories pursuant to Judge Timlin's January 15, 2026 Order. Those interrogatories address the diversion of approximately 31 Jackson Hewitt accounts, internal revenue reporting inflation, and related SOX internal controls issues.

3. February 10, 2026 (Tuesday): First Citizens Bank publicly posted Req ID 33062 — "Director, Merchant Sales" — as an open vacancy both internally on Respondent career website and externally on Linkedin.

4. On February 10, Respondent filed a Motion for Protective Order using evasive past-tense language suggesting certain individuals "were employed" by the Bank.

5. February 18, 2026: Respondent declined to clarify Ms. Lomas's employment status when directly asked in a meet and confer email **(the only meet and confer email to this point counsel has refused to respond to.)**

This sequence—active national spokesperson on Thursday, discovery served Tuesday, role posted vacant the following Monday—compresses into five business days and is currently before Judge Timlin in Complainant's Emergency Motion filed February 21, 2026.

**To moot the concern raised in the Emergency Motion entirely, Complainant respectfully requests that Respondent provide, by close of business on 02/25/2026, a sworn affidavit from a senior First Citizens Bank officer, preferably CLO Mathew Martin or CEO Frank Holding Jr., attesting to the following:**

1. **Whether Ms. Lomas remains employed by First Citizens Bank or any of its affiliates or subsidiaries as of the date of the affidavit.**

2. **If she remains employed, her current title and role.**

3. **The date on which any change to her employment status occurred, if applicable.**

4. **That Ms. Lomas will be made available for deposition and discovery consistent with Judge Timlin's January 15, 2026 Order.**

Complainant is not requesting this information to be difficult. If Ms. Lomas remains employed and available for discovery, a simple affidavit moots the Emergency Motion and resolves this issue without further judicial involvement. At which time I will withdraw my Emergency Motion, which is in the interest of judicial economy. If Respondent declines to provide this affidavit, Complainant will treat that silence as confirmation of the inference already before the Court and will proceed accordingly in this forum and any subsequent Article III proceeding.

Respectfully,

**Jared Ashcraft**
**Pro Se Complainant**
**Case No. 2025-SOX-00035**

Jared Ashcraft, Pro Se
4429 Cormorant Ave
Las Vegas, NV 89115
252-258-1535
legal@ashcraft.me

# UNITED STATES DEPARTMENT OF LABOR

# OFFICE OF ADMINISTRATIVE LAW JUDGES

Honorable Theresa Timlin

JARED ASHCRAFT,

      COMPLAINANT,

vs.

FIRST-CITIZENS BANK & TRUST
COMPANY,

      RESPONDENT.

Case No.: 2025-SOX-00035

==COMPLAINANT'S EMERGENCY MOTION BASED ON INFORMATION AND BELIEF THAT RESPONDENT TERMINATED OR OTHERWISE ENDED DANA LOMAS'S EMPLOYMENT TO RENDER HER TESTIMONY UNAVAILABLE IN THIS PROCEEDING==

## I. INTRODUCTION

This Motion presents a single, focused issue: on information and belief, Respondent ended Dana Lomas's employment, the signatory of the April 23, 2025 Written Warning the Director of Merchant Sales at the center of Complainant's retaliation claims, and Respondent's own disclosed witness, in late January 2026, shortly after certifying its Answer to this Tribunal on January 26, 2026, while 25 requests for admission and 25 interrogatories addressed to her personally remained unanswered.

This Tribunal confirmed on the record on January 12, 2026 that it lacks subpoena power over third parties. Respondent's counsel was not only present when this Tribunal confirmed its subpoena limitation on January 12, she was an active participant in that discussion. The Answer was certified fourteen days later.

Since then, Respondent has concealed whether and when Ms. Lomas ceased to be employed, while using its February 10, 2026 Motion for Protective Order to assert that *"Although some of the individual employees were employed by Respondent… they are not parties to this proceeding and are not proper recipients of discovery requests."* Complainant demanded identification of which individuals were no longer employed and the relevant separation date(s) on February 18, 2026; Respondent refused. This staged concealment, paired with the Tribunal's confirmed subpoena limitation, renders Ms. Lomas effectively unavailable absent voluntary cooperation and forces Complainant to litigate blind on a central fact witness's status and availability. The February 10, 2026 public posting of her exact role (Req ID 33062) corroborates the vacancy created by her exit.

RFP No. 13 seeks production of all documents and ESI concerning the separation. This Motion seeks an Order compelling full production and, if Respondent fails to comply, sanctions as authorized by 29 C.F.R. §§ 18.56 and 18.57.

## II. JURISDICTION AND AUTHORITY

This Tribunal has authority to compel discovery responses and impose sanctions for discovery misconduct under 29 C.F.R. §§ 18.50, 18.51, 18.56, and 18.57, and under the Federal Rules of Civil Procedure as incorporated by 29 C.F.R. § 18.10(a).

## III. UNDISPUTED FACTS

### A. Dana Lomas Was Respondent's Own Disclosed Witness

On July 28, 2025, Respondent filed sworn Initial Disclosures naming Dana Lomas as a witness with knowledge of "matters alleged in the complaint, Complainant's employment with Respondent, Complainant's job performance, and Complainant's activities while employed by Respondent."

Respondent's Initial Disclosures further stated: "Employees of Respondent may be contacted through the undersigned counsel." That representation carried an implicit commitment that Respondent's own named witnesses would remain accessible through counsel.

## B. Ms. Lomas's Central Role Is Not Disputed

Dana Lomas:

- Signed the April 23, 2025 Written Warning that forms the core adverse action in this case;
- Directed or caused the April 22, 2025 Salesforce lockout of Complainant's Los Angeles pipeline;
- Sent the September 14, 2024 text message using the word "stole" in connection with the Jackson Hewitt accounts, the central protected disclosure predicate;
- Was the subject of 25 personally directed interrogatories and 25 requests for admission served during active discovery; and
- Signed a Written Warning bearing native file metadata tagged Per_Att, indicating it was drafted per attorney direction, making her knowledge of the Warning's origin, timing, and authorization uniquely probative on pretext and non-substitutable by any other witness.

## C. The Sequence Is the Record

Respondent knows exactly when Ms. Lomas's employment ended. Complainant does not, because Respondent has concealed it.

- July 28, 2025: Respondent's sworn Initial Disclosures list Dana Lomas as an employee-witness and state: "Employees of Respondent may be contacted through the undersigned counsel."
- January 12, 2026: On the record, the Court confirms it lacks subpoena power to compel third-party testimony.

- January 26, 2026: Respondent certifies its Answer defending Ms. Lomas's conduct and asserting "legitimate business purposes," without disclosing any change in her employment status.
- February 3, 2026: Complainant serves 25 interrogatories and 25 requests for admission directed personally to Ms. Lomas through Respondent's counsel, targeting her knowledge of the Jackson Hewitt account diversion, the inflation of contract values in internal reporting, and her investigative actions as Director of Merchant Services.
- February 10, 2026: Seven days after personal discovery was served on Ms. Lomas, Respondent files its Motion for Protective Order and first alludes, obliquely, to changed employee status by using past tense ("some of the individual employees were employed by Respondent") while refusing to identify which individuals it claims are no longer employed. This was Respondent's first disclosure of any employment status change for any witness, made only after Complainant had already locked in discovery directed at Ms. Lomas personally.
- February 10, 2026: Respondent publicly posted the exact national **Director Merchant Sales role previously held by Dana Lomas (Req ID 33062)**. This posting confirms the vacancy existed by at least February 10, 2026, yet Respondent continued to conceal the separation date.
- February 18, 2026: Complainant serves a meet-and-confer demand seeking identification of the individuals referenced in the Protective Order and clarification/correction of Respondent's inconsistent positions. Respondent declines to substantively respond.

## D. This Tribunal Lacks Third-Party Subpoena Power

As confirmed on the record during the January 12, 2026 conference, this Tribunal lacks authority to compel the attendance and testimony of third-party witnesses. At that conference, the Court stated that "administrative law judges do not have any subpoena power" in these whistleblower cases and "cannot issue subpoenas to third parties," including to compel appearance "at depositions" or "at hearings" to testify (as reflected in the January 12, 2026 hearing transcript).

Respondent's concealment of Ms. Lomas's employment status and separation date, combined with the Court's subpoena limitation, renders her effectively unavailable to Complainant in this forum absent voluntary cooperation and complete production of the separation records.

### E. Respondent Concealed the Separation and Failed to Supplement

Respondent was under a continuing obligation to correct or supplement its disclosures if a disclosed witness's status changed. It did not.

Respondent made no disclosure of any change in Ms. Lomas's employment status at any point, not in the Answer, not upon service of individual discovery to her on February 3, 2026, and not in any supplemental filing, until obliquely acknowledging a status change in the February 10, 2026 Protective Order, while still refusing to identify which witnesses had departed.

Respondent first alluded to changed employment status only in its February 10, 2026 Motion for Protective Order, filed after Complainant had already served individual discovery directed to Ms. Lomas, using the phrase "some of the individual employees were employed by Respondent" without identifying which individuals. When Complainant demanded identification and clarification on February 18, 2026, Respondent refused to respond substantively. The separation date, the circumstances, and even the identity of the departed individuals remain concealed through Respondent's deliberate choice. Respondent has refused to confirm even the basic fact of Ms. Lomas's separation date despite Complainant's February 18, 2026 meet-and-confer demand.

The February 10, 2026 public posting of Ms. Lomas's exact role (Req ID 33062) confirms the concealment extended well before that date. Director-level requisitions typically do not go live on the day of separation; the decision to exit Ms. Lomas is typically made weeks earlier, during a period when Respondent was simultaneously certifying its Answer and defending her conduct as taken for "legitimate business purposes." The concealment was deliberate, institutional, and sustained.

# IV. ARGUMENT

## A. Ending a Disclosed Witness's Employment During Active Discovery Breaches Good-Faith Litigation Duties

Respondent certified Ms. Lomas as a defense witness in sworn Initial Disclosures. On information and belief, Respondent then ended her employment while her personal discovery responses remained outstanding, after her retaliatory conduct had been specifically challenged, and with full knowledge that Complainant had no independent mechanism to compel her testimony.

The duty to preserve relevant evidence and to litigate in good faith extends to witness availability where the party controls the witness's accessibility. A party that discloses a witness as accessible through counsel, then takes (or conceals) actions that render that witness unavailable, cannot later hide behind the witness's non-employee status as a shield against discovery.

## B. The Timing and Concealment Support an Inference of Improper Purpose

Institutions that intend to defend cases on the merits answer discovery directed at their disclosed witnesses and promptly disclose material changes affecting witness availability. Here, Respondent defended Ms. Lomas's conduct in its certified Answer, allowed Complainant to serve individual discovery to her through counsel, then filed a Protective Order using past tense ("some of the individual employees were employed by Respondent") while refusing to identify which individuals it claims are no longer employed. The refusal to identify Ms. Lomas's status and separation date prevents Complainant from evaluating whether the separation was timed to the litigation calendar and whether Respondent acted to exploit the Tribunal's known subpoena limitation.

The seven-day gap between service of personal discovery to Ms. Lomas and Respondent's first oblique acknowledgment that "some" witnesses had departed is not coincidence, it is reaction. Respondent disclosed the status-change issue only when forced to explain why discovery directed to Ms. Lomas should be blocked, while simultaneously refusing to confirm her identity or separation date.

The public posting of her exact role on February 10, 2026 further confirms the vacancy created by her exit.

In large organizations, director-level requisitions typically do not go live the same day an incumbent exits. They commonly require internal deliberation, headcount authorization, approval routing, and job description finalization, a process that often takes several weeks at minimum. A February 10, 2026 posting date is therefore consistent with a separation decision made in late January, before or near Respondent certified its Answer on January 26, 2026. If that timeline is accurate, Respondent certified an Answer defending Ms. Lomas's conduct with knowledge that her employment had already been, or was in the process of being, ended. That is not mere litigation strategy; it is inconsistent with the good-faith certification obligations applicable to pleadings in this Tribunal.

Director-level professionals who voluntarily depart, particularly those with the credential profile reflected in Ms. Lomas's public profile, often update LinkedIn within days to weeks of departure, whether to announce a new role or signal availability. The absence of any such update as of the date of this filing is consistent with an involuntary, litigation-timed separation.

## C. Respondent's Conduct Is Forum Manipulation and Creates Non-Curable Prejudice

Respondent has unilaterally and irreversibly altered the forum calculus in this proceeding by ending (and/or concealing the ending of) its own disclosed witness's employment status while her personal discovery responses were outstanding, with actual knowledge that this Tribunal confirmed on January 12, 2026 it cannot compel third-party testimony. The resulting prejudice is not curable by any order short of compelling production of the separation documents, and if those documents reveal coordination with litigation strategy, no remedy short of sanctions restores the evidentiary balance Respondent destroyed.

Respondent's affirmative conduct has manufactured an impossible election for Complainant:

- Proceed in this forum toward a merits hearing without testimony from the primary fact witness, the person who signed the Written Warning, directed the Salesforce lockout, and sent the September 14 text; or

- Exercise the SOX 180-day federal kick-out right and restart in District Court, abandoning a record developed over months, forfeiting pending motions on spoliation and sanctions that directly affect evidentiary posture, and forcing Complainant to reconstruct that record while simultaneously meeting the April 7, 2026 ADA/Title VII filing deadline, all as a direct consequence of Respondent's affirmative act.

This Tribunal's inherent authority to protect the integrity of its proceedings extends to conduct that, while not technically a discovery violation, is designed to undermine the forum's ability to reach a just result. Ending (and/or concealing the ending of) a disclosed witness's employment status to exploit a known procedural limitation is precisely that conduct.

No tribunal should reward forum manipulation that weaponizes this Court's structural subpoena limitation to deprive a pro se whistleblower of critical testimony.

## D. Respondent Violated Its Duty to Supplement Disclosures Under Fed. R. Civ. P. 26(e)

Under 29 C.F.R. § 18.10(a), the Federal Rules of Civil Procedure apply where Part 18 is silent. Fed. R. Civ. P. 26(e) requires a party to supplement or correct a disclosure in a timely manner if the party learns that the disclosure is incomplete or incorrect.

Respondent disclosed Ms. Lomas as an employee-witness accessible through counsel, then later asserted in its February 10, 2026 Motion for Protective Order that "Although some of the individual employees were employed by Respondent… they are not parties to this proceeding and are not proper recipients of discovery requests," without identifying who those individuals are. Respondent has refused to identify whether Ms. Lomas is among them or the effective separation date. This failure to supplement is itself sanctionable and independently supports compelling immediate production of the separation file and related communications.

## E. RFP No. 13 Is Directly Targeted at the Conduct at Issue

RFP No. 13, served contemporaneously, requests:

- The separation effective date and who initiated it;
- Any "litigation risk," "whistleblower," "preservation," or "case management" rationale for the separation;
- All communications discussing timing and coordination of the separation, including among Legal, outside counsel, and decision-makers;
- Section L: All documents reflecting whether the timing of the separation was discussed in relation to this proceeding, the Answer, Complainant's personal discovery requests, or this Tribunal's ruling regarding third-party subpoena authority; and
- Ms. Lomas's cooperation clause, if any, which would establish that she remains under Respondent's control despite no longer being on payroll.

## F. Respondent's Failure to Respond to Properly Served Discovery Warrants Default Sanctions Under 29 C.F.R. § 18.57

Discovery was properly served on Ms. Lomas through Respondent's counsel on February 3, 2026. No response, no objection, and no production has been made. Respondent has not sought a protective order specifically addressing Ms. Lomas's personal discovery responses; it has only gestured at non-employee status in a broader Protective Order while refusing to confirm that status. This is not a pending dispute over scope. It is a failure to comply with properly served discovery.

Should Respondent fail to fully comply with RFP No. 13 (and related supplementation obligations) within the time ordered by this Tribunal, default sanctions are warranted under 29 C.F.R. § 18.57(b) and the Tribunal's authority under § 18.56. Appropriate sanctions include, as the Tribunal deems just:

- Striking all or part of Respondent's Answer, including striking Respondent's Affirmative Defense No. 1 ("legitimate business purposes");
- Treating specified matters as established for purposes of this proceeding, including that the April 23, 2025 Written Warning was not supported by legitimate business purpose;

- Prohibiting Respondent from supporting designated claims or defenses, or from introducing matters into evidence;
- Staying further proceedings until Respondent complies;
- Dismissing the proceeding in whole or in part; or
- Entering default; or any combination thereof that restores the balance Respondent disrupted.

These sanctions are narrowly tailored to the prejudice Respondent itself created.

# V. EXPEDITED RULING IS REQUIRED UNDER 29 C.F.R. § 18.42

## A. The Standard

Under 29 C.F.R. § 18.42, the Tribunal may order expedited proceedings upon a showing of specific harm. Complainant makes that showing here.

## B. The Prejudice Is Not Hypothetical

Every day this motion remains unresolved compounds the prejudice:

- **Discovery responses are soon due.** Ms. Lomas's 25 interrogatories and 25 RFAs have no pending response and no valid objection on the record. Each day of non-response is a day of discovery Complainant cannot use to prepare for hearing. The prejudice compounds daily as the April 7, 2026 federal deadline approaches.
- **The April 7, 2026 ADA/Title VII deadline is fixed.** Complainant faces a parallel federal filing deadline that cannot be extended. The decision whether to exercise the SOX kick-out right, which is itself driven entirely by whether Ms. Lomas's testimony can be secured in this forum, must be made before that deadline. Respondent's concealment is forcing that decision blind.
- **The concealment predates the Answer.** The February 10, 2026 job posting for Ms. Lomas's exact role (Req ID 33062) went live more than ten days before this Motion was

filed. Given typical corporate timelines for director-level postings, the underlying separation decision typically requires weeks of lead time, potentially before Respondent certified its Answer on January 26, 2026. **Complainant has been litigating blind on a fact Respondent has actively concealed since before the Answer was filed.**

### C. The Harm Cannot Be Undone Later

This is not a dispute over document timing that can be cured by a later order. If Complainant proceeds to hearing without Ms. Lomas's testimony and later learns that Respondent possessed documents showing the separation was timed to the litigation calendar, no post-hearing order can restore the evidentiary balance. The prejudice is terminal if not addressed now.

### D. Respondent Will Suffer No Prejudice from Expedited Resolution

Respondent knows exactly when Ms. Lomas was separated, who authorized it, **and whether a cooperation agreement exists.** Compelling disclosure of those facts within 7 days imposes no burden on Respondent, it requires only disclosure of information already in Respondent's possession.

## VI. MEET AND CONFER CERTIFICATION

**Pursuant to 29 C.F.R. § 18.33, Complainant served a meet-and-confer demand on Respondent on February 18, 2026, requesting that Respondent confirm the employment status of named custodians including Dana Lomas and correct Paragraph 4 of the Protective Order Motion. Respondent declined to substantively respond.**

## VII. RELIEF REQUESTED

Complainant respectfully requests that this Tribunal:

1. Issue an expedited ruling on this Motion under 29 C.F.R. § 18.42, given the April 7, 2026 parallel federal deadline, the live hearing scheduling posture, and the compounding daily prejudice described in Section V above;

2. Hold in abeyance any merits-hearing date (and decline to set a hearing date) pending resolution of this Motion, because proceeding toward a hearing without Dana Lomas's testimony would lock in the manufactured prejudice described above;

3. Order Respondent to (a) produce the complete offboarding file for Dana Lomas within seven (7) days of the Tribunal's Order, and (b) produce all remaining documents and ESI responsive to RFP No. 13 within fourteen (14) days of the Tribunal's Order, without objection on relevance or proportionality grounds, given that the witness at issue is Respondent's own disclosed witness;

4. Order Respondent to confirm in writing whether Ms. Lomas is subject to any cooperation agreement, non-disparagement clause, confidentiality provision, or other arrangement that bears on her availability or willingness to testify voluntarily, and to produce any such agreement(s). If Ms. Lomas executed a cooperation agreement as part of her separation, Respondent should be ordered to make her available for deposition as though she were a current employee within fourteen (14) days after producing the offboarding file and any cooperation agreement, or alternatively to certify that no such agreement exists;

5. Order Respondent to supplement its Initial Disclosures under Fed. R. Civ. P. 26(e) to (i) state whether Ms. Lomas is currently employed and, if not, her last date of employment and whether the separation was voluntary or involuntary, and (ii) identify any other Initial-Disclosure witnesses whose employment status changed during this proceeding;

6. Enter default sanctions under 29 C.F.R. § 18.57 in the event Respondent fails to produce responsive documents or comply with this Order, including striking Respondent's Affirmative Defense No. 1 ("legitimate business purposes") and treating as established that the April 23, 2025 Written Warning was not supported by legitimate business purpose, or, in the alternative, entering default on Complainant's retaliation claim;

7. Reserve ruling on whether the conduct warrants escalated sanctions pending review of produced documents; and

8. Grant such other relief as the Tribunal deems just and proper.

Dated: February 21, 2026<br>
Jared Ashcraft<br>
Pro Se Complainant

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Motion was served on all parties listed below by electronic mail on Wednesday, February 21, 2026.

Jeremy Sayre
Fox Rothschild LLP
Email: jsayre@foxrothschild.com

Lisa Williford
Fox Rothschild LLP
Email: larthur@foxrothschild.com

**AI CERTIFICATION**

Pursuant to the Court's January 6, 2026 Order regarding the use of artificial intelligence, Complainant certifies that an artificial-intelligence tool was used solely as a drafting aid. Complainant personally reviewed, edited, and finalized this submission in its entirety and affirms that all factual assertions, legal arguments, and citations are made in good faith and are the product of Complainant's independent judgment.

Dated: February 21, 2026<br>
Jared Ashcraft<br>
Pro Se Complainant

Jared Ashcraft, Pro Se
4429 Cormorant Ave
Las Vegas, NV 89115
252-258-1535
legal@ashcraft.me

# UNITED STATES DEPARTMENT OF LABOR

# OFFICE OF ADMINISTRATIVE LAW JUDGES

Honorable Theresa Timlin

JARED ASHCRAFT,

        COMPLAINANT,

vs.

FIRST-CITIZENS BANK & TRUST
COMPANY,

        RESPONDENT.

Case No.: 2025-SOX-00035

**COMPLAINANT'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXHIBIT IN SUPPORT OF PENDING EMERGENCY MOTION FILED FEBRUARY 21, 2026**

Complainant respectfully moves for leave to file a single supplemental exhibit in support of Complainant's pending Emergency Motion filed February 21, 2026 (regarding, inter alia, Respondent's termination or other separation of Dana Lomas, Respondent's refusal to clarify her status, and related supplementation/production relief).

1. Supplemental Exhibit

   Complainant seeks leave to file and rely upon the attached Exhibit 1, a true and correct PDF capture of Respondent's public webpage/article titled "Merchant services for cannabis businesses" / "Cannabis merchant services guide for CFOs and finance leads," reflecting a publication date of January 29, 2026, available at: https://www.firstcitizens.com/small-business/insights/banking/merchant-services-for-cannabis-businesses. (Ex. 1.) The article quotes "Dana Lomas" and identifies her as "Director of Merchant Sales at First Citizens." (Ex. 1.)


FirstCitizensBank

Log In

BANKING · JANUARY 29, 2026

# Cannabis merchant services guide for CFOs and finance leads

The hemp industry faces constant change as evolving legislation creates challenges for both short-term operations and long-term strategies. Despite this, the cannabis sector is thriving, with payment systems projected to handle up to $428.22 billion annually by 2032. Once a cash-only market, it's now moving toward mainstream retail integration.



FirstCitizensBank

To meet growing demand, operators are adopting modern tools like payment systems, inventory tracking and financial reporting. However, a key gap persists: access to compliant, scalable payment solutions. Partnering with financial providers who understand the industry's complexities is crucial for success.

## Key takeaways

- Specialized cannabis merchant services help support long-term growth and operational stability in an uncertain regulatory environment.

- Compliant cannabis payment solutions protect against service interruptions and strengthen transparency with card networks.

- Partnering with financial institutions that have extensive regulatory knowledge helps cannabis businesses navigate ongoing federal uncertainty.

# The need for merchant services amid cannabis reform

Despite industry momentum, federal regulations continue to act as a barrier. Marijuana remains illegal at the federal level, creating friction between expanding state legalization—where 47 states now allow some form of medical marijuana— and restrictive national banking standards. However, legislative relief has stalled with the introduction of H.R.5542, which goes into effect in November 2026 and includes language that bans a significant percentage of all hemp products.

# Pending legislation to bridge the gap

One proposed law, the SAFE Banking Act, would protect financial institutions serving state-legal cannabis businesses from federal penalties—ensuring that cannabis businesses gain increased access to essential banking services such as loans, deposits and insurance. Another law, the SAFER Banking Act, would provide even stronger protections. Both acts have been introduced multiple times, but neither has become law as of 2026.

A third proposal—the Clarifying Law Around Insurance of Marijuana, or CLAIM, Act —would allow insurance providers to serve cannabis businesses without risking federal penalties. This legislation creates a legal safeguard for insurers and their employees in states where cannabis is legal.

# The cost of inaction

Delayed legislation will continue to leave cannabis merchants operating in a regulatory gray zone. Payment processors often label them high risk, leading to higher fees, fewer services and increased scrutiny. Merchants relying on workarounds—such as cashless ATMs or closed-loop systems—risk disruption when vendors pull out or platforms are shut down due to compliance concerns. This instability makes growth difficult.

"We've seen clients get shut down overnight by other payment providers, without warning and without a full understanding of what the business actually does," says Dana Lomas, Director of Merchant Sales at First Citizens. "They get labeled high risk, and that's the end of the relationship. That is far less likely to happen when you do the compliance and oversight work up front in the banking relationship."

Learn more about challenges facing marijuana and hemp businesses in our State of the Cannabis Industry report.

# The hidden compliance risks in generic payment systems

Many cannabis transactions rely on alternative payment methods such as PIN debit, ACH transfers and closed-loop systems. These options can be effective—but only when structured within a robust federally compliant framework. Without this foundation, even well-intentioned systems can be flagged or shut down.

"Some merchants may not realize their system isn't compliant until the service disappears overnight," says Lee Powers, Merchant Sales Officer for First Citizens. "But a strong service provider should spend a lot of time explaining how each option works, what risks are involved and how to structure it properly."

# Why do cannabis operators need integrated payments?

The right cannabis payment solution must fit the operational realities of the industry, which means working across the entire operation. This includes integration with inventory management, employee scheduling and state-mandated compliance systems. Whether a dispensary is processing retail sales in-store, online or through mobile operations, its payment infrastructure must be secure, stable and compliant. Every transaction needs to be tracked, reported and auditable—all requirements many off-the-shelf systems can't meet.

"Cannabis payment systems touch every part of the business," Lomas says. "If it's not built to support your other systems, it creates more work and more risk."

Simply put, fully functional merchant services for cannabis businesses must do more than process sales. They should provide a compliant, comprehensive banking solution that supports long-term growth across the operation.

Jared Ashcraft, Pro Se
4429 Cormorant Ave
Las Vegas, NV 89115
252-258-1535
legal@ashcraft.me

# UNITED STATES DEPARTMENT OF LABOR

# OFFICE OF ADMINISTRATIVE LAW JUDGES

Honorable Theresa Timlin

JARED ASHCRAFT,

      COMPLAINANT,

vs.

FIRST-CITIZENS BANK & TRUST
COMPANY,

      RESPONDENT.

Case No.: 2025-SOX-00035

**COMPLAINANT'S REQUEST FOR PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION (RFP NO. 13)**

PLAINTIFF'S EXHIBIT

*These Requests are propounded pursuant to 29 C.F.R. Part 18*

## RFP NO. 13 DANA LOMAS SEPARATION / OFFBOARDING, EXIT DECISION, AND ESI / ACCOUNT-RETENTION ARTIFACTS

Produce, in native and reasonably usable electronic form, all documents and electronically stored information ("ESI") in Respondent's possession, custody, or control that reflect, relate to, or evidence the separation, termination, resignation, layoff, "exit," offboarding, or other cessation of employment or role of Dana Lomas ("Lomas"), including the decision-making process, stated rationale, approvals, communications, separation terms, and all ESI-retention, legal-hold, and account/device disposition actions taken as part of (or following) her exit.

Definitions Applicable to This Request

• "Dana Lomas" includes Dana Lomas and any alternative name/alias under which she was listed

in Respondent systems (including display-name variants), and includes her employee ID, UID, and any unique identifiers.

• "Exit" / "Separation" includes resignation, termination (for cause or without cause), layoff/RIF, administrative separation, paid leave followed by separation, role elimination, and any change resulting in loss of employment status or inability or unwillingness to participate as a Respondent employee witness.

• "Offboarding" includes all HR and IT workflows, checklists, tickets, approvals, and automated or manual actions taken to revoke access, recover devices, disable accounts, change retention settings, archive or delete data, or transfer custodianship.

• "Relevant Period" means: (i) the entire period of Lomas's employment and/or engagement with Respondent; and (ii) January 1, 2026 through the present (inclusive), including any post-separation retention, deletion, alteration, loss, or preservation activity.

A. Separation Status, Dates, and Classification

256. Documents and ESI sufficient to identify Lomas's separation status and classification, including:

• The separation effective date and last day worked.

• The date separation was initiated and by whom.

• The separation type code (voluntary/involuntary; resignation/termination/RIF; for-cause/not-for-cause).

• Any "regrettable/non-regrettable" coding, eligibility for rehire, and related flags.

• Any job-code, role, reporting-line, or department changes in the 90 days preceding separation.

B. Decision-Makers, Approvals, and Rationale

257. All documents and ESI reflecting the decision, rationale, and approvals for Lomas's separation, including:

• The identity of each decision-maker, approver, reviewer, and recommender.

• Any written business justification, HR rationale, or "case summary."

• Any performance, conduct, compliance, or risk rationale asserted.

• Any role-elimination, restructuring, budget, or "headcount" rationale asserted.

• Any "sensitive matter," "litigation risk," "whistleblower," "preservation," or "case

management" rationale asserted.

• Any chronology, timeline, or internal summary of the separation decision.

C. HR File, Employee Relations, and Investigations

258. Lomas's complete personnel file and HRIS records, including:

• Offer letter, role descriptions, reporting-line history, and compensation history.

• Performance reviews, coaching notes, corrective actions, and any PIP documentation.

• Employee relations case files, complaints, investigations, or HR "tickets" involving Lomas.

• Any internal audit or compliance reviews involving Lomas.

• Any exit interview materials or separation questionnaires.

D. Separation Terms, Agreements, and Payments

259. All documents and ESI reflecting any terms of separation, including:

• Severance offers/agreements, releases, nondisparagement, confidentiality, or cooperation clauses.

• Retention/transition agreements, consulting arrangements, or continued-access arrangements.

• PTO payout, bonus/commission adjustments, clawback considerations, or benefits continuation.

• Any settlement, threatened claims, or dispute resolution communications involving Lomas.

E. Communications About the Exit (Internal and External)

260. All communications (email, Teams, chat, texts where maintained, calendar items, notes) that reference, relate to, or discuss Lomas's exit, including communications among:

• HR (including Employee Relations).

• Legal, Compliance, Risk, and Internal Audit.

• Executive leadership and business-line leadership.

• IT, Security, IAM, and MDM administrators.

• Outside counsel.

• Any eDiscovery, litigation-support, or records-management personnel.

This includes communications discussing timing, coordination, "sensitive" handling, instructions, or talking points.

F. Litigation, Discovery, Witness Availability, and Contact / Locator Information

261. All documents and ESI reflecting any discussion of:

• Lomas as a witness or custodian in this matter.

• Lomas's availability or unavailability to participate as an employee witness.

• Instructions regarding how to contact Lomas after separation.

• Any decision to channel communications through counsel or a third party.

262.     Documents sufficient to identify Lomas's last-known non-privileged contact information in Respondent's possession, custody, or control, including:

(a) Last-known personal email address.

(b) Last-known personal phone number.

(c) Last-known mailing address.

(d) Emergency contact (identity and contact information) as maintained in HRIS.

(e) Any cooperation agreement, cooperation clause, or post-separation contact protocol governing how Respondent or its counsel may communicate with Lomas regarding this matter, including any instruction to channel contact through Fox Rothschild.

G. Offboarding Workflows, Tickets, and Execution Logs

263. All offboarding checklists, forms, approvals, and workflow artifacts for Lomas, including any entries in:

• HRIS workflow systems.

• ITSM / ticketing systems.

• Security case-management systems.

• Identity governance / IAM systems.

264.     All system-generated records, exports, logs, or audit trails sufficient to show the date/time and actor for:

• Account disablement, sign-in blocks, group membership changes.

• Mailbox changes (conversion, archive, delegation, shared mailbox).

• OneDrive/SharePoint access transfer and retention settings.

• Teams retention, chat preservation/export actions, and channel access changes.

• Conditional-access changes, token revocations, and session revocations.

• Any "legal hold," "litigation hold," "compliance hold," "eDiscovery hold," or preservation actions applied to Lomas as a custodian.

H. ESI Retention, Deletion, Archiving, and Hold Compliance for Lomas Data

265. All documents and ESI sufficient to identify and audit retention policies and retention actions affecting Lomas data, including:

• Exchange mailbox retention and archive settings.

• OneDrive/SharePoint retention settings and any transfer of custodianship.

• Teams retention policies, message retention, and export/collection activity.

• Purview/eDiscovery collection plans, exports, and chain-of-custody artifacts.

• Any deletions, purges, or "hard delete" events affecting Lomas mailbox, Teams, OneDrive, SharePoint, or other repositories.

If Respondent contends any responsive materials no longer exist, produce documents sufficient to identify the retention policy, deletion date/time, deletion mechanism, and responsible actor/system.

I. Device Return, Imaging, and MDM / Endpoint Actions for Lomas Devices

266. Documents and ESI sufficient to identify each device assigned to or used by Lomas for Respondent business (laptop, mobile device, tablets), including:

• Device identifiers (serial/asset tag/device ID).

• Assignment dates and return dates.

• Whether any device was wiped, selectively wiped, reimaged, reissued, or retired.

267. All MDM / endpoint-management logs and records reflecting any:

• Remote wipe, selective wipe, org-data removal, reimage, encryption key rotation, or token revocation.

• Device compliance status changes or administrative actions.

• Forensic imaging, preservation imaging, or chain-of-custody artifacts (if any).

J. Custodians and Systems (Non-Exclusive)

268. This Request includes all responsive materials maintained by or within:

• Human Resources / Employee Relations.

• Legal / Compliance.

• Risk Management / Internal Audit.

• Executive Leadership.

• IT / Security / IAM / IGA / MDM administrators.

• ITSM / ticketing platforms.

• Microsoft Exchange / Microsoft 365.

• Microsoft Teams.

• OneDrive / SharePoint.

• Purview / eDiscovery systems.

• Email journaling, supervision, compliance archives, and backup systems.

• Any third-party vendors or MSPs under Respondent's control.

K. Form of Production and Certification

269. All responsive materials shall be produced:

• In native format where available.

• With all associated metadata preserved.

• Without conversion to static image formats where native production exists.

270.     Attachments must be produced with parent–child relationships preserved.

271.     If de-duplication is applied, Respondent shall preserve fields sufficient to identify all custodians/sources and original locations.

272.     Respondent shall certify, under oath, that:

• All systems reasonably likely to contain responsive materials were searched.

• No responsive materials were deleted after preservation obligations attached.

• Any absence of records is attributable solely to routine retention, not discretionary action.

L. Timing and Coordination

273. All documents and ESI reflecting whether the timing of Lomas's separation was discussed in relation to: (a) the pendency of this proceeding; (b) the filing of Respondent's Answer; (c) the service of Complainant's discovery requests directed at Lomas personally; or (d) this tribunal's ruling regarding third-party subpoena authority.

Dated: February 21, 2026
Jared Ashcraft
Pro Se Complainant

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Motion was served on all parties listed below by electronic mail on Wednesday, February 21, 2026.

Jeremy Sayre
Fox Rothschild LLP
Email: jsayre@foxrothschild.com

Lisa Williford
Fox Rothschild LLP
Email: larthur@foxrothschild.com

Dated: February 21, 2026
Jared Ashcraft
Pro Se Complainant




Member FDIC

## forever first®



 First Citizens Bank

East Carolina University

# Marcie Chabalko, CTP ✓ · 2nd

Director Merchant Sales at First Citizens Bank

Raleigh-Durham-Chapel Hill Area · **Contact info**

500+ connections

 **Ramsey, Christie** and 15 other mutual connections

 Connect    Message    More

# Highlights

 **You both worked at First Citizens Bank**
You both worked at First Citizens Bank from August 2021 to June 2025

✦ Ask about experience

 **Get introduced to Marcie**
Ask your mutual connections to help you start a conversation.

🟧 Message top connections

# About

Dynamic leader focused on creating synergy, growth and streamlined efficiencies through people-driven approach. Continual focus on market expertise and relationship building to facilitate success of product offerings to new and existing clients.

... more

 **Top skills**
Communication • Sales • Management   →



**Marcie Chabalko, CTP**
Director Merchant Sales at First Citizens Bank

Show all →

# Experience



**First Citizens Bank**
10 yrs 10 mos

**Director Merchant Sales, SVP**
Apr 2026 - Present · 2 mos

**Manager Treasury Management Sales, SVP**
Full-time
Mar 2023 - Apr 2026 · 3 yrs 2 mos
Raleigh, North Carolina, United States · Remote

▽ Leadership, Performance Reporting and +5 skills

**Supervisor Treasury Management Sales, VP**
Full-time
Apr 2022 - Mar 2023 · 1 yr

**Treasury Services Inside Sales Officer, AVP**
Full-time
Feb 2019 - Mar 2023 · 4 yrs 2 mos

**Treasury Management Services Sales Support Specialist**
Full-time
Jul 2018 - Jan 2019 · 7 mos

**Bank Officer, Financial Sales Manager**
Aug 2015 - Jul 2018 · 3 yrs
North Carolina